CAROLINE R. DJANG
BUCHALTER LLP
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
Telephone: 949.760.1121
Fax: 949.720.0182
Email:  cdjang@buchalter.com

Attorney for CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., Tropical Aquarium Fish (FIJI) Ltd, and Charitha I. Samarasinghe

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>CIS INTERNATIONAL HOLDINGS (N.A.) CORPORATION, dba E TROPICAL FISH,<br><br>     Debtor<br>_____<br><br>CIS INTERNATIONAL DISTRIBUTORS INC., LIVE AQUARIA HOLDINGS CORP., LIONSROCK INVESTMENTS LLC, LIONSROCK WISCONSIN LLC, T3 AQUATICS, SIAM TROPICAL FISH LTD., TROPICAL AQUARIUM FISH (FIJI) LTD., AND CHARITHA I. SAMARASINGHE,<br><br>     Plaintiffs,<br><br>v.<br><br>CIS INTERNATIONAL HOLDINGS (N.A.) CORPORATION, dba E TROPICAL FISH,<br><br>     Defendant. | CASE NO. 2:25-bk-18374-BR<br><br>Chapter 7<br><br>ADV CASE NO. 2:26-ap- 01070-BR<br><br>**REMOVED CIVIL ACTION DOCKET AND DOCUMENTS** |

Plaintiffs, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., Tropical Aquarium Fish (FIJI) Ltd, and Charitha I. Samarasinghe submit the attached **Exhibit A** in accordance with LBR 9027-1(d), which includes a copy of the docket of the removed action

1

REMOVED CIVIL ACTION AND DOCUMENTS

pending in the Superior Court of Connecticut, Stamford Division ("Superior Court") *Panthers Capital LLC v. CIS International Holdings (N.A.) Corp., et al,* Case No. FST-CV25-605223-S, and copies of every document on the Superior Court's docket at the time of filing the Notice of Removal [Doc. 1].

DATED:  March 26, 2026                    BUCHALTER LLP


                                    By:   /s/ Caroline Djang
                                          CAROLINE DJANG
                                          Attorney for Plaintiffs
                                    CIS International Distributors Inc., Live Aquaria
                                    Holdings Corp., Lionsrock Investments LLC,
                                    Lionsrock Wisconsin LLC, T3 Aquatics, Siam
                                    Tropical Fish Ltd., Tropical Aquarium Fish
                                    (FIJI) Ltd, and Charitha I. Samarasinghe

**REMOVED CIVIL ACTION DOCKET AND DOCUMENTS**
BUCHALTER 108888806v1

# EXHIBIT A



# State of Connecticut Judicial Branch
# Superior Court Case Look-up

| | | |
|---|---|---|
| **Superior Court Case Look-up** | | |
| Civil/Family | | |
| Housing | | |
| Small Claims | | |

**Attorney/Firm Juris Number Look-up**

**Case Look-up**
By Party Name
By Docket Number
By Attorney/Firm Juris Number
By Property Address

**Short Calendar Look-up**
By Court Location
By Attorney/Firm Juris Number
Motion to Seal or Close
Calendar Notices

**Court Events Look-up**
By Date
By Docket Number
By Attorney/Firm Juris Number

**Legal Notices**

**Pending Foreclosure Sales**

**Understanding Display of Case Information**

**Contact Us**



**Comments**

**FST-CV25-6075223-S**  **PANTHERS CAPITAL LLC v. CIS INTERNATIONAL HOLDINGS (N.A.) CORP. D/B/A E TR Et Al**

**Prefix/Suffix:** [none]   **Case Type:** C40   **File Date:** 08/05/2025   **Return Date:** 08/12/2025

**Case Detail**  Notices  History  Scheduled Court Dates   E-Services Login   Screen Section Help  ▶

To receive an email when there is activity on this case, click here.

**Information Updated as of:** 03/19/2026

## Case Information

| | |
|---|---|
| **Case Type:** | C40 - Contracts - Collections |
| **Court Location:** | STAMFORD JD |
| **List Type:** | No List Type |
| **Trial List Claim:** | |
| **Last Action Date:** | 03/16/2026  (The "last action date" is the date the information was entered in the system) |

## Disposition Information

| | |
|---|---|
| **Disposition Date:** | |
| **Disposition:** | |
| **Judge or Magistrate:** | |

## Party & Appearance Information

| Party | Party Details | | No Fee Party | Category |
|---|---|---|---|---|
| P-01 | **PANTHERS CAPITAL LLC** | | | Plaintiff |
| | Attorney: NEUBERT PEPE & MONTEITH PC (407996) File Date: 08/05/2025 195 CHURCH ST 13TH FLOOR NEW HAVEN , CT 06510 | | | |
| D-01 | **CIS INTERNATIONAL HOLDINGS (N.A.) CORP. D/B/A E TROPICAL FISH** | | | Defendant |
| | Attorney: PETER A LUCCARELLI III (433492) 777 S. HARBOUR IS. BLVD. SUITE 320 TAMPA , FL 33602 | File Date: 09/17/2025 | | |
| D-02 | **CHARITHA I SAMARASINGHE** | | | Defendant |
| | Attorney: PETER A LUCCARELLI III (433492) 777 S. HARBOUR IS. BLVD. SUITE 320 TAMPA , FL 33602 | File Date: 09/17/2025 | | |
| D-03 | **CIS INTERNATIONAL DISTRIBUTORS INC.** | | | Defendant |
| | Attorney: PETER A LUCCARELLI III (433492) 777 S. HARBOUR IS. BLVD. SUITE 320 TAMPA , FL 33602 | File Date: 09/17/2025 | | |
| D-04 | **LIVE AQUARIA HOLDINGS CORP** | | | Defendant |
| | Attorney: PETER A LUCCARELLI III (433492) 777 S. HARBOUR IS. BLVD. SUITE 320 TAMPA , FL 33602 | File Date: 09/17/2025 | | |
| D-05 | **LIONSROCK INVESTMENTS LLC** | | | Defendant |
| | Attorney: PETER A LUCCARELLI III (433492) 777 S. HARBOUR IS. BLVD. SUITE 320 TAMPA , FL 33602 | File Date: 09/17/2025 | | |
| D-06 | **LIONSROCK WISCONSIN LLC** | | | Defendant |
| | Attorney: PETER A LUCCARELLI III (433492) 777 S. HARBOUR IS. BLVD. | File Date: 09/17/2025 | | |

SUITE 320
TAMPA , FL 33602

**D-07  T3 AQUATICS**                                                                  Defendant
     Attorney: 🄔 PETER A LUCCARELLI III (433492)          File Date: 09/17/2025
          777 S. HARBOUR IS. BLVD.
          SUITE 320
          TAMPA , FL 33602

**D-08  SIAM TROPICAL FISH LTD**                                                        Defendant
     Attorney: 🄔 PETER A LUCCARELLI III (433492)          File Date: 09/17/2025
          777 S. HARBOUR IS. BLVD.
          SUITE 320
          TAMPA , FL 33602

**D-09  TROPICAL AQUARIUM FISH (FIJI) LTD**                                            Defendant
     Attorney: 🄔 PETER A LUCCARELLI III (433492)          File Date: 09/17/2025
          777 S. HARBOUR IS. BLVD.
          SUITE 320
          TAMPA , FL 33602

**Viewing Documents on Civil, Housing and Small Claims Cases:**

If there is an 🄔 in front of the docket number at the top of this page, then the file is electronic (paperless).

- Documents, court orders and judicial notices in electronic (paperless) civil, housing and small claims cases with a return date on or after January 1, 2014 are available publicly over the internet.* For more information on what you can view in all cases, view the Electronic Access to Court Documents Quick Card.

- For civil cases filed prior to 2014, court orders and judicial notices that are electronic are available publicly over the internet. Orders can be viewed by selecting the link to the order from the list below. Notices can be viewed by clicking the **Notices** tab above and selecting the link.*

- Documents, court orders and judicial notices in an electronic (paperless) file can be viewed at any judicial district courthouse during normal business hours.*

- Pleadings or other documents that are not electronic (paperless) can be viewed only during normal business hours at the Clerk's Office in the Judicial District where the case is located.*

- An Affidavit of Debt is not available publicly over the internet on small claims cases filed before October 16, 2017.*

*Any documents protected by law Or by court order that are Not open to the public cannot be viewed by the public online And can only be viewed in person at the clerk's office where the file is located by those authorized by law or court order to see them.

| | | | Motions / Pleadings / Documents / Case Status | |
|---|---|---|---|---|
| **Entry No** | **File Date** | **Filed By** | **Description** | **Arguable** |
| | 08/05/2025 | P | **SUMMONS** 🗐 | |
| | 08/05/2025 | P | **COMPLAINT** 🗐 | |
| | 08/05/2025 | P | **ADDITIONAL PARTIES PAGE** 🗐 | |
| | 09/17/2025 | D | **APPEARANCE** 🗐 <br> Appearance | |
| 100.30 | 08/05/2025 | P | **RETURN OF SERVICE** 🗐 | No |
| 101.00 | 08/27/2025 | P | **AMENDED COMPLAINT** 🗐 | No |
| 102.00 | 08/27/2025 | P | **AMENDED COMPLAINT AS SERVED** 🗐 | No |
| 103.00 | 08/27/2025 | P | **RETURN OF SERVICE** 🗐 | No |
| 104.00 | 09/12/2025 | P | **MOTION FOR DEFAULT -FAILURE TO APPEAR PB 17-20** 🗐 <br> *RESULT:* Denied 9/19/2025 BY THE CLERK | No |
| 104.01 | 09/19/2025 | C | **ORDER** 🗐 <br> *RESULT:* Denied 9/19/2025 BY THE CLERK | No |
| 105.00 | 09/30/2025 | P | **NOTICE OF BANKRUPTCY** 🗐 | No |

| 106.00 | 10/03/2025 | P | **DEMAND FOR DISCLOSURE OF DEFENSE PB 13-19** 📄 | No |
| 107.00 | 10/24/2025 | P | **MOTION FOR DEFAULT FOR FAILURE TO DISCLOSE DEFENSE** 📄 | No |
| 108.00 | 10/30/2025 | D | **DISCLOSURE OF DEFENSE** 📄 | No |
| 109.00 | 11/12/2025 | P | **MOTION FOR DEFAULT-FAILURE TO PLEAD** 📄 <br> *RESULT:* Denied 12/16/2025 BY THE CLERK | No |
| 109.01 | 12/16/2025 | C | **ORDER** 📄 <br> *RESULT:* Denied 12/16/2025 BY THE CLERK | No |
| 110.00 | 11/20/2025 | D | **MOTION FOR EXTENSION OF TIME** 📄 <br> to Respond to Motion for Default | No |
| 111.00 | 11/26/2025 | D | **MOTION FOR EXTENSION OF TIME** 📄 <br> Second Motion to Respond to Motion for Default and Amended Complaint | No |
| 112.00 | 12/11/2025 | D | **ANSWER AND SPECIAL DEFENSE AND COUNTERCLAIM** 📄 | No |
| 113.00 | 12/11/2025 | D | **EXHIBITS** 📄 <br> Exhibits to Answer and Special Defense and Counterclaim, Entry No. 112.00 | No |
| 114.00 | 12/31/2025 | P | **MOTION TO DISMISS PB 10-30** 📄 <br> Motion to Dismiss Counterclaim <br> *RESULT:* Take Papers 3/16/2026 HON JOHN KAVANEWSKY | Yes |
| 114.01 | 02/11/2026 | C | **ORDER** 📄 <br> *RESULT:* Order 2/11/2026 HON JOHN KAVANEWSKY | No |
| 114.02 | 03/16/2026 | C | **ORDER** 📄 ❗NEW <br> *RESULT:* Take Papers 3/16/2026 HON JOHN KAVANEWSKY | No |
| 115.00 | 12/31/2025 | P | **MEMORANDUM IN SUPPORT OF MOTION** 📄 <br> Memorandum of Law in Support of Motion to Dismiss Counterclaim | No |
| 116.00 | 01/08/2026 | P | **NOTICE OF SERVICE OF REQUEST FOR ADMISSION PB 13-22** 📄 | No |
| 117.00 | 01/30/2026 | D | **OBJECTION TO MOTION** 📄 <br> To Dismiss Counterclaim | No |
| 118.00 | 02/05/2026 | P | **REPLY** 📄 <br> Reply to 117.00 Objection to Motion to Dismiss | No |
| 119.00 | 02/09/2026 | D | **ANSWER AND/OR OBJECTIONS TO REQUEST FOR ADMISSIONS PB 13-23(a)** 📄 | No |
| 120.00 | 03/09/2026 | P | **NOTICE** 📄 ❗NEW <br> Notice of Supplemental Authority re 114.00 and 115.00 | No |

| Scheduled Court Dates as of 03/18/2026 | | | | |
|---|---|---|---|---|
| **FST-CV25-6075223-S** - **PANTHERS CAPITAL LLC v. CIS INTERNATIONAL HOLDINGS (N.A.) CORP. D/B/A E TR Et Al** | | | | |
| **#** | **Date** | **Time** | **Event Description** | **Status** |
| | | | No Events Scheduled | |

Judicial ADR events may be heard in a court that is different from the court where the case is filed. To check location information about an ADR event, select the **Notices** tab on the top of the case detail page.

Matters that appear on the Short Calendar are shown as scheduled court events on this page. The date displayed on this page is the date of the calendar.

The status of a Short Calendar matter is not displayed because it is determined by markings made by the parties as required by the calendar notices and the civil🔗 standing orders. Markings made electronically can be viewed by those who have electronic access through the Markings History link on the Civil/Family Menu in E-Services. Markings made by telephone can only be obtained through the clerk's office. If more than one motion is on a single short calendar, the calendar will be listed once on this page. You can see more information on matters appearing on

Short Calendars by going to the Civil/Family Case Look-Up page and Short Calendars By Juris Number or By Court Location.

Periodic changes to terminology that do not affect the status of the case may be made.

This list does not constitute or replace official notice of scheduled court events.

**Disclaimer:** For civil and family cases statewide, case information is displayed and is available for inquiry on this website for a period of time, one year to a maximum period of ten years, after the disposition date. To the extent that Connecticut Practice Book Sections 7-10 and 7-11 provide for a shorter period of time, this information will be displayed for the shorter period.

In accordance with the Federal Violence Against Women Act of 2005, cases involving relief from physical abuse (restraining orders), civil protection orders, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Pursuant to section 47a-26j of the Connecticut General Statutes, certain eviction cases will be removed from this website 30 days after disposition or other final activity of the case.

Attorneys | Case Look-up | Courts | Directories | EducationalResources | E-Services | FAQ's | Juror Information | News & Updates | Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

Copyright © 2026, State of Connecticut Judicial Branch

Page Created on 3/19/2026 at 3:47:04 PM

**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-20
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA.*

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
*www.jud.ct.gov*

**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**

By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | **Return Date** *(Must be a Tuesday)* |
|---|---|---|
| **123 Hoyt st. Stamford, CT 06902** | **( 203 ) 965 – 5308** | **08/12/2025** |

| | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* |
|---|---|---|---|
| ☒ Judicial District ☐ Housing Session | ☐ Number: ___ | **Stamford/Norwalk at Stamford** | Major: **C**   Minor: **40** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| **Neubert, Pepe & Monteith, P.C., 195 Church Street, 13th Floor, New Haven, CT 06510** | **407996** |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| **( 203 ) 781 – 2856** | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* **lrocklin@npmlaw.com** |
|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: Panthers Capital LLC<br>Address: 9 W Broad St. #320, Stamford, CT 06902 | **P-01** |
| **Additional plaintiff** | Name:<br>Address: | **P-02** |
| **First defendant** | Name: CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish<br>Address: 1405 W 178th St, Gardena, CA 90248 | **D-01** |
| **Additional defendant** | Name: Samarasinghe, Charitha, I<br>Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274 | **D-02** |
| **Additional defendant** | Name: CIS INTERNATIONAL DISTRIBUTORS INC.<br>Address: 1401 W 178th St b, Gardena, CA 90248 | **D-03** |
| **Additional defendant** | Name: LIVE AQUARIA HOLDINGS CORP<br>Address: 1405 W 178th St, Gardena, CA 90248 | **D-04** |

| Total number of plaintiffs: 1 | Total number of defendants: 9 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued**. This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.

2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.

3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.

4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.

5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date<br>07/11/2025 | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court<br>☐ _____ Clerk | Name of person signing<br>**Lucas Rocklin, Esq.** |
|---|---|---|---|

| If this summons is signed by a Clerk: | *For Court Use Only* |
|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.<br>b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.<br>c. The court staff is not permitted to give any legal advice in connection with any lawsuit.<br>d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | File Date |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|
| | | | |

**Page 1 of 2**

**Instructions**

1. Type or print legibly. If you are a self-represented party, this summons must be signed by a clerk of the court.

2. If there is more than one defendant, make a copy of the summons for each additional defendant. Each defendant must receive a copy of this summons. Each copy of the summons must show who signed the summons and when it was signed. If there are more than two plaintiffs or more than four defendants, complete the Civil Summons Continuation of Parties (form JD-CV-2) and attach it to the original and all copies of the summons.

3. Attach the summons to the complaint, and attach a copy of the summons to each copy of the complaint. Include a copy of the Civil Summons Continuation of Parties form, if applicable.

4. After service has been made by a proper officer, file the original papers and the officer's return of service with the clerk of the court.

5. Use this summons for the case type codes shown below.

   Do <u>not</u> use this summons for the following actions:

   (a) Family matters (for example divorce, child support, custody, paternity, and visitation matters)

   (b) Any actions or proceedings in which an attachment, garnishment or replevy is sought

   (c) Applications for change of name

   (d) Probate appeals

   (e) Administrative appeals

   (f)  Proceedings pertaining to arbitration

   (g) Summary Process (Eviction) actions

   (h) Entry and Detainer proceedings

   (i) Housing Code Enforcement actions

**Case Type Codes**

| MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION | MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Property | P 00 | Foreclosure |
| | C 10 | Construction - State and Local | | P 10 | Partition |
| | C 20 | Insurance Policy | | P 20 | Quiet Title/Discharge of Mortgage or Lien |
| | C 30 | Specific Performance | | P 30 | Asset Forfeiture |
| | C 40 | Collections | | P 90 | All other |
| | C 50 | Uninsured/Underinsured Motorist Coverage | | | |
| | C 60 | Uniform Limited Liability Company Act – C.G.S. 34-243 | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 90 | All other | | T 03 | Defective Premises - Private - Other |
| | | | | T 11 | Defective Premises - Public - Snow or Ice |
| Eminent Domain | E 00 | State Highway Condemnation | | T 12 | Defective Premises - Public - Other |
| | E 10 | Redevelopment Condemnation | | T 20 | Products Liability - Other than Vehicular |
| | E 20 | Other State or Municipal Agencies | | T 28 | Malpractice - Medical |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 29 | Malpractice - Legal |
| | E 90 | All other | | T 30 | Malpractice - All other |
| | | | | T 40 | Assault and Battery |
| Housing | H 10 | Housing - Return of Security Deposit | | T 50 | Defamation |
| | H 12 | Housing - Rent and/or Damages | | T 61 | Animals - Dog |
| | H 40 | Housing - Housing - Audita Querela/Injunction | | T 69 | Animals - Other |
| | H 50 | Housing - Administrative Appeal | | T 70 | False Arrest |
| | H 60 | Housing - Municipal Enforcement | | T 71 | Fire Damage |
| | H 90 | Housing - All Other | | T 90 | All other |
| Miscellaneous | M 00 | Injunction | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | M 10 | Receivership | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | M 15 | Receivership for Abandoned/Blighted Property | | V 05 | Motor Vehicles* - Property Damage only |
| | M 20 | Mandamus | | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | | V 09 | Motor Vehicle* - All other |
| | M 40 | Arbitration | | V 10 | Boats |
| | M 50 | Declaratory Judgment | | V 20 | Airplanes |
| | M 63 | Bar Discipline | | V 30 | Railroads |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | | V 40 | Snowmobiles |
| | M 68 | Bar Discipline - Inactive Status | | V 90 | All other *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| | M 70 | Municipal Ordinance and Regulation Enforcement | | | |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | | | |
| | M 83 | Small Claims Transfer to Regular Docket | Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | M 84 | Foreign Protective Order | | W 90 | All other |
| | M 89 | CHRO Action in the Public Interest - P.A. 19-93 | | | |
| | M 90 | All other | | | |

**Page 2 of 2**

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff  *(Last, First, Middle Initial)*

**Panthers Capital LLC**

First named Defendant  *(Last, First, Middle Initial)*

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| **LIONSROCK INVESTMENTS LLC, 1405 W 178th St, Gardena, CA 90248** | 05 |
| **LIONSROCK WISCONSIN LLC, 2253 Air Pk Rd, Rhinelander, WI 54501 and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274** | 06 |
| **T3 AQUATICS, 2253 Air Pk Rd, Rhinelander, WI 54501 and/or 1401 W 178th St., Gardena, CA 90248** | 07 |
| **and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274** | 08 |
| **SIAM TROPICAL FISH LTD, 1405 W 178th St, Gardena, CA 90248** | 09 |
| **TROPICAL AQUARIUM FISH (FIJI) LTD, 1405 W 178th St, Gardena, CA 90248** | 10 |
| | 11 |

| | | FOR COURT USE ONLY - File Date |
|---|---|---|
| | 12 | |
| | 13 | |
| | 14 | Docket number |

**CIVIL SUMMONS-Continuation**

**NOTICE OF EX PARTE PRE-JUDGMENT REMEDY/CLAIM FOR HEARING TO DISSOLVE OR MODIFY**

JD-CV-55 Rev. 3-03
C.G.S. §§ 52-278e, 52-278f

**STATE OF CONNECTICUT**
**SUPERIOR COURT**

| COURT USE ONLY |
| --- |
| CLPJRX Ex Parte Application |
| CLPJRXP Contest Ex Parte PJR Application |

**INSTRUCTIONS  TO PLAINTIFF/APPLICANT**
1. *This form MUST be used in connection with ex parte prejudgment remedies issued pursuant to Gen. Stat. § 52-278e, and MAY be used in connection with prejudgment remedies issued in an action upon a commercial transaction pursuant to Gen. Stat. § 52-278f.*
2. *Complete Section I below and submit to the Clerk along with, and immediately followed by your application and the other required documents for ex parte prejudgment remedy.*
3. *If prejudgment remedy issued, include this form in the process served on the defendant.*

## SECTION I - CASE INFORMATION *(To be completed by Plaintiff/Applicant)*

☒ Judicial District   ☐ Housing Session   ☐ G.A. No. ____

COURT ADDRESS
**123 Hoyt St. Stamford CT 06905**

Has a temporary restraining order been requested?   ☐ YES   ☒ NO

AMOUNT, LEGAL INTEREST, OR PROPERTY IN DEMAND, EXCLUSIVE OF INTEREST AND COSTS IS *("X" one of the following)*
☐ LESS THAN $2500
☐ $2500 THROUGH $14,999.99
☒ $15,000 OR MORE

NAME OF CASE *(First-named plaintiff vs. First-named defendant)*
**Panthers Capital LLC vs Upspring LLC d/b/a Upspring et al**

C L P J R X

☒ SEE ATTACHED FORM JD-CV-67 FOR CONTINUATION PARTIES

| CASE TYPE *(From Judicial Branch code list)* | NO. COUNTS |
| --- | --- |
| MAJOR: **C**   MINOR: **40** | **2** |

*("X" if applicable)*
☐ CLAIMING OTHER RELIEF IN ADDITION TO OR IN LIEU OF MONEY DAMAGES

NAME AND ADDRESS OF PLAINTIFF/APPLICANT (Person making application for Prejudgment Remedy) *(No., street, town and zip code)*
**Panthers Capital LLC: 9 W Broad St. #320, Stamford, CT 06902**

NAME AND ADDRESS OF DEFENDANT (Person against whom Prejudgment Remedy is sought) *(No., street, town and zip code)*
**CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish, 1405 W 178th St, Gardena, CA 90248 (and see Schedule A for additional parties)**

NAME AND ADDRESS OF ANY THIRD PERSON HOLDING PROPERTY OF DEFENDANT WHO IS SUBJECT TO GARNISHEE PROCESS PREVENTING DISSIPATION OF SUCH PROPERTY   **Bank of America N.A., J.P. Morgan Chase Bank, N.A., Wells Fargo Bank, N.A., Truist Bank, N.A.**

FOR THE PLAINTIFF(S) ENTER THE APPEARANCE OF:

NAME AND ADDRESS OF ATTORNEY, LAW  FIRM OR PLAINTIFF IF PRO SE *(No., street, town and zip code)*
**Neubert, Pepe & Monteith, P.C., 195 Church Street, 13th Floor, New Haven, CT 06510**

| TELEPHONE NO. | JURIS NO. *(If atty. or law firm)* | SIGNED | DATE SIGNED |
| --- | --- | --- | --- |
| **(203) 781-2856** | **407996** | | 7/11/2025 |

## SECTION II - NOTICE TO DEFENDANT

You have rights specified in the Connecticut General Statutes, including Chapter 903a, that you may wish to exercise concerning this prejudgment remedy. These rights include the right to a hearing:

(1)   to object to the prejudgment remedy because you have a defense to or set-off against the action or a counterclaim against the plaintiff or because the amount of the prejudgment remedy allowed by the court is unreasonably high or because payment of any judgment that may be rendered against you is adequately secured by any insurance that you may have;

(2)   to request that the plaintiff post a bond in accordance with section 52-278d of the General Statutes to secure you against any damages that may result from the prejudgment remedy;

(3)   to request that the prejudgment remedy be dissolved or modified or that you be allowed to substitute a bond for the prejudgment remedy; and

(4)   to show that the property subject to the prejudgment remedy is exempt from such prejudgment remedy.

You may request a hearing to move to dissolve or modify the prejudgment remedy. **The hearing may be requested by any proper motion or by completing section III below and returning this form to the superior court at the Court Address listed above.**

## SECTION III - DEFENDANT'S CLAIM AND REQUEST FOR HEARING *(To be completed by Defendant)*

I, the defendant, request a hearing to dissolve or modify the prejudgment remedy, and claim:

C L P J R X P

FOR COURT USE ONLY

☐ a defense, counterclaim, set-off, or exemption.
☐ that any judgment that may be rendered is adequately secured by insurance.
☐ that the amount of the prejudgment remedy is unreasonably high.
☐ that the plaintiff be required to post a bond to secure me againstany damages which may result from the prejudgment remedy.
☐ that I be allowed to substitute a bond for the prejudgment remedy.

I certify that a copy of the above claim was mailed/delivered to the Plaintiff or the Plaintiff's attorney on the Date Mailed or Delivered shown below.

| DATE MAILED OR DELIVERED | SIGNED *(Defendant)* | DATE SIGNED |
| --- | --- | --- |

| TYPE OR PRINT NAME AND ADDRESS OF DEFENDANT | DOCKET NO. **PJR CV** |
| --- | --- |

| NAME OF EACH PARTY SERVED* | ADDRESS AT WHICH SERVICE WAS MADE* |
| --- | --- |

*If necessary, attach additional sheet with names of each party served and the address at which service was made.

**CONTINUATION OF PARTIES**

JD-CV-67  Rev. 5-21

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



First named plaintiff *(Last, first, middle initial)*

**Panthers Capital LLC**

First named defendant *(Last, first, middle initial)*

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish**

## Additional Plaintiffs

| Name *(Last, first, middle initial, if individual)* | Address *(Number, street, town and zip code)* |
|---|---|
| | |

## Additional Defendants

| Name *(Last, first, middle initial, if individual)* | Address *(Number, street, town and zip code)* |
|---|---|

**Samarasinghe, Charitha, I, 4 Sundown Dr, Rolling Hills Estates, CA 90274**

**CIS INTERNATIONAL DISTRIBUTORS INC., 1401 W 178th St b, Gardena, CA 90248**

**LIVE AQUARIA HOLDINGS CORP, 1405 W 178th St, Gardena, CA 90248**

**LIONSROCK INVESTMENTS LLC, 1405 W 178th St, Gardena, CA 90248**

**LIONSROCK WISCONSIN LLC, 2253 Air Pk Rd, Rhinelander, WI 54501 and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274**

**T3 AQUATICS, 2253 Air Pk Rd, Rhinelander, WI 54501 and/or 1401 W 178th St., Gardena, CA 90248 and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274**

**SIAM TROPICAL FISH LTD, 1405 W 178th St, Gardena, CA 90248**

**TROPICAL AQUARIUM FISH (FIJI) LTD, 1405 W 178th St, Gardena, CA 90248**

| | **For Court Use Only** |
|---|---|
| | |
| | Docket number |

**CONTINUATION OF PARTIES**

## SCHEDULE A

## EX PARTE PRE-JUDGMENT REMEDY (JD-CV-55)

**Name and Address of Defendants (Persons Against Whom Prejudgment Remedy Is Sought)**

CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish
1405 W 178th St, Gardena, CA 90248

Samarasinghe, Charitha, I
4 Sundown Dr, Rolling Hills Estates, CA 90274

CIS INTERNATIONAL DISTRIBUTORS INC.
1401 W 178th St b, Gardena, CA 90248

LIVE AQUARIA HOLDINGS CORP
1405 W 178th St, Gardena, CA 90248

LIONSROCK INVESTMENTS LLC
1405 W 178th St, Gardena, CA 90248

LIONSROCK WISCONSIN LLC
2253 Air Pk Rd, Rhinelander, WI 54501 and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274

T3 AQUATICS
2253 Air Pk Rd, Rhinelander, WI 54501 and/or 1401 W 178th St., Gardena, CA 90248 and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274

SIAM TROPICAL FISH LTD
1405 W 178th St, Gardena, CA 90248

TROPICAL AQUARIUM FISH (FIJI) LTD
1405 W 178th St, Gardena, CA 90248

RETURN DATE: AUGUST 12, 2025      :      SUPERIOR COURT

:

PANTHERS CAPITAL LLC      :      J.D. OF STAMFORD/NORWALK

:      AT STAMFORD

V.      :

:

CIS INTERNATIONAL HOLDINGS (N.A.)      :
CORP. d/b/a E TROPICAL FISH,      :
CHARITHA I SAMARASINGHE,      :
CIS INTERNATIONAL DISTRIBUTORS INC.,      :
LIVE AQUARIA HOLDINGS CORP,      :
LIONSROCK INVESTMENTS LLC,      :
LIONSROCK WISCONSIN LLC,      :
T3 AQUATICS,      :
SIAM TROPICAL FISH LTD,      :
TROPICAL AQUARIUM FISH (FIJI) LTD      :

## AFFIDAVIT IN SUPPORT OF EX PARTE PREJUDGMENT REMEDY

I, Mike Herzog, being duly sworn, hereby depose and say:

1.      I am over the age of eighteen years and understand and believe in the obligations of an oath.

2.      I am the Executive Vice President of Panthers Capital LLC ("Buyer"), a limited liability company with a place of business in Connecticut.

3.      Each fact in this Affidavit is based upon my personal knowledge derived from the business records that the Buyer maintains and that are pertinent to this action. The Buyer's business records are created in its ordinary course of business and affairs and consist of memoranda, reports and data compilations of acts, events, and transactions. It is the regular practice of the Buyer to make these memoranda, reports and data compilations of acts, events, and transactions at the time of the occurrence or within a reasonable time thereafter.

4.      The Buyer and the defendant, CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish ("Seller"), entered into that certain Future Receivables Sale and Purchase Agreement dated June 4, 2025 (the "Agreement"), pursuant to which the Seller sold, and the Buyer

purchased, future receipts of the Seller in the aggregate amount of $1,500,236.00. A redacted copy of the Agreement is attached to the Buyer's Complaint as Exhibit A.

5. The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Guarantors") jointly and severally guaranteed the Seller's obligations under the Agreement, as evidenced by the Guaranty of Performance executed by each of the Guarantors and incorporated within the Agreement (the "Guaranty").

6. Upon execution of the Agreement and Guaranty by the Seller and the Guarantors, the Buyer advanced funds to the Seller in accordance with the terms and conditions set forth in the Agreement.

7. The Seller defaulted under the Agreement in July 2025, including, without limitation, by taking actions that denied and interfered with the Buyer's contractual rights, including the Buyer's right to receive its designated share of the Seller's revenue. Specifically, and without limitation, the Seller caused a stop payment to be placed on the bank account into which it was required to deposit all receipts and from which the Buyer was authorized to initiate ACH debits to receive payment.

8. The Guarantors defaulted under the Guaranty by failing to pay the Buyer all amounts due and owing under the Agreement

9. Pursuant to the Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

10. Pursuant to the Guaranty, the Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

2

11.     Further, pursuant to the Agreement, the Seller expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Seller's property. See Agreement (Exhibit A), Paragraph 44.

12.     Further, pursuant to the Guaranty, the Guarantors expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Guarantors' property. See Guaranty (Exhibit A), Paragraph 10.

13.     The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement and the Guaranty.

14.     As of July 10, 2025, the balance due on the Agreement and Guaranty is no less than **$1,320,798.00** as follows:

| | |
|---|---|
| Balance of purchased future receipts | $1,280,798.00 |
| Default Fee (Agreement, Rider 3) | $    10,000.00 |
| Anticipated Legal Fees & Costs (Agreement, Paragraph 28) | $    30,000.00 |
| **TOTAL** | **$1,320,798.00** |

15.     The Buyer is not aware of any defenses or setoffs to the debt, and accordingly, it is my belief that probable cause exists that a judgment will enter in favor of the Buyer against the Seller and Guarantors, joint and severally, in an amount not less than **$1,320,798.00**.

_____
Mike Herzog
Executive Vice President of Panthers Capital LLC


Subscribed and sworn to before me on July 11th , 2025

_____
Notary Public

Notary Public State of Florida
Evelyn  Suarez
My Commission  HH 531577
Expires  8/22/2026

3

RETURN DATE: AUGUST 12, 2025     :     SUPERIOR COURT

    :

PANTHERS CAPITAL LLC     :     J.D. OF STAMFORD/NORWALK

    :     AT STAMFORD

V.     :

    :

CIS INTERNATIONAL HOLDINGS (N.A.)     :

CORP. d/b/a E TROPICAL FISH,     :

CHARITHA I SAMARASINGHE,     :

CIS INTERNATIONAL DISTRIBUTORS INC.,     :

LIVE AQUARIA HOLDINGS CORP,     :

LIONSROCK INVESTMENTS LLC,     :

LIONSROCK WISCONSIN LLC,     :

T3 AQUATICS,     :

SIAM TROPICAL FISH LTD,     :

TROPICAL AQUARIUM FISH (FIJI) LTD     :     JULY 11, 2025

<u>WRIT, SUMMONS AND DIRECTION FOR ATTACHMENT</u>

TO ANY PROPER OFFICER: By authority of the State of Connecticut you are hereby commanded in accordance with Connecticut General Statutes § 52-278f:

1.     To attach to the value of **<u>$1,320,798.00</u>** the property of the defendants,

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd**., and **Tropical Aquarium Fish (Fiji) Ltd.** (collectively "Defendants"), including their interests in the following accounts at:

- Bank of America, N.A.

- J.P. Morgan Chase Bank, N.A.

- Wells Fargo Bank, N.A.

- Truist Bank, N.A.

2.     To serve the Defendants with the following pleadings of the Plaintiff: (i) Notice of Ex-Parte Prejudgment Remedy/Claim for Hearing to Dissolve or Modify (JD-CV-55), (ii)

Affidavit in Support of Ex Parte Prejudgment Remedy, (iii) Summons – Civil (JD-CV-1; JD-CV-2), (iv) Complaint with exhibit, and (v) this Writ, Summons and Direction for Attachment, including in order to summon the Defendants to appear before the Superior Court of Connecticut, Judicial District of Stamford/Norwalk at Stamford, such appearance to be made by filing an appearance with the Clerk of the Court on or before the second day following the return date, then and there to answer unto the Plaintiff, wherein the Plaintiff complains as set forth in the accompanying Complaint.

HEREOF FAIL NOT, but due service and return make. Dated at New Haven, CT on July 11, 2025.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Firm Juris Number 407996

2

RETURN DATE: AUGUST 12, 2025      :      SUPERIOR COURT

     :

PANTHERS CAPITAL LLC      :      J.D. OF STAMFORD/NORWALK

     :      AT STAMFORD

V.      :

     :

CIS INTERNATIONAL HOLDINGS (N.A.)      :

CORP. d/b/a E TROPICAL FISH,      :

CHARITHA I SAMARASINGHE,      :

CIS INTERNATIONAL DISTRIBUTORS INC.,      :

LIVE AQUARIA HOLDINGS CORP,      :

LIONSROCK INVESTMENTS LLC,      :

LIONSROCK WISCONSIN LLC,      :

T3 AQUATICS,      :

SIAM TROPICAL FISH LTD,      :

TROPICAL AQUARIUM FISH (FIJI) LTD      :      JULY 11, 2025

## COMPLAINT

### COUNT ONE
### (BREACH OF CONTRACT AGAINST SELLER)

1. The plaintiff, Panthers Capital LLC ("Buyer"), is a limited liability company with a place of business in Connecticut.

2. The Buyer and the defendant, CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish ("Seller"), entered into that certain Future Receivables Sale and Purchase Agreement dated June 4, 2025 (the "Agreement"), pursuant to which the Seller sold, and the Buyer purchased, future receipts of the Seller in the aggregate amount of $1,500,236.00. A redacted copy of the Agreement is attached hereto as Exhibit A.

3. The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Guarantors") jointly and severally guaranteed the Seller's obligations under the Agreement, as evidenced by the

Guaranty of Performance executed by each of the Guarantors and incorporated within the Agreement (the "Guaranty").

4.      Upon execution of the Agreement and Guaranty by the Seller and the Guarantors, the Buyer advanced funds to the Seller in accordance with the terms and conditions set forth in the Agreement.

5.      The Seller defaulted under the Agreement in July 2025, including, without limitation, by taking actions that denied and interfered with the Buyer's contractual rights, including the Buyer's right to receive its designated share of the Seller's revenue. Specifically, and without limitation, the Seller caused a stop payment to be placed on the bank account into which it was required to deposit all receipts and from which the Buyer was authorized to initiate ACH debits to receive payment.

6.      Pursuant to the Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7.      Further, pursuant to the Agreement, the Seller expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Seller's property. See Agreement (Exhibit A), Paragraph 44.

8.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement.

<div align="center">

COUNT TWO
(BREACH OF CONTRACT AGAINST GUARANTORS)

</div>

1-5.    Paragraphs 1 through 5 of Count One are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Two as if fully set forth herein.

<div align="center">

2

</div>

6.      The Guarantors defaulted under the Guaranty by failing to pay the Buyer all amounts due and owing under the Agreement

7.      Pursuant to the Guaranty, the Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

8.      Further, pursuant to the Guaranty, the Guarantors expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Guarantors' property. See Guaranty (Exhibit A), Paragraph 10.

9.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement and the Guaranty.

WHEREFORE, the Buyer respectfully requests that the Court enter judgment in its favor and award the following relief:
   a. Money damages in an amount to be determined at trial;
   b. The Buyer's reasonable attorneys' fees and costs incurred herein;
   c. Prejudgment and post-judgment interest as permitted by law and the Agreement; and
   d. Such other and further relief as the Court deems just and equitable.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Firm Juris Number 407996

3

| | | |
|---|---|---|
| RETURN DATE: AUGUST 12, 2025 | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | JULY 11, 2025 |

<u>STATEMENT OF AMOUNT IN DEMAND</u>

The amount in demand, exclusive of interest and costs, exceeds $15,000.00.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Juris Number 407996

4

# EXHIBIT
# A

PANTHERS CAPITAL

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated _____6/4/2025_____, between Panthers Capital LLC D/B/A Panthers Capital ("Panthers Capital"), the seller(s) listed herein (collectively, the "Seller"), and each guarantor identified below (each a "Guarantor") (all capitalized terms shall have the meanings ascribed to them below):

**Seller Legal Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** E TROPICAL FISH

**Form of Business Entity:** Corporation          **EIN #:** ▮▮▮▮▮▮

**Physical Address:** 1405 W 178TH ST, GARDENA , CA 90248

**Mailing Address:** 1405 W 178TH ST, GARDENA , CA 90248

**PURCHASE PRICE:** $ 1,020,569.00     **PURCHASED AMOUNT:** $ 1,500,236.00     **SPECIFIED PERCENTAGE:** 50.00%

**ORIGINATION FEE:** $ 250.00     **PRIOR BALANCE:** $ 1,020,319.00     **INITIAL** Daily **DEBIT:** $ 10,002.00

**AMOUNT PAID TO SELLER (AFTER DEDUCTING THE ORIGINATION FEE AND ANY PRIOR BALANCE):** $ 0.00

**FOR SELLER #1**

By: _____
086ED1260399401...

**Name:** CHARITHA I SAMARASINGHE

**Title:** Owner

**Email:** ▮▮▮▮▮▮

**Business Phone:** ▮▮▮▮▮▮

**FOR SELLER #2**

By: _____

**Name:** _____

**Title:** Owner

**Email:** _____

**Business Phone:** _____

**\*Accurate contact information is required to provide the Seller with important information regarding the Agreement.**

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guaranty of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to Panthers Capital by the following Owner(s)/Guarantor(s) of Seller

**OWNER/GUARANTOR #1**

By: _____
086ED1260399401...

**Name:** CHARITHA I SAMARASINGHE

**SSN** ▮▮▮▮▮▮

**PHONE:** ▮▮▮▮▮▮

**Address:** 4 SUNDOWN DR , RLLNG HLS EST , CA 90274

**OWNER/GUARANTOR #2**

By: _____

**Name:** _____

**SSN:** _____

**PHONE:** _____

**Address:** _____

**WHEREAS**, Seller is desirous to sell to Panthers Capital, and Panthers Capital is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, Panthers Capital and Seller hereby agree to the foregoing and as follows:

1. **Basic Terms and Definitions.**

a. "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when Panthers Capital paid the Purchase Price to Seller. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee and Prior Balance.

b. "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of Seller's Future Receipts.

c. "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

d. " Daily  Receipts" shall mean the amount of Future Receipts received by Seller on a  Daily  basis.

e. "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and permit Panthers Capital to debit pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

f. "Purchase Price" shall mean the total amount that Panthers Capital agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from Panthers Capital pursuant to this Agreement will be less than the Purchase Price by the total sum of the Origination Fee and Prior Balance, if any, set forth in the Preamble to this Agreement.

g. " Daily  Installment" shall mean the amount that Seller and Panthers Capital agree to be a good faith approximation of the Specified Percentage of Seller's  Daily  Future Receipts. Seller and Panthers Capital further agree that the Initial  Daily  Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to Panthers Capital concerning Seller's most recent accounts receivables, including representations by the Seller to Panthers Capital regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

h. "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

i. "Prior Balance" shall mean the sum of all amounts that Seller may owe to Panthers Capital and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

j. "Origination Fee" shall mean the fee that Panthers Capital charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 20 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

k. In the event "Seller" is comprised of more than one entity, then:

 i. The term "Seller" shall mean, individually and collectively, all such entities; and

 ii. Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by statute, or by contract; and

 iii. The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

**iv.**    The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.**    The terms "Specified Percentage", "Future Receipts", " Daily  Receipts", " Daily  Installment" shall mean the Specified Percentage, the Future Receipts and the   Daily   Receipts of all Sellers jointly; and each Seller individually; and

**vi.**    Panthers Capital may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

**l.**    In the event "Guarantor" is comprised of more than one individual, then:

**i.**    The term "Guarantor" shall mean, individually and collectively, all such individuals; and

**ii.**    Each Guarantor is an Affiliate of all other Guarantor(s); and

**iii.**    The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

**iv.**    The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.**    Panthers Capital may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2.**    **No Fixed Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to Panthers Capital pursuant to this Agreement are received by Panthers Capital in full. Seller hereby acknowledges that it fully understands that: (i) Panthers Capital's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to Panthers Capital in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business Panthers Capital's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely.

**3.**    **Sale of Purchased Future  Receipts**. Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto Panthers Capital all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to Panthers Capital (hereinafter, the portion of the Future Receipts sold by Seller to Panthers Capital pursuant to this Agreement, the "Purchased Future Receipts" ); to have and hold the same unto Panthers Capital, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to Panthers Capital of collectability of the Purchased Future Receipts by Panthers Capital and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to Panthers Capital full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4.**    **Payment of Purchase Price**. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by paying to Seller the Purchase Price (reduced by the Origination Fee and Prior Balance, if any).

**5.**    **Use of Purchase Price**. Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6.**     Daily  **Installments of Purchased Amount.** Subject to Seller's right of adjustment/reconciliation set forth in this Agreement, the Purchased Amount shall be delivered by Seller to Panthers Capital  Daily  in the amount of the  Daily  Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

**7.**    **Approved Bank Account and Credit Card Processor**. During the course of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) business-purpose bank account which bank account shall be acceptable and preapproved by Panthers Capital (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by Panthers Capital (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the course of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

**8.**    **Authorization to Debit Approved Bank Account.** Seller hereby authorizes Panthers Capital to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the   Daily   Installment on each Workday commencing on the Effective Date until Panthers Capital receives the full Purchased Amount;

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633

The   Daily   Installment is to be drawn via ACH payment, from the following bank account:



NOTE that this authorization is to remain in full force and effect until Panthers Capital receives written notification from Seller of its termination in such time and in such manner to afford Panthers Capital a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

9.     **Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or Panthers Capital's banking institution directly (or to compensate Panthers Capital, in case it is charged) all fees, charges and expenses incurred by either Seller or Panthers Capital due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

10.    **Seller's Right of Reconciliation.** Seller and Panthers Capital each acknowledge and agree that:

a.     If at any time during the course of this Agreement Seller experiences a decrease or increase in its   Daily   Receipts, Seller shall have the right to request retroactive reconciliation of the   Daily   Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by Panthers Capital (each such calendar month, a "Reconciliation Month").

b.     Such reconciliation (the "Reconciliation") of the Seller's   Daily   Installment for a Reconciliation Month shall be performed by Panthers Capital within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by Panthers Capital from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

c.     One or more Reconciliation procedures performed by Panthers Capital may reduce or increase the effective   Daily   Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which Panthers Capital will be debiting the Approved Bank Account may get shortened or  extended indefinitely.

11.    **Request for Reconciliation Procedure.**

a.     Seller may initiate Reconciliation of Seller's actual   Daily   Installments at any time by sending a request for Reconciliation to Panthers Capital.

b.     Any such request for Reconciliation of the Seller's   Daily   Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements,and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by Panthers Capital via email to accounting@pantherscapital.com with the subject line "REQUEST FOR RECONCILIATION."

c.     Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply with each such request, provided that:

i.     Each such request is made in accordance with the terms of this Section 11; and

ii.    If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by Panthers Capital from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

d.     Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with Panthers Capital's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by Panthers Capital in full, or (ii) modify the amount of the   Daily   Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

12.    **Adjustment of the   Daily   Installment**. Seller and Panthers Capital each acknowledge and agree that:

a.     Seller and Panthers Capital shall have the right to request modification ("Adjustment") of the amount of

the Daily Installment on a going-forward basis to more closely reflect Seller's actual Daily Receipts times the Specified Percentage. Panthers Capital will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Daily Installment until any subsequent Adjustment. If Seller requests an Adjustment, Panthers Capital shall perform the Adjustment within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Daily Installment that shall be debited from the Approved Bank Account.

b.  One or more Adjustments performed by Panthers Capital may substantially extend the term of this Agreement.

**13.    Request for Adjustment Procedure.**

a.  Seller and/or Panthers Capital may initiate an Adjustment by sending a request for Adjustment to the other party in writing. Seller may request an adjustment via e-mail to accounting@pantherscapital.com with the subject line "REQUEST FOR ADJUSTMENT."

b.  Within five (5) Workdays following a request for Adjustment (an "Adjustment Request") Seller shall provide to Panthers Capital's copies of: (i) Seller's most recent month's bank statement of the Approved Bank Account and month-to-date transaction activity, credit card processing statements and any aging reports immediately preceding the date of Panthers Capital's receipt of the Adjustment Request.

c.  Seller and Panthers Capital shall have the right to request Adjustment of the Daily Installment as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply in good faith with such request, provided that:

   i.  Each such request for Adjustment is made in accordance with the terms of this Section 13; and

   ii.  A request for Adjustment shall not be made after the Expiration Date.

**14.    Rights and Obligations of Panthers Capital upon Receipt of the full Purchased Amount.**

Upon receipt of the full amount of the Purchased Amount and any fees owed to Panthers Capital under this Agreement:

a. Panthers Capital shall notify Seller's bank and request from it to stop transferring Daily Installments to Panthers Capital's bank account.

b. If Panthers Capital shall have received funds in excess of the Purchased Amount and any fees owed to Panthers Capital under this Agreement, Panthers Capital shall promptly return such excess to Seller.

**15.    Risk Sharing Acknowledgments and Arrangements.**

a. Seller and Panthers Capital each hereby acknowledges and agrees that:

   i.  The Purchased Future Receipts represent a portion of Seller's Future Receipts.

   ii.  This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from Panthers Capital. Panthers Capital does not charge Seller and will not collect from Seller any interest on the monies used by Panthers Capital for the purchase of the Purchased Future Receipts. The period of time that it will take Panthers Capital to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. <u>As an extreme example, in the event Seller's business ceases to exist after Panthers Capital's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's reasonable control, Panthers Capital may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.</u>

   iii.  The amount of the Initial Daily Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Daily Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to Panthers Capital.

   iv.  The amounts of Seller's future Daily Receipts may increase or decrease over time.

**16.    Panthers Capital's Risk Acknowledgments.** Panthers Capital agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and Panthers Capital assumes these risks based

exclusively upon the information provided to it by Seller related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give Panthers Capital a reasonable and fair opportunity to receive the benefit of its bargain. Panthers Capital assumes the risk that Future Receipts may be remitted more slowly than Panthers Capital may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business went bankrupt or Seller otherwise ceased operations in the ordinary course of business.

17. **Application of Amounts Received by** Panthers Capital. Panthers Capital reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Panthers Capital from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

18. **Not a Loan.** Seller and Panthers Capital agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by Panthers Capital is not intended to be, nor shall it be construed as, a loan from Panthers Capital to Seller that requires absolute and unconditional repayment on a maturity date. To thecontrary, Panthers Capital's ability to receive the Purchased Amount pursuant to  this Agreement, and the date when the Purchased Amount is delivered to Panthers Capital in full (if ever) are subject to and conditioned upon performance of Seller's business.

19. **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes eachof those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless Panthers Capital for any and all damages and losses (including without limitation legal fees and expenses) incurred by Panthers Capital as the result of such representation being untrue, incorrect or incomplete.

20. **Origination Fee.** Seller hereby agrees for Panthers Capital to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

21. Seller represents, warrants and covenants that as of this date and, unless otherwise stated, during the course of this Agreement:

   a. **Financial Condition and  Financial Information.**  Seller's bank and financial statements, copies of which have been furnished to Panthers Capital, and future statements which may be furnished hereafter pursuant to this Agreement or upon Panthers Capital's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Panthers Capital may request Seller's bank statements at any time during the term of this Agreement and view-only access to Seller's bank account and Seller shall provide them to Panthers Capital within five (5) Workdays. Seller's failure to do so is a material breach of this Agreement.

   b. **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

   c. **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

   d. **Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

   e. **Accounting Records and Tax Returns.**  Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that Panthers Capital is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

f.    **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

g.    **Electronic Check Processing Agreement.** Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede Panthers Capital's rights under this Agreement, without Panthers Capital's prior written consent.

h.    **No Diversion of Future Receipts.** Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without Panthers Capital's written permission.

i.    **Change of Name or Location.** Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and Panthers Capital, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining Panthers Capital's written consent.

j.    **Prohibited Business Transactions.** Seller shall not: (i) voluntarily transfer or sell all or substantially all of its assets (including without limitation the Collateral as such term is defined in Section 23 or any portion thereof) without first obtaining Panthers Capital's consent; or (ii) make or send notice of its intended bulk sale or transfer.

k.    **Closing of Business.** Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of Panthers Capital, and (ii) providing Panthers Capital with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Panthers Capital. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until Panthers Capital shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide Panthers Capital ten (10) Workdays advance notice, to the extent practicable.

l.    **No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six (6) months immediately preceding the date of this Agreement.

m.    **Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) Workday's prior notice from Panthers Capital to Seller, execute, acknowledge and deliver to Panthers Capital and/or to any other person or entity specified by Panthers Capital, a statement certifying that this Agreement is unmodified and in full force and effect or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been delivered.

n.    **Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

o.    **No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of Panthers Capital.

p.    **Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

q.    **No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

r.   **Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants Panthers Capital the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's Daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants Panthers Capital and its employees and consultants access during regular business hours to Seller's employees and records and all other items of property located at the Seller's place of business during the course of this Agreement. Seller hereby agrees to provide Panthers Capital, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow Panthers Capital to interview any of those parties.

s.   **Phone Recordings and Contact.** Seller agrees that any call between Seller and Panthers Capital and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with Panthers Capital, its managers, employees and agents (collectively, the "Panthers Capital Parties") and that Seller may be contacted by any of Panthers Capital Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of Panthers Capital Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

t.   **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

u.   **Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Panthers Capital.

v.   **Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

Y.   **No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and Panthers Capital with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by Panthers Capital or any of the Panthers Capital Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Panthers Capital Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement

Z.   **No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Origination Fee, if any, set forth in Section 20 herein, Panthers Capital is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Section 2 hereof, such fee is not charged by Panthers Capital. Moreover, as all working capital received under this Agreement is intended to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

aa.   **Credit Report and Other Authorizations** Seller and each of the Owners signing above authorize Panthers Capital, its agents and representatives and any credit reporting agency engaged by Panthers Capital, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement; (ii) obtain consumer and business credit reports on the Seller and any of its Owners; and (iii) to contact personal and business references provided by the Seller in any application, at any time now or for so long as Seller and/or Owners continue to have any obligations to Panthers Capital as a consequence of this Agreement or for Panthers Capital's ability to determine Seller's eligibility to enter into any future agreement with Panthers Capital.

## PLEDGE OF SECURITY

22. **Pledge.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Panthers Capital (collectively, "Pledge") and grants to Panthers Capital a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

    a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    b. all Seller's proceeds, as such term is defined by Article 9 of the UCC.

23. **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Panthers Capital will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

24. **Representations with Respect to Collateral.** Seller hereby represents and warrants to Panthers Capital that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party.

25. **Further Assurances.** Upon the request of Panthers Capital, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Panthers Capital may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

## EVENTS OF DEFAULT AND REMEDIES

26. **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:
    a. Seller shall violate any term, condition or covenant in this Agreement.
    b. Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.
    c. Seller shall default under any of the terms, covenants and conditions of any other agreement with Panthers Capital (if any) which is related to the instant Agreement.
    d. Seller uses multiple depository accounts without obtaining prior written consent of Panthers Capital in each instance.
    e. Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;
    f. Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of Panthers Capital in each instance.
    g. Seller intentionally interferes with Panthers Capital's collection of Daily Installments.

27. **Default under the Agreement.** In case any Event of Default occurs and is not waived by Panthers Capital, in writing, Panthers Capital may declare Seller in default under this Agreement without notice.

28. **Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Panthers Capital the entire undelivered portion of the Purchased Amount and the Specified Percentage shall equal 100% of all Future Receipts. In addition, Seller shall also pay to Panthers Capital, as additional damages, any reasonable expenses incurred by Panthers Capital in connection with recovering the monies due to Panthers Capital from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages").

29. **Remedies Upon Default.** Upon Seller's default, Panthers Capital may immediately proceed to protect and enforce

its rights under this Agreement and/or Guaranty by:

    **a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Panthers Capital's security interest;

    **b.** Enforcing the provisions of the Personal Guaranty of Performance against the Guarantor(s) without first seeking recourse from Seller;

    **c.** Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to Panthers Capital of all or any portion of the amounts received by such credit card processor on behalf of Seller;

    **d.** Subject to arbitration as provided in Section 50 of this Agreement, commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or remedy including without limitation Panthers Capital's rights of a secured party under the UCC.

30. **Remedies are not Exclusive.** Subject to arbitration as provided in Section 50 of this Agreement, all rights, powers and remedies of Panthers Capital in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Panthers Capital by law or equity.

## ADDITIONAL TERMS

31. **Seller Deposit Agreement.** Seller shall execute an agreement with Panthers Capital that shall authorize Panthers Capital to arrange for electronic fund transfer services and/or "ACH" payments of Daily Installments from the Approved Bank Account. Seller shall upon request provide Panthers Capital and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

32. **Financial Condition.** Seller and its Guarantor(s) authorize Panthers Capital and its agents to investigate their financial status and history and will provide to Panthers Capital any bank or financial statements, tax returns, etc., as Panthers Capital deems reasonably necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable for release of financial information. Seller hereby authorizes Panthers Capital to receive from time to time updates on such information and financial status.

33. **Transactional History.** Seller shall execute written authorization(s) to its bank(s) to provide Panthers Capital with Seller's banking and/or credit-card processing history.

34. **Indemnification.** Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by Panthers Capital for monies owed to Panthers Capital from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by Panthers Capital.

35. **No Liability.** In no event shall Panthers Capital be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

36. **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

37. **Assignment.** Panthers Capital may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining Panthers Capital's written consent.

38. **Notices.**

    **a.** Panthers Capital may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Panthers Capital's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

b.   Subject to Section 11 of this Agreement, Seller and Guarantor may send any notices to Panthers Capital by e-mail only upon the prior written consent of Panthers Capital, which consent may be withheld or revoked at any time in Panthers Capital's sole discretion.   Otherwise, any notices or other communications from Seller and Guarantor to Panthers Capital must be delivered by certified mail, return receipt requested, to Panthers Capital's address as set forth in this Agreement.  Notices sent to Panthers Capital shall become effective only upon receipt by Panthers Capital.

39.   **Waiver Remedies.** No failure on the part of Panthers Capital to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to arbitration as provided in Section 50 of this Agreement, the remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

40.   **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

41.   **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the partiesto this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums.  Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on this Agreement, or via email address(es) listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

42.   **Service of Process.**

**IMPORTANT NOTICE -** THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a.   In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

1.   Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

2.   Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b.   Each Seller and Guarantor make, agree and consent to the following representations and waivers:

1.   Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

2.   Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

i.   If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

ii.   If sent by e-mail, on the same day and time that the e-mail is sent;

3.   Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in this Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected

to be received by them;

4. Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

43. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

IMPORTANT NOTICE - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

44. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

IMPORTANT NOTICE - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY UPON OR AFTER COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER UPON OR AFTER COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

45. **Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

46. **Severability.** In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

47. **Entire Agreement.** This Agreement embodies the entire agreement between Seller and Panthers Capital and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

48. JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

49. CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATEDWITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECUREDTHROUGH THE CLASS OR REPRESENTATIVE ACTION.

50. ARBITRATION. Notwithstanding any other provision of this Agreement, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, MAY BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators may be appointed by RapidRuling. The place of

arbitration may be in Connecticut, and any hearing may be held via video or telephone conference. The parties agree that no objection may be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THIS AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "SAFE SENDERS" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis.   Panthers Capital, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees may be equally paid by the parties, and the commencing party may be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. Panthers Capital, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party may be responsible for any attorney's fees, court or other fees associated with such actions. Panthers Capital, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, Panthers Capital, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE MAY BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

51. **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND Panthers Capital A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: Panthers Capital – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902, ATTENTION: Arbitration Opt-Out.**

52. **Counterparts and Facsimile Signatures.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER #1**                                          **FOR SELLER #2**

By: _____                    By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE          **Name:**

**Title:** Owner                                           **Title:** Owner

**EIN** ██████████                                      **EIN:** _____


**AGREE TO BE BOUND BY THE PROVISIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**                           **OWNER/GUARANTOR # 2**

By: _____                    By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE          **Name:**

**SSN** ██████████                                      **SSN:**


**Panthers Capital LLC**

**By:** _____

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is being executed and delivered by each undersigned ("Guarantor") in favor of Panthers Capital LLC, and its subsidiaries, affiliates, agents, and assigns (collectively, "Buyer"), in connection with that certain Future Receivables Sale and Purchase Agreement (the "Agreement"), dated effective as of [ 6/4/2025 ] by and between Buyer and [CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHE] ("Seller"), a business entity that desires to sell certain of its Future Receipts to Buyer pursuant to the Agreement. Capitalized terms used herein have the meanings provided in the Agreement. Each Guarantor is a shareholder, member, partner or other principal owner of Seller or is an affiliate of seller that is owned and controlled by a shareholder, member, partner or other principal owner of Seller. Each Guarantor executes and delivers this Guaranty to induce Buyer to enter into the Agreement and purchase Seller's Future Receipts. Accordingly, each Guarantor acknowledges and agrees that Guarantor will receive substantial benefits from providing this Guaranty.

**SELLER # 1:**                                                    **SELLER # 2:**

**Legal Business Name** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTI **Legal Business Name** _____

**D/B/A:** E TROPICAL FISH _____        **D/B/A:** _____

NOW, THEREFORE, as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's obligations under the Agreement (the "Obligations"); and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly perform (or cause to be performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

   a.   any amendment, modification or extension of the Agreement or any Obligation;

   b.   any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

   c.   any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

   d.   any other guaranty now or hereafter executed by Guarantor or anyone else;

   e.   any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

   f.   any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

   g.   the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

   h.   the failure to give Guarantor any notice whatsoever;

   i.   any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other  Agreements.** Guarantor will not voluntarily dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. Subject to arbitration as provided in Section 13 of this Guaranty, the remedies provided in this Guaranty are cumulative and not exclusive of anyremedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer mayenforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipts is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law.  Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Guaranty irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums.  Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on the Agreement, or via email address(es) listed on the Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**8. Service of Process.**

**<u>IMPORTANT NOTICE</u>** - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

    1.  Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

    2.  Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

    1.  Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

    2.  Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

        i.        If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at

the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

ii.     If sent by e-mail, on the same day and time that the e-mail is sent;

3.  Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in the Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them;

4.  Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5.  EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

**9.  PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a.  EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1.     THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2.     WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.     WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

**10. PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a.  EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1.     THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2.     WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY UPON OR AFTER COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.       WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER UPON OR AFTER COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR BUYER OBTAINING ANY PREJUDGMENT REMEDY.

11. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION ORPROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

12.   CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OROTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

13. ARBITRATION. Notwithstanding any other provision of this Guaranty, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE AGREEMENT, THE SECURITY AGREEMENT AND/OR THE GUARANTY(S), OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED, CONFIRMED AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators shall be appointed by RapidRuling. The place of arbitration shall be in Connecticut and any hearing shall be held via video or telephone conference. The parties agree that no objection shall be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference.  SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THE AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "safe senders" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. BUYER, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees shall be equally paid by the parties, and the commencing party shall be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. BUYER, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party shall be responsible for any attorney's fees, court or other fees associated with such actions. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ORREPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

**14. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS GUARANTY. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS GUARANTY: PANTHERS CAPITAL. – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902 ATTENTION: <u>Arbitration Opt-Out</u>.**

**15. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**16. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**17. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                                   **OWNER/GUARANTOR #2**

By: _____                          By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE                      **Name:**

**SSN** ███████                                          **SSN:**

**Panthers Capital LLC**

By: _____

### RIDER 3

**TO THE** _____6/4/2025_____

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Panthers Capital LLC ("BUYER")

**and** <u>CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES L</u> **("Seller")**

## <u>APPLICABLE FEES</u>

1. **Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3. _C. I. S._    **Applicable Fees.** The parties agree that the Applicable Fees which Seller shall pay to Buyer, pursuant to Section 17 of the Agreement shall be as follows:

    A. **Monthly Fee:** ___$299___ (charged monthly to cover expense of ACH processing program).

    B. **UCC Fee:** _____$200_____ (part of filing UCC financing statements and their terminations).

    C. **Wire Fee** _____$50_____ (deducted from the Purchase Price to cover cost of remitting the Purchase Price).

    D. **NSF Fee:** _____$10_____ (to cover expense of an NSF – if this occurs twice in a row, the third occurrence constitutes a default under the Agreement).

    E. **ACH Rejection Fee:** ____$25____ for each rejected ACH debit.

    F. **Bank Change Fee:** ____$25____

    G. **Blocked Account Fee:** _____$100_____

    H. **UCC Release Fee:** ____$200____

    I. **Additional Broker Fee:** _____

    J. **Stacking Fee:** _____$5,000_____ **(in the event Seller takes additional capital without written consent of Buyer).**

    K. **Default Fee:** _____$10,000_____

    L. **Cancellation of contract:** _____$0_____

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivery to Seller.

5. **No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed a reduction of the Purchase Price.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**                **FOR THE BUYER**

**By:** _____       **By:** _____
086ED1260399401...

**Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES  **Name:** Panthers Capital

## RIDER 2

**TO THE** <u>6/4/2025</u>

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

("Agreement")

### Between Panthers Capital LLC ("Buyer")

### and <u>CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND</u> ("Seller")

### <u>PRIOR BALANCE</u>

1. **Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3. **Prior Balance.** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE:** <u>$ 1,020,319.00</u>    **owed to:** <u>Panthers Capital</u>

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 19 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to Buyer and/or the creditors listed in this Rider.

5. **No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

6. **Indemnification.** Seller hereby indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                    **OWNER/GUARANTOR #2**

By: _____          By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE          **Name:**

**Panthers Capital LLC**

**By:** _____

## RIDER 1

**TO THE** ___6/4/2025___

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES **("Seller")**

## ORIGINATION FEE

**1. Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated.

**3. Origination Fee.** The parties agree that the Origination Fee that Seller shall pay to Buyer pursuant to Section 20 of the Agreement shall be:

___$ 250.00___

**4. Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 20 of theAgreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Amount.** Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchased Amount.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**

| **OWNER/GUARANTOR #1** | **OWNER/GUARANTOR #2** |
|---|---|
| By: _____ | By: _____ |
| **Name:** CHARITHA I  SAMARASINGHE | **Name:** |

**Panthers Capital LLC**

**By:** _____

**EARLY DELIVERY ADDENDUM**

**TO THE** ___6/4/2025___

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES **("Seller")**


**<u>EARLY DELIVERY OPTION</u>**


1. **<u>Qualification.</u>** As long as no Event of Default has taken place during the term of the Agreement, Seller may opt-in to obtain a discounted Purchased Amount.

2. **<u>Thirty (30) Day Option.</u>** If paid in full within 30  calendar  days, payback will be at a discounted rate of ___1.1___ .

3. **<u>Sixty (60) Day Option.</u>** If paid in full within 60   calendar   days, payback will be at a discounted rate of ___1.15___ .

4. **<u>Ninety (90) Day Option.</u>** If paid in full within 90  calendar  days, payback will be at a discounted rate of _____ .

5. **<u>One hundred twenty (120) Day.</u>** If paid in full within 120 calendar days, payback will be at a discounted rate of _____ .

**Seller and Buyer agree that this Addendum shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                              **OWNER/GUARANTOR #2**

By: _____         By: _____

086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE              **Name:** _____


**Panthers Capital LLC**


**By:** _____

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633



**PANTHERS CAPITAL**

**List of top 5 clients – Please list the top 5 clients that you are currently providing services for / have provided services for in the past 30 days.**

Business Name █████████ _____

Contact Name █████████ _____

Phone Number: _____

Does the client owe you money? Yes ___✔___ If so, Amount: $ 1,800,000.00 _____


Business Name: ████ _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes ___✔___ If so, Amount: $ 50,000.00 _____


Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____


Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____


Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____


Signature here: _____

086ED1260399401...

# OFFER SUMMARY - Sales-Based Financing

| | | |
|---|---|---|
| Funding Provided | $ 1,020,569.00 | This is how much funding Panthers Capital will provide.  Due to deductions or payments to others, the total funds that will be provided to you directly is _____ $ 0.00 _____ . For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." <br><br> The amount paid directly to Merchant may change where the required disbursements to satisfy Merchant's other obligations change. |
| Estimated Annual Percentage Rate (APR) | % 114.00 | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through revenue of CIS INTERNATIONAL HOLDINGS (N.A.) CORP will be ___ $ 1,500,000.00 ___ . Since your actual income may vary from our estimate, your effective APR may also vary. <br><br> APR is not an interest rate. The cost of this financing is based upon fees charged by Panthers Capital rather than interest that accrues over time. |
| Finance Charge | $ 479,667.00 | This is the dollar cost of your financing. <br> Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $ 1,500,236.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | $ 210,042.00 | Although you do not make payments on a monthly basis, this is Panthers Capital 's calculation of your average monthly cost based upon the payment amounts disclosed below. |
| Estimated Payment | _____ $ 10,002.00 _____ / _____ Daily _____ <br> Panthers Capital _____ | is not aware of any reasonably anticipated true-ups. |
| Payment Terms | _____ Daily _____ ACH withdrawals of the Estimated Payment described above will be made from the bank account you provided to us for this purpose. The Estimated Payment is based on our estimate of _____ Daily _____ of your ( CIS INTERNATIONAL HOLDINGS (N.A.) CORP's)  daily  revenue,  based  upon  your average  monthly  revenue  income  of  _____ $ 1,500,000.00 _____  for  the  last  four months. <br> You have the right to receive refunds of all or part of your payments if you demonstrate that your payments have exceeded _____ Daily _____ of your | |

| | | total income during any given month. For more details on your rights, see section 10. Seller's Right of Reconciliation and 11. Request for Reconciliation Procedure of your revenue purchase agreement. |
|---|---|---|
| Estimated Term | __150__ days | This is our estimate of how long it will take to collect amounts due to Panthers Capital under the revenue purchase agreement based upon the assumption that you will receive __$ 1,500,000.00__ in monthly income through your revenue stream. |
| Prepayment | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to ____$ 479,667.00____ based upon our estimates. | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

Signed by:

_____
Recipient Signature

_____
Recipient Signature

_____
Date

_____
Date

- By checking this box, you are confirming that you have read and understand the Offer Summary provided to you.

Docusign Envelope ID: 525852DB-AA68-46B6-AEC4-6B2A20EEA632

# EXHIBIT A
## CROSS COLLATERAL ADDENDUM

This addendum shall serve to modify the Agreement of Sale of **Future Receivables ("Merchant Agreement")** which was entered into between _____ Panthers Capital _____ (hereafter **"Purchaser")** and ___ CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OT (Hereafter the "Merchants" or "Affiliates") **Dated:** ___ 6/4/2025 ___

**Whereas**, the Merchants have individually entered into a Merchant Agreement with Purchaser to sell a portion of their future receivables at a discount;

**Whereas**, the Merchants are affiliated and hereby pledge to assume any and all liability of the other owned entities in the event that one fails to perform or defaults under the terms and conditions the Merchant Agreement. Affiliated entity or collateral is as follows:

1.  CIS INTERNATIONAL HOLDINGS (N.A.) CORP      CHARITHA I SAMARSINGHE
2.  CIS INTERNATIONAL DISTRIBUTOR      CHARITHA I SAMARSINGHE
3.  SIAM TROPICAL FISH LTD      CHARITHA I SAMARSINGHE
4.  TROPICAL FISH INTERNATIONAL EUROPE      CHARITHA I SAMARSINGHE
5.  TROPICAL AQUARIUM FISH (FIJI) LTD      CHARITHA I SAMARSINGHE
6.  LIVE AQUARIA HOLDINGS CORP      CHARITHA I. SAMARASINGHE
7.  T3 AQUATICS      CHARITHA I. SAMARASINGHE
8.  LIONSROCK INVESTMENTS LLC      CHARITHA I. SAMARASINGHE
9.  LIONSROCK WISCONSIN LLC      CHARITHA I. SAMARASINGHE
10. _____
11. _____
12. _____
13. _____
14. _____
15. _____
16. _____
17. _____
18. _____
19. _____
20. _____

**("Corporate Guarantor(s)")**

Additionally, the Merchants and Affiliates individually hereby grant cross collateral to each other and all the affiliated entities included in this addendum.

Merchants and Corporate Guarantor(s) hereby grant Purchaser a security interest in, and authorizes Purchaser **to file a UCC financing statement covering, all of Merchants and Corporate Guarantor(s)' present and future** accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Merchant and Corporate Guarantor(s).

This addendum does not alter the terms and conditions of the original Merchant Agreement and that all terms remain in full force and effect.

By executing this addendum, the undersigned represent that it has authority to enter into this agreement on behalf of the above-named Corporate Guarantors.

**Agreed & Accepted:**

**For:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"
**(as member, manager, or authorized agent of Corporate Guarantor(s))**

Signed by:

_____  6/4/2025        _____

086ED1260399401...

Name: CHARITHA I  SAMARASINGHE        Name: _____

Title: OWNER_____        Title: _____

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | $ 1,020,569.00 |
| 2. Amount Paid on your Account with Us | $ 1,020,319.00 |
| 3. Disbursement paid to a third-party on your behalf to _____ | |
| 4. Amount Provided to You or on Your Behalf (Sum of Items 1-3) | $ 2,040,888.00 |
| 5. Prepaid Finance Charge: Brokerage Fee | |
| 6. Prepaid Finance Charge: Origination Fee | $ 250.00 |
| 7. Amount Financed (Item 4 minus Items 5 and 6) | $ 2,040,638.00 |

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*

**Panthers Capital LLC**

First named Defendant *(Last, First, Middle Initial)*

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)*     Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| **LIONSROCK INVESTMENTS LLC, 1405 W 178th St, Gardena, CA 90248** | 05 |
| **LIONSROCK WISCONSIN LLC, 2253 Air Pk Rd, Rhinelander, WI 54501 and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274** | 06 |
| **T3 AQUATICS, 2253 Air Pk Rd, Rhinelander, WI 54501 and/or 1401 W 178th St., Gardena, CA 90248** | 07 |
| **and/or 4 Sundown Dr, Rolling Hills Estates, CA 90274** | 08 |
| **SIAM TROPICAL FISH LTD, 1405 W 178th St, Gardena, CA 90248** | 09 |
| **TROPICAL AQUARIUM FISH (FIJI) LTD, 1405 W 178th St, Gardena, CA 90248** | 10 |
| | 11 |

| | | *FOR COURT USE ONLY - File Date* |
|---|---|---|
| | 12 | |
| | 13 | |
| | 14 | Docket number |

**CIVIL SUMMONS-Continuation**

**APPEARANCE**

JD-CL-12   Rev. 2-25
P.B. §§ 3-1 through 3-12, 10-13, 25-6A, 25a-2, 25a-3

STATE OF CONNECTICUT
**SUPERIOR COURT**
www.jud.ct.gov

☐ *I am filing this appearance to let the court and all attorneys and self-represented parties of record know that I have changed my address. My new address is below.*

| Return date *(For Civil/Family cases)* |
|---|
| **Aug-12-2025** |

| Docket Number |
|---|
| **FST-CV-25-6075223-S** |

**Name of case** *(Full name of first Plaintiff v. Full name of first Defendant)  Note: In Criminal/Motor Vehicles cases, the Plaintiff is The State of Connecticut*

**PANTHERS CAPITAL LLC  v. CIS INTERNATIONAL HOLDINGS (N.A.) CORP. D/B/A E TR Et AI**

| ☐ Housing Session | ☒ Judicial District | ☐ Geographic Area | Address of court *(Number, street, town and zip code)*  **123 HOYT STREET STAMFORD, CT 06905** | Scheduled court date *(Criminal/Motor Vehicle cases only)* |
|---|---|---|---|---|

## Enter the Appearance of

| **Name** *(Your name or name of official, firm, professional corporation, or individual attorney)*  **PETER A LUCCARELLI III** | Juris number *(For attorney/law firm)*  **433492** |
|---|---|

| Mailing address  **777 S. HARBOUR IS. BLVD. SUITE 320** | Post Office box number | Telephone number *(Area code first)*  **813-224-0555** |
|---|---|---|

| City/town  **TAMPA** | State  **FL** | Zip code  **33602** | Fax number  **813-221-9736** | E-mail address  **pluccarelli@sisco-law.com** |
|---|---|---|---|---|

in the case named above for: *(Select one of the following parties)*

**PLAINTIFF**
☐ The Plaintiff.
☐ All Plaintiffs.
☐ The following Plaintiff(s) only: _____

**DEFENDANT**
☐ The Defendant.
☒ All Defendants.
☐ The following Defendant(s) only: _____

☐ **Other** *(Specify):* _____

☐ This is a **Family Matters** case (such as divorce, custody, or child support). My appearance is for: *(Select one or both)*
   ☐ matters in the Family Division of the Superior Court      ☐ Title IV-D Child Support matters

☐ This is a **Criminal/Motor Vehicle** case, and I am filing this appearance as ☐ a Public Defender <u>or</u> ☐ Assigned Counsel
☐ This appearance is for the purpose of a bail hearing only.                                        (Special Public Defender)
☐ This appearance is for the purpose of alternative arraignment proceedings only.

If an appearance by other counsel or self-represented party is on file for this party/parties, select one option below:

1. ☐ This appearance is in place of the appearance of: _____
   *Name and Juris Number (if applicable) to be replaced*

2. ☐ This appearance is in addition to an appearance already on file.

**I agree that documents can be delivered (served) to me electronically in this case.**   ☒ Yes   ☐ No

*Any attorney who is <u>not</u> exempt from e-filing is required to accept electronic delivery. (Practice Book Section 10-13)*

| Signed *(Individual attorney or self-represented party)*  **433492** | Name of person signing at left *(Print or type)*  **PETER A LUCCARELLI III** | Date signed  **Sep 17 2025** |
|---|---|---|

## Certification

| I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on *(date)* ___**Sep 17 2025**___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery. | *FOR COURT USE ONLY* |
|---|---|

Name and address of each party and attorney that copy was or will be mailed or delivered to*

**NEUBERT PEPE & MONTEITH PC - 195 CHURCH ST/13TH FLOOR/NEW HAVEN, CT 06510**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed *(Signature of filer)*  **433492** | Print or type name of person signing  **PETER A LUCCARELLI III** | Date signed  **Sep 17 2025** |
|---|---|---|

**Continuation of JDCL12 Appearance Form for FST-CV-25-6075223-S**

**Submitted By PETER A LUCCARELLI III (433492)**

**Additional Party(ies) (Continued from JDCL12)**

**For these party(ies)**

Pty# D-01 CIS INTERNATIONAL HOLDINGS (N.A.) CORP. D/B/A E TROPICAL

Pty# D-02 CHARITHA I SAMARASINGHE

Pty# D-03 CIS INTERNATIONAL DISTRIBUTORS INC.

Pty# D-04 LIVE AQUARIA HOLDINGS CORP

Pty# D-05 LIONSROCK INVESTMENTS LLC

Pty# D-06 LIONSROCK WISCONSIN LLC

Pty# D-07 T3 AQUATICS

Pty# D-08 SIAM TROPICAL FISH LTD

Pty# D-09 TROPICAL AQUARIUM FISH (FIJI) LTD

**\*\*\*\*\* End of Party List \*\*\*\*\***

ERNEST A. LADEN
STATE MARSHAL FAIRFIELD COUNTY

<u>STATE MARSHAL'S RETURN OF SERVICE</u>

STATE OF CONNECTICUT

SS: Bridgeport                    July 11, 2025

COUNTY OF FAIFIELD

Then and there, by virtue hereof and by direction of the Plaintiff's Attorney and Connecticut General Statutes 52-278a on July 11, 2025, I attached to the value **$ 1,320,798.00** (ONE MILLION THREE HUNDRED AND TWENTY THOUSAND AND SEVEN HUNDRED AND NINETY-EIGHT DOLLARS) all right, title and interest of the within named defendant(s) **CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin, LLC, T3 Aquatics, Siam Tropical Fish LTD, Tropical Aquarium Fish (Fiji) LTD** and **Charitha I Samarasinghe,** And to the bank accounts, situated in various financial institutions in the County of Fairfield, Connecticut (Exhibit A) Then and by virtue hereof and by direction of the Plaintiff's Attorney, I left a true and attested copy of the within original, NOTICE OF EX PARTE PRE-JUDGMENT REMEDY, WRIT OF ATTACHMENT/GARNISHMENT AND SUMMONS, AND AFFIDAVIT IN SUPPORT, with my CERTIFICATE OF ATTACHMENT and doings hereon endorsed, with and in the hands of the within named banks:

July 11, 2025, **Bank of America, N.A.,** 1 Trap Falls Rd, Shelton, CT, Accepted by Ann, Person, authorized to accept at time of service.

July 11, 2025, **Chase Bank N.A.,** 675 Bridgeport Ave, Shelton, CT, Accepted by Washington, Person, authorized to accept at time of service.

July 11, 2025, **Wells Fargo Bank, N.A.,** 320 Coram Ave, Shelton, CT, Accepted by Joel Santiago, Person, authorized to accept at time of service.

July 14, 2025, **Truist Bank,** 4 Greenwich Office Park, Greenwich, CT, Accepted by Rosa Jelly, Person authorized to accept at time of service; Goodwin Square, 225 Asylum Street, 20th Floor, Hartford, CT, Accepted by Shelley Kurpaska of Corporation Service Company, Agent for Service authorized to accept at time of service.

SS: Trumbull                    July 15, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, on the out of state defendant CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, 1405 W 178th St., Gardena, CA 90248 [95890710527021225472790].

SS: Trumbull                    July 15, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, on the out of state defendant CIS International Distributors Inc, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant CIS International Distributors Inc, 1405 W 178th St. b, Gardena, CA 90248 [95890710527021225472776].

SS: Trumbull                    July 15, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify,

ERNEST A. LADEN
STATE MARSHAL FAIRFIELD COUNTY

## STATE MARSHAL'S RETURN OF SERVICE

Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, on the out of state defendant LIVE Aquaria Holdings Corp, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant LIVE Aquaria Holdings Corp, 1405 W 178th St., Gardena, CA 90248 [95890710527021254727752].

|  |  |
|---|---|
| SS: Hartford | July 14, 2025 |
| SS: Trumbull | July 15, 2025 |

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, by leaving a true and attested copy for the out of state defendant Lionsrock Investments LLC, in accordance with Connecticut State Statute 52-59b(c), with the Secretary of State, with the statutory fee attached, said office being the designated recipient for Service, service being made at the office of the Secretary of State of Connecticut, 165 Capitol Ave, Hartford, CT, and in further accordance with C.G.S. 52-59b(c) an additional true and attested copy was sent by mailing, postage paid and certified, return receipt requested, addressed to Lionsrock Investments LLC, 1405 W 178th St., Gardena, CA 90248 [95890710527021254728813].

|  |  |
|---|---|
| SS: Hartford | July 14, 2025 |
| SS: Trumbull | July 15, 2025 |

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, by leaving a true and attested copy for the out of state defendant Lionsrock Wisconsin LLC, in accordance with Connecticut State Statute 52-59b(c), with the Secretary of State, with the statutory fee attached, said office being the designated recipient for Service, service being made at the office of the Secretary of State of Connecticut, 165 Capitol Ave, Hartford, CT, and in further accordance with C.G.S. 52-59b(c) an additional true and attested copy was sent by mailing, postage paid and certified, return receipt requested, addressed to Lionsrock Wisconsin LLC, 2253 Air Pk Rd, Rhinelander, WI 54501 [95890710527021254728201]; and to Lionsrock Wisconsin LLC, 4 Sundown Dr, Rolling Hills Estates, CA 90274 [95890710527021254728006].

|  |  |
|---|---|
| SS: Trumbull | July 15, 2025 |

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, on the out of state defendant T3 Aquatics, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant T3 Aquatics, 1405 W 178th St., Gardena, CA 90248 [95890710527021254727769]; and T3 Aquatics, 4 Sundown Dr, Rolling Hills Estates, CA 90274 [95890710527021254727714]; and T3 Aquatics, 2253 Air Pk Rd, Rhinelander, WI 54501 [95890710527021254727721].

|  |  |
|---|---|
| SS: Trumbull | July 15, 2025 |

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, on the out of state defendant Siam Tropical Fish LTD, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a

ERNEST A. LADEN

STATE MARSHAL FAIRFIELD COUNTY

## STATE MARSHAL'S RETURN OF SERVICE

true and attested copy to the defendant, defendant Siam Tropical Fish LTD, 1405 W 178th St., Gardena, CA 90248 [95890710527021254727745].

|  |  |
|---|---|
| SS: Trumbull | July 15, 2025 |

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, on the out of state defendant Tropical Aquarium Fish (Fiji) LTD, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant Tropical Aquarium Fish (Fiji) LTD, 1405 W 178th St., Gardena, CA 90248 [95890710527021254727738].

|  |  |
|---|---|
| SS: Hartford | July 14, 2025 |
| SS: Trumbull | July 15, 2025 |

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Service of Attachment Endorsement, Notice of Ex Parte l;-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, by leaving a true and attested copy for the out of state defendant Charitha I Samarasinghe, in accordance with Connecticut State Statute 52-59b, with the Secretary of State, with the statutory fee attached, said office being the designated recipient for Service, service being made at the office of the Secretary of State of Connecticut, 165 Capitol Ave, Hartford, CT, and in further accordance with C.G.S. 52-59b an additional true and attested copy was sent by mailing, postage paid and certified, return receipt requested, addressed to Charitha I Samarasinghe, 4 Sundown Dr, Rolling Hills Estates, CA 90274 [95890710527021254727783].

At least one such copy for each of the within named defendants.

The within and foregoing is the original Notice of Ex Parte Pre-Judgment Remedy/Claim For Hearing to Dissolve or Modify, Schedule A, Summons-Civil, Writ Summons and Direction For Attachment, Affidavit In Support Of Ex Parte Prejudgment Remedy, Complaint, Statement of Amount In Demand, and Exhibit A, with my doings hereon endorsed.

| | | ATTEST:_____ |
|---|---|---|
| Travel | $ 0.00 | |
| Copies | $ 900.00 | Ernest A. Laden |
| Services | $ 670.00 | State Marshal for Fairfield County |
| Endorsement | $ 10.50 | |
| State & Mailing Fee | $ 297.54 | |
| Total | $ 1878.04 | |

| | | |
|---|---|---|
| DOCKET NO: | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | AUGUST 27, 2025 |

## COMPLIANCE WITH PRACTICE BOOK § 10-60(a)(2) FOR AMENDED COMPLAINT

The Plaintiff, in accordance with Practice Book § 10-60(a)(2) & (b), attaches this Amended

Complaint (Exhibit A) and document showing the changes between the Complaint and Amended

Complaint (Exhibit B).

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____ 427656 _____
Joseph R. Dunaj, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 821-2000
Firm Juris Number 407996

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above was mailed or electronically delivered on August 27, 2025, to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served.

No Appearing Parties

_____427656_____
Joseph R. Dunaj
Neubert, Pepe & Monteith, P.C.

2

# EXHIBIT
# A

| | | |
|---|---|---|
| DOCKET NO: | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | JULY 31, 2025 |

AMENDED COMPLAINT

COUNT ONE
(BREACH OF CONTRACT AGAINST SELLER)

1.      The plaintiff, Panthers Capital LLC ("Buyer"), is a limited liability company with a place of business in Connecticut.

2.      The Buyer and the defendant, CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish ("Seller"), entered into that certain Future Receivables Sale and Purchase Agreement dated June 4, 2025 (the "Agreement"), pursuant to which the Seller sold, and the Buyer purchased, future receipts of the Seller in the aggregate amount of $1,500,236.00. A redacted copy of the Agreement is attached hereto as Exhibit A.

3.      The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Guarantors") jointly and severally guaranteed the Seller's obligations under the Agreement, as evidenced by the

Guaranty of Performance executed by each of the Guarantors and incorporated within the Agreement (the "Guaranty").

4.      Upon execution of the Agreement and Guaranty by the Seller and the Guarantors, the Buyer advanced funds to the Seller in accordance with the terms and conditions set forth in the Agreement.

5.      The Seller defaulted under the Agreement in July 2025, including, without limitation, by taking actions that denied and interfered with the Buyer's contractual rights, including the Buyer's right to receive its designated share of the Seller's revenue. Specifically, and without limitation, the Seller caused a stop payment to be placed on the bank account into which it was required to deposit all receipts and from which the Buyer was authorized to initiate ACH debits to receive payment.

6.      Pursuant to the Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7.      Further, pursuant to the Agreement, the Seller expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Seller's property. See Agreement (Exhibit A), Paragraph 44.

8.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement.

<div align="center">

COUNT TWO
(BREACH OF CONTRACT AGAINST GUARANTORS)

</div>

1-5.    Paragraphs 1 through 5 of Count One are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Two as if fully set forth herein.

6.      The Guarantors defaulted under the Guaranty by failing to pay the Buyer all amounts due and owing under the Agreement

<div align="center">2</div>

7.     Pursuant to the Guaranty, the Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

8.     Further, pursuant to the Guaranty, the Guarantors expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Guarantors' property. See Guaranty (Exhibit A), Paragraph 10.

9.     The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement and the Guaranty.

<div align="center">COUNT THREE</div>

<div align="center">(BREACH OF CONTRACT AGAINST SELLER)</div>

1.     Paragraph 1 of Count One is hereby incorporated by reference as Paragraph 1 of Count Three as if fully set forth herein.

2.     The Buyer and the Seller entered into a Factoring Facility Agreement dated December 1, 2024 ("Factoring Agreement"), pursuant to which, the Buyer agreed to purchase certain unencumbered invoices of an account receivable ("Factor Account") and sign exclusive payment rights of the Factor Account to the Buyer of the Seller up to a maximum of $3,000,000.00 at any given time. A redacted copy of the Factoring Agreement is attached hereto as Exhibit B.

3.     The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Factoring Guarantors") jointly and severally guaranteed the Seller's obligations under the Factoring Agreement, as evidenced by the Guaranty of Performance executed by each of the Guarantors and incorporated within the Factoring Agreement (the "Factoring Guaranty").

<div align="center">3</div>

4. Upon execution of the Factoring Agreement and Factoring Guaranty by the Seller and the Factoring Guarantors, the Buyer purchased certain invoices of the Seller, the Seller assigned exclusive payment rights of the Factor Account to the Buyer, and the Buyer began to advance funds to the Seller in accordance with the terms and conditions set forth in the Factoring Agreement.

5. The Seller defaulted on the Factoring Agreement in July 2025 by engaging in actions that violated and undermined the Buyer's contractual rights. Specifically, and without limitation the Seller (i) misrepresented the unencumbered status of certain invoices submitted to the Buyer, (ii) submitted identical invoices to the Buyer that had previously sold to the Buyer, (iii) subsequently sold invoices to third parties that were already sold to the Buyer.

6. Pursuant to the Factoring Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7. The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement.

<div align="center">COUNT FOUR</div>

<div align="center">(BREACH OF CONTRACT AGAINST GUARANTORS)</div>

1-5. Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Four as if fully set forth herein.

6. The Factoring Guarantors defaulted under the Factoring Guaranty by failing to pay the Buyer all amounts due and owing under the Factoring Agreement.

7. Pursuant to the Factoring Guaranty, the Factoring Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

<div align="center">4</div>

8.    The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement and the Factory Guaranty.

## COUNT FIVE

### (FRAUDULENT MISREPRESENTATION)

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Five as if fully set forth herein.

6.    The Seller intentionally made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon.

7.    The Seller intentionally misrepresented previously sold invoices to the Buyer as new invoices to the Buyer to induce the Buyer in continuing to preform on the Factoring Agreement and advance funds to the Seller.

8.    The Buyer reasonably and justifiably relied on the Seller's misrepresentations in entering into and preforming on the Factoring Agreement.

9.    As a direct and proximate result, the Buyer sustained damages.

## COUNT SIX

### (NEGLIGENT MISREPRESENTATION)

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Six as if fully set forth herein.

6.    The Seller made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon without exercising reasonable care or competence in obtaining or communicating accurate information

5

7. The Buyer reasonably and justifiably relied on the Seller's misrepresentations.

8. As a direct and proximate result, the Buyer sustained damages.

<div align="center">COUNT SEVEN</div>

<div align="center">(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)</div>

1-5. Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Seven as if fully set forth herein.

6. Implicit in the Factoring Agreement and Factoring Guaranty was a covenant of good faith and fair dealing, obligating Defendant to act honestly and fairly in the performance and enforcement of the parties' contractual relationship.

7-8. Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 7 through 8 of this Count Seven as if fully set forth herein.

9. Paragraph 6 of Count Six is hereby incorporated by reference as Paragraph 9 of this Count Seven as if fully set forth herein.

10. Seller's conduct deprived the Buyer the benefit of the bargain and undermined the reasonable expectations of the Buyer under the Factoring Agreement.

11. As a direct and proximate result of the Seller's breach of the covenant of good faith and fair dealing, the Plaintiff has sustained damages.

<div align="center">COUNT EIGHT</div>

<div align="center">(VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA"))</div>

1-5. Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Eight as if fully set forth herein.

6-7. Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 6 through 7 of this Count Eight as if fully set forth herein.

<div align="center">6</div>

8.      Seller's actions were unethical, unscrupulous, and offends established public policy as set forth in CUTPA.

9.      As a result of Seller's unfair and deceptive acts, Plaintiff has suffered an ascertainable loss of money and property.

10.     Plaintiff is entitled to all remedies available under C.G.S. § 42-110g, including actual damages, attorneys' fees, and punitive damages.

WHEREFORE, the Buyer respectfully requests that the Court enter judgment in its favor and award the following relief:
   a.  Money damages in an amount to be determined at trial;
   b.  Punitive damages
   c. The Buyer's reasonable attorneys' fees and costs incurred herein;
   d. Prejudgment and post-judgment interest as permitted by law and the Agreement; and
   e. Such other and further relief as the Court deems just and equitable.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
John T Szalan Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Firm Juris Number 407996

7

| DOCKET NO: | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | JULY 31, 2025 |

<u>STATEMENT OF AMOUNT IN DEMAND</u>

The amount in demand, exclusive of interest and costs, exceeds $15,000.00.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
John T Szalan, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Juris Number 407996

8

# EXHIBIT
# A

## PANTHERS CAPITAL

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated _____6/4/2025_____, between Panthers Capital LLC D/B/A Panthers Capital ("Panthers Capital"), the seller(s) listed herein (collectively, the "Seller"), and each guarantor identified below (each a "Guarantor") (all capitalized terms shall have the meanings ascribed to them below):

**Seller Legal Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** E TROPICAL FISH

**Form of Business Entity:** Corporation                          **EIN #:** ███████

**Physical Address:** 1405 W 178TH ST, GARDENA , CA 90248

**Mailing Address:** 1405 W 178TH ST, GARDENA , CA 90248

**PURCHASE PRICE:** $ 1,020,569.00      **PURCHASED AMOUNT:** $ 1,500,236.00      **SPECIFIED PERCENTAGE:** 50.00%

**ORIGINATION FEE:** $ 250.00      **PRIOR BALANCE:** $ 1,020,319.00      **INITIAL Daily DEBIT:** $ 10,002.00

**AMOUNT PAID TO SELLER (AFTER DEDUCTING THE ORIGINATION FEE AND ANY PRIOR BALANCE):** $ 0.00

| FOR SELLER #1 | FOR SELLER #2 |
|---|---|
| By: _Signed by_ 086ED1260399401... | By: _____ |
| Name: CHARITHA I SAMARASINGHE | Name: _____ |
| Title: Owner | Title: Owner |
| Email: ███████ | Email: _____ |
| Business Phone: ███████ | Business Phone: _____ |

*Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guaranty of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to Panthers Capital by the following Owner(s)/Guarantor(s) of Seller

| OWNER/GUARANTOR #1 | OWNER/GUARANTOR #2 |
|---|---|
| By: _Signed by_ 086ED1260399401... | By: _____ |
| Name: CHARITHA I SAMARASINGHE | Name: _____ |
| SSN ███████ | SSN: _____ |
| PHONE: ███████ | PHONE: _____ |
| Address: 4 SUNDOWN DR , RLLNG HLS EST , CA 90274 | Address: _____ |

**WHEREAS**, Seller is desirous to sell to Panthers Capital, and Panthers Capital is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, Panthers Capital and Seller hereby agree to the foregoing and as follows:

1. **Basic Terms and Definitions.**

   a.   "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when Panthers Capital paid the Purchase Price to Seller. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee and Prior Balance.

   b.   "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of Seller's Future Receipts.

   c.   "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

   d.   " Daily  Receipts" shall mean the amount of Future Receipts received by Seller on a  Daily  basis.

   e.   "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and permit Panthers Capital to debit pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

   f.   "Purchase Price" shall mean the total amount that Panthers Capital agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from Panthers Capital pursuant to this Agreement will be less than the Purchase Price by the total sum of the Origination Fee and Prior Balance, if any, set forth in the Preamble to this Agreement.

   g.   " Daily  Installment" shall mean the amount that Seller and Panthers Capital agree to be a good faith approximation of the Specified Percentage of Seller's  Daily  Future Receipts. Seller and Panthers Capital further agree that the Initial  Daily  Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to Panthers Capital concerning Seller's most recent accounts receivables, including representations by the Seller to Panthers Capital regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

   h.   "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

   i.   "Prior Balance" shall mean the sum of all amounts that Seller may owe to Panthers Capital and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

   j.   "Origination Fee" shall mean the fee that Panthers Capital charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 20 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

   k.   In the event "Seller" is comprised of more than one entity, then:

   i.   The term "Seller" shall mean, individually and collectively, all such entities; and

   ii.   Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by statute, or by contract; and

   iii.   The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

**iv.** The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** The terms "Specified Percentage", "Future Receipts", " Daily  Receipts", " Daily  Installment" shall mean the Specified Percentage, the Future Receipts and the  Daily  Receipts of all Sellers jointly; and each Seller individually; and

**vi.** Panthers Capital may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

**l.** In the event "Guarantor" is comprised of more than one individual, then:

**i.** The term "Guarantor" shall mean, individually and collectively, all such individuals; and

**ii.** Each Guarantor is an Affiliate of all other Guarantor(s); and

**iii.** The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

**iv.** The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** Panthers Capital may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2.** **No Fixed Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to Panthers Capital pursuant to this Agreement are received by Panthers Capital in full. Seller hereby acknowledges that it fully understands that: (i) Panthers Capital's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to Panthers Capital in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business Panthers Capital's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely.

**3.** **Sale of Purchased Future  Receipts**. Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto Panthers Capital all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to Panthers Capital (hereinafter, the portion of the Future Receipts sold by Seller to Panthers Capital pursuant to this Agreement, the "Purchased Future Receipts" ); to have and hold the same unto Panthers Capital, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to Panthers Capital of collectability of the Purchased Future Receipts by Panthers Capital and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to Panthers Capital full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4.** **Payment of Purchase Price**. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by paying to Seller the Purchase Price (reduced by the Origination Fee and Prior Balance, if any).

**5.** **Use of Purchase Price**. Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6.**   Daily  **Installments of Purchased Amount.** Subject to Seller's right of adjustment/reconciliation set forth in this Agreement, the Purchased  Amount  shall  be  delivered  by  Seller  to Panthers Capital  Daily  in the amount of the  Daily  Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

**7.** **Approved Bank Account and Credit Card Processor**. During the course of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) business-purpose bank account which bank account shall be acceptable and preapproved by Panthers Capital (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by Panthers Capital (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the course of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

**8.** **Authorization to Debit Approved Bank Account.** Seller hereby authorizes Panthers Capital to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the  Daily  Installment on each Workday commencing on the Effective Date until Panthers Capital receives the full Purchased Amount;

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633

The  Daily  Installment is to be drawn via ACH payment, from the following bank account:



NOTE that this authorization is to remain in full force and effect until Panthers Capital receives written notification from Seller of its termination in such time and in such manner to afford Panthers Capital a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

9. **Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or Panthers Capital's banking institution directly (or to compensate Panthers Capital, in case it is charged) all fees, charges and expenses incurred by either Seller or Panthers Capital due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

10. **Seller's Right of Reconciliation.** Seller and Panthers Capital each acknowledge and agree that:

a. If at any time during the course of this Agreement Seller experiences a decrease or increase in its  Daily  Receipts, Seller shall have the right to request retroactive reconciliation of the  Daily  Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by Panthers Capital (each such calendar month, a "Reconciliation Month").

b. Such reconciliation (the "Reconciliation") of the Seller's  Daily  Installment for a Reconciliation Month shall be performed by Panthers Capital within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by Panthers Capital from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

c. One or more Reconciliation procedures performed by Panthers Capital may reduce or increase the effective  Daily  Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which Panthers Capital will be debiting the Approved Bank Account may get shortened or  extended indefinitely.

11. **Request for Reconciliation Procedure.**

a. Seller may initiate Reconciliation of Seller's actual  Daily  Installments at any time by sending a request for Reconciliation to Panthers Capital.

b. Any such request for Reconciliation of the Seller's  Daily  Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements,and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by Panthers Capital via email to accounting@pantherscapital.com with the subject line "REQUEST FOR RECONCILIATION."

c. Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply with each such request, provided that:

i. Each such request is made in accordance with the terms of this Section 11; and

ii. If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by Panthers Capital from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

d. Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with Panthers Capital's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by Panthers Capital in full, or (ii) modify the amount of the  Daily  Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

12. **Adjustment of the  Daily  Installment**. Seller and Panthers Capital each acknowledge and agree that:

a. Seller and Panthers Capital shall have the right to request modification ("Adjustment") of the amount of

the Daily Installment on a going-forward basis to more closely reflect Seller's actual Daily Receipts times the Specified Percentage. Panthers Capital will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Daily Installment until any subsequent Adjustment. If Seller requests an Adjustment, Panthers Capital shall perform the Adjustment within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Daily Installment that shall be debited from the Approved Bank Account.

b.    One or more Adjustments performed by Panthers Capital may substantially extend the term of this Agreement.

13.    **Request for Adjustment Procedure.**

a.    Seller and/or Panthers Capital may initiate an Adjustment by sending a request for Adjustment to the other party in writing. Seller may request an adjustment via e-mail to accounting@pantherscapital.com with the subject line "REQUEST FOR ADJUSTMENT."

b.    Within five (5) Workdays following a request for Adjustment (an "Adjustment Request") Seller shall provide to Panthers Capital's copies of: (i) Seller's most recent month's bank statement of the Approved Bank Account and month-to-date transaction activity, credit card processing statements and any aging reports immediately preceding the date of Panthers Capital's receipt of the Adjustment Request.

c.    Seller and Panthers Capital shall have the right to request Adjustment of the Daily Installment as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply in good faith with such request, provided that:

   i.    Each such request for Adjustment is made in accordance with the terms of this Section 13; and

   ii.    A request for Adjustment shall not be made after the Expiration Date.

14.    **Rights and Obligations of** Panthers Capital **upon Receipt of the full Purchased Amount.**

Upon receipt of the full amount of the Purchased Amount and any fees owed to Panthers Capital under this Agreement:

   a. Panthers Capital shall notify Seller's bank and request from it to stop transferring Daily Installments to Panthers Capital's bank account.

   b. If Panthers Capital shall have received funds in excess of the Purchased Amount and any fees owed to Panthers Capital under this Agreement, Panthers Capital shall promptly return such excess to Seller.

15.    **Risk Sharing Acknowledgments and Arrangements.**

   a. Seller and Panthers Capital each hereby acknowledges and agrees that:

   i.    The Purchased Future Receipts represent a portion of Seller's Future Receipts.

   ii.    This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from Panthers Capital. Panthers Capital does not charge Seller and will not collect from Seller any interest on the monies used by Panthers Capital for the purchase of the Purchased Future Receipts. The period of time that it will take Panthers Capital to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after Panthers Capital's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's reasonable control, Panthers Capital may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

   iii.    The amount of the Initial Daily Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Daily Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to Panthers Capital.

   iv.    The amounts of Seller's future Daily Receipts may increase or decrease over time.

16.    **Panthers Capital's Risk Acknowledgments.** Panthers Capital agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and Panthers Capital assumes these risks based

exclusively upon the information provided to it by Seller related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give Panthers Capital a reasonable and fair opportunity to receive the benefit of its bargain. Panthers Capital assumes the risk that Future Receipts may be remitted more slowly than Panthers Capital may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business went bankrupt or Seller otherwise ceased operations in the ordinary course of business.

17. **Application of Amounts Received by** Panthers Capital. Panthers Capital reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Panthers Capital from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

18. **Not a Loan.** Seller and Panthers Capital agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by Panthers Capital is not intended to be, nor shall it be construed as, a loan from Panthers Capital to Seller that requires absolute and unconditional repayment on a maturity date. To thecontrary, Panthers Capital's ability to receive the Purchased Amount pursuant to  this Agreement, and the date when the Purchased Amount is delivered to Panthers Capital in full (if ever) are subject to and conditioned upon performance of Seller's business.

19. **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes eachof those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless Panthers Capital for any and all damages and losses (including without limitation legal fees and expenses) incurred by Panthers Capital as the result of such representation being untrue, incorrect or incomplete.

20. **Origination Fee.** Seller hereby agrees for Panthers Capital to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

21. Seller represents, warrants and covenants that as of this date and, unless otherwise stated, during the course of this Agreement:

   a. **Financial Condition and  Financial Information.** Seller's bank and financial statements, copies of which have been furnished to Panthers Capital, and future statements which may be furnished hereafter pursuant to this Agreement or upon Panthers Capital's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Panthers Capital may request Seller's bank statements at any time during the term of this Agreement and view-only access to Seller's bank account and Seller shall provide them to Panthers Capital within five (5) Workdays. Seller's failure to do so is a material breach of this Agreement.

   b. **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

   c. **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

   d. **Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

   e. **Accounting Records and Tax Returns.**  Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that Panthers Capital is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

f.      **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

g.      **Electronic Check Processing Agreement.** Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede Panthers Capital's rights under this Agreement, without Panthers Capital's prior written consent.

h.      **No Diversion of Future Receipts.** Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without Panthers Capital's written permission.

i.      **Change of Name or Location.** Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and Panthers Capital, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining Panthers Capital's written consent.

j.      **Prohibited Business Transactions.** Seller shall not: (i) voluntarily transfer or sell all or substantially all of its assets (including without limitation the Collateral as such term is defined in Section 23 or any portion thereof) without first obtaining Panthers Capital's consent; or (ii) make or send notice of its intended bulk sale or transfer.

k.      **Closing of Business.** Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of Panthers Capital, and (ii) providing Panthers Capital with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Panthers Capital. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until Panthers Capital shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide Panthers Capital ten (10) Workdays advance notice, to the extent practicable.

l.      **No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six (6) months immediately preceding the date of this Agreement.

m.     **Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) Workday's prior notice from Panthers Capital to Seller, execute, acknowledge and deliver to Panthers Capital and/or to any other person or entity specified by Panthers Capital, a statement certifying that this Agreement is unmodified and in full force and effect or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been delivered.

n.      **Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

o.      **No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of Panthers Capital.

p.      **Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

q.      **No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

r.  **Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants Panthers Capital the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's  Daily  receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants Panthers Capital and its employees and consultants access during regular business hours to Seller's employees and records and all other items of property located at the Seller's place of business during the course of this Agreement. Seller hereby agrees to provide Panthers Capital, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow Panthers Capital to interview any of those parties.

s.  **Phone Recordings and Contact.** Seller agrees that any call between Seller and Panthers Capital and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with Panthers Capital, its managers, employees and agents (collectively, the "Panthers Capital Parties") and that Seller may be contacted by any of Panthers Capital Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of Panthers Capital Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

t.  **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

u.  **Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Panthers Capital.

v.  **Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

Y.  **No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and Panthers Capital with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by Panthers Capital or any of the Panthers Capital Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Panthers Capital Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement

Z.  **No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Origination Fee, if any, set forth in Section 20 herein, Panthers Capital is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Section 2 hereof, such fee is not charged by Panthers Capital. Moreover, as all working capital received under this Agreement is intended to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

aa.  **Credit Report and Other Authorizations** Seller and each of the Owners signing above authorize Panthers Capital, its agents and representatives and any credit reporting agency engaged by Panthers Capital, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement; (ii) obtain consumer and business credit reports on the Seller and any of its Owners; and (iii) to contact personal and business references provided by the Seller in any application, at any time now or for so long as Seller and/or Owners continue to have any obligations to Panthers Capital as a consequence of this Agreement or for Panthers Capital's ability to determine Seller's eligibility to enter into any future agreement with Panthers Capital.

## PLEDGE OF SECURITY

22. **Pledge.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Panthers Capital (collectively, "Pledge") and grants to Panthers Capital a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

    a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    b. all Seller's proceeds, as such term is defined by Article 9 of the UCC.

23. **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Panthers Capital will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

24. **Representations with Respect to Collateral.** Seller hereby represents and warrants to Panthers Capital that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party.

25. **Further Assurances.** Upon the request of Panthers Capital, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Panthers Capital may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

## EVENTS OF DEFAULT AND REMEDIES

26. **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:
    a. Seller shall violate any term, condition or covenant in this Agreement.
    b. Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.
    c. Seller shall default under any of the terms, covenants and conditions of any other agreement with Panthers Capital (if any) which is related to the instant Agreement.
    d. Seller uses multiple depository accounts without obtaining prior written consent of Panthers Capital in each instance.
    e. Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;
    f. Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of Panthers Capital in each instance.
    g. Seller intentionally interferes with Panthers Capital's collection of Daily Installments.

27. **Default under the Agreement.** In case any Event of Default occurs and is not waived by Panthers Capital, in writing, Panthers Capital may declare Seller in default under this Agreement without notice.

28. **Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Panthers Capital the entire undelivered portion of the Purchased Amount and the Specified Percentage shall equal 100% of all Future Receipts. In addition, Seller shall also pay to Panthers Capital, as additional damages, any reasonable expenses incurred by Panthers Capital in connection with recovering the monies due to Panthers Capital from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages").

29. **Remedies Upon Default.** Upon Seller's default, Panthers Capital may immediately proceed to protect and enforce

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633

its rights under this Agreement and/or Guaranty by:

**a.**  Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Panthers Capital's security interest;

**b.**  Enforcing the provisions of the Personal Guaranty of Performance against the Guarantor(s) without first seeking recourse from Seller;

**c.**  Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to Panthers Capital of all or any portion of the amounts received by such credit card processor on behalf of Seller;

**d.**  Subject to arbitration as provided in Section 50 of this Agreement, commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or remedy including without limitation Panthers Capital's rights of a secured party under the UCC.

30.  **Remedies are not Exclusive.** Subject to arbitration as provided in Section 50 of this Agreement,  all  rights,powers and remedies of Panthers Capital in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall bein addition to any other rights, powers or remedies provided to Panthers Capital by law or equity.

### ADDITIONAL TERMS

31.  **Seller Deposit Agreement.** Seller shall execute an agreement with Panthers Capital that shall authorize Panthers Capital to arrange for electronic fund transfer services and/or "ACH" payments of   Daily  Installments from the Approved Bank Account. Seller shall upon request provide Panthers Capital and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

32.  **Financial Condition.**  Seller and its Guarantor(s) authorize Panthers Capital and its agents to investigate their financial status and history and will provide to Panthers Capital any bank or financial statements, tax returns, etc., as Panthers Capital deems reasonably necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable for release of financial information. Seller hereby authorizes Panthers Capital to receive from time to time updates on such informationand financial status.

33.  **Transactional History.** Seller shall execute written authorization(s) to its bank(s) to provide Panthers Capital with Seller's banking and/or credit-card processing history.

34.  **Indemnification.** Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of  the  Sellerresulting from (a) claims asserted by Panthers Capital for monies owed to Panthers Capital from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by Panthers Capital.

35.  **No Liability.** In no event shall Panthers Capital be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

### MISCELLANEOUS

36.  **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

37.  **Assignment.** Panthers Capital may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining Panthers Capital's written consent.

38.  **Notices.**

**a.**  Panthers Capital may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Panthers Capital's option and Seller consents to such electronic delivery.  Notices sent by e-mail are effective when sent.  Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

b.  Subject to Section 11 of this Agreement, Seller and Guarantor may send any notices to Panthers Capital by e-mail only upon the prior written consent of Panthers Capital, which consent may be withheld or revoked at any time in Panthers Capital's sole discretion.  Otherwise, any notices or other communications from Seller and Guarantor to Panthers Capital must be delivered by certified mail, return receipt requested, to Panthers Capital's address as set forth in this Agreement.  Notices sent to Panthers Capital shall become effective only upon receipt by Panthers Capital.

39.  **Waiver Remedies.** No failure on the part of Panthers Capital to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to arbitration as provided in Section 50 of this Agreement, the remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

40.  **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

41.  **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the partiesto this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums.  Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on this Agreement, or via email address(es) listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

42.  **Service of Process.**

**IMPORTANT NOTICE -** THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a.  In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

1.  Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

2.  Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b.  Each Seller and Guarantor make, agree and consent to the following representations and waivers:

1.  Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

2.  Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

i.  If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

ii.  If sent by e-mail, on the same day and time that the e-mail is sent;

3.  Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in this Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected

to be received by them;

4. Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

43.    **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON,</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

44.    **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE -** THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2.  WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.  WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

d.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

45.  <u>Survival of Representation, etc.</u> All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

46.  <u>Severability.</u>  In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

47.  <u>Entire Agreement.</u>  This Agreement embodies the entire agreement between Seller and Panthers Capital and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

48.  <u>JURY TRIAL WAIVER</u>. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

49.  <u>CLASS ACTION WAIVER.</u>  EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATEDWITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECUREDTHROUGH THE CLASS OR REPRESENTATIVE ACTION.

50.  <u>ARBITRATION.</u>  Notwithstanding any other provision of this Agreement, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, MAY BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators may be appointed by RapidRuling. The place of

arbitration may be in Connecticut, and any hearing may be held via video or telephone conference. The parties agree that no objection may be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THIS AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "SAFE SENDERS" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis.   Panthers Capital, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees may be equally paid by the parties, and the commencing party may be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. Panthers Capital, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party may be responsible for any attorney's fees, court or other fees associated with such actions. Panthers Capital, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, Panthers Capital, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE MAY BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

51.  **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND Panthers Capital A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: Panthers Capital – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902, ATTENTION: Arbitration Opt-Out.**

52.  **Counterparts and Facsimile Signatures.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER #1**

By: _Signed by:_ _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE

**Title:** Owner

**EIN** ███████

**FOR SELLER #2**

**By:** _____

**Name:**

**Title:** Owner

**EIN:** _____

**AGREE TO BE BOUND BY THE PROVISIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**

By: _Signed by:_ _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE

**SSN** ███████

**OWNER/GUARANTOR # 2**

**By:** _____

**Name:**

**SSN:**

**Panthers Capital LLC**

**By:** _____

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is being executed and delivered by each undersigned ("Guarantor") in favor of Panthers Capital LLC, and its subsidiaries, affiliates, agents, and assigns (collectively, "Buyer"), in connection with that certain Future Receivables Sale and Purchase Agreement (the "Agreement"), dated effective as of [  6/4/2025  ] by and between Buyer and [CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHE] ("Seller"), a business entity that desires to sell certain of its Future Receipts to Buyer pursuant to the Agreement. Capitalized terms used herein have the meanings provided in the Agreement. Each Guarantor is a shareholder, member, partner or other principal owner of Seller or is an affiliate of seller that is owned and controlled by a shareholder, member, partner or other principal owner of Seller. Each Guarantor executes and delivers this Guaranty to induce Buyer to enter into the Agreement and purchase Seller's Future Receipts. Accordingly, each Guarantor acknowledges and agrees that Guarantor will receive substantial benefits from providing this Guaranty.

| SELLER # 1: | SELLER # 2: |
|---|---|
| **Legal Business Name** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTI | **Legal Business Name** _____ |
| **D/B/A:** E TROPICAL FISH _____ | **D/B/A:** _____ |

NOW, THEREFORE, as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor does hereby agree as follows:

1. **Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

2. **Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's obligations under the Agreement (the "Obligations"); and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly perform (or cause to be performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

3. **Guarantor's Additional Covenants**. The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

   a.  any amendment, modification or extension of the Agreement or any Obligation;

   b.  any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

   c.  any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

   d.  any other guaranty now or hereafter executed by Guarantor or anyone else;

   e.  any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

   f.  any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

   g.  the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

   h.  the failure to give Guarantor any notice whatsoever;

   i.  any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not voluntarily dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. Subject to arbitration as provided in Section 13 of this Guaranty, the remedies provided in this Guaranty are cumulative and not exclusive of anyremedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer mayenforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipts is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Guaranty irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums. Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on the Agreement, or via email address(es) listed on the Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**8. Service of Process.**

**IMPORTANT NOTICE** - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

i. If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at

the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

      ii.    If sent by e-mail, on the same day and time that the e-mail is sent;

3. Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in the Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them;

4. Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

**9. PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON,</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

**10. PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

**3.** WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

**b.** EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

**c.** EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

**d.** EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR BUYER OBTAINING ANY PREJUDGMENT REMEDY.

**11. JURY WAIVER.** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION ORPROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**12.  CLASS ACTION WAIVER.** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OROTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**13. ARBITRATION.** Notwithstanding any other provision of this Guaranty, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE AGREEMENT, THE SECURITY AGREEMENT AND/OR THE GUARANTY(S), OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED, CONFIRMED AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators shall be appointed by RapidRuling. The place of arbitration shall be in Connecticut and any hearing shall be held via video or telephone conference. The parties agree that no objection shall be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference.  SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THE AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "safe senders" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. BUYER, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees shall be equally paid by the parties, and the commencing party shall be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. BUYER, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party shall be responsible for any attorney's fees, court or other fees associated with such actions. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ORREPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

**14. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS GUARANTY. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS GUARANTY: PANTHERS CAPITAL. – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902 ATTENTION: <u>Arbitration Opt-Out</u>.**

**15. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**16. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**17. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original documentfor evidentiary purposes.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                                    **OWNER/GUARANTOR #2**

By: _____                            By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE                        **Name:**

**SSN:** ▓▓▓▓▓▓▓▓                                         **SSN:**

**Panthers Capital LLC**

**By:** _____

## RIDER 3

### TO THE ___6/4/2025___

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Panthers Capital LLC ("BUYER")

### and <u>CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES L</u> ("Seller")

### <u>APPLICABLE FEES</u>

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

**3.** ___C. I. S.___ **Applicable Fees.** The parties agree that the Applicable Fees which Seller shall pay to Buyer, pursuant to Section 17 of the Agreement shall be as follows:

    **A. Monthly Fee:** ___$299___ (charged monthly to cover expense of ACH processing program).

    **B. UCC Fee:** ___$200___ (part of filing UCC financing statements and their terminations).

    **C. Wire Fee** ___$50___ (deducted from the Purchase Price to cover cost of remitting the Purchase Price).

    **D. NSF Fee:** ___$10___ (to cover expense of an NSF – if this occurs twice in a row, the third occurrence constitutes a default under the Agreement).

    **E. ACH Rejection Fee:** ___$25___ for each rejected ACH debit.

    **F. Bank Change Fee:** ___$25___

    **G. Blocked Account Fee:** ___$100___

    **H. UCC Release Fee:** ___$200___

    **I. Additional Broker Fee:** _____

    **J. Stacking Fee:** ___$5,000___ (in the event Seller takes additional capital without written consent of Buyer).

    **K. Default Fee:** ___$10,000___

    **L. Cancellation of contract:** ___$0___

**4. Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivery to Seller.

**5. No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed a reduction of the Purchase Price.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**                                    **FOR THE BUYER**

By: _Signed by:_ _____          By: _____
086ED1260399401...

**Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES    **Name:** Panthers Capital

**RIDER 2**

**TO THE** __6/4/2025__

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** <u>CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND</u> **("Seller")**

**PRIOR BALANCE**

1. **Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3. **Prior Balance.** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE:** $ 1,020,319.00   **owed to:** Panthers Capital

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 19 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to Buyer and/or the creditors listed in this Rider.

5. **No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

6. **Indemnification.** Seller hereby indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                    **OWNER/GUARANTOR #2**

By: _____          By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE        **Name:**

**Panthers Capital LLC**

**By:** _____

**RIDER 1**

**TO THE** ___6/4/2025___

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** _CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES_ **("Seller")**

**ORIGINATION FEE**

1. **Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated.

3. **Origination Fee.** The parties agree that the Origination Fee that Seller shall pay to Buyer pursuant to Section 20 of the Agreement shall be:

____$ 250.00____

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 20 of theAgreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

5. **No Reduction of Purchase Amount.** Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchased Amount.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                    **OWNER/GUARANTOR #2**

By: _____          By: _____
    086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE          **Name:**

**Panthers Capital LLC**

**By:** _____

## EARLY DELIVERY ADDENDUM

### TO THE ___6/4/2025___

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

("Agreement")

### Between Panthers Capital LLC ("Buyer")

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES **("Seller")**

### EARLY DELIVERY OPTION

1. **Qualification.** As long as no Event of Default has taken place during the term of the Agreement, Seller may opt-in to obtain a discounted Purchased Amount.

2. **Thirty (30) Day Option.** If paid in full within 30 calendar days, payback will be at a discounted rate of ___1.1___.

3. **Sixty (60) Day Option.** If paid in full within 60 calendar days, payback will be at a discounted rate of ___1.15___.

4. **Ninety (90) Day Option.** If paid in full within 90 calendar days, payback will be at a discounted rate of _____.

5. **One hundred twenty (120) Day.** If paid in full within 120 calendar days, payback will be at a discounted rate of _____.

Seller and Buyer agree that this Addendum shall be attached to the Agreement and shall be madea part thereof.

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                    **OWNER/GUARANTOR #2**

By: _____          By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE          **Name:** _____

**Panthers Capital LLC**

**By:** _____

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633



**PANTHERS CAPITAL**

**List of top 5 clients – Please list the top 5 clients that you are currently providing services for / have provided services for in the past 30 days.**

Business Name: ██████

Contact Name: ██████

Phone Number: _____

Does the client owe you money? Yes __✔__ If so, Amount: $ 1,800,000.00 _____

Business Name: ██████ _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes __✔__ If so, Amount: $ 50,000.00 _____

Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____

Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____

Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____

Signature here: _Signed by:_ _____
086ED1260399401...

Docusign Envelope ID: 525852DB-AA68-46B6-AEG4-6B2A20EEA632

# OFFER SUMMARY - Sales-Based Financing

| | | |
|---|---|---|
| Funding Provided | $ 1,020,569.00 | This is how much funding Panthers Capital will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is ___ $ 0.00 ___ . For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." The amount paid directly to Merchant may change where the required disbursements to satisfy Merchant's other obligations change. |
| Estimated Annual Percentage Rate (APR) | % 114.00 | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through revenue of CIS INTERNATIONAL HOLDINGS (N.A.) CORP will be ___ $ 1,500,000.00 ___ . Since your actual income may vary from our estimate, your effective APR may also vary. APR is not an interest rate. The cost of this financing is based upon fees charged by Panthers Capital rather than interest that accrues over time. |
| Finance Charge | $ 479,667.00 | This is the dollar cost of your financing. Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $ 1,500,236.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | $ 210,042.00 | Although you do not make payments on a monthly basis, this is Panthers Capital 's calculation of your average monthly cost based upon the payment amounts disclosed below. |
| Estimated Payment | ___ $ 10,002.00 ___ / ___ Daily ___ <br> Panthers Capital | is not aware of any reasonably anticipated true-ups. |
| Payment Terms | ___ Daily ___ ACH withdrawals of the Estimated Payment described above will be made from the bank account you provided to us for this purpose. The Estimated Payment is based on our estimate of ___ Daily ___ of your ( CIS INTERNATIONAL HOLDINGS (N.A.) CORP 's) daily revenue, based upon your average monthly revenue income of ___ $ 1,500,000.00 ___ for the last four months. You have the right to receive refunds of all or part of your payments if you demonstrate that your payments have exceeded ___ Daily ___ of your | |

|  | total income during any given month. For more details on your rights, see section 10. Seller's Right of Reconciliation and 11. Request for Reconciliation Procedure of your revenue purchase agreement. | |
|---|---|---|
| Estimated Term | __150__ days | This is our estimate of how long it will take to collect amounts due to Panthers Capital_____ under the revenue purchase agreement based upon the assumption that you will receive ___$ 1,500,000.00___ in monthly income through your revenue stream. |
| Prepayment | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to _____$ 479,667.00_____ based upon our estimates. | |
|  | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

Signed by:

_____                          _____
086ED1260399401...

Recipient Signature                                                 Recipient Signature


_____                          _____

Date                                                                    Date


- By checking this box, you are confirming that you have read and understand the Offer Summary provided to you.

# EXHIBIT A
## CROSS COLLATERAL ADDENDUM

This addendum shall serve to modify the Agreement of Sale of **Future Receivables ("Merchant Agreement")** which was entered into between _____Panthers Capital_____ (hereafter **"Purchaser")** and
__CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OT__(Hereafter the **"Merchants" or "Affiliates") Dated:** ___6/4/2025___

**Whereas**, the Merchants have individually entered into a Merchant Agreement with Purchaser to sell a portion of their future receivables at a discount;

**Whereas**, the Merchants are affiliated and hereby pledge to assume any and all liability of the other owned entities in the event that one fails to perform or defaults under the terms and conditions the Merchant Agreement.  Affiliated entity or collateral is as follows:

1. CIS INTERNATIONAL HOLDINGS (N.A.) CORP          CHARITHA I SAMARSINGHE

2. CIS INTERNATIONAL DISTRIBUTOR          CHARITHA I SAMARSINGHE

3. SIAM TROPICAL FISH LTD          CHARITHA I SAMARSINGHE

4. TROPICAL FISH INTERNATIONAL EUROPE          CHARITHA I SAMARSINGHE

5. TROPICAL AQUARIUM FISH (FIJI) LTD          CHARITHA I SAMARSINGHE

6. LIVE AQUARIA HOLDINGS CORP          CHARITHA I. SAMARASINGHE

7. T3 AQUATICS          CHARITHA I. SAMARASINGHE

8. LIONSROCK INVESTMENTS LLC          CHARITHA I. SAMARASINGHE

9. LIONSROCK WISCONSIN LLC          CHARITHA I. SAMARASINGHE

10. _____

11. _____

12. _____

13. _____

14. _____

15. _____

16. _____

17. _____

18. _____

19. _____

20. _____

**("Corporate Guarantor(s)")**

Additionally, the Merchants and Affiliates individually hereby grant cross collateral to each other and all the affiliated entities included in this addendum.

Merchants and Corporate Guarantor(s) hereby grant Purchaser a security interest in, and authorizes Purchaser **to file a UCC financing statement covering, all of Merchants and Corporate Guarantor(s)' present and future** accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Merchant and Corporate Guarantor(s).

This addendum does not alter the terms and conditions of the original Merchant Agreement and that all terms remain in full force and effect.

By executing this addendum, the undersigned represent that it has authority to enter into this agreement on behalf of the above-named Corporate Guarantors.

**Agreed & Accepted:**

**For:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"
**(as member, manager, or authorized agent of Corporate Guarantor(s))**

Signed by:

_____    6/4/2025    _____

086ED1260399401...

Name:  CHARITHA I  SAMARASINGHE          Name: _____

Title:  OWNER_____          Title: _____

Docusign Envelope ID: 525852DB-AA68-46B6-AEC4-6B2A20EFA632

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | $ 1,020,569.00 |
| 2. Amount Paid on your Account with Us | $ 1,020,319.00 |
| 3. Disbursement paid to a third-party on your behalf to _____ | |
| 4. Amount Provided to You or on Your Behalf (Sum of Items 1-3) | $ 2,040,888.00 |
| 5. Prepaid Finance Charge: Brokerage Fee | |
| 6. Prepaid Finance Charge: Origination Fee | $ 250.00 |
| 7. Amount Financed (Item 4 minus Items 5 and 6) | $ 2,040,638.00 |

# EXHIBIT B

Docusign Envelope ID: C39B5AEA-844E-42A7-A8B9-D52983838BEF

PANTHERS CAPITAL

## FACTORING FACILITY AGREEMENT

This Agreement is made and entered into as of the date of the Seller's electronic signature by and between CIS INTERNATIONAL HOLDINGS (N.A.) CORP, a California corporation, located at 1405 W 178th St, Gardena, CA 90248, with ▮▮▮▮▮▮▮▮ ("**Seller**"); and PANTHERS CAPITAL LLC, a limited liability company, located at 9 W Broad St #320, Stamford, CT 06902 ("**Purchaser**"). Charitha I. Samarasinghe, as the guarantor and CEO of CIS INTERNATIONAL HOLDINGS (N.A.) CORP, also executes this Agreement as an individual guarantor.

### Recitals

WHEREAS, Seller desires to establish a factoring facility to sell all of its accounts receivable ("ARs") exclusively to Purchaser on the terms set forth herein, and Purchaser desires to acquire such Accounts for the purpose of providing liquidity to Seller; and

WHEREAS, the Seller hereby covenants that all Accounts Receivable due from Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. (hereinafter collectively referred to as "Petco") shall be paid directly by Petco to the Purchaser, without any deviation or redirection of funds.

WHEREAS, Seller is engaged in the general business of supplying products to Petco, and normally sells and delivers merchandise to Petco on a credit basis; and

WHEREAS, Seller desires to obtain funds and commercial credit for the operation of its business against its accounts receivable; and

WHEREAS, Purchaser is willing to purchase Seller's accounts receivable according to the terms set forth in this Agreement;

NOW, THEREFORE, for and in consideration of the mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1    Assignment of Accounts Receivable.**

1.1 **Assignment of Accounts Receivable.** Seller hereby assigns to Purchaser as absolute owner, and Purchaser purchases and accepts from Seller without recourse to Seller, except as set forth in this Agreement, all accounts receivable created now or in the future by Seller's credit sales to Petco. Such accounts receivable are acceptable to Purchaser and represented by Seller to be bona fide existing obligations of Petco, arising out of and acquired by it in the ordinary course of its business. These accounts receivable are or will be due and owing to Seller without defense, offset, or counterclaim. For purposes of this Agreement, accounts receivable include all accounts, notes, trade acceptances, bills of exchange, pledges, mortgages, choses in action, or any other form of obligation.

1.2 **Sale of Accounts.** Seller hereby sells, assigns, and transfers to Purchaser, on an ongoing and exclusive basis, all right, title, and interest in and to its eligible accounts receivable ("Eligible Accounts") that arise from the sale of goods or services by Seller to Petco. Seller agrees to

Page 1 of 14

Seller Initials: _____

provide Purchaser with copies of all relevant documentation supporting these transactions, including invoices, shipping documentation, and proof of delivery or service acceptance.

1.3 **Factoring Facility Advance.** Purchaser shall advance to Seller an amount equivalent to eighty-five percent (85%) of the total value of Eligible Accounts presented for factoring, subject to eligibility verification. The maximum credit exposure under this facility shall be $3,000,000 at any given time.

1.4 **Factoring Fee Structure.** Purchaser shall charge a factoring fee of 0.234% per day on the face value of each financed invoice until such invoice is paid. Factoring fees will accrue from the date of advance until the invoice is fully satisfied or reaches 90 days in age, whichever comes first. Should Petco make payment within 45 days, Purchaser shall retain the accrued factoring fees along with the principal advanced, and any residual amount shall be rebated to Seller.

1.5 **Example Calculation.** Under this factoring facility, an advance of $100,000 against a gross receivable of $117,647.05 will accrue a factoring fee of $234 per day. After 45 days, once Petco remits payment, Purchaser will retain $110,530 to cover the principal and factoring fees, while rebating $7,117.05 to Seller.

1.6 **Recourse Provision.** This factoring facility is provided with recourse to the Seller. In the event that any Account remains unpaid after 90 days from the invoice date, Seller shall be obligated to repurchase the unpaid Account from Purchaser at the original advance amount, plus any applicable accrued fees. Should the Seller fail to repurchase the unpaid Account, Purchaser shall have the right to apply a clawback against future ARs from Petco to recover the outstanding amount, including any accrued fees and costs incurred.

2 **Sales and Delivery of Merchandise.**

2.1 **Sales and Delivery by Seller.** All sales and deliveries of merchandise by Seller to Petco will be made in Seller's name, with explicit notification to Petco that the accounts receivable thus created have been assigned, sold, and transferred to Purchaser as absolute owner.

2.2 **Invoicing and Notification.** Invoices and statements to Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. ("Petco") shall be issued by Seller in a manner and on forms approved by Purchaser. Purchaser reserves the right, at its sole discretion, to issue such invoices or statements directly to Petco, with the costs associated with stationery and postage being charged to Seller's account. All invoices must be clearly marked in a manner specified by Purchaser, providing full notification to Petco that payment is to be made to Purchaser at the following bank account:



Page 2 of 14    Seller Initials: _____

2.3 **Right to Collection.** Purchaser has the right to institute and maintain actions in its name or otherwise to collect such accounts. Actions based upon Seller Risk Accounts shall be at the cost of Seller. "Seller Risk Account" shall mean any account with amounts or invoices which, when aggregated with those amounts or invoices already existing, exceed the credit limit established by Purchaser with respect to Petco.

**3   Credit Approval.**

3.1 **Sales and Deliveries with Approval.** All sales and deliveries of merchandise to Petco must be made with prior notification by email to Purchaser at Ben@pantherscapital.com and Mike@pantherscapital.com. Since all deliveries are made in large quantities, they shall be considered invoiced when the tracking number is provided to both Petco and Purchaser.

3.2 **Withdrawal of Credit Approval.** If, in Purchaser's sole opinion, Petco's creditworthiness becomes impaired before the actual delivery of merchandise, Purchaser shall have the right to withdraw approval of any order taken from Petco.

3.3 **Right of Stoppage in Transit.** Purchaser shall also be entitled to exercise a seller's right of stoppage in transit, replevin, or reclamation. Any merchandise so recovered shall be dealt with, as between Purchaser and Seller, as returned merchandise.

3.4 **Assignment of Merchandise and Receivables.** Seller hereby sells and assigns to Purchaser all receivables purchased by Purchaser that may be returned by Petco. However, due to the nature of the merchandise (i.e., live pet fish and other items that Purchaser cannot resell or utilize), Purchaser shall not be obligated to take possession or ownership of any returned merchandise. Seller retains full responsibility for any returned merchandise, including its care, handling, and any associated costs. The assignment of any interest or rights in the merchandise, including stoppage in transit, replevin, or reclamation, shall be strictly for the purpose of securing payment on the receivables, and does not obligate Purchaser to take physical control or bear any risk related to the merchandise itself.

3.5 **Liability Disclaimer.** Purchaser shall not be liable to any party for refusing to approve the delivery of merchandise sold under this Agreement. Given the nature of the merchandise, Purchaser is under no obligation to take possession or assume any responsibility for the merchandise itself, including live pet fish and other unsellable items, and any refusal to approve delivery shall not result in any liability on the part of Purchaser.

**4   Assumption of Credit Risks.**

4.1 **Assumption of Credit Risk**. On all accounts receivable accepted and purchased by Purchaser, except those receivables termed Seller Risk Accounts, Purchaser will assume any losses resulting from the insolvency of Petco. Such assumption of credit risk shall take effect upon delivery and acceptance without dispute of the value and quality of the merchandise.

4.2 Adherence to Credit Limits. Seller agrees that it shall adhere strictly to the credit limits established by Purchaser.

Page 3 of 14

Seller Initials: _____

4.3 **Advances Beyond Credit Limit.** Purchaser, at its option, may advance funds against accounts or invoices exceeding the established credit limit with full recourse against Seller.

4.4 **Claim Disputes.** If an unadjusted claim or dispute delays the payment of an account beyond sixty (60) days after it is due, Purchaser's assumption of the credit risk is canceled, and the amount may be charged back to Seller as of the original credit date.

4.5 **Rejections and Returns.** Seller shall immediately notify Purchaser of all rejections, returns of merchandise, and customer claims upon becoming aware of these matters, and shall promptly resolve all claims and disputes with Petco. Any returned merchandise that comes into Seller's possession shall remain the responsibility of Seller, given that such merchandise (including live pet fish and other non-resalable items) cannot be handled or utilized by Purchaser. Seller shall either repay or secure to Purchaser's satisfaction the amount credited by reason of the sale of such merchandise. Purchaser shall have no obligation to take possession of any returned merchandise, nor shall Purchaser have any liability with respect to its disposal or resale. If Purchaser incurs any deficiency resulting from the sale or settlement of an invoice related to returned merchandise, Seller shall be fully liable for such deficiency, and Purchaser retains full recourse against Seller.

5 **Book Entries.** Immediately upon the purchase of an account by Purchaser, Seller will make appropriate entries upon its books disclosing such purchase and will execute and deliver all papers and instruments and do all things necessary to effectuate this Agreement.

6 **Amounts Owed to Purchaser.**

6.1 **Amounts Owed.** Any amounts owed by Seller to Purchaser for commissions, interest, or otherwise shall be considered as advances against Seller's sales and are chargeable to Seller's current account at any time, at Purchaser's option.

6.2 **Taxes Paid by Purchaser.** If, at any time, Purchaser is required to pay any state, federal, or local sales or excise tax on sales or services performed under and pursuant to this Agreement, the amount of the tax paid by Purchaser shall be charged to Seller's account.

7 **Rights under Seller's Contracts.** Seller warrants and agrees that all the rights and privileges existing under the contractual agreements with Petco, whose receivables are being purchased by Purchaser, are transferred to Purchaser, and Seller further agrees to provide Purchaser with a copy of such contracts or agreements.

8 **Warranty of Assignment.** Seller warrants that none of the accounts being sold to Purchaser have previously been sold or assigned to any person, firm, corporation, or other entity, and will not be sold or assigned at any time during the term of this Agreement.

9 **Power of Attorney.** Seller appoints Panthers Capital LLC ("Purchaser"), or any other person whom Purchaser may designate, as Seller's attorney-in-fact with power to receive, open, and dispose of all mail addressed to Seller relating to the Accounts; to notify postal authorities to change the address for delivery of mail addressed to Seller to an address that Purchaser may designate; to endorse in Seller's name any notes, acceptances, checks, drafts, money orders, and other evidences of payment or collateral that may come into Purchaser's possession; to sign Seller's name on any

Page 4 of 14

Seller Initials:

Docusign Envelope ID: C39B5AEA-844E-42A7-A8B9-D52983838BEF

invoice or bill of lading relating to any account, drafts against debtors, assignments and verifications of accounts, and notice to debtors; to send verifications of accounts to any debtor; and to do all other acts and things necessary to effectuate this Agreement. All acts of such attorney or designee are ratified and approved, and such attorney or designee shall not be liable for any acts of commission or omission, nor for any error of judgment or mistake of law or fact. This power, being coupled with an interest, is irrevocable while any purchased account shall remain unpaid.

10    **Breach of Warranty.** If any warranty or covenant in this Agreement, express or implied, shall be broken or violated, whether caused by the act or the fault of Seller, a debtor, or others, Purchaser shall be entitled to recover from Seller or Seller's guarantors the damages consequently sustained, including, but not limited to, all attorney's fees, court costs, collection charges, and all other expenses that may be incurred by Purchaser to enforce payment of any account, either as against the debtor, Seller, or its guarantors, or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement.

11    **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

11.1    Seller shall violate any term, condition, or covenant in this Agreement.

11.2    Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false, or misleading in any material respect when made.

11.3    Seller shall default under any of the terms, covenants, and conditions of any other agreement with Purchaser (if any) which is related to the instant Agreement.

11.4    Seller uses multiple depository accounts without obtaining prior written consent of Purchaser in each instance.

11.5    Petco fails to deposit any portion of the accounts receivable owed to Seller into the designated bank account of Purchaser as specified in this Agreement.

11.6    Seller changes the designated Purchaser bank account provided to Petco without obtaining prior written consent from Purchaser for each such instance.

11.7    Seller intentionally interferes with Purchaser's collection of Petco Accounts Receivable that become due and payable to Purchaser on behalf of Seller, as agreed herein, thereby obstructing the agreed payment process.

11.8    Seller changes the agreement between Purchaser, Seller, and Petco, wherein all future Accounts Receivable that become due and payable shall be paid directly to Purchaser, without obtaining prior written consent from Purchaser.

12    **Default under the Agreement.** In case any Event of Default occurs and is not waived by Purchaser, in writing, Purchaser may declare Seller in default under this Agreement without notice.

13    **Seller's Obligations Upon Default.** In the event of an occurrence of default due to Seller's breach of any obligations under this Agreement, Seller shall immediately remit to Purchaser the entire outstanding and undelivered portion of the Purchased Amount. Furthermore, upon such default, all future Accounts Receivable owed by Petco shall be deemed fully factored to Purchaser, with the Specified Percentage adjusted to 100% of all such future receivables, thereby entitling Purchaser to absolute and direct collection rights over all Petco AR. Seller shall additionally be liable to Purchaser for all reasonable costs and expenses incurred in enforcing Purchaser's rights and recovering any amounts owed under this Agreement, including, but not limited to, expenses arising from the

Page 5 of 14

Seller Initials:

Docusign Envelope ID: C39B5AEA-844E-42A7-A8B9-D52983838BEF

retention of third-party collection firms and reasonable attorneys' fees, as well as any related disbursements (collectively, "Reasonable Damages").

14 **No Liability Clause.** In no event shall Purchaser be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

15 **Waiver.**

15.1 **Waiver by Purchaser.** Purchaser's waiver of a particular breach by Seller of any covenant or warranty contained in this Agreement shall not be deemed to constitute a waiver of any subsequent breach.

15.2 **Non-Waiver of Rights.** Purchaser's failure at any particular time to exercise a right or privilege granted to it in this Agreement shall not be deemed to constitute a waiver of that or any other right or privilege.

16 **Profit and Loss Statement.**

16.1 **Monthly Profit and Loss Statement.** Seller shall submit to Purchaser, at Purchaser's request, a monthly profit and loss statement signed by an officer or employee of Seller on behalf of and as the act of Seller within five (5) days after the close of each month, covering the business for the month immediately preceding the statement. In addition, Seller shall furnish Purchaser a semiannual balance sheet on Seller's business, accompanied by a profit and loss statement from the beginning of Seller's then-current fiscal year. Such semiannual balance sheet and accompanying profit and loss statement shall be prepared by an independent, certified public accountant that has no pecuniary interest in Seller's business.

16.2 **Inspection of Records.** All books, records, accounts, corporate records, bank statements, and records of deposit of Seller, as well as any other financial records maintained by Seller, shall be open to inspection by Purchaser, and any accountant or auditor designated by Purchaser, for all purposes and at all times during normal business hours at Seller's main place of business.

17 **Warranty of Solvency.**

17.1 **Warranty of Solvency.** Seller warrants its solvency. If Seller receives any checks, drafts, notes, acceptances, or other moneyed instruments, or cash in payment of any of the receivables assigned to Purchaser under and pursuant to this Agreement, such payment will immediately be turned over to Purchaser in its original form.

17.2 **Endorsement of Instruments.** Purchaser, or other persons as it may from time to time designate, shall have the right to endorse all instruments in Seller's name or otherwise.

18 **Eligible Accounts Criteria.**

18.1 **Eligible Accounts are defined as follows:**

18.1.1 All accounts due from Petco that are less than 90 days from the invoice date.

Page 6 of 14                                                                                          Seller Initials: _____

18.1.2 All accounts due from Petco that, in Purchaser's judgment, are deemed creditworthy, up to the credit limit established by Purchaser.

18.1.3 All accounts arising from the shipment of goods or completion of services to Petco that are not subject to any disputes, offsets, or counterclaims.

18.1.4 All accounts due from Petco where less than 25% of the total outstanding invoices are aged more than 90 days.

18.1.5 All accounts due from Petco with payment terms of Net 60 days or less.

18.2 Purchaser reserves the right to make exceptions to these criteria at its sole discretion on a case-by-case basis.

19 **Pledge of Security.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants, or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Purchaser a continuing, perfected and first priority lien upon and security interest in, to, and under all of Seller's right, title, and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

19.1 All accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

19.2 All Seller's proceeds, as such term is defined by Article 9 of the UCC.

20 **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Purchaser will execute, acknowledge (where applicable), and deliver such satisfactions, releases, and termination statements, as Seller shall reasonably request.

21 **Representations with Respect to Collateral.** Seller hereby represents and warrants to Purchaser that the execution, delivery, and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement, or any other instrument to which Seller is a party.

22 **Further Assurances.** Upon the request of Purchaser, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances, and assignments of the Collateral and documents with respect to the pledge of the Collateral as Purchaser shall reasonably request. Seller shall execute and deliver such instruments, assignments, or documents and do all such other acts and things, as Purchaser may reasonably request to effectuate the purpose and purposes of this Pledge and to provide for the continuing validity, perfection, and priority of Purchaser's security interest in the Collateral.

Page 7 of 14

Seller Initials: _____

**22.1    Security Interest.**

22.1.1    **Security Interest Grant.** Seller grants to Purchaser a first-priority security interest in all of Seller's present and future accounts receivable and all proceeds thereof. Seller further authorizes Purchaser to file a UCC-1 Financing Statement naming Purchaser as the secured party to perfect such security interest.

22.1.2    **Subordination of Existing Liens.** Seller agrees to obtain lien terminations or subordinations from any third parties holding liens against accounts receivable and proceeds as required by Purchaser in order to maintain Purchaser's priority interest.

23    **Guaranty of Performance.** Charitha I. Samarasinghe personally guarantees the prompt and full performance of all obligations of Seller under this Agreement. This personal guaranty shall be binding and enforceable immediately, and shall not be contingent upon Purchaser seeking recourse against Seller or any other party. Purchaser is entitled to pursue remedies against the Guarantor independently of actions taken against Seller.

24    **Prejudgment Remedy.** In the event of a default by Seller, Purchaser is entitled to seek a prejudgment remedy under Uniform Commercial Code (UCC) laws. Seller and Guarantor hereby waive all rights to prior notice and prior opportunity for a hearing under applicable Connecticut General Statutes regarding Purchaser's obtaining of any prejudgment remedy. Purchaser may attach or garnish the Seller's or Guarantor's funds and property held at financial institutions if certain statutory conditions are satisfied.

25    **Term and Termination of Facility.**

25.1    **Term of Facility.** The initial term of this factoring facility shall be twenty-four (24) months from the effective date of this Agreement. The facility shall automatically renew for additional twelve (12) month periods unless either party provides written notice of termination at least sixty (60) days prior to the end of the current term.

25.2    **Early Termination by Seller.** If Seller wishes to terminate this Agreement before the end of the term, Seller must provide a ninety (90) days written notice. Seller shall also be responsible for any outstanding advances, accrued fees, and any applicable early termination charges.

25.3    **Termination Rights.** Either party may terminate this Agreement as to future transactions on one hundred eighty (180) days' written notice.

26    **Severability Clause.** The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision. If any provision of this Agreement is held to be invalid, the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision.

27    **Governing Law.** This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Connecticut.

Seller Initials:

28 **Notices Requirements.** Any notice provided for or concerning this Agreement shall be in writing and shall be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this Agreement.

29 **Attorney Fees.** In the event that any lawsuit is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all the sums that either party may be called on to pay, a reasonable sum for the successful party's attorney fees.

30 **Mandatory Arbitration.** Any dispute arising under this Agreement shall be resolved through binding arbitration, as determined solely at Purchaser's discretion. Seller irrevocably agrees that, if the parties are unable to mutually agree upon an arbitrator, Purchaser shall have the exclusive right to appoint the arbitrator who will arbitrate the dispute. The arbitration shall be conducted in accordance with the rules of the American Arbitration Association in force at the time of arbitration, and all decisions made by the appointed arbitrator shall be final and binding upon Seller without further recourse.

31 **Modification of Agreement.** Any modification of this Agreement or additional obligation assumed by either party in connection with this Agreement shall be binding only if placed in writing and signed by each party or an authorized representative of each party.

32 **Assignment of Rights.** The rights under this Agreement are personal to each party; however, only Purchaser shall have the right to assign or transfer its rights to any other person, firm, corporation, or entity without the prior consent of Seller. Seller may not assign or transfer any rights or obligations under this Agreement without the prior, express, and written consent of Purchaser.

33 **Counterparts and Electronic Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any electronic signature, including signatures executed through electronic means such as DocuSign or email, shall be considered valid, binding, and fully enforceable as if signed in physical form.

34 **Binding Effect on Successors.** In this Agreement, any reference to a party includes that party's heirs, executors, administrators, successors, and assigns. Singular includes plural, and masculine includes feminine.

35 **Entire Agreement.** This Agreement shall constitute the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement.

36 **Miscellaneous Provisions.**

36.1 **Governing Law.** This Agreement and all related matters shall be governed by and construed in accordance with the laws of the State of Connecticut, Fairfield County, without giving effect to conflict of law principles.

36.2 **Enforceability of Electronic Signatures.** The parties agree that this Agreement may be executed electronically, and such electronic execution shall have the same legal effect as

Page 9 of 14

Seller Initials:

manual signatures. The Agreement shall become effective and binding once signed electronically by Seller.

36.3    **Operational Mechanics and Documentation.** In the event that Seller receives any payment on an Account assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust as fiduciary for Purchaser, segregating said funds from its own assets, and shall immediately remit the full amount to Purchaser without delay. Seller acknowledges that any failure to promptly remit such funds shall constitute a material breach of this Agreement. Purchaser shall have the absolute right to recover all reasonable costs, expenses, and attorney's fees incurred in enforcing this provision, including any actions taken to recover improperly retained payments.

36.4    **Acknowledgment of Default and Factoring Terms for Petco Accounts.** Seller hereby irrevocably acknowledges and stipulates that, as of the effective date of this Agreement, Seller is in default under a prior funding agreement executed with Purchaser, resulting in an outstanding adjusted balance of $1,018,196.92. This balance accounts for the application of a wire transfer payment in the amount of $150,177.08, received by Purchaser from Petco on November 27, 2024, which was applied towards Seller's defaulted obligation. Petco has formally agreed to remit all future Accounts Payable directly to Purchaser and shall continue to do so for the duration of this Agreement. This Agreement shall, under no circumstances, be construed as a waiver or release of Seller's liability for the remaining defaulted balance owed to Purchaser. Until the entire outstanding defaulted balance is fully satisfied by Petco's remittances, Purchaser shall have no obligation to purchase any new Accounts Receivable from Petco. The remaining balance owed by Seller shall be adjusted accordingly by Purchaser, and only Accounts Receivable in excess of the outstanding balance shall be eligible for future purchase by Purchaser. Furthermore, all Accounts Receivable currently assigned to satisfy Seller's defaulted balance, which Petco has agreed to pay directly to Purchaser, shall be deemed irrevocably allocated for such purposes, and shall not be subject to further sale, transfer, or assignment by Seller under this or any other agreement. Seller expressly agrees that Purchaser maintains an absolute priority on these receivables until the defaulted balance is extinguished. Any interference by Seller in directing or controlling these payments shall be deemed a material breach of this Agreement, entitling Purchaser to immediate enforcement of remedies. Seller further covenants and agrees to sell and assign to Purchaser only those Petco Accounts Receivable that are in excess of the obligations currently in default, ensuring that the defaulted balance is fully prioritized and satisfied prior to any additional assignment or transaction under this Agreement. Any attempts by Seller to divert, hinder, or otherwise delay payment by Petco to Purchaser will result in immediate enforcement action, and Seller shall be liable for all costs and attorneys' fees incurred by Purchaser in securing its rights hereunder.

37  **Clawback and Misapplication of Payments.** In the event that Seller receives any payment on an Account that has been assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust for the sole benefit of Purchaser, segregating said funds from Seller's own assets. Seller shall immediately and without delay remit the entirety of such funds to Purchaser in the form received. Seller's failure to remit these funds promptly shall constitute a material breach of this Agreement and result in immediate liability for all damages and remedies available to Purchaser. Seller expressly acknowledges that

Page 10 of 14                                                            Seller Initials:

Purchaser has the absolute right to recover from Seller any and all costs, expenses, and reasonable attorneys' fees incurred by Purchaser in enforcing this provision, including, but not limited to, any actions taken to recover misapplied or improperly retained payments. Seller's obligation to hold and remit such payments is fiduciary in nature, and any failure to comply shall be deemed a breach of trust, entitling Purchaser to pursue equitable remedies, including but not limited to specific performance, injunctive relief, and recovery of all legal costs associated with the enforcement of Purchaser's rights under this Agreement.

This Agreement is executed by the authorized representatives of both parties as of the date of Seller's electronic signature. This Agreement shall be binding upon and inure to the benefit of each party's successors and permitted assigns.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____

By: Charitha I. Samarasinghe

Title: CEO and President

████████████████

████████████████

████████████████

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**Owner/Guarantor:**

By: _____

Name: Charitha I. Samarasinghe

████████████████

████████████████

████████████████

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**PANTHERS CAPITAL LLC - Purchaser**

By: _____

By:

Title:

Date:

Page 11 of 14

Seller Initials: _____

## CROSS COLLATERAL ADDENDUM

This Cross Collateral Addendum (the "Addendum") is entered into as of December 1, 2024, by and between Panthers Capital, LLC (hereinafter referred to as "Purchaser") and CIS INTERNATIONAL HOLDINGS (N.A.) CORP, along with the other entities listed below (hereinafter collectively referred to as "Seller" or "Affiliates"). This Addendum serves as an integral supplement to the existing Factoring Facility Agreement (the "Agreement") entered into between the aforementioned parties.

### Recitals

WHEREAS, each of the Seller entities has individually entered into the Factoring Facility Agreement with Purchaser, whereby the Seller agreed to sell and assign all accounts receivable arising from transactions with Petco (the "ARs") to Purchaser, on the terms set forth therein; and

WHEREAS, the Seller entities are affiliated entities under common control and ownership, and each Seller entity desires to further secure its obligations to Purchaser by pledging a cross-collateralized security interest in favor of Purchaser, thereby guaranteeing each other's performance under the Factoring Facility Agreement; and

NOW, THEREFORE, for good and valuable consideration, the Affiliates listed below (collectively, the "Corporate Guarantors") agree as follows:

1. **Corporate and Personal Guarantors.**

   a. CIS International Holdings (N.A.) Corp - ▮▮▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   b. CIS International Distributor - ▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   c. Siam Tropical Fish Ltd - ▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   d. Tropical Fish International Europe - ▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   e. Tropical Aquarium Fish (Fiji) Ltd - ▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   f. Live Aquaria Holdings Corp - Charitha I. Samarasinghe
   g. T3 Aquatics - Charitha I. Samarasinghe
   h. LIONSROCK INVESTMENTS LLC - Charitha I. Samarasinghe
   i. LIONSROCK WISCONSIN LLC - Charitha I. Samarasinghe

2. **Cross-Collateralization and Security Interest.**

   a. **Cross-Collateralization.** Each Seller and Corporate Guarantor hereby irrevocably and unconditionally grants to Purchaser a cross-collateral pledge of their respective assets to secure the performance and obligations of each other entity under the Factoring Facility Agreement. This pledge extends to all present and future accounts receivable, personal property, general intangibles, and any other assets of each Corporate Guarantor, which shall serve as collateral to secure the obligations of any affiliated entity in the event of breach or default by any one entity.

   b. **First-Priority Security Interest.** To further secure the obligations arising under the Factoring Facility Agreement, each Seller and Corporate Guarantor grants Purchaser a continuing, perfected, first-priority security interest in all present and future accounts, chattel paper, deposit accounts, inventory, equipment, fixtures, general intangibles, and all proceeds now owned or hereafter acquired by any Seller or Corporate Guarantor (the "Collateral"). Each Seller

Page 12 of 14

Seller Initials:



and Corporate Guarantor authorizes Purchaser to file any and all necessary Uniform Commercial Code (UCC) Financing Statements, as well as any amendments or continuation statements, in order to evidence and perfect such security interest.

c. **Cross-Default.** A default by any one Seller or Corporate Guarantor shall be deemed a default by all affiliated entities. Upon such an event of default, Purchaser shall have the immediate right to enforce its rights and remedies under the Factoring Facility Agreement and this Addendum, including, but not limited to, repossession, foreclosure, attachment, garnishment, and sale of the Collateral, without limitation and without further notice to any Seller or Corporate Guarantor.

d. **Cumulative Rights.** All rights and remedies available to Purchaser under this Addendum are cumulative and are in addition to any other rights or remedies provided by law, equity, or under the original Factoring Facility Agreement. The exercise of any right or remedy by Purchaser shall not preclude the concurrent or subsequent exercise of any other right or remedy available to Purchaser.

3. **No Alteration of Original Agreement.**

a. **No Alteration or Waiver.** Except as expressly modified by this Addendum, all terms, conditions, covenants, representations, and warranties set forth in the original Factoring Facility Agreement shall remain in full force and effect. Nothing in this Addendum shall be construed as a waiver, modification, or novation of Purchaser's rights under the Agreement, except as specifically provided herein.

4. **Execution and Authority.**

a. **Authority to Bind.** Each undersigned representative of the Seller and Corporate Guarantors represents and warrants that they have the full authority to execute this Addendum, and that this Addendum constitutes a valid, binding, and enforceable agreement of each respective Seller and Corporate Guarantor. This Addendum shall be binding upon the parties and their respective successors and assigns.

Page 13 of 14                                                    Seller Initials: _____

IN WITNESS WHEREOF, the parties hereto have executed this Cross Collateral Addendum as of the day and year first above written.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____

By: Charitha I. Samarasinghe

Title: CEO and President

███████████████

███████████████████

████████████████████████

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**Owner/Guarantor:**

By: _____

Name: Charitha I. Samarasinghe

███████████████

███████████████████

████████████████████████

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

Seller Initials: _____

# EXHIBIT B

| | | |
|---|---|---|
| DOCKET NO:RETURN DATE: AUGUST 12, 2025 | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | JULY 3110, 2025 |

<div align="center">

AMENDED COMPLAINT

COUNT ONE
(BREACH OF CONTRACT AGAINST SELLER)

</div>

1. The plaintiff, Panthers Capital LLC ("Buyer"), is a limited liability company with a place of business in Connecticut.

2. The Buyer and the defendant, CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish ("Seller"), entered into that certain Future Receivables Sale and Purchase Agreement dated June 4, 2025 (the "Agreement"), pursuant to which the Seller sold, and the Buyer purchased, future receipts of the Seller in the aggregate amount of $1,500,236.00. A redacted copy of the Agreement is attached hereto as Exhibit A.

3. The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Guarantors") jointly and severally guaranteed the Seller's obligations under the Agreement, as evidenced by the

Guaranty of Performance executed by each of the Guarantors and incorporated within the Agreement (the "Guaranty").

4.      Upon execution of the Agreement and Guaranty by the Seller and the Guarantors, the Buyer advanced funds to the Seller in accordance with the terms and conditions set forth in the Agreement.

5.      The Seller defaulted under the Agreement in July 2025, including, without limitation, by taking actions that denied and interfered with the Buyer's contractual rights, including the Buyer's right to receive its designated share of the Seller's revenue. Specifically, and without limitation, the Seller caused a stop payment to be placed on the bank account into which it was required to deposit all receipts and from which the Buyer was authorized to initiate ACH debits to receive payment.

6.      Pursuant to the Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7.      Further, pursuant to the Agreement, the Seller expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Seller's property. See Agreement (Exhibit A), Paragraph 44.

8.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement.

**Formatted:** Justified, Indent: First line: 0.5", Line spacing: Double

<div align="center">

COUNT TWO
(BREACH OF CONTRACT AGAINST GUARANTORS)

</div>

1-5.    Paragraphs 1 through 5 of Count One are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Two as if fully set forth herein.

6.      The Guarantors defaulted under the Guaranty by failing to pay the Buyer all amounts due and owing under the Agreement

7.      Pursuant to the Guaranty, the Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

8.      Further, pursuant to the Guaranty, the Guarantors expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Guarantors' property. See Guaranty (Exhibit A), Paragraph 10.

9.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement and the Guaranty.

COUNT THREE

(BREACH OF CONTRACT AGAINST SELLER)

1.      Paragraph 1 of Count One is hereby incorporated by reference as Paragraph 1 of Count Three as if fully set forth herein.

2.      The Buyer and the Seller entered into a Factoring Facility Agreement dated December 1, 2024 ("Factoring Agreement"), pursuant to which, the Buyer agreed to purchase certain unencumbered invoices of an account receivable ("Factor Account") and sign exclusive payment rights of the Factor Account to the Buyer of the Seller up to a maximum of $3,000,000.00 at any given time. A redacted copy of the Factoring Agreement is attached hereto as Exhibit B.

3.      The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Factoring Guarantors") jointly and severally guaranteed the Seller's obligations under the

3

Factoring Agreement, as evidenced by the Guaranty of Performance executed by each of the Guarantors and incorporated within the Factoring Agreement (the "Factoring Guaranty").

4.	Upon execution of the Factoring Agreement and Factoring Guaranty by the Seller and the Factoring Guarantors, the Buyer purchased certain invoices of the Seller, the Seller assigned exclusive payment rights of the Factor Account to the Buyer, and the Buyer began to advance funds to the Seller in accordance with the terms and conditions set forth in the Factoring Agreement.

5.	The Seller defaulted on the Factoring Agreement in July 2025 by engaging in actions that violated and undermined the Buyer's contractual rights. Specifically, and without limitation the Seller (i) misrepresented the unencumbered status of certain invoices submitted to the Buyer, (ii) submitted identical invoices to the Buyer that had previously been sold to the Buyer, (iii) subsequently sold invoices to third parties that were already sold to the Buyer.

6.	Pursuant to the Factoring Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7.	The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement.

<div align="center">COUNT FOUR</div>

<div align="center">(BREACH OF CONTRACT AGAINST GUARANTORS)</div>

1-5.	Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Four as if fully set forth herein.

6.	The Factoring Guarantors defaulted under the Factoring Guaranty by failing to pay the Buyer all amounts due and owing under the Factoring Agreement.

**Formatted:** Underline

<div align="center">4</div>

7.    Pursuant to the Factoring Guaranty, the Factoring Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

8.    The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement and the Factory Guaranty.

<div align="center">COUNT FIVE</div>

<div align="center">(FRAUDULENT MISREPRESENTATION)</div>

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Five as if fully set forth herein.

6.    The Seller intentionally made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon.

7.    The Seller intentionally misrepresented previously sold invoices to the Buyer as new invoices to the Buyer to induce the Buyer in continuing to preform on the Factoring Agreement and advance funds to the Seller.

8.    The Buyer reasonably and justifiably relied on the Seller's misrepresentations in entering into and preforming on the Factoring Agreement.

9.    As a direct and proximate result, the Buyer sustained damages.

<div align="center">COUNT SIX</div>

<div align="center">(NEGLIGENT MISREPRESENTATION)</div>

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Six as if fully set forth herein.

**Formatted:** Underline

<div align="center">5</div>

6. The Seller made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon without exercising reasonable care or competence in obtaining or communicating accurate information

7. The Buyer reasonably and justifiably relied on the Seller's misrepresentations.

8. As a direct and proximate result, the Buyer sustained damages.

COUNT SEVEN

(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

1-5. Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Seven as if fully set forth herein.

6. Implicit in the Factoring Agreement and Factoring Guaranty was a covenant of good faith and fair dealing, obligating Defendant to act honestly and fairly in the performance and enforcement of the parties' contractual relationship.

7-8. Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 7 through 8 of this Count Seven as if fully set forth herein.

9. Paragraph 6 of Count Six is hereby incorporated by reference as Paragraph 9 of this Count Seven as if fully set forth herein.

10. Seller's conduct deprived the Buyer the benefit of the bargain and undermined the reasonable expectations of the Buyer under the Factoring Agreement.

11. As a direct and proximate result of the Seller's breach of the covenant of good faith and fair dealing, the Plaintiff has sustained damages.

COUNT EIGHT

(VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA"))

6

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Eight as if fully set forth herein.

6-7.    Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 6 through 7 of this Count Eight as if fully set forth herein.

8.    Seller's actions were unethical, unscrupulous, and offends established public policy as set forth in CUTPA.

9.    As a result of Seller's unfair and deceptive acts, Plaintiff has suffered an ascertainable loss of money and property.

10.    Plaintiff is entitled to all remedies available under C.G.S. § 42-110g, including actual damages, attorneys' fees, and punitive damages.

WHEREFORE, the Buyer respectfully requests that the Court enter judgment in its favor and award the following relief:

a.    a. Money damages in an amount to be determined at trial;
b.    Punitive damages
cb. The Buyer's reasonable attorneys' fees and costs incurred herein;
de. Prejudgment and post-judgment interest as permitted by law and the Agreement; and
ed. Such other and further relief as the Court deems just and equitable.

THE PLAINTIFF,
PANTHERS CAPITAL LLC


By _____
Lucas Rocklin, Esq.
John T Szalan Esq.
Neubert, Pepe & Monteith, P.C.


7

195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Firm Juris Number 407996

8

DOCKET NO:RETURN DATE: AUGUST 12, 2025   :   SUPERIOR COURT

PANTHERS CAPITAL LLC   :   J.D. OF STAMFORD/NORWALK

:   AT STAMFORD

V.   :

:

CIS INTERNATIONAL HOLDINGS (N.A.)   :

CORP. d/b/a E TROPICAL FISH,   :

CHARITHA I SAMARASINGHE,   :

CIS INTERNATIONAL DISTRIBUTORS INC.,   :

LIVE AQUARIA HOLDINGS CORP,   :

LIONSROCK INVESTMENTS LLC,   :

LIONSROCK WISCONSIN LLC,   :

T3 AQUATICS,   :

SIAM TROPICAL FISH LTD,   :

TROPICAL AQUARIUM FISH (FIJI) LTD   :   JULY 31JULY 10, 2025

### STATEMENT OF AMOUNT IN DEMAND

The amount in demand, exclusive of interest and costs, exceeds $15,000.00.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____

Lucas Rocklin, Esq.
John T Szalan, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Juris Number 407996

9

# EXHIBIT A

10

# EXHIBIT B

Formatted: Centered

11

DOCKET NO:                    :      SUPERIOR COURT

PANTHERS CAPITAL LLC       :      J.D. OF STAMFORD/NORWALK

V.                               :      AT STAMFORD

                                       :

CIS INTERNATIONAL HOLDINGS (N.A.)   :

CORP. d/b/a E TROPICAL FISH,        :

CHARITHA I SAMARASINGHE,        :

CIS INTERNATIONAL DISTRIBUTORS INC.,   :

LIVE AQUARIA HOLDINGS CORP,       :

LIONSROCK INVESTMENTS LLC,       :

LIONSROCK WISCONSIN LLC,         :

T3 AQUATICS,                        :

SIAM TROPICAL FISH LTD,          :

TROPICAL AQUARIUM FISH (FIJI) LTD    :      JULY 31, 2025

A True Copy Attest

ERNEST A. LADEN
STATE MARSHAL
FAIRFIELD COUNTY

## AMENDED COMPLAINT

### COUNT ONE
### (BREACH OF CONTRACT AGAINST SELLER)

1. The plaintiff, Panthers Capital LLC ("Buyer"), is a limited liability company with a place of business in Connecticut.

2. The Buyer and the defendant, CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish ("Seller"), entered into that certain Future Receivables Sale and Purchase Agreement dated June 4, 2025 (the "Agreement"), pursuant to which the Seller sold, and the Buyer purchased, future receipts of the Seller in the aggregate amount of $1,500,236.00. A redacted copy of the Agreement is attached hereto as Exhibit A.

3. The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Guarantors") jointly and severally guaranteed the Seller's obligations under the Agreement, as evidenced by the

Guaranty of Performance executed by each of the Guarantors and incorporated within the Agreement (the "Guaranty").

4. Upon execution of the Agreement and Guaranty by the Seller and the Guarantors, the Buyer advanced funds to the Seller in accordance with the terms and conditions set forth in the Agreement.

5. The Seller defaulted under the Agreement in July 2025, including, without limitation, by taking actions that denied and interfered with the Buyer's contractual rights, including the Buyer's right to receive its designated share of the Seller's revenue. Specifically, and without limitation, the Seller caused a stop payment to be placed on the bank account into which it was required to deposit all receipts and from which the Buyer was authorized to initiate ACH debits to receive payment.

6. Pursuant to the Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7. Further, pursuant to the Agreement, the Seller expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Seller's property. See Agreement (Exhibit A), Paragraph 44.

8. The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement.

<div align="center">

COUNT TWO
(BREACH OF CONTRACT AGAINST GUARANTORS)

</div>

1-5. Paragraphs 1 through 5 of Count One are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Two as if fully set forth herein.

6. The Guarantors defaulted under the Guaranty by failing to pay the Buyer all amounts due and owing under the Agreement

<div align="center">2</div>

7.   Pursuant to the Guaranty, the Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

8.   Further, pursuant to the Guaranty, the Guarantors expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Guarantors' property. See Guaranty (Exhibit A), Paragraph 10.

9.   The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement and the Guaranty.

<div align="center">COUNT THREE</div>

<div align="center">(BREACH OF CONTRACT AGAINST SELLER)</div>

1.   Paragraph 1 of Count One is hereby incorporated by reference as Paragraph 1 of Count Three as if fully set forth herein.

2.   The Buyer and the Seller entered into a Factoring Facility Agreement dated December 1, 2024 ("Factoring Agreement"), pursuant to which, the Buyer agreed to purchase certain unencumbered invoices of an account receivable ("Factor Account") and sign exclusive payment rights of the Factor Account to the Buyer of the Seller up to a maximum of $3,000,000.00 at any given time. A redacted copy of the Factoring Agreement is attached hereto as Exhibit B.

3.   The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Factoring Guarantors") jointly and severally guaranteed the Seller's obligations under the Factoring Agreement, as evidenced by the Guaranty of Performance executed by each of the Guarantors and incorporated within the Factoring Agreement (the "Factoring Guaranty").

<div align="center">3</div>

4.      Upon execution of the Factoring Agreement and Factoring Guaranty by the Seller and the Factoring Guarantors, the Buyer purchased certain invoices of the Seller, the Seller assigned exclusive payment rights of the Factor Account to the Buyer, and the Buyer began to advance funds to the Seller in accordance with the terms and conditions set forth in the Factoring Agreement.

5.      The Seller defaulted on the Factoring Agreement in July 2025 by engaging in actions that violated and undermined the Buyer's contractual rights. Specifically, and without limitation the Seller (i) misrepresented the unencumbered status of certain invoices submitted to the Buyer, (ii) submitted identical invoices to the Buyer that had previously sold to the Buyer, (iii) subsequently sold invoices to third parties that were already sold to the Buyer.

6.      Pursuant to the Factoring Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement.

<div align="center">COUNT FOUR</div>

<div align="center">(BREACH OF CONTRACT AGAINST GUARANTORS)</div>

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Four as if fully set forth herein.

6.      The Factoring Guarantors defaulted under the Factoring Guaranty by failing to pay the Buyer all amounts due and owing under the Factoring Agreement.

7.      Pursuant to the Factoring Guaranty, the Factoring Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

<div align="center">4</div>

8.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement and the Factory Guaranty.

### COUNT FIVE

### (FRAUDULENT MISREPRESENTATION)

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Five as if fully set forth herein.

6.      The Seller intentionally made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon.

7.      The Seller intentionally misrepresented previously sold invoices to the Buyer as new invoices to the Buyer to induce the Buyer in continuing to preform on the Factoring Agreement and advance funds to the Seller.

8.      The Buyer reasonably and justifiably relied on the Seller's misrepresentations in entering into and preforming on the Factoring Agreement.

9.      As a direct and proximate result, the Buyer sustained damages.

### COUNT SIX

### (NEGLIGENT MISREPRESENTATION)

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Six as if fully set forth herein.

6.      The Seller made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon without exercising reasonable care or competence in obtaining or communicating accurate information

5

7.  The Buyer reasonably and justifiably relied on the Seller's misrepresentations.

8.  As a direct and proximate result, the Buyer sustained damages.

COUNT SEVEN

(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

1-5.  Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Seven as if fully set forth herein.

6.  Implicit in the Factoring Agreement and Factoring Guaranty was a covenant of good faith and fair dealing, obligating Defendant to act honestly and fairly in the performance and enforcement of the parties' contractual relationship.

7-8.  Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 7 through 8 of this Count Seven as if fully set forth herein.

9.  Paragraph 6 of Count Six is hereby incorporated by reference as Paragraph 9 of this Count Seven as if fully set forth herein.

10.  Seller's conduct deprived the Buyer the benefit of the bargain and undermined the reasonable expectations of the Buyer under the Factoring Agreement.

11.  As a direct and proximate result of the Seller's breach of the covenant of good faith and fair dealing, the Plaintiff has sustained damages.

COUNT EIGHT

(VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA"))

1-5.  Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Eight as if fully set forth herein.

6-7.  Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 6 through 7 of this Count Eight as if fully set forth herein.

6

8.    Seller's actions were unethical, unscrupulous, and offends established public policy as set forth in CUTPA.

9.    As a result of Seller's unfair and deceptive acts, Plaintiff has suffered an ascertainable loss of money and property.

10.    Plaintiff is entitled to all remedies available under C.G.S. § 42-110g, including actual damages, attorneys' fees, and punitive damages.

WHEREFORE, the Buyer respectfully requests that the Court enter judgment in its favor and award the following relief:
   a.  Money damages in an amount to be determined at trial;
   b.  Punitive damages
   c. The Buyer's reasonable attorneys' fees and costs incurred herein;
   d. Prejudgment and post-judgment interest as permitted by law and the Agreement; and
   e. Such other and further relief as the Court deems just and equitable.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
John T Szalan Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Firm Juris Number 407996

7

DOCKET NO: : SUPERIOR COURT

PANTHERS CAPITAL LLC :

: J.D. OF STAMFORD/NORWALK
V. : AT STAMFORD

:

CIS INTERNATIONAL HOLDINGS (N.A.) :
CORP. d/b/a E TROPICAL FISH, :
CHARITHA I SAMARASINGHE, :
CIS INTERNATIONAL DISTRIBUTORS INC., :
LIVE AQUARIA HOLDINGS CORP, :
LIONSROCK INVESTMENTS LLC, :
LIONSROCK WISCONSIN LLC, :
T3 AQUATICS, :
SIAM TROPICAL FISH LTD, :
TROPICAL AQUARIUM FISH (FIJI) LTD : JULY 31, 2025

## STATEMENT OF AMOUNT IN DEMAND

The amount in demand, exclusive of interest and costs, exceeds $15,000.00.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
John T Szalan, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Juris Number 407996

8

# EXHIBIT

# A

Docusign Envelope ID: 5298E2DB-AAC8-46BC-AEA9-6B9740B4B4A2



## PANTHERS CAPITAL

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated _____6/4/2025_____, between Panthers Capital LLC D/B/A Panthers Capital ("Panthers Capital"), the seller(s) listed herein (collectively, the "Seller"), and each guarantor identified below (each a "Guarantor") (all capitalized terms shall have the meanings ascribed to them below):

**Seller Legal Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** E TROPICAL FISH

**Form of Business Entity:** Corporation                    **EIN #:** ▮▮▮▮▮▮

**Physical Address:** 1405 W 178TH ST, GARDENA , CA 90248

**Mailing Address:** 1405 W 178TH ST, GARDENA , CA 90248

**PURCHASE PRICE:** $ 1,020,569.00    **PURCHASED AMOUNT:** $ 1,500,236.00    **SPECIFIED PERCENTAGE:** 50.00%

**ORIGINATION FEE:** $ 250.00    **PRIOR BALANCE:** $ 1,020,319.00    **INITIAL Daily DEBIT:** $ 10,002.00

**AMOUNT PAID TO SELLER (AFTER DEDUCTING THE ORIGINATION FEE AND ANY PRIOR BALANCE):** $ 0.00

| FOR SELLER #1 | FOR SELLER #2 |
|---|---|
| By: _[signature]_ | By: _____ |
| Name: CHARITHA I SAMARASINGHE | Name: _____ |
| Title: Owner | Title: Owner |
| Email: ▮▮▮▮▮ | Email: _____ |
| Business Phone: ▮▮▮▮▮ | Business Phone: _____ |

*Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guaranty of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to Panthers Capital by the following Owner(s)/Guarantor(s) of Seller

| OWNER/GUARANTOR #1 | OWNER/GUARANTOR #2 |
|---|---|
| By: _[signature]_ | By: _____ |
| Name: CHARITHA I SAMARASINGHE | Name: _____ |
| SSN ▮▮▮▮▮ | SSN: _____ |
| PHONE: ▮▮▮▮▮ | PHONE: _____ |
| Address: 4 SUNDOWN DR , RLLNG HLS EST , CA 90274 | Address: _____ |

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633

**WHEREAS,** Seller is desirous to sell to Panthers Capital, and Panthers Capital is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, Panthers Capital and Seller hereby agree to the foregoing and as follows:

## 1. Basic Terms and Definitions.

a. "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when Panthers Capital paid the Purchase Price to Seller. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee and Prior Balance.

b. "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of Seller's Future Receipts.

c. "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Dateof this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge,or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

d. " Daily Receipts" shall mean the amount of Future Receipts received by Seller on a Daily basis.

e. "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and permit Panthers Capital to debit pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

f. "Purchase Price" shall mean the total amount that Panthers Capital agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from Panthers Capital pursuant to this Agreement will be less than the Purchase Price by the total sum of the Origination Fee and Prior Balance, if any, set forth in the Preamble to this Agreement.

g. " Daily Installment" shall mean the amount that Seller and Panthers Capital agree to be a good faith approximation of the Specified Percentage of Seller's Daily Future Receipts. Seller and Panthers Capital further agree that the Initial Daily Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to Panthers Capital concerning Seller's most recent accounts receivables, including representations by the Seller to Panthers Capital regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

h. "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

i. "Prior Balance" shall mean the sum of all amounts that Seller may owe to Panthers Capital and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

j. "Origination Fee" shall mean the fee that Panthers Capital charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 20 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

k. In the event "Seller" is comprised of more than one entity, then:

   i. The term "Seller" shall mean, individually and collectively, all such entities; and

   ii. Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by statute, or by contract; and

   iii. The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

iv. The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

v. The terms "Specified Percentage", "Future Receipts", " Daily  Receipts", " Daily  Installment" shall mean the Specified Percentage, the Future Receipts and the  Daily  Receipts of all Sellers jointly; and each Seller individually; and

vi. Panthers Capital may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

l. In the event "Guarantor" is comprised of more than one individual, then:

i. The term "Guarantor" shall mean, individually and collectively, all such individuals; and

ii. Each Guarantor is an Affiliate of all other Guarantor(s); and

iii. The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

iv. The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

v. Panthers Capital may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

2. **No Fixed Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to Panthers Capital pursuant to this Agreement are received by Panthers Capital in full. Seller hereby acknowledges that it fully understands that: (i) Panthers Capital's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to Panthers Capital in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business Panthers Capital's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely.

3. **Sale of Purchased Future  Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto Panthers Capital all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to Panthers Capital (hereinafter, the portion of the Future Receipts sold by Seller to Panthers Capital pursuant to this Agreement, the "Purchased Future Receipts" ); to have and hold the same unto Panthers Capital, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to Panthers Capital of collectability of the Purchased Future Receipts by Panthers Capital and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to Panthers Capital full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

4. **Payment of Purchase Price.** The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by paying to Seller the Purchase Price (reduced by the Origination Fee and Prior Balance, if any).

5. **Use of Purchase Price.** Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

6. **Daily  Installments of Purchased Amount.** Subject to Seller's right of adjustment/reconciliation set forth in this Agreement, the Purchased Amount shall be delivered by Seller to Panthers Capital  Daily  in the amount of the  Daily  Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

7. **Approved Bank Account and Credit Card Processor.** During the course of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) business-purpose bank account which bank account shall be acceptable and preapproved by Panthers Capital (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by Panthers Capital (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the course of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

8. **Authorization to Debit Approved Bank Account.** Seller hereby authorizes Panthers Capital to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the  Daily  Installment on each Workday commencing on the Effective Date until Panthers Capital receives the full Purchased Amount;

The  Daily  Installment is to be drawn via ACH payment, from the following bank account:



NOTE that this authorization is to remain in full force and effect until Panthers Capital receives written notification from Seller of its termination in such time and in such manner to afford Panthers Capital a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

9.  **Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or Panthers Capital's banking institution directly (or to compensate Panthers Capital, in case it is charged) all fees, charges and expenses incurred by either Seller or Panthers Capital due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

10.  **Seller's Right of Reconciliation.** Seller and Panthers Capital each acknowledge and agree that:

a.    If at any time during the course of this Agreement Seller experiences a decrease or increase in its  Daily  Receipts, Seller shall have the right to request retroactive reconciliation of the  Daily  Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by Panthers Capital (each such calendar month, a "Reconciliation Month").

b.    Such reconciliation (the "Reconciliation") of the Seller's  Daily  Installment for a Reconciliation Month shall be performed by Panthers Capital within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by Panthers Capital from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

c.    One or more Reconciliation procedures performed by Panthers Capital may reduce or increase the effective  Daily  Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which Panthers Capital will be debiting the Approved Bank Account may get shortened or  extended indefinitely.

11.    **Request for Reconciliation Procedure.**

a.    Seller may initiate Reconciliation of Seller's actual  Daily  Installments at any time by sending a request for Reconciliation to Panthers Capital.

b.    Any such request for Reconciliation of the Seller's  Daily  Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements,and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by Panthers Capital via email to accounting@pantherscapital.com with the subject line "REQUEST FOR RECONCILIATION."

c.    Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply with each such request, provided that:

i.    Each such request is made in accordance with the terms of this Section 11; and

ii.    If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by Panthers Capital from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

d.    Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with Panthers Capital's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by Panthers Capital in full, or (ii) modify the amount of the  Daily  Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

12.    **Adjustment of the  Daily   Installment.** Seller and Panthers Capital each acknowledge and agree that:

a.    Seller and Panthers Capital shall have the right to request modification ("Adjustment") of the amount of

the Daily Installment on a going-forward basis to more closely reflect Seller's actual Daily Receipts times the Specified Percentage. Panthers Capital will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Daily Installment until any subsequent Adjustment. If Seller requests an Adjustment, Panthers Capital shall perform the Adjustment within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Daily Installment that shall be debited from the Approved Bank Account.

b.    One or more Adjustments performed by Panthers Capital may substantially extend the term of this Agreement.

**13.    Request for Adjustment Procedure.**

a.    Seller and/or Panthers Capital may initiate an Adjustment by sending a request for Adjustment to the other party in writing. Seller may request an adjustment via e-mail to accounting@pantherscapital.com with the subject line "REQUEST FOR ADJUSTMENT."

b.    Within five (5) Workdays following a request for Adjustment (an "Adjustment Request") Seller shall provide to Panthers Capital's copies of: (i) Seller's most recent month's bank statement of the Approved Bank Account and month-to-date transaction activity, credit card processing statements and any aging reports immediately preceding the date of Panthers Capital's receipt of the Adjustment Request.

c.    Seller and Panthers Capital shall have the right to request Adjustment of the Daily Installment as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply in good faith with such request, provided that:

i.    Each such request for Adjustment is made in accordance with the terms of this Section 13; and

ii.    A request for Adjustment shall not be made after the Expiration Date.

**14.    Rights and Obligations of Panthers Capital upon Receipt of the full Purchased Amount.**

Upon receipt of the full amount of the Purchased Amount and any fees owed to Panthers Capital under this Agreement:

a. Panthers Capital shall notify Seller's bank and request from it to stop transferring Daily Installments to Panthers Capital's bank account.

b. If Panthers Capital shall have received funds in excess of the Purchased Amount and any fees owed to Panthers Capital under this Agreement, Panthers Capital shall promptly return such excess to Seller.

**15.    Risk Sharing Acknowledgments and Arrangements.**

a. Seller and Panthers Capital each hereby acknowledges and agrees that:

i.    The Purchased Future Receipts represent a portion of Seller's Future Receipts.

ii.    This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from Panthers Capital. Panthers Capital does not charge Seller and will not collect from Seller any interest on the monies used by Panthers Capital for the purchase of the Purchased Future Receipts. The period of time that it will take Panthers Capital to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after Panthers Capital's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's reasonable control, Panthers Capital may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

iii.    The amount of the Initial Daily Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Daily Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to Panthers Capital.

iv.    The amounts of Seller's future Daily Receipts may increase or decrease over time.

**16.    Panthers Capital's Risk Acknowledgments.** Panthers Capital agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and Panthers Capital assumes these risks based

exclusively upon the information provided to it by Seller related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give Panthers Capital a reasonable and fair opportunity to receive the benefit of its bargain. Panthers Capital assumes the risk that Future Receipts may be remitted more slowly than Panthers Capital may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business went bankrupt or Seller otherwise ceased operations in the ordinary course of business.

17. **Application of Amounts Received by Panthers Capital.** Panthers Capital reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Panthers Capital from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

18. **Not a Loan.** Seller and Panthers Capital agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by Panthers Capital is not intended to be, nor shall it be construed as, a loan from Panthers Capital to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, Panthers Capital's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to Panthers Capital in full (if ever) are subject to and conditioned upon performance of Seller's business.

19. **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless Panthers Capital for any and all damages and losses (including without limitation legal fees and expenses) incurred by Panthers Capital as the result of such representation being untrue, incorrect or incomplete.

20. **Origination Fee.** Seller hereby agrees for Panthers Capital to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

21. Seller represents, warrants and covenants that as of this date and, unless otherwise stated, during the course of this Agreement:

   a. **Financial Condition and Financial Information.** Seller's bank and financial statements, copies of which have been furnished to Panthers Capital, and future statements which may be furnished hereafter pursuant to this Agreement or upon Panthers Capital's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Panthers Capital may request Seller's bank statements at any time during the term of this Agreement and view-only access to Seller's bank account and Seller shall provide them to Panthers Capital within five (5) Workdays. Seller's failure to do so is a material breach of this Agreement.

   b. **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

   c. **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

   d. **Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

   e. **Accounting Records and Tax Returns.** Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that Panthers Capital is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

f.   **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

g.   **Electronic Check Processing Agreement.** Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede Panthers Capital's rights under this Agreement, without Panthers Capital's prior written consent.

h.   **No Diversion of Future Receipts.** Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without Panthers Capital's written permission.

i.   **Change of Name or Location.** Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and Panthers Capital, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining Panthers Capital's written consent.

j.   **Prohibited Business Transactions.** Seller shall not: (i) voluntarily transfer or sell all or substantially all of its assets (including without limitation the Collateral as such term is defined in Section 23 or any portion thereof) without first obtaining Panthers Capital's consent; or (ii) make or send notice of its intended bulk sale or transfer.

k.   **Closing of Business.** Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of Panthers Capital, and (ii) providing Panthers Capital with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Panthers Capital. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until Panthers Capital shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide Panthers Capital ten (10) Workdays advance notice, to the extent practicable.

l.   **No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six (6) months immediately preceding the date of this Agreement.

m.   **Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) Workday's prior notice from Panthers Capital to Seller, execute, acknowledge and deliver to Panthers Capital and/or to any other person or entity specified by Panthers Capital, a statement certifying that this Agreement is unmodified and in full force and effect or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been delivered.

n.   **Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

o.   **No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of Panthers Capital.

p.   **Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

q.   **No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

r.  **Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants Panthers Capital the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's Daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants Panthers Capital and its employees and consultants access during regular business hours to Seller's employees and records and all other items of property located at the Seller's place of business during the course of this Agreement. Seller hereby agrees to provide Panthers Capital, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow Panthers Capital to interview any of those parties.

s.  **Phone Recordings and Contact.** Seller agrees that any call between Seller and Panthers Capital and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with Panthers Capital, its managers, employees and agents (collectively, the "Panthers Capital Parties") and that Seller may be contacted by any of Panthers Capital Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of Panthers Capital Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

t.  **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

u.  **Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Panthers Capital.

v.  **Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

Y.  **No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and Panthers Capital with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by Panthers Capital or any of the Panthers Capital Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Panthers Capital Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement

z.  **No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Origination Fee, if any, set forth in Section 20 herein, Panthers Capital is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Section 2 hereof, such fee is not charged by Panthers Capital. Moreover, as all working capital received under this Agreement is intended to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

aa.  **Credit Report and Other Authorizations** Seller and each of the Owners signing above authorize Panthers Capital, its agents and representatives and any credit reporting agency engaged by Panthers Capital, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement; (ii) obtain consumer and business credit reports on the Seller and any of its Owners; and (iii) to contact personal and business references provided by the Seller in any application, at any time now or for so long as Seller and/or Owners continue to have any obligations to Panthers Capital as a consequence of this Agreement or for Panthers Capital's ability to determine Seller's eligibility to enter into any future agreement with Panthers Capital.

Docusign Envelope ID: ...

## PLEDGE OF SECURITY

22. **Pledge.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Panthers Capital (collectively, "Pledge") and grants to Panthers Capital a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

    a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    b. all Seller's proceeds, as such term is defined by Article 9 of the UCC.

23. **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Panthers Capital will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

24. **Representations with Respect to Collateral.** Seller hereby represents and warrants to Panthers Capital that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party.

25. **Further Assurances.** Upon the request of Panthers Capital, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts andthings, as Panthers Capital may request in order to more fully effectuate the purposes of this Pledge andthe assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

## EVENTS OF DEFAULT AND REMEDIES

26. **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

    a. Seller shall violate any term, condition or covenant in this Agreement.

    b. Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    c. Seller shall default under any of the terms, covenants and conditions of any other agreement with Panthers Capital (if any) which is related to the instant Agreement.

    d. Seller uses multiple depository accounts without obtaining prior written consent of Panthers Capital in each instance.

    e. Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    f. Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of Panthers Capital in each instance.

    g. Seller intentionally interferes with Panthers Capital's collection of Daily Installments.

27. **Default under the Agreement.** In case any Event of Default occurs and is not waived by Panthers Capital, in writing, Panthers Capital may declare Seller in default under this Agreement without notice.

28. **Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Panthers Capital the entire undelivered portion of the Purchased Amount and the Specified Percentage shall equal 100% of all Future Receipts. In addition, Seller shall also pay to Panthers Capital, as additional damages, any reasonable expenses incurred by Panthers Capital in connection with recovering the monies due to Panthers Capital from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages").

29. **Remedies Upon Default.** Upon Seller's default, Panthers Capital may immediately proceed to protect and enforce

its rights under this Agreement and/or Guaranty by:

    a. Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Panthers Capital's security interest;

    b. Enforcing the provisions of the Personal Guaranty of Performance against the Guarantor(s) without first seeking recourse from Seller;

    c. Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to Panthers Capital of all or any portion of the amounts received by such credit card processor on behalf of Seller;

    d. Subject to arbitration as provided in Section 50 of this Agreement, commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or remedy including without limitation Panthers Capital's rights of a secured party under the UCC.

30. **Remedies are not Exclusive.** Subject to arbitration as provided in Section 50 of this Agreement, all rights, powers and remedies of Panthers Capital in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Panthers Capital by law or equity.

## ADDITIONAL TERMS

31. **Seller Deposit Agreement.** Seller shall execute an agreement with Panthers Capital that shall authorize Panthers Capital to arrange for electronic fund transfer services and/or "ACH" payments of Daily Installments from the Approved Bank Account. Seller shall upon request provide Panthers Capital and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

32. **Financial Condition.** Seller and its Guarantor(s) authorize Panthers Capital and its agents to investigate their financial status and history and will provide to Panthers Capital any bank or financial statements, tax returns, etc., as Panthers Capital deems reasonably necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable for release of financial information. Seller hereby authorizes Panthers Capital to receive from time to time updates on such information and financial status.

33. **Transactional History.** Seller shall execute written authorization(s) to its bank(s) to provide Panthers Capital with Seller's banking and/or credit-card processing history.

34. **Indemnification.** Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by Panthers Capital for monies owed to Panthers Capital from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by Panthers Capital.

35. **No Liability.** In no event shall Panthers Capital be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

36. **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

37. **Assignment.** Panthers Capital may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining Panthers Capital's written consent.

38. **Notices.**

    a. Panthers Capital may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Panthers Capital's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

b. Subject to Section 11 of this Agreement, Seller and Guarantor may send any notices to Panthers Capital by e-mail only upon the prior written consent of Panthers Capital, which consent may be withheld or revoked at any time in Panthers Capital's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to Panthers Capital must be delivered by certified mail, return receipt requested, to Panthers Capital's address as set forth in this Agreement. Notices sent to Panthers Capital shall become effective only upon receipt by Panthers Capital.

39. **Waiver Remedies.** No failure on the part of Panthers Capital to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to arbitration as provided in Section 50 of this Agreement, the remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

40. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

41. **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the partiesto this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums. Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on this Agreement, or via email address(es) listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

42. **Service of Process.**

**IMPORTANT NOTICE** - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

i. If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

ii. If sent by e-mail, on the same day and time that the e-mail is sent;

3. Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in this Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected

to be received by them;

4. Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

43. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDGMENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON,</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDGMENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

44. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE** - THIS PREJUDGMENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY UPON OR AFTER COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER UPON OR AFTER COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

45. Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

46. Severability. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

47. Entire Agreement. This Agreement embodies the entire agreement between Seller and Panthers Capital and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

48. JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

49. CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATEDWITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECUREDTHROUGH THE CLASS OR REPRESENTATIVE ACTION.

50. ARBITRATION. Notwithstanding any other provision of this Agreement, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, MAY BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators may be appointed by RapidRuling. The place of

Docusign Envelope ID: 5256E2DB-AAL-B-86BL-REC4-6B7A4UEFAB35

arbitration may be in Connecticut, and any hearing may be held via video or telephone conference. The parties agree that no objection may be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THIS AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "SAFE SENDERS" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis.   Panthers Capital, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees may be equally paid by the parties, and the commencing party may be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. Panthers Capital, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party may be responsible for any attorney's fees, court or other fees associated with such actions. Panthers Capital, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, Panthers Capital, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE MAY BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

51.    **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND Panthers Capital A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: Panthers Capital - ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902, ATTENTION: Arbitration Opt-Out.**

52.    **Counterparts and Facsimile Signatures.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER #1**

By: _____

Name: CHARITHA I SAMARASINGHE

Title: Owner

EIN ████████

**FOR SELLER #2**

By: _____

Name:

Title: Owner

EIN: _____

AGREE TO BE BOUND BY THE PROVISIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.

**OWNER/GUARANTOR # 1**

By: _____

Name: CHARITHA I  SAMARASINGHE

SSN ████████

**OWNER/GUARANTOR # 2**

By: _____

Name:

SSN:

**Panthers Capital LLC**

By: _____

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is being executed and delivered by each undersigned ("Guarantor") in favor of Panthers Capital LLC, and its subsidiaries, affiliates, agents, and assigns (collectively, "Buyer"), in connection with that certain Future Receivables Sale and Purchase Agreement (the "Agreement"), dated effective as of [ 6/4/2025 ] by and between Buyer and [CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHE] ("Seller"), a business entity that desires to sell certain of its Future Receipts to Buyer pursuant to the Agreement. Capitalized terms used herein have the meanings provided in the Agreement. Each Guarantor is a shareholder, member, partner or other principal owner of Seller or is an affiliate of seller that is owned and controlled by a shareholder, member, partner or other principal owner of Seller. Each Guarantor executes and delivers this Guaranty to induce Buyer to enter into the Agreement and purchase Seller's Future Receipts. Accordingly, each Guarantor acknowledges and agrees that Guarantor will receive substantial benefits from providing this Guaranty.

**SELLER # 1:**                                            **SELLER # 2:**

Legal Business Name CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTI Legal Business Name _____

D/B/A: E TROPICAL FISH _____    D/B/A: _____

NOW, THEREFORE, as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's obligations under the Agreement (the "Obligations"); and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly perform (or cause to be performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

   a.   any amendment, modification or extension of the Agreement or any Obligation;

   b.   any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

   c.   any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

   d.   any other guaranty now or hereafter executed by Guarantor or anyone else;

   e.   any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

   f.   any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

   g.   the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

   h.   the failure to give Guarantor any notice whatsoever;

   i.   any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not voluntarily dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. Subject to arbitration as provided in Section 13 of this Guaranty, the remedies provided in this Guaranty are cumulative and not exclusive of anyremedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer mayenforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipts is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Guaranty irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums. Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on the Agreement, or via email address(es) listed on the Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**8. Service of Process.**

<u>IMPORTANT NOTICE</u> - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

    i.      If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at

the earlier of: (a) four calendar days after mailing, (b) when delivered, (c) when received; and

   ii.    If sent by e-mail, on the same day and time that the e-mail is sent;

3. Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in the Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them;

4. Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

**9. PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

IMPORTANT NOTICE - THIS PREJUDGMENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

   a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

   1.    THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

   2.    WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

   3.    WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

   b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDGMENT REMEDY, THROUGH USE OF THIS WAIVER, AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

   c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

   d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

**10. PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

IMPORTANT NOTICE - THIS PREJUDGMENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

   a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

   1.    THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

   2.    WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY UPON OR AFTER COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.    WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.    EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c.    EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR BUYER OBTAINING ANY PREJUDGMENT REMEDY.

**11. JURY WAIVER.** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**12. CLASS ACTION WAIVER.** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**13. ARBITRATION.** Notwithstanding any other provision of this Guaranty, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE AGREEMENT, THE SECURITY AGREEMENT AND/OR THE GUARANTY(S), OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED, CONFIRMED AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators shall be appointed by RapidRuling. The place of arbitration shall be in Connecticut and any hearing shall be held via video or telephone conference. The parties agree that no objection shall be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THE AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "safe senders" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. BUYER, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees shall be equally paid by the parties, and the commencing party shall be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. BUYER, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party shall be responsible for any attorney's fees, court or other fees associated with such actions. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

**14. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS GUARANTY. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS GUARANTY: PANTHERS CAPITAL. - ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902 ATTENTION: <u>Arbitration Opt-Out</u>.**

**15. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**16. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**17. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

AGREED AND ACCEPTED:

OWNER/GUARANTOR #1

By: _____

Name: CHARITHA I SAMARASINGHE

SSN: ████████████

Panthers Capital LLC

By: _____

OWNER/GUARANTOR #2

By: _____

Name:

SSN:

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AFF4-5H28/ILLFAbXX

## RIDER 3

### TO THE ___6/4/2025___

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Panthers Capital LLC ("BUYER")

### and CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES L ("Seller")

### APPLICABLE FEES

1. **Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3. **C. I. S.   Applicable Fees.** The parties agree that the Applicable Fees which Seller shall pay to Buyer, pursuant to Section 17 of the Agreement shall be as follows:

   A. **Monthly Fee:** ___$299___ (charged monthly to cover expense of ACH processing program).

   B. **UCC Fee:** ___$200___ (part of filing UCC financing statements and their terminations).

   C. **Wire Fee** ___$50___ (deducted from the Purchase Price to cover cost of remitting the Purchase Price).

   D. **NSF Fee:** ___$10___ (to cover expense of an NSF - if this occurs twice in a row, the third occurrence constitutes a default under the Agreement).

   E. **ACH Rejection Fee:** ___$25___ for each rejected ACH debit.

   F. **Bank Change Fee:** ___$25___

   G. **Blocked Account Fee:** ___$100___

   H. **UCC Release Fee:** ___$200___

   I. **Additional Broker Fee:** _____

   J. **Stacking Fee:** ___$5,000___ (in the event Seller takes additional capital without written consent of Buyer).

   K. **Default Fee:** ___$10,000___

   L. **Cancellation of contract:** ___$0___

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivery to Seller.

5. **No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed a reduction of the Purchase Price.

Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.

**FOR THE SELLER**                                **FOR THE BUYER**

By: _____          By: _____

Name: CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES  Name: Panthers Capital

## RIDER 2

TO THE ___6/4/2025___

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

("Agreement")

Between Panthers Capital LLC ("Buyer")

and CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ("Seller")

### PRIOR BALANCE

1. **Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3. **Prior Balance.** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

TOTAL PRIOR BALANCE: $ 1,020,319.00    owed to: Panthers Capital___

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 19 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to Buyer and/or the creditors listed in this Rider.

5. **No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

6. **Indemnification.** Seller hereby indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.

AGREED AND ACCEPTED:

OWNER/GUARANTOR #1                          OWNER/GUARANTOR #2

By: _____                By: _____

Name: CHARITHA I SAMARASINGHE             Name:

Panthers Capital LLC

By: _____

## RIDER 1

### TO THE ___6/4/2025___

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

("Agreement")

### Between Panthers Capital LLC ("Buyer")

and <u>CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES</u> ("Seller")

### ORIGINATION FEE

1. **Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated.

3. **Origination Fee.** The parties agree that the Origination Fee that Seller shall pay to Buyer pursuant to Section 20 of the Agreement shall be:

   $ 250.00

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 20 of theAgreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

5. **No Reduction of Purchase Amount.** Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchased Amount.

Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                          **OWNER/GUARANTOR #2**

By: _____                    By: _____

Name: CHARITHA I SAMARASINGHE                  Name:

**Panthers Capital LLC**

By: _____

## EARLY DELIVERY ADDENDUM

### TO THE __6/4/2025__

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES ("Seller")

### EARLY DELIVERY OPTION

1. **Qualification.** As long as no Event of Default has taken place during the term of the Agreement, Seller may opt-in to obtain a discounted Purchased Amount.

2. **Thirty (30) Day Option.** If paid in full within 30 calendar days, payback will be at a discounted rate of __1.1__.

3. **Sixty (60) Day Option.** If paid in full within 60 calendar days, payback will be at a discounted rate of __1.15__.

4. **Ninety (90) Day Option.** If paid in full within 90 calendar days, payback will be at a discounted rate of _____.

5. **One hundred twenty (120) Day.** If paid in full within 120 calendar days, payback will be at a discounted rate of _____.

Seller and Buyer agree that this Addendum shall be attached to the Agreement and shall be madea part thereof.

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**

OWNER/GUARANTOR #2

By: _____

By: _____

Name: CHARITHA I SAMARASINGHE

Name: _____

**Panthers Capital LLC**

By: _____



**PANTHERS CAPITAL**

**List of top 5 clients - Please list the top 5 clients that you are currently providing services for / have provided services for in the past 30 days.**

Business Nam

Contact Name

Phone Number: _____

Does the client owe you money? Yes __✔__ If so, Amount: $ 1,800,000.00 _____

Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes __✔__ If so, Amount: $ 50,000.00 _____

Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____

Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____

Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____

Signed by:

Signature here: _____
086ED1260399401

## OFFER SUMMARY – Sales-Based Financing

| | | |
|---|---|---|
| Funding Provided | $ 1,020,569.00 | This is how much funding Panthers Capital _____ will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is _____ $ 0.00 _____ . For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." The amount paid directly to Merchant may change where the required disbursements to satisfy Merchant's other obligations change. |
| Estimated Annual Percentage Rate (APR) | % 114.00 | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through revenue of CIS INTERNATIONAL HOLDINGS (N.A.) CORP will be _____ $ 1,500,000.00 _____ . Since your actual income may vary from our estimate, your effective APR may also vary. APR is not an interest rate. The cost of this financing is based upon fees charged by Panthers Capital _____ rather than interest that accrues over time. |
| Finance Charge | $ 479,667.00 | This is the dollar cost of your financing. Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $ 1,500,236.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | $ 210,042.00 | Although you do not make payments on a monthly basis, this is Panthers Capital _____ 's calculation of your average monthly cost based upon the payment amounts disclosed below. |
| Estimated Payment | $ 10,002.00 / Daily _____ Panthers Capital _____ | is not aware of any reasonably anticipated true-ups. |
| Payment Terms | _____ Daily _____ | ACH withdrawals of the Estimated Payment described above will be made from the bank account you provided to us for this purpose. The Estimated Payment is based on our estimate of _____ Daily _____ of your (CIS INTERNATIONAL HOLDINGS (N.A.) CORP's) daily revenue, based upon your average monthly revenue income of _____ $ 1,500,000.00 _____ for the last four months. You have the right to receive refunds of all or part of your payments if you demonstrate that your payments have exceeded _____ Daily _____ of your |

| | total income during any given month. For more details on your rights, see section 10. Seller's Right of Reconciliation and 11. Request for Reconciliation Procedure of your revenue purchase agreement. | |
|---|---|---|
| Estimated Term | <u>150</u> days | This is our estimate of how long it will take to collect amounts due to <u>Panthers Capital</u> under the revenue purchase agreement based upon the assumption that you will receive <u>$ 1,500,000.00</u> in monthly income through your revenue stream. |
| Prepayment | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to <u>$ 479,667.00</u> based upon our estimates. | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

Signed by:

086ED1260399401...

**Recipient Signature**                                    **Recipient Signature**

_____                    _____

**Date**                                                          **Date**

- By checking this box, you are confirming that you have read and understand the Offer Summary provided to you.

# EXHIBIT A

## CROSS COLLATERAL ADDENDUM

This addendum shall serve to modify the Agreement of Sale of **Future Receivables ("Merchant Agreement")** which was entered into between _____ Panthers Capital _____ (hereafter **"Purchaser"**) and CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL O1 **(Hereafter the "Merchants" or "Affiliates") Dated:** 6/4/2025

**Whereas,** the Merchants have individually entered into a Merchant Agreement with Purchaser to sell a portion of their future receivables at a discount;

**Whereas,** the Merchants are affiliated and hereby pledge to assume any and all liability of the other owned entities in the event that one fails to perform or defaults under the terms and conditions the Merchant Agreement. Affiliated entity or collateral is as follows:

| | | |
|---|---|---|
| 1. | CIS INTERNATIONAL HOLDINGS (N.A.) CORP | CHARITHA I SAMARSINGHE |
| 2. | CIS INTERNATIONAL DISTRIBUTOR | CHARITHA I SAMARSINGHE |
| 3. | SIAM TROPICAL FISH LTD | CHARITHA I SAMARSINGHE |
| 4. | TROPICAL FISH INTERNATIONAL EUROPE | CHARITHA I SAMARSINGHE |
| 5. | TROPICAL AQUARIUM FISH (FIJI) LTD | CHARITHA I SAMARSINGHE |
| 6. | LIVE AQUARIA HOLDINGS CORP | CHARITHA I. SAMARASINGHE |
| 7. | T3 AQUATICS | CHARITHA I. SAMARASINGHE |
| 8. | LIONSROCK INVESTMENTS LLC | CHARITHA I. SAMARASINGHE |
| 9. | LIONSROCK WISCONSIN LLC | CHARITHA I. SAMARASINGHE |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| 16. | | |
| 17. | | |
| 18. | | |
| 19. | | |
| 20. | | |

**("Corporate Guarantor(s)")**

Docusign Envelope ID: 5255E2DB-AAC8-46BC-AEC4-...

Additionally, the Merchants and Affiliates individually hereby grant cross collateral to each other and all the affiliated entities included in this addendum.

Merchants and Corporate Guarantor(s) hereby grant Purchaser a security interest in, and authorizes Purchaser **to file a UCC financing statement covering, all of Merchants and Corporate Guarantor(s)' present and future** accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Merchant and Corporate Guarantor(s).

This addendum does not alter the terms and conditions of the original Merchant Agreement and that all terms remain in full force and effect.

By executing this addendum, the undersigned represent that it has authority to enter into this agreement on behalf of the above-named Corporate Guarantors.

**Agreed & Accepted:**

**For:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"
(as member, manager, or authorized agent of Corporate Guarantor(s))

Signed by:

086ED1260399401                     6/4/2025

Name: CHARITHA I SAMARASINGHE          Name:

Title: OWNER                           Title:

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | $ 1,020,569.00 |
| 2. Amount Paid on your Account with Us | $ 1,020,319.00 |
| 3. Disbursement paid to a third-party on your behalf to _____ | |
| 4. Amount Provided to You or on Your Behalf (Sum of Items 1-3) | $ 2,040,888.00 |
| 5. Prepaid Finance Charge: Brokerage Fee | |
| 6. Prepaid Finance Charge: Origination Fee | $ 250.00 |
| 7. Amount Financed (Item 4 minus Items 5 and 6) | $ 2,040,638.00 |

# EXHIBIT
# B

## PANTHERS CAPITAL

### FACTORING FACILITY AGREEMENT

This Agreement is made and entered into as of the date of the Seller's electronic signature by and between CIS INTERNATIONAL HOLDINGS (N.A.) CORP, a California corporation, located at 1405 W 178th St, Gardena, CA 90248, with ▮▮▮▮▮▮▮▮▮ ("**Seller**"); and PANTHERS CAPITAL LLC, a limited liability company, located at 9 W Broad St #320, Stamford, CT 06902 ("**Purchaser**"). Charitha I. Samarasinghe, as the guarantor and CEO of CIS INTERNATIONAL HOLDINGS (N.A.) CORP, also executes this Agreement as an individual guarantor.

### Recitals

WHEREAS, Seller desires to establish a factoring facility to sell all of its accounts receivable ("ARs") exclusively to Purchaser on the terms set forth herein, and Purchaser desires to acquire such Accounts for the purpose of providing liquidity to Seller; and

WHEREAS, the Seller hereby covenants that all Accounts Receivable due from Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. (hereinafter collectively referred to as "Petco") shall be paid directly by Petco to the Purchaser, without any deviation or redirection of funds.

WHEREAS, Seller is engaged in the general business of supplying products to Petco, and normally sells and delivers merchandise to Petco on a credit basis; and

WHEREAS, Seller desires to obtain funds and commercial credit for the operation of its business against its accounts receivable; and

WHEREAS, Purchaser is willing to purchase Seller's accounts receivable according to the terms set forth in this Agreement;

NOW, THEREFORE, for and in consideration of the mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1  **Assignment of Accounts Receivable.**

1.1 **Assignment of Accounts Receivable.** Seller hereby assigns to Purchaser as absolute owner, and Purchaser purchases and accepts from Seller without recourse to Seller, except as set forth in this Agreement, all accounts receivable created now or in the future by Seller's credit sales to Petco. Such accounts receivable are acceptable to Purchaser and represented by Seller to be bona fide existing obligations of Petco, arising out of and acquired by it in the ordinary course of its business. These accounts receivable are or will be due and owing to Seller without defense, offset, or counterclaim. For purposes of this Agreement, accounts receivable include all accounts, notes, trade acceptances, bills of exchange, pledges, mortgages, choses in action, or any other form of obligation.

1.2 **Sale of Accounts.** Seller hereby sells, assigns, and transfers to Purchaser, on an ongoing and exclusive basis, all right, title, and interest in and to its eligible accounts receivable ("Eligible Accounts") that arise from the sale of goods or services by Seller to Petco. Seller agrees to

Page 1 of 14

Seller Initials: ▮▮▮▮▮

provide Purchaser with copies of all relevant documentation supporting these transactions, including invoices, shipping documentation, and proof of delivery or service acceptance.

1.3 **Factoring Facility Advance.** Purchaser shall advance to Seller an amount equivalent to eighty-five percent (85%) of the total value of Eligible Accounts presented for factoring, subject to eligibility verification. The maximum credit exposure under this facility shall be $3,000,000 at any given time.

1.4 **Factoring Fee Structure.** Purchaser shall charge a factoring fee of 0.234% per day on the face value of each financed invoice until such invoice is paid. Factoring fees will accrue from the date of advance until the invoice is fully satisfied or reaches 90 days in age, whichever comes first. Should Petco make payment within 45 days, Purchaser shall retain the accrued factoring fees along with the principal advanced, and any residual amount shall be rebated to Seller.

1.5 **Example Calculation.** Under this factoring facility, an advance of $100,000 against a gross receivable of $117,647.05 will accrue a factoring fee of $234 per day. After 45 days, once Petco remits payment, Purchaser will retain $110,530 to cover the principal and factoring fees, while rebating $7,117.05 to Seller.

1.6 **Recourse Provision.** This factoring facility is provided with recourse to the Seller. In the event that any Account remains unpaid after 90 days from the invoice date, Seller shall be obligated to repurchase the unpaid Account from Purchaser at the original advance amount, plus any applicable accrued fees. Should the Seller fail to repurchase the unpaid Account, Purchaser shall have the right to apply a clawback against future ARs from Petco to recover the outstanding amount, including any accrued fees and costs incurred.

## 2 Sales and Delivery of Merchandise.

2.1 **Sales and Delivery by Seller.** All sales and deliveries of merchandise by Seller to Petco will be made in Seller's name, with explicit notification to Petco that the accounts receivable thus created have been assigned, sold, and transferred to Purchaser as absolute owner.

2.2 **Invoicing and Notification.** Invoices and statements to Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. ("Petco") shall be issued by Seller in a manner and on forms approved by Purchaser. Purchaser reserves the right, at its sole discretion, to issue such invoices or statements directly to Petco, with the costs associated with stationery and postage being charged to Seller's account. All invoices must be clearly marked in a manner specified by Purchaser, providing full notification to Petco that payment is to be made to Purchaser at the following bank account:



Page 2 of 14

Seller Initials: _____

Docusign Envelope ID: C3985AEA-844E-47A7-A8B0-D529838388EF

2.3 **Right to Collection.** Purchaser has the right to institute and maintain actions in its name or otherwise to collect such accounts. Actions based upon Seller Risk Accounts shall be at the cost of Seller. "Seller Risk Account" shall mean any account with amounts or invoices which, when aggregated with those amounts or invoices already existing, exceed the credit limit established by Purchaser with respect to Petco.

## 3   Credit Approval.

3.1 **Sales and Deliveries with Approval.** All sales and deliveries of merchandise to Petco must be made with prior notification by email to Purchaser at Ben@pantherscapital.com and Mike@pantherscapital.com. Since all deliveries are made in large quantities, they shall be considered invoiced when the tracking number is provided to both Petco and Purchaser.

3.2 **Withdrawal of Credit Approval.** If, in Purchaser's sole opinion, Petco's creditworthiness becomes impaired before the actual delivery of merchandise, Purchaser shall have the right to withdraw approval of any order taken from Petco.

3.3 **Right of Stoppage in Transit.** Purchaser shall also be entitled to exercise a seller's right of stoppage in transit, replevin, or reclamation. Any merchandise so recovered shall be dealt with, as between Purchaser and Seller, as returned merchandise.

3.4 **Assignment of Merchandise and Receivables.** Seller hereby sells and assigns to Purchaser all receivables purchased by Purchaser that may be returned by Petco. However, due to the nature of the merchandise (i.e., live pet fish and other items that Purchaser cannot resell or utilize), Purchaser shall not be obligated to take possession or ownership of any returned merchandise. Seller retains full responsibility for any returned merchandise, including its care, handling, and any associated costs. The assignment of any interest or rights in the merchandise, including stoppage in transit, replevin, or reclamation, shall be strictly for the purpose of securing payment on the receivables, and does not obligate Purchaser to take physical control or bear any risk related to the merchandise itself.

3.5 **Liability Disclaimer.** Purchaser shall not be liable to any party for refusing to approve the delivery of merchandise sold under this Agreement. Given the nature of the merchandise, Purchaser is under no obligation to take possession or assume any responsibility for the merchandise itself, including live pet fish and other unsellable items, and any refusal to approve delivery shall not result in any liability on the part of Purchaser.

## 4   Assumption of Credit Risks.

4.1 **Assumption of Credit Risk.** On all accounts receivable accepted and purchased by Purchaser, except those receivables termed Seller Risk Accounts, Purchaser will assume any losses resulting from the insolvency of Petco. Such assumption of credit risk shall take effect upon delivery and acceptance without dispute of the value and quality of the merchandise.

4.2 **Adherence to Credit Limits.** Seller agrees that it shall adhere strictly to the credit limits established by Purchaser.

Page 3 of 14

Seller Initials:

**4.3 Advances Beyond Credit Limit.** Purchaser, at its option, may advance funds against accounts or invoices exceeding the established credit limit with full recourse against Seller.

**4.4 Claim Disputes.** If an unadjusted claim or dispute delays the payment of an account beyond sixty (60) days after it is due, Purchaser's assumption of the credit risk is canceled, and the amount may be charged back to Seller as of the original credit date.

**4.5 Rejections and Returns.** Seller shall immediately notify Purchaser of all rejections, returns of merchandise, and customer claims upon becoming aware of these matters, and shall promptly resolve all claims and disputes with Petco. Any returned merchandise that comes into Seller's possession shall remain the responsibility of Seller, given that such merchandise (including live pet fish and other non-resalable items) cannot be handled or utilized by Purchaser. Seller shall either repay or secure to Purchaser's satisfaction the amount credited by reason of the sale of such merchandise. Purchaser shall have no obligation to take possession of any returned merchandise, nor shall Purchaser have any liability with respect to its disposal or resale. If Purchaser incurs any deficiency resulting from the sale or settlement of an invoice related to returned merchandise, Seller shall be fully liable for such deficiency, and Purchaser retains full recourse against Seller.

5    **Book Entries.** Immediately upon the purchase of an account by Purchaser, Seller will make appropriate entries upon its books disclosing such purchase and will execute and deliver all papers and instruments and do all things necessary to effectuate this Agreement.

6    **Amounts Owed to Purchaser.**

**6.1 Amounts Owed.** Any amounts owed by Seller to Purchaser for commissions, interest, or otherwise shall be considered as advances against Seller's sales and are chargeable to Seller's current account at any time, at Purchaser's option.

**6.2 Taxes Paid by Purchaser.** If, at any time, Purchaser is required to pay any state, federal, or local sales or excise tax on sales or services performed under and pursuant to this Agreement, the amount of the tax paid by Purchaser shall be charged to Seller's account.

7    **Rights under Seller's Contracts.** Seller warrants and agrees that all the rights and privileges existing under the contractual agreements with Petco, whose receivables are being purchased by Purchaser, are transferred to Purchaser, and Seller further agrees to provide Purchaser with a copy of such contracts or agreements.

8    **Warranty of Assignment.** Seller warrants that none of the accounts being sold to Purchaser have previously been sold or assigned to any person, firm, corporation, or other entity, and will not be sold or assigned at any time during the term of this Agreement.

9    **Power of Attorney.** Seller appoints Panthers Capital LLC ("Purchaser"), or any other person whom Purchaser may designate, as Seller's attorney-in-fact with power to receive, open, and dispose of all mail addressed to Seller relating to the Accounts; to notify postal authorities to change the address for delivery of mail addressed to Seller to an address that Purchaser may designate; to endorse in Seller's name any notes, acceptances, checks, drafts, money orders, and other evidences of payment or collateral that may come into Purchaser's possession; to sign Seller's name on any

Page 4 of 14

Seller Initials:

Docusign Envelope ID: C39B5AEA-8445-4847-A5BB-D52B3B3BEF

invoice or bill of lading relating to any account, drafts against debtors, assignments and verifications of accounts, and notice to debtors; to send verifications of accounts to any debtor; and to do all other acts and things necessary to effectuate this Agreement. All acts of such attorney or designee are ratified and approved, and such attorney or designee shall not be liable for any acts of commission or omission, nor for any error of judgment or mistake of law or fact. This power, being coupled with an interest, is irrevocable while any purchased account shall remain unpaid.

10 **Breach of Warranty.** If any warranty or covenant in this Agreement, express or implied, shall be broken or violated, whether caused by the act or the fault of Seller, a debtor, or others, Purchaser shall be entitled to recover from Seller or Seller's guarantors the damages consequently sustained, including, but not limited to, all attorney's fees, court costs, collection charges, and all other expenses that may be incurred by Purchaser to enforce payment of any account, either as against the debtor, Seller, or its guarantors, or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement.

11 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

11.1   Seller shall violate any term, condition, or covenant in this Agreement.

11.2   Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false, or misleading in any material respect when made.

11.3   Seller shall default under any of the terms, covenants, and conditions of any other agreement with Purchaser (if any) which is related to the instant Agreement.

11.4   Seller uses multiple depository accounts without obtaining prior written consent of Purchaser in each instance.

11.5   Petco fails to deposit any portion of the accounts receivable owed to Seller into the designated bank account of Purchaser as specified in this Agreement.

11.6   Seller changes the designated Purchaser bank account provided to Petco without obtaining prior written consent from Purchaser for each such instance.

11.7   Seller intentionally interferes with Purchaser's collection of Petco Accounts Receivable that become due and payable to Purchaser on behalf of Seller, as agreed herein, thereby obstructing the agreed payment process.

11.8   Seller changes the agreement between Purchaser, Seller, and Petco, wherein all future Accounts Receivable that become due and payable shall be paid directly to Purchaser, without obtaining prior written consent from Purchaser.

12 **Default under the Agreement.** In case any Event of Default occurs and is not waived by Purchaser, in writing, Purchaser may declare Seller in default under this Agreement without notice.

13 **Seller's Obligations Upon Default.** In the event of an occurrence of default due to Seller's breach of any obligations under this Agreement, Seller shall immediately remit to Purchaser the entire outstanding and undelivered portion of the Purchased Amount. Furthermore, upon such default, all future Accounts Receivable owed by Petco shall be deemed fully factored to Purchaser, with the Specified Percentage adjusted to 100% of all such future receivables, thereby entitling Purchaser to absolute and direct collection rights over all Petco AR. Seller shall additionally be liable to Purchaser for all reasonable costs and expenses incurred in enforcing Purchaser's rights and recovering any amounts owed under this Agreement, including, but not limited to, expenses arising from the

Seller Initials:

retention of third-party collection firms and reasonable attorneys' fees, as well as any related disbursements (collectively, "Reasonable Damages").

14 **No Liability Clause.** In no event shall Purchaser be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

15 **Waiver.**

15.1 **Waiver by Purchaser.** Purchaser's waiver of a particular breach by Seller of any covenant or warranty contained in this Agreement shall not be deemed to constitute a waiver of any subsequent breach.

15.2 **Non-Waiver of Rights.** Purchaser's failure at any particular time to exercise a right or privilege granted to it in this Agreement shall not be deemed to constitute a waiver of that or any other right or privilege.

16 **Profit and Loss Statement.**

16.1 **Monthly Profit and Loss Statement.** Seller shall submit to Purchaser, at Purchaser's request, a monthly profit and loss statement signed by an officer or employee of Seller on behalf of and as the act of Seller within five (5) days after the close of each month, covering the business for the month immediately preceding the statement. In addition, Seller shall furnish Purchaser a semiannual balance sheet on Seller's business, accompanied by a profit and loss statement from the beginning of Seller's then-current fiscal year. Such semiannual balance sheet and accompanying profit and loss statement shall be prepared by an independent, certified public accountant that has no pecuniary interest in Seller's business.

16.2 **Inspection of Records.** All books, records, accounts, corporate records, bank statements, and records of deposit of Seller, as well as any other financial records maintained by Seller, shall be open to inspection by Purchaser, and any accountant or auditor designated by Purchaser, for all purposes and at all times during normal business hours at Seller's main place of business.

17 **Warranty of Solvency.**

17.1 **Warranty of Solvency.** Seller warrants its solvency. If Seller receives any checks, drafts, notes, acceptances, or other moneyed instruments, or cash in payment of any of the receivables assigned to Purchaser under and pursuant to this Agreement, such payment will immediately be turned over to Purchaser in its original form.

17.2 **Endorsement of Instruments.** Purchaser, or other persons as it may from time to time designate, shall have the right to endorse all instruments in Seller's name or otherwise.

18 **Eligible Accounts Criteria.**

18.1 **Eligible Accounts are defined as follows:**

18.1.1 All accounts due from Petco that are less than 90 days from the invoice date.

Page 6 of 14

Seller Initials:

18.1.2 All accounts due from Petco that, in Purchaser's judgment, are deemed creditworthy, up to the credit limit established by Purchaser.

18.1.3 All accounts arising from the shipment of goods or completion of services to Petco that are not subject to any disputes, offsets, or counterclaims.

18.1.4 All accounts due from Petco where less than 25% of the total outstanding invoices are aged more than 90 days.

18.1.5 All accounts due from Petco with payment terms of Net 60 days or less.

18.2    Purchaser reserves the right to make exceptions to these criteria at its sole discretion on a case-by-case basis.

19 **Pledge of Security.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants, or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Purchaser a continuing, perfected and first priority lien upon and security interest in, to, and under all of Seller's right, title, and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

19.1    All accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

19.2    All Seller's proceeds, as such term is defined by Article 9 of the UCC.

20 **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Purchaser will execute, acknowledge (where applicable), and deliver such satisfactions, releases, and termination statements, as Seller shall reasonably request.

21 **Representations with Respect to Collateral.** Seller hereby represents and warrants to Purchaser that the execution, delivery, and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement, or any other instrument to which Seller is a party.

22 **Further Assurances.** Upon the request of Purchaser, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances, and assignments of the Collateral and documents with respect to the pledge of the Collateral as Purchaser shall reasonably request. Seller shall execute and deliver such instruments, assignments, or documents and do all such other acts and things, as Purchaser may reasonably request to effectuate the purpose and purposes of this Pledge and to provide for the continuing validity, perfection, and priority of Purchaser's security interest in the Collateral.

Page 7 of 14                                                                 Seller Initials: _____

**22.1    Security Interest.**

    **22.1.1 Security Interest Grant.** Seller grants to Purchaser a first-priority security interest in all of Seller's present and future accounts receivable and all proceeds thereof. Seller further authorizes Purchaser to file a UCC-1 Financing Statement naming Purchaser as the secured party to perfect such security interest.

    **22.1.2 Subordination of Existing Liens.** Seller agrees to obtain lien terminations or subordinations from any third parties holding liens against accounts receivable and proceeds as required by Purchaser in order to maintain Purchaser's priority interest.

**23 Guaranty of Performance.** Charitha I. Samarasinghe personally guarantees the prompt and full performance of all obligations of Seller under this Agreement. This personal guaranty shall be binding and enforceable immediately, and shall not be contingent upon Purchaser seeking recourse against Seller or any other party. Purchaser is entitled to pursue remedies against the Guarantor independently of actions taken against Seller.

**24 Prejudgment Remedy.** In the event of a default by Seller, Purchaser is entitled to seek a prejudgment remedy under Uniform Commercial Code (UCC) laws. Seller and Guarantor hereby waive all rights to prior notice and prior opportunity for a hearing under applicable Connecticut General Statutes regarding Purchaser's obtaining of any prejudgment remedy. Purchaser may attach or garnish the Seller's or Guarantor's funds and property held at financial institutions if certain statutory conditions are satisfied.

**25 Term and Termination of Facility.**

    **25.1    Term of Facility.** The initial term of this factoring facility shall be twenty-four (24) months from the effective date of this Agreement. The facility shall automatically renew for additional twelve (12) month periods unless either party provides written notice of termination at least sixty (60) days prior to the end of the current term.

    **25.2    Early Termination by Seller.** If Seller wishes to terminate this Agreement before the end of the term, Seller must provide a ninety (90) days written notice. Seller shall also be responsible for any outstanding advances, accrued fees, and any applicable early termination charges.

    **25.3    Termination Rights.** Either party may terminate this Agreement as to future transactions on one hundred eighty (180) days' written notice.

**26 Severability Clause.** The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision. If any provision of this Agreement is held to be invalid, the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision.

**27 Governing Law.** This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Connecticut.

Page 8 of 14

Seller Initials:

28  **Notices Requirements.** Any notice provided for or concerning this Agreement shall be in writing and shall be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this Agreement.

29  **Attorney Fees.** In the event that any lawsuit is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all the sums that either party may be called on to pay, a reasonable sum for the successful party's attorney fees.

30  **Mandatory Arbitration.** Any dispute arising under this Agreement shall be resolved through binding arbitration, as determined solely at Purchaser's discretion. Seller irrevocably agrees that, if the parties are unable to mutually agree upon an arbitrator, Purchaser shall have the exclusive right to appoint the arbitrator who will arbitrate the dispute. The arbitration shall be conducted in accordance with the rules of the American Arbitration Association in force at the time of arbitration, and all decisions made by the appointed arbitrator shall be final and binding upon Seller without further recourse.

31  **Modification of Agreement.** Any modification of this Agreement or additional obligation assumed by either party in connection with this Agreement shall be binding only if placed in writing and signed by each party or an authorized representative of each party.

32  **Assignment of Rights.** The rights under this Agreement are personal to each party; however, only Purchaser shall have the right to assign or transfer its rights to any other person, firm, corporation, or entity without the prior consent of Seller. Seller may not assign or transfer any rights or obligations under this Agreement without the prior, express, and written consent of Purchaser.

33  **Counterparts and Electronic Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any electronic signature, including signatures executed through electronic means such as DocuSign or email, shall be considered valid, binding, and fully enforceable as if signed in physical form.

34  **Binding Effect on Successors.** In this Agreement, any reference to a party includes that party's heirs, executors, administrators, successors, and assigns. Singular includes plural, and masculine includes feminine.

35  **Entire Agreement.** This Agreement shall constitute the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement.

36  **Miscellaneous Provisions.**

36.1  **Governing Law.** This Agreement and all related matters shall be governed by and construed in accordance with the laws of the State of Connecticut, Fairfield County, without giving effect to conflict of law principles.

36.2  **Enforceability of Electronic Signatures.** The parties agree that this Agreement may be executed electronically, and such electronic execution shall have the same legal effect as

Page 9 of 14

Seller Initials:

manual signatures. The Agreement shall become effective and binding once signed electronically by Seller.

36.3    **Operational Mechanics and Documentation.** In the event that Seller receives any payment on an Account assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust as fiduciary for Purchaser, segregating said funds from its own assets, and shall immediately remit the full amount to Purchaser without delay. Seller acknowledges that any failure to promptly remit such funds shall constitute a material breach of this Agreement. Purchaser shall have the absolute right to recover all reasonable costs, expenses, and attorney's fees incurred in enforcing this provision, including any actions taken to recover improperly retained payments.

36.4    **Acknowledgment of Default and Factoring Terms for Petco Accounts.** Seller hereby irrevocably acknowledges and stipulates that, as of the effective date of this Agreement, Seller is in default under a prior funding agreement executed with Purchaser, resulting in an outstanding adjusted balance of $1,018,196.92. This balance accounts for the application of a wire transfer payment in the amount of $150,177.08, received by Purchaser from Petco on November 27, 2024, which was applied towards Seller's defaulted obligation. Petco has formally agreed to remit all future Accounts Payable directly to Purchaser and shall continue to do so for the duration of this Agreement. This Agreement shall, under no circumstances, be construed as a waiver or release of Seller's liability for the remaining defaulted balance owed to Purchaser. Until the entire outstanding defaulted balance is fully satisfied by Petco's remittances, Purchaser shall have no obligation to purchase any new Accounts Receivable from Petco. The remaining balance owed by Seller shall be adjusted accordingly by Purchaser, and only Accounts Receivable in excess of the outstanding balance shall be eligible for future purchase by Purchaser. Furthermore, all Accounts Receivable currently assigned to satisfy Seller's defaulted balance, which Petco has agreed to pay directly to Purchaser, shall be deemed irrevocably allocated for such purposes, and shall not be subject to further sale, transfer, or assignment by Seller under this or any other agreement. Seller expressly agrees that Purchaser maintains an absolute priority on these receivables until the defaulted balance is extinguished. Any interference by Seller in directing or controlling these payments shall be deemed a material breach of this Agreement, entitling Purchaser to immediate enforcement of remedies. Seller further covenants and agrees to sell and assign to Purchaser only those Petco Accounts Receivable that are in excess of the obligations currently in default, ensuring that the defaulted balance is fully prioritized and satisfied prior to any additional assignment or transaction under this Agreement. Any attempts by Seller to divert, hinder, or otherwise delay payment by Petco to Purchaser will result in immediate enforcement action, and Seller shall be liable for all costs and attorneys' fees incurred by Purchaser in securing its rights hereunder.

37    **Clawback and Misapplication of Payments.** In the event that Seller receives any payment on an Account that has been assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust for the sole benefit of Purchaser, segregating said funds from Seller's own assets. Seller shall immediately and without delay remit the entirety of such funds to Purchaser in the form received. Seller's failure to remit these funds promptly shall constitute a material breach of this Agreement and result in immediate liability for all damages and remedies available to Purchaser. Seller expressly acknowledges that

Page 10 of 14

Seller Initials:

Purchaser has the absolute right to recover from Seller any and all costs, expenses, and reasonable attorneys' fees incurred by Purchaser in enforcing this provision, including, but not limited to, any actions taken to recover misapplied or improperly retained payments. Seller's obligation to hold and remit such payments is fiduciary in nature, and any failure to comply shall be deemed a breach of trust, entitling Purchaser to pursue equitable remedies, including but not limited to specific performance, injunctive relief, and recovery of all legal costs associated with the enforcement of Purchaser's rights under this Agreement.

This Agreement is executed by the authorized representatives of both parties as of the date of Seller's electronic signature. This Agreement shall be binding upon and inure to the benefit of each party's successors and permitted assigns.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____
By: Charitha I. Samarasinghe
Title: CEO and President

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274
Date: December 1, 2024

**Owner/Guarantor:**

By: _____
Name: Charitha I. Samarasinghe

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274
Date: December 1, 2024

**PANTHERS CAPITAL LLC - Purchaser**

By: Benjamin Isaacon
By:
Title:
Date:

Seller Initials: _____

## CROSS COLLATERAL ADDENDUM

This Cross Collateral Addendum (the "Addendum") is entered into as of December 1, 2024, by and between Panthers Capital, LLC (hereinafter referred to as "Purchaser") and CIS INTERNATIONAL HOLDINGS (N.A.) CORP, along with the other entities listed below (hereinafter collectively referred to as "Seller" or "Affiliates"). This Addendum serves as an integral supplement to the existing Factoring Facility Agreement (the "Agreement") entered into between the aforementioned parties.

### Recitals

WHEREAS, each of the Seller entities has individually entered into the Factoring Facility Agreement with Purchaser, whereby the Seller agreed to sell and assign all accounts receivable arising from transactions with Petco (the "ARs") to Purchaser, on the terms set forth therein; and

WHEREAS, the Seller entities are affiliated entities under common control and ownership, and each Seller entity desires to further secure its obligations to Purchaser by pledging a cross-collateralized security interest in favor of Purchaser, thereby guaranteeing each other's performance under the Factoring Facility Agreement; and

NOW, THEREFORE, for good and valuable consideration, the Affiliates listed below (collectively, the "Corporate Guarantors") agree as follows:

1. **Corporate and Personal Guarantors.**

   a. CIS International Holdings (N.A.) Corp - ▮▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   b. CIS International Distributor - ▮▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   c. Siam Tropical Fish Ltd - ▮▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   d. Tropical Fish International Europe - ▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   e. Tropical Aquarium Fish (Fiji) Ltd - ▮▮▮▮▮▮▮ - Charitha I. Samarasinghe
   f. Live Aquaria Holdings Corp - Charitha I. Samarasinghe
   g. T3 Aquatics - Charitha I. Samarasinghe
   h. LIONSROCK INVESTMENTS LLC - Charitha I. Samarasinghe
   i. LIONSROCK WISCONSIN LLC - Charitha I. Samarasinghe

2. **Cross-Collateralization and Security Interest.**

   a. **Cross-Collateralization.** Each Seller and Corporate Guarantor hereby irrevocably and unconditionally grants to Purchaser a cross-collateral pledge of their respective assets to secure the performance and obligations of each other entity under the Factoring Facility Agreement. This pledge extends to all present and future accounts receivable, personal property, general intangibles, and any other assets of each Corporate Guarantor, which shall serve as collateral to secure the obligations of any affiliated entity in the event of breach or default by any one entity.

   b. **First-Priority Security Interest.** To further secure the obligations arising under the Factoring Facility Agreement, each Seller and Corporate Guarantor grants Purchaser a continuing, perfected, first-priority security interest in all present and future accounts, chattel paper, deposit accounts, inventory, equipment, fixtures, general intangibles, and all proceeds now owned or hereafter acquired by any Seller or Corporate Guarantor (the "Collateral"). Each Seller

Page 12 of 14

Seller Initials: ▮▮▮▮

and Corporate Guarantor authorizes Purchaser to file any and all necessary Uniform Commercial Code (UCC) Financing Statements, as well as any amendments or continuation statements, in order to evidence and perfect such security interest.

c. **Cross-Default.** A default by any one Seller or Corporate Guarantor shall be deemed a default by all affiliated entities. Upon such an event of default, Purchaser shall have the immediate right to enforce its rights and remedies under the Factoring Facility Agreement and this Addendum, including, but not limited to, repossession, foreclosure, attachment, garnishment, and sale of the Collateral, without limitation and without further notice to any Seller or Corporate Guarantor.

d. **Cumulative Rights.** All rights and remedies available to Purchaser under this Addendum are cumulative and are in addition to any other rights or remedies provided by law, equity, or under the original Factoring Facility Agreement. The exercise of any right or remedy by Purchaser shall not preclude the concurrent or subsequent exercise of any other right or remedy available to Purchaser.

3. **No Alteration of Original Agreement.**

a. **No Alteration or Waiver.** Except as expressly modified by this Addendum, all terms, conditions, covenants, representations, and warranties set forth in the original Factoring Facility Agreement shall remain in full force and effect. Nothing in this Addendum shall be construed as a waiver, modification, or novation of Purchaser's rights under the Agreement, except as specifically provided herein.

4. **Execution and Authority.**

a. **Authority to Bind.** Each undersigned representative of the Seller and Corporate Guarantors represents and warrants that they have the full authority to execute this Addendum, and that this Addendum constitutes a valid, binding, and enforceable agreement of each respective Seller and Corporate Guarantor. This Addendum shall be binding upon the parties and their respective successors and assigns.

Page 13 of 14

Seller Initials: _____

IN WITNESS WHEREOF, the parties hereto have executed this Cross Collateral Addendum as of the day and year first above written.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____

By: Charitha I. Samarasinghe

Title: CEO and President

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**Owner/Guarantor:**

By: _____

Name: Charitha I. Samarasinghe

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

Page 14 of 14

Seller Initials: _____

DOCKET NO: : SUPERIOR COURT
                          :

PANTHERS CAPITAL LLC : J.D. OF STAMFORD/NORWALK
                          : AT STAMFORD

V. :
                          :

CIS INTERNATIONAL HOLDINGS (N.A.) :
CORP. d/b/a E TROPICAL FISH, :
CHARITHA I SAMARASINGHE, :
CIS INTERNATIONAL DISTRIBUTORS INC., :
LIVE AQUARIA HOLDINGS CORP, :
LIONSROCK INVESTMENTS LLC, :
LIONSROCK WISCONSIN LLC, :
T3 AQUATICS, :
SIAM TROPICAL FISH LTD, :
TROPICAL AQUARIUM FISH (FIJI) LTD : JULY 31, 2025

<u>AMENDED COMPLAINT</u>

<u>COUNT ONE</u>
(<u>BREACH OF CONTRACT AGAINST SELLER</u>)

1. The plaintiff, Panthers Capital LLC ("Buyer"), is a limited liability company with a place of business in Connecticut.

2. The Buyer and the defendant, CIS INTERNATIONAL HOLDINGS (N.A.) CORP. d/b/a E Tropical Fish ("Seller"), entered into that certain Future Receivables Sale and Purchase Agreement dated June 4, 2025 (the "Agreement"), pursuant to which the Seller sold, and the Buyer purchased, future receipts of the Seller in the aggregate amount of $1,500,236.00. A redacted copy of the Agreement is attached hereto as <u>Exhibit A</u>.

3. The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Guarantors") jointly and severally guaranteed the Seller's obligations under the Agreement, as evidenced by the

Guaranty of Performance executed by each of the Guarantors and incorporated within the Agreement (the "Guaranty").

4.      Upon execution of the Agreement and Guaranty by the Seller and the Guarantors, the Buyer advanced funds to the Seller in accordance with the terms and conditions set forth in the Agreement.

5.      The Seller defaulted under the Agreement in July 2025, including, without limitation, by taking actions that denied and interfered with the Buyer's contractual rights, including the Buyer's right to receive its designated share of the Seller's revenue. Specifically, and without limitation, the Seller caused a stop payment to be placed on the bank account into which it was required to deposit all receipts and from which the Buyer was authorized to initiate ACH debits to receive payment.

6.      Pursuant to the Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7.      Further, pursuant to the Agreement, the Seller expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Seller's property. See Agreement (Exhibit A), Paragraph 44.

8.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement.

<div align="center">

COUNT TWO
(BREACH OF CONTRACT AGAINST GUARANTORS)

</div>

1-5.      Paragraphs 1 through 5 of Count One are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Two as if fully set forth herein.

6.      The Guarantors defaulted under the Guaranty by failing to pay the Buyer all amounts due and owing under the Agreement

<div align="center">2</div>

7.      Pursuant to the Guaranty, the Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

8.      Further, pursuant to the Guaranty, the Guarantors expressly waived any right to notice and a hearing prior to the Buyer obtaining prejudgment attachment of the Guarantors' property. See Guaranty (Exhibit A), Paragraph 10.

9.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Agreement and the Guaranty.

<div align="center">COUNT THREE</div>

<div align="center">(BREACH OF CONTRACT AGAINST SELLER)</div>

1.      Paragraph 1 of Count One is hereby incorporated by reference as Paragraph 1 of Count Three as if fully set forth herein.

2.      The Buyer and the Seller entered into a Factoring Facility Agreement dated December 1, 2024 ("Factoring Agreement"), pursuant to which, the Buyer agreed to purchase certain unencumbered invoices of an account receivable ("Factor Account") and sign exclusive payment rights of the Factor Account to the Buyer of the Seller up to a maximum of $3,000,000.00 at any given time. A redacted copy of the Factoring Agreement is attached hereto as Exhibit B.

3.      The defendants, Charitha I. Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp., Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish Ltd., and Tropical Aquarium Fish (Fiji) Ltd. (collectively, the "Factoring Guarantors") jointly and severally guaranteed the Seller's obligations under the Factoring Agreement, as evidenced by the Guaranty of Performance executed by each of the Guarantors and incorporated within the Factoring Agreement (the "Factoring Guaranty").

<div align="center">3</div>

4.      Upon execution of the Factoring Agreement and Factoring Guaranty by the Seller and the Factoring Guarantors, the Buyer purchased certain invoices of the Seller, the Seller assigned exclusive payment rights of the Factor Account to the Buyer, and the Buyer began to advance funds to the Seller in accordance with the terms and conditions set forth in the Factoring Agreement.

5.      The Seller defaulted on the Factoring Agreement in July 2025 by engaging in actions that violated and undermined the Buyer's contractual rights. Specifically, and without limitation the Seller (i) misrepresented the unencumbered status of certain invoices submitted to the Buyer, (ii) submitted identical invoices to the Buyer that had previously sold to the Buyer, (iii) subsequently sold invoices to third parties that were already sold to the Buyer.

6.      Pursuant to the Factoring Agreement, the Seller consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

7.      The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement.

<p style="text-align:center">COUNT FOUR</p>

<p style="text-align:center">(BREACH OF CONTRACT AGAINST GUARANTORS)</p>

1-5.    Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Four as if fully set forth herein.

6.      The Factoring Guarantors defaulted under the Factoring Guaranty by failing to pay the Buyer all amounts due and owing under the Factoring Agreement.

7.      Pursuant to the Factoring Guaranty, the Factoring Guarantors consented to the jurisdiction of the courts of the State of Connecticut, with Connecticut law governing all matters arising thereunder.

<p style="text-align:center">4</p>

8.     The Buyer is, and at all relevant times has been, the lawful owner and holder of the Factoring Agreement and the Factory Guaranty.

<div align="center">COUNT FIVE</div>

<div align="center">(FRAUDULENT MISREPRESENTATION)</div>

1-5.     Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Five as if fully set forth herein.

6.     The Seller intentionally made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon.

7.     The Seller intentionally misrepresented previously sold invoices to the Buyer as new invoices to the Buyer to induce the Buyer in continuing to preform on the Factoring Agreement and advance funds to the Seller.

8.     The Buyer reasonably and justifiably relied on the Seller's misrepresentations in entering into and preforming on the Factoring Agreement.

9.     As a direct and proximate result, the Buyer sustained damages.

<div align="center">COUNT SIX</div>

<div align="center">(NEGLIGENT MISREPRESENTATION)</div>

1-5.     Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Six as if fully set forth herein.

6.     The Seller made misrepresentations concerning the unencumbered status of some invoices to the Buyer to induce the Buyer would enter into the Factoring Agreement and preform thereupon without exercising reasonable care or competence in obtaining or communicating accurate information

<div align="center">5</div>

7. The Buyer reasonably and justifiably relied on the Seller's misrepresentations.

8. As a direct and proximate result, the Buyer sustained damages.

COUNT SEVEN

(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

1-5. Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Seven as if fully set forth herein.

6. Implicit in the Factoring Agreement and Factoring Guaranty was a covenant of good faith and fair dealing, obligating Defendant to act honestly and fairly in the performance and enforcement of the parties' contractual relationship.

7-8. Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 7 through 8 of this Count Seven as if fully set forth herein.

9. Paragraph 6 of Count Six is hereby incorporated by reference as Paragraph 9 of this Count Seven as if fully set forth herein.

10. Seller's conduct deprived the Buyer the benefit of the bargain and undermined the reasonable expectations of the Buyer under the Factoring Agreement.

11. As a direct and proximate result of the Seller's breach of the covenant of good faith and fair dealing, the Plaintiff has sustained damages.

COUNT EIGHT

(VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA"))

1-5. Paragraphs 1 through 5 of Count Three are hereby incorporated by reference as Paragraphs 1 through 5 of this Count Eight as if fully set forth herein.

6-7. Paragraphs 7 through 8 of Count Five are hereby incorporated by reference as Paragraphs 6 through 7 of this Count Eight as if fully set forth herein.

6

8.    Seller's actions were unethical, unscrupulous, and offends established public policy as set forth in CUTPA.

9.    As a result of Seller's unfair and deceptive acts, Plaintiff has suffered an ascertainable loss of money and property.

10.    Plaintiff is entitled to all remedies available under C.G.S. § 42-110g, including actual damages, attorneys' fees, and punitive damages.

WHEREFORE, the Buyer respectfully requests that the Court enter judgment in its favor and award the following relief:
   a. Money damages in an amount to be determined at trial;
   b. Punitive damages
   c. The Buyer's reasonable attorneys' fees and costs incurred herein;
   d. Prejudgment and post-judgment interest as permitted by law and the Agreement; and
   e. Such other and further relief as the Court deems just and equitable.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
John T Szalan Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Firm Juris Number 407996

7

| | | |
|---|---|---|
| DOCKET NO: | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | JULY 31, 2025 |

<u>STATEMENT OF AMOUNT IN DEMAND</u>

The amount in demand, exclusive of interest and costs, exceeds $15,000.00.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By _____
Lucas Rocklin, Esq.
John T Szalan, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 781-2835
Juris Number 407996

8

# EXHIBIT A

PANTHERS CAPITAL

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated _____6/4/2025_____, between Panthers Capital LLC D/B/A Panthers Capital ("Panthers Capital"), the seller(s) listed herein (collectively, the "Seller"), and each guarantor identified below (each a "Guarantor") (all capitalized terms shall have the meanings ascribed to them below):

**Seller Legal Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** E TROPICAL FISH

**Form of Business Entity:** Corporation        **EIN #:** ███████

**Physical Address:** 1405 W 178TH ST, GARDENA , CA 90248

**Mailing Address:** 1405 W 178TH ST, GARDENA , CA 90248

**PURCHASE PRICE:** $ 1,020,569.00     **PURCHASED AMOUNT:** $ 1,500,236.00     **SPECIFIED PERCENTAGE:** 50.00%

**ORIGINATION FEE:** $ 250.00     **PRIOR BALANCE:** $ 1,020,319.00     **INITIAL** Daily **DEBIT:** $ 10,002.00

**AMOUNT PAID TO SELLER (AFTER DEDUCTING THE ORIGINATION FEE AND ANY PRIOR BALANCE):** $ 0.00

| FOR SELLER #1 | FOR SELLER #2 |
|---|---|
| By: _(signed)_ 086ED1260399401... | By: _____ |
| Name: CHARITHA I SAMARASINGHE | Name: _____ |
| Title: Owner | Title: Owner |
| Email: ███████ | Email: _____ |
| Business Phone: ███████ | Business Phone: _____ |

**\*Accurate contact information is required to provide the Seller with important information regarding the Agreement.**

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guaranty of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to Panthers Capital by the following Owner(s)/Guarantor(s) of Seller

| OWNER/GUARANTOR #1 | OWNER/GUARANTOR #2 |
|---|---|
| By: _(signed)_ 086ED1260399401... | By: _____ |
| Name: CHARITHA I SAMARASINGHE | Name: _____ |
| SSN ███████ | SSN: _____ |
| PHONE: ███████ | PHONE: _____ |
| Address: 4 SUNDOWN DR , RLLNG HLS EST , CA 90274 | Address: _____ |

WHEREAS, Seller is desirous to sell to Panthers Capital, and Panthers Capital is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, Panthers Capital and Seller hereby agree to the foregoing and as follows:

1. **Basic Terms and Definitions.**

   a.  "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when Panthers Capital paid the Purchase Price to Seller. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee and Prior Balance.

   b.  "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of Seller's Future Receipts.

   c.  "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

   d.  " Daily  Receipts" shall mean the amount of Future Receipts received by Seller on a  Daily  basis.

   e.  "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and permit Panthers Capital to debit pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

   f.  "Purchase Price" shall mean the total amount that Panthers Capital agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from Panthers Capital pursuant to this Agreement will be less than the Purchase Price by the total sum of the Origination Fee and Prior Balance, if any, set forth in the Preamble to this Agreement.

   g.  " Daily  Installment" shall mean the amount that Seller and Panthers Capital agree to be a good faith approximation of the Specified Percentage of Seller's  Daily  Future Receipts. Seller and Panthers Capital further agree that the Initial  Daily  Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to Panthers Capital concerning Seller's most recent accounts receivables, including representations by the Seller to Panthers Capital regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

   h.  "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

   i.  "Prior Balance" shall mean the sum of all amounts that Seller may owe to Panthers Capital and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

   j.  "Origination Fee" shall mean the fee that Panthers Capital charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 20 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

   k.  In the event "Seller" is comprised of more than one entity, then:

       i.  The term "Seller" shall mean, individually and collectively, all such entities; and

       ii.  Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by statute, or by contract; and

       iii.  The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

**iv.**      The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.**      The terms "Specified Percentage", "Future Receipts", " Daily  Receipts", " Daily  Installment" shall mean the Specified Percentage, the Future Receipts and the   Daily   Receipts of all Sellers jointly; and each Seller individually; and

**vi.**      Panthers Capital may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

**l.**      In the event "Guarantor" is comprised of more than one individual, then:

**i.**      The term "Guarantor" shall mean, individually and collectively, all such individuals; and

**ii.**      Each Guarantor is an Affiliate of all other Guarantor(s); and

**iii.**      The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

**iv.**      The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.**      Panthers Capital may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

2.    **No Fixed Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to Panthers Capital pursuant to this Agreement are received by Panthers Capital in full. Seller hereby acknowledges that it fully understands that: (i) Panthers Capital's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to Panthers Capital in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business Panthers Capital's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely.

3.    **Sale of Purchased Future  Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto Panthers Capital all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to Panthers Capital (hereinafter, the portion of the Future Receipts sold by Seller to Panthers Capital pursuant to this Agreement, the "Purchased Future Receipts" ); to have and hold the same unto Panthers Capital, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to Panthers Capital of collectability of the Purchased Future Receipts by Panthers Capital and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to Panthers Capital full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

4.    **Payment of Purchase Price.** The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by paying to Seller the Purchase Price (reduced by the Origination Fee and Prior Balance, if any).

5.    **Use of Purchase Price.** Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

6.     Daily  **Installments of Purchased Amount.** Subject to Seller's right of adjustment/reconciliation set forth in this Agreement, the Purchased  Amount  shall  be  delivered  by  Seller  to Panthers Capital   Daily   in the amount of the  Daily   Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

7.    **Approved Bank Account and Credit Card Processor.** During the course of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) business-purpose bank account which bank account shall be acceptable and preapproved by Panthers Capital (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by Panthers Capital (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the course of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

8.    **Authorization to Debit Approved Bank Account.** Seller hereby authorizes Panthers Capital to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the   Daily   Installment on each Workday commencing on the Effective Date until Panthers Capital receives the full Purchased Amount;

The  Daily  Installment is to be drawn via ACH payment, from the following bank account:



NOTE that this authorization is to remain in full force and effect until Panthers Capital receives written notification from Seller of its termination in such time and in such manner to afford Panthers Capital a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

9. <u>**Fees Associated with Debiting Approved Bank Account.**</u> It shall be Seller's exclusive responsibility to pay to its banking institution and/or Panthers Capital's banking institution directly (or to compensate Panthers Capital, in case it is charged) all fees, charges and expenses incurred by either Seller or Panthers Capital due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

10. <u>**Seller's Right of Reconciliation.**</u> Seller and Panthers Capital each acknowledge and agree that:

a.    If at any time during the course of this Agreement Seller experiences a decrease or increase in its  Daily  Receipts, Seller shall have the right to request retroactive reconciliation of the  Daily  Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by Panthers Capital (each such calendar month, a <u>"Reconciliation Month"</u>).

b.    Such reconciliation (the "<u>Reconciliation</u>") of the Seller's  Daily  Installment for a Reconciliation Month shall be performed by Panthers Capital within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by Panthers Capital from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

c.    One or more Reconciliation procedures performed by Panthers Capital may reduce or increase the effective  Daily  Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which Panthers Capital will be debiting the Approved Bank Account may get shortened or  extended indefinitely.

11. <u>**Request for Reconciliation Procedure.**</u>

a.    Seller may initiate Reconciliation of Seller's actual  Daily  Installments at any time by sending a request for Reconciliation to Panthers Capital.

b. Any such request for Reconciliation of the Seller's  Daily  Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements,and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by Panthers Capital via email to accounting@pantherscapital.com with the subject line "REQUEST FOR RECONCILIATION."

c.    Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply with each such request, provided that:

i.   Each such request is made in accordance with the terms of this Section 11; and

ii.   If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by Panthers Capital from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

d.    Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with Panthers Capital's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by Panthers Capital in full, or (ii) modify the amount of the  Daily  Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

12. <u>**Adjustment of the**  Daily  **Installment**</u>. Seller and Panthers Capital each acknowledge and agree that:

a.    Seller and Panthers Capital shall have the right to request modification ("Adjustment") of the amount of

the Daily Installment on a going-forward basis to more closely reflect Seller's actual Daily Receipts times the Specified Percentage. Panthers Capital will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Daily Installment until any subsequent Adjustment. If Seller requests an Adjustment, Panthers Capital shall perform the Adjustment within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Daily Installment that shall be debited from the Approved Bank Account.

b.    One or more Adjustments performed by Panthers Capital may substantially extend the term of this Agreement.

13.    **Request for Adjustment Procedure.**

a.    Seller and/or Panthers Capital may initiate an Adjustment by sending a request for Adjustment to the other party in writing. Seller may request an adjustment via e-mail to accounting@pantherscapital.com with the subject line "REQUEST FOR ADJUSTMENT."

b.    Within five (5) Workdays following a request for Adjustment (an "Adjustment Request") Seller shall provide to Panthers Capital's copies of: (i) Seller's most recent month's bank statement of the Approved Bank Account and month-to-date transaction activity, credit card processing statements and any aging reports immediately preceding the date of Panthers Capital's receipt of the Adjustment Request.

c.    Seller and Panthers Capital shall have the right to request Adjustment of the Daily Installment as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply in good faith with such request, provided that:

i.    Each such request for Adjustment is made in accordance with the terms of this Section 13; and

ii.    A request for Adjustment shall not be made after the Expiration Date.

14.    **Rights and Obligations of** Panthers Capital **upon Receipt of the full Purchased Amount.**

Upon receipt of the full amount of the Purchased Amount and any fees owed to Panthers Capital under this Agreement:

a. Panthers Capital shall notify Seller's bank and request from it to stop transferring Daily Installments to Panthers Capital's bank account.

b. If Panthers Capital shall have received funds in excess of the Purchased Amount and any fees owed to Panthers Capital under this Agreement, Panthers Capital shall promptly return such excess to Seller.

15.    **Risk Sharing Acknowledgments and Arrangements.**

a. Seller and Panthers Capital each hereby acknowledges and agrees that:

i.    The Purchased Future Receipts represent a portion of Seller's Future Receipts.

ii.    This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from Panthers Capital. Panthers Capital does not charge Seller and will not collect from Seller any interest on the monies used by Panthers Capital for the purchase of the Purchased Future Receipts. The period of time that it will take Panthers Capital to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after Panthers Capital's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's reasonable control, Panthers Capital may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

iii.    The amount of the Initial Daily Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Daily Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to Panthers Capital.

iv.    The amounts of Seller's future Daily Receipts may increase or decrease over time.

16.    **Panthers Capital's Risk Acknowledgments.** Panthers Capital agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and Panthers Capital assumes these risks based

exclusively upon the information provided to it by Seller related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give Panthers Capital a reasonable and fair opportunity to receive the benefit of its bargain. Panthers Capital assumes the risk that Future Receipts may be remitted more slowly than Panthers Capital may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business went bankrupt or Seller otherwise ceased operations in the ordinary course of business.

17.    **Application of Amounts Received by** Panthers Capital. Panthers Capital reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Panthers Capital from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

18.    **Not a Loan.** Seller and Panthers Capital agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by Panthers Capital is not intended to be, nor shall it be construed as, a loan from Panthers Capital to Seller that requires absolute and unconditional repayment on a maturity date. To thecontrary, Panthers Capital's ability to receive the Purchased Amount pursuant to  this Agreement, and the date when the Purchased Amount is delivered to Panthers Capital in full (if ever) are subject to and conditioned upon performance of Seller's business.

19.    **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes eachof those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless Panthers Capital for any and all damages and losses (including without limitation legal fees and expenses) incurred by Panthers Capital as the result of such representation being untrue, incorrect or incomplete.

20.    **Origination Fee.** Seller hereby agrees for Panthers Capital to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

**REPRESENTATIONS, WARRANTIES AND COVENANTS**

21.    Seller represents, warrants and covenants that as of this date and, unless otherwise stated, during the course of this Agreement:

   a.    **Financial Condition and  Financial Information.**  Seller's bank and financial statements, copies of which have been furnished to Panthers Capital, and future statements which may be furnished hereafter pursuant to this Agreement or upon Panthers Capital's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Panthers Capital may request Seller's bank statements at any time during the term of this Agreement and view-only access to Seller's bank account and Seller shall provide them to Panthers Capital within five (5) Workdays. Seller's failure to do so is a material breach of this Agreement.

   b.    **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

   c.    **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

   d.    **Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

   e.    **Accounting Records and Tax Returns.**  Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that Panthers Capital is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

f.  **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

g.  **Electronic Check Processing Agreement.** Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede Panthers Capital's rights under this Agreement, without Panthers Capital's prior written consent.

h.  **No Diversion of Future Receipts.** Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without Panthers Capital's written permission.

i.  **Change of Name or Location.** Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and Panthers Capital, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining Panthers Capital's written consent.

j.  **Prohibited Business Transactions.** Seller shall not: (i) voluntarily transfer or sell all or substantially all of its assets (including without limitation the Collateral as such term is defined in Section 23 or any portion thereof) without first obtaining Panthers Capital's consent; or (ii) make or send notice of its intended bulk sale or transfer.

k.  **Closing of Business.** Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of Panthers Capital, and (ii) providing Panthers Capital with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Panthers Capital. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until Panthers Capital shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide Panthers Capital ten (10) Workdays advance notice, to the extent practicable.

l.  **No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six (6) months immediately preceding the date of this Agreement.

m.  **Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) Workday's prior notice from Panthers Capital to Seller, execute, acknowledge and deliver to Panthers Capital and/or to any other person or entity specified by Panthers Capital, a statement certifying that this Agreement is unmodified and in full force and effect or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been delivered.

n.  **Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

o.  **No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of Panthers Capital.

p.  **Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

q.  **No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**r.** **Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants Panthers Capital the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's  Daily  receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants Panthers Capital and its employees and consultants access during regular business hours to Seller's employees and records and all other items of property located at the Seller's place of business during the course of this Agreement. Seller hereby agrees to provide Panthers Capital, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow Panthers Capital to interview any of those parties.

**s.** **Phone Recordings and Contact.** Seller agrees that any call between Seller and Panthers Capital and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with Panthers Capital, its managers, employees and agents (collectively, the "Panthers Capital Parties") and that Seller may be contacted by any of Panthers Capital Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of Panthers Capital Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

**t.** **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have  such  knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

**u.** **Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Panthers Capital.

**v.** **Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

**Y.** **No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and Panthers Capital with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement  and representation  previously made, by Panthers Capital or any of the Panthers Capital Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Panthers Capital Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement

**Z.** **No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Origination Fee, if any, set forth in Section 20 herein, Panthers Capital is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Section 2 hereof, such fee is not charged by Panthers Capital. Moreover, as all working capital received under this Agreement is intended to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

**aa.** **Credit Report and Other Authorizations** Seller and each of the Owners signing above authorize Panthers Capital, its agents and representatives and any credit reporting agency engaged by Panthers Capital, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement; (ii) obtain consumer and business credit reports on the Seller and any of its Owners; and (iii) to contact personal and business references provided by the Seller in any application, at any time now or for so long as Seller and/or Owners continue to have any obligations to Panthers Capital as a consequence of this Agreement or for Panthers Capital's ability to determine Seller's eligibility to enter into any future agreement with Panthers Capital.

### PLEDGE OF SECURITY

22. **Pledge.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Panthers Capital (collectively, "Pledge") and grants to Panthers Capital a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

    a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    b. all Seller's proceeds, as such term is defined by Article 9 of the UCC.

23. **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Panthers Capital will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

24. **Representations with Respect to Collateral.** Seller hereby represents and warrants to Panthers Capital that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party.

25. **Further Assurances.** Upon the request of Panthers Capital, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Panthers Capital may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

### EVENTS OF DEFAULT AND REMEDIES

26. **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

    a. Seller shall violate any term, condition or covenant in this Agreement.

    b. Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    c. Seller shall default under any of the terms, covenants and conditions of any other agreement with Panthers Capital (if any) which is related to the instant Agreement.

    d. Seller uses multiple depository accounts without obtaining prior written consent of Panthers Capital in each instance.

    e. Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    f. Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of Panthers Capital in each instance.

    g. Seller intentionally interferes with Panthers Capital's collection of Daily Installments.

27. **Default under the Agreement.** In case any Event of Default occurs and is not waived by Panthers Capital, in writing, Panthers Capital may declare Seller in default under this Agreement without notice.

28. **Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Panthers Capital the entire undelivered portion of the Purchased Amount and the Specified Percentage shall equal 100% of all Future Receipts. In addition, Seller shall also pay to Panthers Capital, as additional damages, any reasonable expenses incurred by Panthers Capital in connection with recovering the monies due to Panthers Capital from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages").

29. **Remedies Upon Default.** Upon Seller's default, Panthers Capital may immediately proceed to protect and enforce

its rights under this Agreement and/or Guaranty by:

**a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Panthers Capital's security interest;

**b.** Enforcing the provisions of the Personal Guaranty of Performance against the Guarantor(s) without first seeking recourse from Seller;

**c.** Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to Panthers Capital of all or any portion of the amounts received by such credit card processor on behalf of Seller;

**d.** Subject to arbitration as provided in Section 50 of this Agreement, commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or remedy including without limitation Panthers Capital's rights of a secured party under the UCC.

30. **Remedies are not Exclusive.** Subject to arbitration as provided in Section 50 of this Agreement, all rights, powers and remedies of Panthers Capital in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Panthers Capital by law or equity.

### ADDITIONAL TERMS

31. **Seller Deposit Agreement.** Seller shall execute an agreement with Panthers Capital that shall authorize Panthers Capital to arrange for electronic fund transfer services and/or "ACH" payments of Daily Installments from the Approved Bank Account. Seller shall upon request provide Panthers Capital and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

32. **Financial Condition.** Seller and its Guarantor(s) authorize Panthers Capital and its agents to investigate their financial status and history and will provide to Panthers Capital any bank or financial statements, tax returns, etc., as Panthers Capital deems reasonably necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable for release of financial information. Seller hereby authorizes Panthers Capital to receive from time to time updates on such information and financial status.

33. **Transactional History.** Seller shall execute written authorization(s) to its bank(s) to provide Panthers Capital with Seller's banking and/or credit-card processing history.

34. **Indemnification.** Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by Panthers Capital for monies owed to Panthers Capital from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by Panthers Capital.

35. **No Liability.** In no event shall Panthers Capital be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

### MISCELLANEOUS

36. **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

37. **Assignment.** Panthers Capital may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining Panthers Capital's written consent.

38. **Notices.**

**a.** Panthers Capital may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Panthers Capital's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

**b.** Subject to Section 11 of this Agreement, Seller and Guarantor may send any notices to Panthers Capital by e-mail only upon the prior written consent of Panthers Capital, which consent may be withheld or revoked at any time in Panthers Capital's sole discretion.  Otherwise, any notices or other communications from Seller and Guarantor to Panthers Capital must be delivered by certified mail, return receipt requested, to Panthers Capital's address as set forth in this Agreement.  Notices sent to Panthers Capital shall become effective only upon receipt by Panthers Capital.

39. **Waiver Remedies.** No failure on the part of Panthers Capital to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to arbitration as provided in Section 50 of this Agreement, the remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

40. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

41. **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the partiesto this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums.  Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on this Agreement, or via email address(es) listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

42. **Service of Process.**

    **IMPORTANT NOTICE -** THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

    a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

        1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

        2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

    b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

        1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

        2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

            i. If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

            ii. If sent by e-mail, on the same day and time that the e-mail is sent;

        3. Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in this Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected

to be received by them;

4. Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

43. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON,</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

44. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE -** THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

45. <u>Survival of Representation, etc.</u> All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

46. <u>Severability.</u>  In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

47. <u>Entire Agreement.</u>  This Agreement embodies the entire agreement between Seller and Panthers Capital and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

48. <u>JURY TRIAL WAIVER</u>. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

49. <u>CLASS ACTION WAIVER.</u>  EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATEDWITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECUREDTHROUGH THE CLASS OR REPRESENTATIVE ACTION.

50. <u>ARBITRATION.</u>  Notwithstanding any other provision of this Agreement, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, MAY BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators may be appointed by RapidRuling. The place of

arbitration may be in Connecticut, and any hearing may be held via video or telephone conference. The parties agree that no objection may be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THIS AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "SAFE SENDERS" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis.   Panthers Capital, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees may be equally paid by the parties, and the commencing party may be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. Panthers Capital, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party may be responsible for any attorney's fees, court or other fees associated with such actions. Panthers Capital, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, Panthers Capital, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE MAY BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

51. **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND Panthers Capital A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: Panthers Capital – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902, ATTENTION: Arbitration Opt-Out.**

52. **Counterparts and Facsimile Signatures.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER #1**

By: _____ 
086ED1260399401...

Name: CHARITHA I  SAMARASINGHE

**Title:** Owner

**EIN** ████████

**FOR SELLER #2**

By: _____

**Name:**

**Title:** Owner

**EIN:** _____

**AGREE TO BE BOUND BY THE PROVISIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**

By: _____ 
086ED1260399401...

Name: CHARITHA I  SAMARASINGHE

**SSN** ██████████

**OWNER/GUARANTOR # 2**

By: _____

**Name:**

**SSN:**

**Panthers Capital LLC**

**By:** _____

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is being executed and delivered by each undersigned ("Guarantor") in favor of Panthers Capital LLC, and its subsidiaries, affiliates, agents, and assigns (collectively, "Buyer"), in connection with that certain Future Receivables Sale and Purchase Agreement (the "Agreement"), dated effective as of [ __6/4/2025__ ] by and between Buyer and [CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHE] ("Seller"), a business entity that desires to sell certain of its Future Receipts to Buyer pursuant to the Agreement. Capitalized terms used herein have the meanings provided in the Agreement. Each Guarantor is a shareholder, member, partner or other principal owner of Seller or is an affiliate of seller that is owned and controlled by a shareholder, member, partner or other principal owner of Seller. Each Guarantor executes and delivers this Guaranty to induce Buyer to enter into the Agreement and purchase Seller's Future Receipts. Accordingly, each Guarantor acknowledges and agrees that Guarantor will receive substantial benefits from providing this Guaranty.

**SELLER # 1:**                                          **SELLER # 2:**

**Legal Business Name** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTI **Legal Business Name** _____

**D/B/A:** E TROPICAL FISH _____          **D/B/A:** _____

NOW, THEREFORE, as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor does hereby agree as follows:

1. **Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

2. **Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's obligations under the Agreement (the "Obligations"); and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly perform (or cause to be performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

3. **Guarantor's Additional Covenants**. The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

   a.   any amendment, modification or extension of the Agreement or any Obligation;

   b.   any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

   c.   any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

   d.   any other guaranty now or hereafter executed by Guarantor or anyone else;

   e.   any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

   f.   any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

   g.   the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

   h.   the failure to give Guarantor any notice whatsoever;

   i.   any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other  Agreements.** Guarantor will not voluntarily dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. Subject to arbitration as provided in Section 13 of this Guaranty, the  remedies  provided  in this Guaranty are cumulative and not exclusive of anyremedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer mayenforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipts is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law.  Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Guaranty irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums.  Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on the Agreement, or via email address(es) listed on the Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**8. Service of Process.**

<u>**IMPORTANT NOTICE**</u> - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

1.  Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

2.  Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

1.  Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

2.  Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

   i.      If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at

the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

    ii.    If sent by e-mail, on the same day and time that the e-mail is sent;

3.   Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in the Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them;

4.   Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5.   EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

**9.  PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

<u>IMPORTANT NOTICE</u> - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a.  EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1.    THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2.    WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON</u>, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.    WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

**10. PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

<u>IMPORTANT NOTICE</u> - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a.  EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1.    THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2.    WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.       WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER UPON OR AFTER COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR BUYER OBTAINING ANY PREJUDGMENT REMEDY.

11. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION ORPROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

12.  CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OROTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

13. ARBITRATION. Notwithstanding any other provision of this Guaranty, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE AGREEMENT, THE SECURITY AGREEMENT AND/OR THE GUARANTY(S), OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED, CONFIRMED AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators shall be appointed by RapidRuling. The place of arbitration shall be in Connecticut and any hearing shall be held via video or telephone conference. The parties agree that no objection shall be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THE AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "safe senders" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. BUYER, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees shall be equally paid by the parties, and the commencing party shall be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. BUYER, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party shall be responsible for any attorney's fees, court or other fees associated with such actions. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ORREPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

**14. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS GUARANTY. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS GUARANTY: PANTHERS CAPITAL. – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902 ATTENTION:** <u>Arbitration Opt-Out</u>.

**15. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**16. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**17. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                                **OWNER/GUARANTOR #2**

By: _____                        By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE            **Name:**

**SSN** ████████                                          **SSN:**

**Panthers Capital LLC**

By: _____

## RIDER 3

### TO THE ___6/4/2025___

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Panthers Capital LLC ("BUYER")

### and CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES L ("Seller")

## APPLICABLE FEES

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

**3.** __C. I. S.__ **Applicable Fees.** The parties agree that the Applicable Fees which Seller shall pay to Buyer, pursuant to Section 17 of the Agreement shall be as follows:

   **A. Monthly Fee:** ___$299___ (charged monthly to cover expense of ACH processing program).

   **B. UCC Fee:** ____$200____ (part of filing UCC financing statements and their terminations).

   **C. Wire Fee** ____$50____ (deducted from the Purchase Price to cover cost of remitting the Purchase Price).

   **D. NSF Fee:** ____$10____ (to cover expense of an NSF – if this occurs twice in a row, the third occurrence constitutes a default under the Agreement).

   **E. ACH Rejection Fee:** ___$25___ for each rejected ACH debit.

   **F. Bank Change Fee:** ___$25___

   **G. Blocked Account Fee:** ____$100____

   **H. UCC Release Fee:** ___$200___

   **I. Additional Broker Fee:** _____

   **J. Stacking Fee:** ____$5,000____ (in the event Seller takes additional capital without written consent of Buyer).

   **K. Default Fee:** ____$10,000____

   **L. Cancellation of contract:** ____$0____

**4. Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivery to Seller.

**5. No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed a reduction of the Purchase Price.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**                                        **FOR THE BUYER**

Signed by:

By: _____                    By: _____
086ED1260399401...

**Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES   **Name:** Panthers Capital

**RIDER 2**

**TO THE** ___6/4/2025___

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** <u>CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND</u> **("Seller")**

**<u>PRIOR BALANCE</u>**

1. **<u>Possible Conflicts</u>**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **<u>Definitions.</u>** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3. **<u>Prior Balance.</u>** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE:** $ 1,020,319.00    **owed to:** Panthers Capital ___

4. **<u>Authorization.</u>** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 19 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to Buyer and/or the creditors listed in this Rider.

5. **<u>No Reduction of Purchase Price.</u>** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

6. **<u>Indemnification.</u>** Seller hereby indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                            **OWNER/GUARANTOR #2**

By: _____                    By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE          **Name:**

**Panthers Capital LLC**

**By:** _____

**RIDER 1**

**TO THE** ___6/4/2025___

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** _CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES_ **("Seller")**


**ORIGINATION FEE**


1. **Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated.

3. **Origination Fee.** The parties agree that the Origination Fee that Seller shall pay to Buyer pursuant to Section 20 of the Agreement shall be:

   ___$ 250.00___

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 20 of theAgreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

5. **No Reduction of Purchase Amount.** Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchased Amount.


**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**


**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                          **OWNER/GUARANTOR #2**

By: _____                        By: _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE            **Name:**


**Panthers Capital LLC**

**By:** _____

**EARLY DELIVERY ADDENDUM**

**TO THE** ___6/4/2025___

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES **("Seller")**


**<u>EARLY DELIVERY OPTION</u>**


1. **<u>Qualification.</u>** As long as no Event of Default has taken place during the term of the Agreement, Seller may opt-in to obtain a discounted Purchased Amount.

2. **<u>Thirty (30) Day Option.</u>** If paid in full within 30 calendar days, payback will be at a discounted rate of ___1.1___.

3. **<u>Sixty (60) Day Option.</u>** If paid in full within 60 calendar days, payback will be at a discounted rate of ___1.15___.

4. **<u>Ninety (90) Day Option.</u>** If paid in full within 90 calendar days, payback will be at a discounted rate of _____.

5. **<u>One hundred twenty (120) Day.</u>** If paid in full within 120 calendar days, payback will be at a discounted rate of _____.

**Seller and Buyer agree that this Addendum shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**

| **OWNER/GUARANTOR #1** | **OWNER/GUARANTOR #2** |
|---|---|
| By: _(Signed by: 086ED1260399401...)_ | By: _____ |
| **Name:** CHARITHA I SAMARASINGHE | **Name:** _____ |


**Panthers Capital LLC**


**By:** _____

Docusign Envelope ID: 5258E2DB-AAC8-46BC-AEC4-6B2A20EFA633



**List of top 5 clients – Please list the top 5 clients that you are currently providing services for / have provided services for in the past 30 days.**

Business Name: ███████████

Contact Name: ███████████

Phone Number: _____

Does the client owe you money? Yes __✔__ If so, Amount: $ 1,800,000.00 _____


Business Name: ███████ _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes __✔__ If so, Amount: $ 50,000.00 _____


Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____


Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____


Business Name: _____

Contact Name: _____

Phone Number: _____

Does the client owe you money? Yes _____ If so, Amount: $_____


Signature here: _____

—086ED1260399401…

# OFFER SUMMARY - Sales-Based Financing

| | | |
|---|---|---|
| Funding Provided | $ 1,020,569.00 | This is how much funding Panthers Capital will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is $ 0.00 . For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed."<br><br>The amount paid directly to Merchant may change where the required disbursements to satisfy Merchant's other obligations change. |
| Estimated Annual Percentage Rate (APR) | % 114.00 | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through revenue of CIS INTERNATIONAL HOLDINGS (N.A.) CORP will be $ 1,500,000.00 . Since your actual income may vary from our estimate, your effective APR may also vary.<br><br>APR is not an interest rate. The cost of this financing is based upon fees charged by Panthers Capital rather than interest that accrues over time. |
| Finance Charge | $ 479,667.00 | This is the dollar cost of your financing.<br>Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $ 1,500,236.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | $ 210,042.00 | Although you do not make payments on a monthly basis, this is Panthers Capital 's calculation of your average monthly cost based upon the payment amounts disclosed below. |
| Estimated Payment | $ 10,002.00 / Daily<br>Panthers Capital | is not aware of any reasonably anticipated true-ups. |
| Payment Terms | Daily ACH withdrawals of the Estimated Payment described above will be made from the bank account you provided to us for this purpose.<br>The Estimated Payment is based on our estimate of Daily of your ( CIS INTERNATIONAL HOLDINGS (N.A.) CORP's) daily revenue, based upon your average monthly revenue income of $ 1,500,000.00 for the last four months.<br>You have the right to receive refunds of all or part of your payments if you demonstrate that your payments have exceeded Daily of your | |

| | total income during any given month. For more details on your rights, see section 10. Seller's Right of Reconciliation and 11. Request for Reconciliation Procedure of your revenue purchase agreement. | |
|---|---|---|
| Estimated Term | __150__ days | This is our estimate of how long it will take to collect amounts due to Panthers Capital under the revenue purchase agreement based upon the assumption that you will receive $ 1,500,000.00 in monthly income through your revenue stream. |
| Prepayment | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to _____ $ 479,667.00 _____ based upon our estimates. | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

Signed by:

_____          _____
086ED1260399401...
Recipient Signature                             Recipient Signature


_____          _____

Date                                            Date

- By checking this box, you are confirming that you have read and understand the Offer Summary provided to you.

# EXHIBIT A
## CROSS COLLATERAL ADDENDUM

This addendum shall serve to modify the Agreement of Sale of **Future Receivables ("Merchant Agreement")** which was entered into between _____Panthers Capital_____ (hereafter **"Purchaser"**) and _CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OT_ (Hereafter the **"Merchants"** or **"Affiliates"**) **Dated:** ___6/4/2025___

**Whereas**, the Merchants have individually entered into a Merchant Agreement with Purchaser to sell a portion of their future receivables at a discount;

**Whereas**, the Merchants are affiliated and hereby pledge to assume any and all liability of the other owned entities in the event that one fails to perform or defaults under the terms and conditions the Merchant Agreement.  Affiliated entity or collateral is as follows:

1. CIS INTERNATIONAL HOLDINGS (N.A.) CORP     CHARITHA I SAMARSINGHE ██████
2. CIS INTERNATIONAL DISTRIBUTOR     CHARITHA I SAMARSINGHE ██████
3. SIAM TROPICAL FISH LTD     CHARITHA I SAMARSINGHE ██████
4. TROPICAL FISH INTERNATIONAL EUROPE     CHARITHA I SAMARSINGHE ██████
5. TROPICAL AQUARIUM FISH (FIJI) LTD     CHARITHA I SAMARSINGHE ██████
6. LIVE AQUARIA HOLDINGS CORP     CHARITHA I. SAMARASINGHE
7. T3 AQUATICS     CHARITHA I. SAMARASINGHE
8. LIONSROCK INVESTMENTS LLC     CHARITHA I. SAMARASINGHE
9. LIONSROCK WISCONSIN LLC     CHARITHA I. SAMARASINGHE
10. _____
11. _____
12. _____
13. _____
14. _____
15. _____
16. _____
17. _____
18. _____
19. _____
20. _____

**("Corporate Guarantor(s)")**

Additionally, the Merchants and Affiliates individually hereby grant cross collateral to each other and all the affiliated entities included in this addendum.

Merchants and Corporate Guarantor(s) hereby grant Purchaser a security interest in, and authorizes Purchaser **to file a UCC financing statement covering, all of Merchants and Corporate Guarantor(s)' present and future** accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Merchant and Corporate Guarantor(s).

This addendum does not alter the terms and conditions of the original Merchant Agreement and that all terms remain in full force and effect.

By executing this addendum, the undersigned represent that it has authority to enter into this agreement on behalf of the above-named Corporate Guarantors.

**Agreed & Accepted:**

**For:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"
**(as member, manager, or authorized agent of Corporate Guarantor(s))**

Signed by:

_____   6/4/2025       _____
086ED1260399401...

Name:  CHARITHA I  SAMARASINGHE        Name: _____

Title:  OWNER_____        Title: _____

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | $ 1,020,569.00 |
| 2. Amount Paid on your Account with Us | $ 1,020,319.00 |
| 3. Disbursement paid to a third-party on your behalf to _____ | |
| 4. Amount Provided to You or on Your Behalf (Sum of Items 1-3) | $ 2,040,888.00 |
| 5. Prepaid Finance Charge: Brokerage Fee | |
| 6. Prepaid Finance Charge: Origination Fee | $ 250.00 |
| 7. Amount Financed (Item 4 minus Items 5 and 6) | $ 2,040,638.00 |

# EXHIBIT B

Docusign Envelope ID: C39B5AEA-844E-42A7-A8B9-D52983838BEF

PANTHERS CAPITAL

## FACTORING FACILITY AGREEMENT

This Agreement is made and entered into as of the date of the Seller's electronic signature by and between CIS INTERNATIONAL HOLDINGS (N.A.) CORP, a California corporation, located at 1405 W 178th St, Gardena, CA 90248, with ▮▮▮▮▮▮▮▮ ("**Seller**"); and PANTHERS CAPITAL LLC, a limited liability company, located at 9 W Broad St #320, Stamford, CT 06902 ("**Purchaser**"). Charitha I. Samarasinghe, as the guarantor and CEO of CIS INTERNATIONAL HOLDINGS (N.A.) CORP, also executes this Agreement as an individual guarantor.

### Recitals

WHEREAS, Seller desires to establish a factoring facility to sell all of its accounts receivable ("ARs") exclusively to Purchaser on the terms set forth herein, and Purchaser desires to acquire such Accounts for the purpose of providing liquidity to Seller; and

WHEREAS, the Seller hereby covenants that all Accounts Receivable due from Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. (hereinafter collectively referred to as "Petco") shall be paid directly by Petco to the Purchaser, without any deviation or redirection of funds.

WHEREAS, Seller is engaged in the general business of supplying products to Petco, and normally sells and delivers merchandise to Petco on a credit basis; and

WHEREAS, Seller desires to obtain funds and commercial credit for the operation of its business against its accounts receivable; and

WHEREAS, Purchaser is willing to purchase Seller's accounts receivable according to the terms set forth in this Agreement;

NOW, THEREFORE, for and in consideration of the mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1    **Assignment of Accounts Receivable.**

1.1 **Assignment of Accounts Receivable.** Seller hereby assigns to Purchaser as absolute owner, and Purchaser purchases and accepts from Seller without recourse to Seller, except as set forth in this Agreement, all accounts receivable created now or in the future by Seller's credit sales to Petco. Such accounts receivable are acceptable to Purchaser and represented by Seller to be bona fide existing obligations of Petco, arising out of and acquired by it in the ordinary course of its business. These accounts receivable are or will be due and owing to Seller without defense, offset, or counterclaim. For purposes of this Agreement, accounts receivable include all accounts, notes, trade acceptances, bills of exchange, pledges, mortgages, choses in action, or any other form of obligation.

1.2 **Sale of Accounts.** Seller hereby sells, assigns, and transfers to Purchaser, on an ongoing and exclusive basis, all right, title, and interest in and to its eligible accounts receivable ("Eligible Accounts") that arise from the sale of goods or services by Seller to Petco. Seller agrees to

Page 1 of 14

Seller Initials: ▮▮▮▮▮

provide Purchaser with copies of all relevant documentation supporting these transactions, including invoices, shipping documentation, and proof of delivery or service acceptance.

1.3 **Factoring Facility Advance.** Purchaser shall advance to Seller an amount equivalent to eighty-five percent (85%) of the total value of Eligible Accounts presented for factoring, subject to eligibility verification. The maximum credit exposure under this facility shall be $3,000,000 at any given time.

1.4 **Factoring Fee Structure.** Purchaser shall charge a factoring fee of 0.234% per day on the face value of each financed invoice until such invoice is paid. Factoring fees will accrue from the date of advance until the invoice is fully satisfied or reaches 90 days in age, whichever comes first. Should Petco make payment within 45 days, Purchaser shall retain the accrued factoring fees along with the principal advanced, and any residual amount shall be rebated to Seller.

1.5 **Example Calculation.** Under this factoring facility, an advance of $100,000 against a gross receivable of $117,647.05 will accrue a factoring fee of $234 per day. After 45 days, once Petco remits payment, Purchaser will retain $110,530 to cover the principal and factoring fees, while rebating $7,117.05 to Seller.

1.6 **Recourse Provision.** This factoring facility is provided with recourse to the Seller. In the event that any Account remains unpaid after 90 days from the invoice date, Seller shall be obligated to repurchase the unpaid Account from Purchaser at the original advance amount, plus any applicable accrued fees. Should the Seller fail to repurchase the unpaid Account, Purchaser shall have the right to apply a clawback against future ARs from Petco to recover the outstanding amount, including any accrued fees and costs incurred.

2 **Sales and Delivery of Merchandise.**

2.1 **Sales and Delivery by Seller.** All sales and deliveries of merchandise by Seller to Petco will be made in Seller's name, with explicit notification to Petco that the accounts receivable thus created have been assigned, sold, and transferred to Purchaser as absolute owner.

2.2 **Invoicing and Notification.** Invoices and statements to Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. ("Petco") shall be issued by Seller in a manner and on forms approved by Purchaser. Purchaser reserves the right, at its sole discretion, to issue such invoices or statements directly to Petco, with the costs associated with stationery and postage being charged to Seller's account. All invoices must be clearly marked in a manner specified by Purchaser, providing full notification to Petco that payment is to be made to Purchaser at the following bank account:



Page 2 of 14    Seller Initials: _____

Docusign Envelope ID: C39B5AEA-844F-42A7-A8B9-D52983838BEF

2.3 **Right to Collection.** Purchaser has the right to institute and maintain actions in its name or otherwise to collect such accounts. Actions based upon Seller Risk Accounts shall be at the cost of Seller. "Seller Risk Account" shall mean any account with amounts or invoices which, when aggregated with those amounts or invoices already existing, exceed the credit limit established by Purchaser with respect to Petco.

**3    Credit Approval.**

3.1 **Sales and Deliveries with Approval.** All sales and deliveries of merchandise to Petco must be made with prior notification by email to Purchaser at Ben@pantherscapital.com and Mike@pantherscapital.com. Since all deliveries are made in large quantities, they shall be considered invoiced when the tracking number is provided to both Petco and Purchaser.

3.2 **Withdrawal of Credit Approval.** If, in Purchaser's sole opinion, Petco's creditworthiness becomes impaired before the actual delivery of merchandise, Purchaser shall have the right to withdraw approval of any order taken from Petco.

3.3 **Right of Stoppage in Transit.** Purchaser shall also be entitled to exercise a seller's right of stoppage in transit, replevin, or reclamation. Any merchandise so recovered shall be dealt with, as between Purchaser and Seller, as returned merchandise.

3.4 **Assignment of Merchandise and Receivables.** Seller hereby sells and assigns to Purchaser all receivables purchased by Purchaser that may be returned by Petco. However, due to the nature of the merchandise (i.e., live pet fish and other items that Purchaser cannot resell or utilize), Purchaser shall not be obligated to take possession or ownership of any returned merchandise. Seller retains full responsibility for any returned merchandise, including its care, handling, and any associated costs. The assignment of any interest or rights in the merchandise, including stoppage in transit, replevin, or reclamation, shall be strictly for the purpose of securing payment on the receivables, and does not obligate Purchaser to take physical control or bear any risk related to the merchandise itself.

3.5 **Liability Disclaimer.** Purchaser shall not be liable to any party for refusing to approve the delivery of merchandise sold under this Agreement. Given the nature of the merchandise, Purchaser is under no obligation to take possession or assume any responsibility for the merchandise itself, including live pet fish and other unsellable items, and any refusal to approve delivery shall not result in any liability on the part of Purchaser.

**4    Assumption of Credit Risks.**

4.1 **Assumption of Credit Risk**. On all accounts receivable accepted and purchased by Purchaser, except those receivables termed Seller Risk Accounts, Purchaser will assume any losses resulting from the insolvency of Petco. Such assumption of credit risk shall take effect upon delivery and acceptance without dispute of the value and quality of the merchandise.

4.2 Adherence to Credit Limits. Seller agrees that it shall adhere strictly to the credit limits established by Purchaser.

Seller Initials: _____

Docusign Envelope ID: C39B5AEA-844E-42A7-A8B0-D52983838BEF

4.3 **Advances Beyond Credit Limit.** Purchaser, at its option, may advance funds against accounts or invoices exceeding the established credit limit with full recourse against Seller.

4.4 **Claim Disputes.** If an unadjusted claim or dispute delays the payment of an account beyond sixty (60) days after it is due, Purchaser's assumption of the credit risk is canceled, and the amount may be charged back to Seller as of the original credit date.

4.5 **Rejections and Returns.** Seller shall immediately notify Purchaser of all rejections, returns of merchandise, and customer claims upon becoming aware of these matters, and shall promptly resolve all claims and disputes with Petco. Any returned merchandise that comes into Seller's possession shall remain the responsibility of Seller, given that such merchandise (including live pet fish and other non-resalable items) cannot be handled or utilized by Purchaser. Seller shall either repay or secure to Purchaser's satisfaction the amount credited by reason of the sale of such merchandise. Purchaser shall have no obligation to take possession of any returned merchandise, nor shall Purchaser have any liability with respect to its disposal or resale. If Purchaser incurs any deficiency resulting from the sale or settlement of an invoice related to returned merchandise, Seller shall be fully liable for such deficiency, and Purchaser retains full recourse against Seller.

5  **Book Entries.** Immediately upon the purchase of an account by Purchaser, Seller will make appropriate entries upon its books disclosing such purchase and will execute and deliver all papers and instruments and do all things necessary to effectuate this Agreement.

6   **Amounts Owed to Purchaser.**

6.1 **Amounts Owed.** Any amounts owed by Seller to Purchaser for commissions, interest, or otherwise shall be considered as advances against Seller's sales and are chargeable to Seller's current account at any time, at Purchaser's option.

6.2 **Taxes Paid by Purchaser.** If, at any time, Purchaser is required to pay any state, federal, or local sales or excise tax on sales or services performed under and pursuant to this Agreement, the amount of the tax paid by Purchaser shall be charged to Seller's account.

7  **Rights under Seller's Contracts.** Seller warrants and agrees that all the rights and privileges existing under the contractual agreements with Petco, whose receivables are being purchased by Purchaser, are transferred to Purchaser, and Seller further agrees to provide Purchaser with a copy of such contracts or agreements.

8  **Warranty of Assignment.** Seller warrants that none of the accounts being sold to Purchaser have previously been sold or assigned to any person, firm, corporation, or other entity, and will not be sold or assigned at any time during the term of this Agreement.

9  **Power of Attorney.** Seller appoints Panthers Capital LLC ("Purchaser"), or any other person whom Purchaser may designate, as Seller's attorney-in-fact with power to receive, open, and dispose of all mail addressed to Seller relating to the Accounts; to notify postal authorities to change the address for delivery of mail addressed to Seller to an address that Purchaser may designate; to endorse in Seller's name any notes, acceptances, checks, drafts, money orders, and other evidences of payment or collateral that may come into Purchaser's possession; to sign Seller's name on any

Page 4 of 14                                                                 Seller Initials: _____

Docusign Envelope ID: C39B5AEA-844E-42A7-A8B9-D52983838BEF

invoice or bill of lading relating to any account, drafts against debtors, assignments and verifications of accounts, and notice to debtors; to send verifications of accounts to any debtor; and to do all other acts and things necessary to effectuate this Agreement. All acts of such attorney or designee are ratified and approved, and such attorney or designee shall not be liable for any acts of commission or omission, nor for any error of judgment or mistake of law or fact. This power, being coupled with an interest, is irrevocable while any purchased account shall remain unpaid.

10  **Breach of Warranty.** If any warranty or covenant in this Agreement, express or implied, shall be broken or violated, whether caused by the act or the fault of Seller, a debtor, or others, Purchaser shall be entitled to recover from Seller or Seller's guarantors the damages consequently sustained, including, but not limited to, all attorney's fees, court costs, collection charges, and all other expenses that may be incurred by Purchaser to enforce payment of any account, either as against the debtor, Seller, or its guarantors, or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement.

11  **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

11.1    Seller shall violate any term, condition, or covenant in this Agreement.

11.2    Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false, or misleading in any material respect when made.

11.3    Seller shall default under any of the terms, covenants, and conditions of any other agreement with Purchaser (if any) which is related to the instant Agreement.

11.4    Seller uses multiple depository accounts without obtaining prior written consent of Purchaser in each instance.

11.5    Petco fails to deposit any portion of the accounts receivable owed to Seller into the designated bank account of Purchaser as specified in this Agreement.

11.6    Seller changes the designated Purchaser bank account provided to Petco without obtaining prior written consent from Purchaser for each such instance.

11.7    Seller intentionally interferes with Purchaser's collection of Petco Accounts Receivable that become due and payable to Purchaser on behalf of Seller, as agreed herein, thereby obstructing the agreed payment process.

11.8    Seller changes the agreement between Purchaser, Seller, and Petco, wherein all future Accounts Receivable that become due and payable shall be paid directly to Purchaser, without obtaining prior written consent from Purchaser.

12  **Default under the Agreement.** In case any Event of Default occurs and is not waived by Purchaser, in writing, Purchaser may declare Seller in default under this Agreement without notice.

13  **Seller's Obligations Upon Default.** In the event of an occurrence of default due to Seller's breach of any obligations under this Agreement, Seller shall immediately remit to Purchaser the entire outstanding and undelivered portion of the Purchased Amount. Furthermore, upon such default, all future Accounts Receivable owed by Petco shall be deemed fully factored to Purchaser, with the Specified Percentage adjusted to 100% of all such future receivables, thereby entitling Purchaser to absolute and direct collection rights over all Petco AR. Seller shall additionally be liable to Purchaser for all reasonable costs and expenses incurred in enforcing Purchaser's rights and recovering any amounts owed under this Agreement, including, but not limited to, expenses arising from the

Page 5 of 14

Seller Initials:

retention of third-party collection firms and reasonable attorneys' fees, as well as any related disbursements (collectively, "Reasonable Damages").

14 **No Liability Clause.** In no event shall Purchaser be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

15 **Waiver.**

   15.1    **Waiver by Purchaser.** Purchaser's waiver of a particular breach by Seller of any covenant or warranty contained in this Agreement shall not be deemed to constitute a waiver of any subsequent breach.

   15.2    **Non-Waiver of Rights.** Purchaser's failure at any particular time to exercise a right or privilege granted to it in this Agreement shall not be deemed to constitute a waiver of that or any other right or privilege.

16 **Profit and Loss Statement.**

   16.1    **Monthly Profit and Loss Statement.** Seller shall submit to Purchaser, at Purchaser's request, a monthly profit and loss statement signed by an officer or employee of Seller on behalf of and as the act of Seller within five (5) days after the close of each month, covering the business for the month immediately preceding the statement. In addition, Seller shall furnish Purchaser a semiannual balance sheet on Seller's business, accompanied by a profit and loss statement from the beginning of Seller's then-current fiscal year. Such semiannual balance sheet and accompanying profit and loss statement shall be prepared by an independent, certified public accountant that has no pecuniary interest in Seller's business.

   16.2    **Inspection of Records.** All books, records, accounts, corporate records, bank statements, and records of deposit of Seller, as well as any other financial records maintained by Seller, shall be open to inspection by Purchaser, and any accountant or auditor designated by Purchaser, for all purposes and at all times during normal business hours at Seller's main place of business.

17 **Warranty of Solvency.**

   17.1    **Warranty of Solvency.** Seller warrants its solvency. If Seller receives any checks, drafts, notes, acceptances, or other moneyed instruments, or cash in payment of any of the receivables assigned to Purchaser under and pursuant to this Agreement, such payment will immediately be turned over to Purchaser in its original form.

   17.2    **Endorsement of Instruments.** Purchaser, or other persons as it may from time to time designate, shall have the right to endorse all instruments in Seller's name or otherwise.

18 **Eligible Accounts Criteria.**

   **18.1**    **Eligible Accounts are defined as follows:**

      18.1.1  All accounts due from Petco that are less than 90 days from the invoice date.

Page 6 of 14

Seller Initials: _____

18.1.2 All accounts due from Petco that, in Purchaser's judgment, are deemed creditworthy, up to the credit limit established by Purchaser.

18.1.3 All accounts arising from the shipment of goods or completion of services to Petco that are not subject to any disputes, offsets, or counterclaims.

18.1.4 All accounts due from Petco where less than 25% of the total outstanding invoices are aged more than 90 days.

18.1.5 All accounts due from Petco with payment terms of Net 60 days or less.

18.2 Purchaser reserves the right to make exceptions to these criteria at its sole discretion on a case-by-case basis.

19 **Pledge of Security.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants, or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Purchaser a continuing, perfected and first priority lien upon and security interest in, to, and under all of Seller's right, title, and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

19.1 All accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

19.2 All Seller's proceeds, as such term is defined by Article 9 of the UCC.

20 **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Purchaser will execute, acknowledge (where applicable), and deliver such satisfactions, releases, and termination statements, as Seller shall reasonably request.

21 **Representations with Respect to Collateral.** Seller hereby represents and warrants to Purchaser that the execution, delivery, and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement, or any other instrument to which Seller is a party.

22 **Further Assurances.** Upon the request of Purchaser, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances, and assignments of the Collateral and documents with respect to the pledge of the Collateral as Purchaser shall reasonably request. Seller shall execute and deliver such instruments, assignments, or documents and do all such other acts and things, as Purchaser may reasonably request to effectuate the purpose and purposes of this Pledge and to provide for the continuing validity, perfection, and priority of Purchaser's security interest in the Collateral.

Seller Initials: _____

**22.1    Security Interest.**

22.1.1  **Security Interest Grant.** Seller grants to Purchaser a first-priority security interest in all of Seller's present and future accounts receivable and all proceeds thereof. Seller further authorizes Purchaser to file a UCC-1 Financing Statement naming Purchaser as the secured party to perfect such security interest.

22.1.2  **Subordination of Existing Liens.** Seller agrees to obtain lien terminations or subordinations from any third parties holding liens against accounts receivable and proceeds as required by Purchaser in order to maintain Purchaser's priority interest.

23  **Guaranty of Performance.** Charitha I. Samarasinghe personally guarantees the prompt and full performance of all obligations of Seller under this Agreement. This personal guaranty shall be binding and enforceable immediately, and shall not be contingent upon Purchaser seeking recourse against Seller or any other party. Purchaser is entitled to pursue remedies against the Guarantor independently of actions taken against Seller.

24  **Prejudgment Remedy.** In the event of a default by Seller, Purchaser is entitled to seek a prejudgment remedy under Uniform Commercial Code (UCC) laws. Seller and Guarantor hereby waive all rights to prior notice and prior opportunity for a hearing under applicable Connecticut General Statutes regarding Purchaser's obtaining of any prejudgment remedy. Purchaser may attach or garnish the Seller's or Guarantor's funds and property held at financial institutions if certain statutory conditions are satisfied.

25  **Term and Termination of Facility.**

25.1    **Term of Facility.** The initial term of this factoring facility shall be twenty-four (24) months from the effective date of this Agreement. The facility shall automatically renew for additional twelve (12) month periods unless either party provides written notice of termination at least sixty (60) days prior to the end of the current term.

25.2    **Early Termination by Seller.** If Seller wishes to terminate this Agreement before the end of the term, Seller must provide a ninety (90) days written notice. Seller shall also be responsible for any outstanding advances, accrued fees, and any applicable early termination charges.

25.3    **Termination Rights.** Either party may terminate this Agreement as to future transactions on one hundred eighty (180) days' written notice.

26  **Severability Clause.** The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision. If any provision of this Agreement is held to be invalid, the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision.

27  **Governing Law.** This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Connecticut.

Page 8 of 14

Seller Initials:

28  **Notices Requirements.** Any notice provided for or concerning this Agreement shall be in writing and shall be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this Agreement.

29  **Attorney Fees.** In the event that any lawsuit is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all the sums that either party may be called on to pay, a reasonable sum for the successful party's attorney fees.

30  **Mandatory Arbitration.** Any dispute arising under this Agreement shall be resolved through binding arbitration, as determined solely at Purchaser's discretion. Seller irrevocably agrees that, if the parties are unable to mutually agree upon an arbitrator, Purchaser shall have the exclusive right to appoint the arbitrator who will arbitrate the dispute. The arbitration shall be conducted in accordance with the rules of the American Arbitration Association in force at the time of arbitration, and all decisions made by the appointed arbitrator shall be final and binding upon Seller without further recourse.

31  **Modification of Agreement.** Any modification of this Agreement or additional obligation assumed by either party in connection with this Agreement shall be binding only if placed in writing and signed by each party or an authorized representative of each party.

32  **Assignment of Rights.** The rights under this Agreement are personal to each party; however, only Purchaser shall have the right to assign or transfer its rights to any other person, firm, corporation, or entity without the prior consent of Seller. Seller may not assign or transfer any rights or obligations under this Agreement without the prior, express, and written consent of Purchaser.

33  **Counterparts and Electronic Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any electronic signature, including signatures executed through electronic means such as DocuSign or email, shall be considered valid, binding, and fully enforceable as if signed in physical form.

34  **Binding Effect on Successors.** In this Agreement, any reference to a party includes that party's heirs, executors, administrators, successors, and assigns. Singular includes plural, and masculine includes feminine.

35  **Entire Agreement.** This Agreement shall constitute the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement.

36  **Miscellaneous Provisions.**

36.1    **Governing Law.** This Agreement and all related matters shall be governed by and construed in accordance with the laws of the State of Connecticut, Fairfield County, without giving effect to conflict of law principles.

36.2    **Enforceability of Electronic Signatures.** The parties agree that this Agreement may be executed electronically, and such electronic execution shall have the same legal effect as

Page 9 of 14

Seller Initials:

manual signatures. The Agreement shall become effective and binding once signed electronically by Seller.

36.3 **Operational Mechanics and Documentation.** In the event that Seller receives any payment on an Account assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust as fiduciary for Purchaser, segregating said funds from its own assets, and shall immediately remit the full amount to Purchaser without delay. Seller acknowledges that any failure to promptly remit such funds shall constitute a material breach of this Agreement. Purchaser shall have the absolute right to recover all reasonable costs, expenses, and attorney's fees incurred in enforcing this provision, including any actions taken to recover improperly retained payments.

36.4 **Acknowledgment of Default and Factoring Terms for Petco Accounts.** Seller hereby irrevocably acknowledges and stipulates that, as of the effective date of this Agreement, Seller is in default under a prior funding agreement executed with Purchaser, resulting in an outstanding adjusted balance of $1,018,196.92. This balance accounts for the application of a wire transfer payment in the amount of $150,177.08, received by Purchaser from Petco on November 27, 2024, which was applied towards Seller's defaulted obligation. Petco has formally agreed to remit all future Accounts Payable directly to Purchaser and shall continue to do so for the duration of this Agreement. This Agreement shall, under no circumstances, be construed as a waiver or release of Seller's liability for the remaining defaulted balance owed to Purchaser. Until the entire outstanding defaulted balance is fully satisfied by Petco's remittances, Purchaser shall have no obligation to purchase any new Accounts Receivable from Petco. The remaining balance owed by Seller shall be adjusted accordingly by Purchaser, and only Accounts Receivable in excess of the outstanding balance shall be eligible for future purchase by Purchaser. Furthermore, all Accounts Receivable currently assigned to satisfy Seller's defaulted balance, which Petco has agreed to pay directly to Purchaser, shall be deemed irrevocably allocated for such purposes, and shall not be subject to further sale, transfer, or assignment by Seller under this or any other agreement. Seller expressly agrees that Purchaser maintains an absolute priority on these receivables until the defaulted balance is extinguished. Any interference by Seller in directing or controlling these payments shall be deemed a material breach of this Agreement, entitling Purchaser to immediate enforcement of remedies. Seller further covenants and agrees to sell and assign to Purchaser only those Petco Accounts Receivable that are in excess of the obligations currently in default, ensuring that the defaulted balance is fully prioritized and satisfied prior to any additional assignment or transaction under this Agreement. Any attempts by Seller to divert, hinder, or otherwise delay payment by Petco to Purchaser will result in immediate enforcement action, and Seller shall be liable for all costs and attorneys' fees incurred by Purchaser in securing its rights hereunder.

37 **Clawback and Misapplication of Payments.** In the event that Seller receives any payment on an Account that has been assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust for the sole benefit of Purchaser, segregating said funds from Seller's own assets. Seller shall immediately and without delay remit the entirety of such funds to Purchaser in the form received. Seller's failure to remit these funds promptly shall constitute a material breach of this Agreement and result in immediate liability for all damages and remedies available to Purchaser. Seller expressly acknowledges that

Page 10 of 14

Seller Initials:

Purchaser has the absolute right to recover from Seller any and all costs, expenses, and reasonable attorneys' fees incurred by Purchaser in enforcing this provision, including, but not limited to, any actions taken to recover misapplied or improperly retained payments. Seller's obligation to hold and remit such payments is fiduciary in nature, and any failure to comply shall be deemed a breach of trust, entitling Purchaser to pursue equitable remedies, including but not limited to specific performance, injunctive relief, and recovery of all legal costs associated with the enforcement of Purchaser's rights under this Agreement.

This Agreement is executed by the authorized representatives of both parties as of the date of Seller's electronic signature. This Agreement shall be binding upon and inure to the benefit of each party's successors and permitted assigns.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____

By: Charitha I. Samarasinghe

Title: CEO and President

██████████████

██████████████

██████████████

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**Owner/Guarantor:**

By: _____

Name: Charitha I. Samarasinghe

██████████████

██████████████

██████████████

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**PANTHERS CAPITAL LLC - Purchaser**

By: _____

By:

Title:

Date:

Seller Initials: _____

## CROSS COLLATERAL ADDENDUM

This Cross Collateral Addendum (the "Addendum") is entered into as of December 1, 2024, by and between Panthers Capital, LLC (hereinafter referred to as "Purchaser") and CIS INTERNATIONAL HOLDINGS (N.A.) CORP, along with the other entities listed below (hereinafter collectively referred to as "Seller" or "Affiliates"). This Addendum serves as an integral supplement to the existing Factoring Facility Agreement (the "Agreement") entered into between the aforementioned parties.

### Recitals

WHEREAS, each of the Seller entities has individually entered into the Factoring Facility Agreement with Purchaser, whereby the Seller agreed to sell and assign all accounts receivable arising from transactions with Petco (the "ARs") to Purchaser, on the terms set forth therein; and

WHEREAS, the Seller entities are affiliated entities under common control and ownership, and each Seller entity desires to further secure its obligations to Purchaser by pledging a cross-collateralized security interest in favor of Purchaser, thereby guaranteeing each other's performance under the Factoring Facility Agreement; and

NOW, THEREFORE, for good and valuable consideration, the Affiliates listed below (collectively, the "Corporate Guarantors") agree as follows:

1. **Corporate and Personal Guarantors.**

   a. CIS International Holdings (N.A.) Corp - ▇▇▇▇▇▇▇▇▇▇ - Charitha I. Samarasinghe
   b. CIS International Distributor - ▇▇▇▇▇▇▇▇ - Charitha I. Samarasinghe
   c. Siam Tropical Fish Ltd - ▇▇▇▇▇▇▇▇ - Charitha I. Samarasinghe
   d. Tropical Fish International Europe - ▇▇▇▇▇▇▇▇ - Charitha I. Samarasinghe
   e. Tropical Aquarium Fish (Fiji) Ltd - ▇▇▇▇▇▇▇▇ - Charitha I. Samarasinghe
   f. Live Aquaria Holdings Corp - Charitha I. Samarasinghe
   g. T3 Aquatics - Charitha I. Samarasinghe
   h. LIONSROCK INVESTMENTS LLC - Charitha I. Samarasinghe
   i. LIONSROCK WISCONSIN LLC - Charitha I. Samarasinghe

2. **Cross-Collateralization and Security Interest.**

   a. **Cross-Collateralization.** Each Seller and Corporate Guarantor hereby irrevocably and unconditionally grants to Purchaser a cross-collateral pledge of their respective assets to secure the performance and obligations of each other entity under the Factoring Facility Agreement. This pledge extends to all present and future accounts receivable, personal property, general intangibles, and any other assets of each Corporate Guarantor, which shall serve as collateral to secure the obligations of any affiliated entity in the event of breach or default by any one entity.

   b. **First-Priority Security Interest.** To further secure the obligations arising under the Factoring Facility Agreement, each Seller and Corporate Guarantor grants Purchaser a continuing, perfected, first-priority security interest in all present and future accounts, chattel paper, deposit accounts, inventory, equipment, fixtures, general intangibles, and all proceeds now owned or hereafter acquired by any Seller or Corporate Guarantor (the "Collateral"). Each Seller

Page 12 of 14                                                        Seller Initials:

and Corporate Guarantor authorizes Purchaser to file any and all necessary Uniform Commercial Code (UCC) Financing Statements, as well as any amendments or continuation statements, in order to evidence and perfect such security interest.

c. **Cross-Default.** A default by any one Seller or Corporate Guarantor shall be deemed a default by all affiliated entities. Upon such an event of default, Purchaser shall have the immediate right to enforce its rights and remedies under the Factoring Facility Agreement and this Addendum, including, but not limited to, repossession, foreclosure, attachment, garnishment, and sale of the Collateral, without limitation and without further notice to any Seller or Corporate Guarantor.

d. **Cumulative Rights.** All rights and remedies available to Purchaser under this Addendum are cumulative and are in addition to any other rights or remedies provided by law, equity, or under the original Factoring Facility Agreement. The exercise of any right or remedy by Purchaser shall not preclude the concurrent or subsequent exercise of any other right or remedy available to Purchaser.

3. **No Alteration of Original Agreement.**

a. **No Alteration or Waiver.** Except as expressly modified by this Addendum, all terms, conditions, covenants, representations, and warranties set forth in the original Factoring Facility Agreement shall remain in full force and effect. Nothing in this Addendum shall be construed as a waiver, modification, or novation of Purchaser's rights under the Agreement, except as specifically provided herein.

4. **Execution and Authority.**

a. **Authority to Bind.** Each undersigned representative of the Seller and Corporate Guarantors represents and warrants that they have the full authority to execute this Addendum, and that this Addendum constitutes a valid, binding, and enforceable agreement of each respective Seller and Corporate Guarantor. This Addendum shall be binding upon the parties and their respective successors and assigns.

Page 13 of 14

Seller Initials: _____

IN WITNESS WHEREOF, the parties hereto have executed this Cross Collateral Addendum as of the day and year first above written.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____

By: Charitha I. Samarasinghe

Title: CEO and President

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**Owner/Guarantor:**

By: _____

Name: Charitha I. Samarasinghe

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

Page 14 of 14

Seller Initials: _____

ERNEST A. LADEN
STATE MARSHAL FAIRFIELD COUNTY

STATE MARSHAL'S RETURN OF SERVICE

STATE OF CONNECTICUT

      SS: Trumbull       August 7, 2025

COUNTY OF FAIFIELD

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, on the out of state defendant CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, 1405 W 178th St., Gardena, CA 90248 [95890710527018074 79232].

      SS: Trumbull       August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, on the out of state defendant CIS International Distributors Inc, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant CIS International Distributors Inc, 1405 W 178th St. b, Gardena, CA 90248 [95890710527018074 79249].

      SS: Trumbull       August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, on the out of state defendant LIVE Aquaria Holdings Corp, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant LIVE Aquaria Holdings Corp, 1405 W 178th St., Gardena, CA 90248 [95890710527018074 79287].

      SS: Hartford       August 4, 2025
      SS: Trumbull       August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, by leaving a true and attested copy for the out of state defendant Lionsrock Investments LLC, in accordance with Connecticut State Statute 52-59b(c), with the Secretary of State, with the statutory fee attached, said office being the designated recipient for Service, service being made at the office of the Secretary of State of Connecticut, 165 Capitol Ave, Hartford, CT, and in further accordance with C.G.S. 52-59b(c) an additional true and attested copy was sent by mailing, postage paid and certified, return receipt requested, addressed to Lionsrock Investments LLC, 1405 W 178th St., Gardena, CA 90248 [95890710527018074 79195].

      SS: Hartford       August 4, 2025
      SS: Trumbull       August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, by leaving a true and attested copy for the out of state defendant Lionsrock Wisconsin LLC, in accordance with Connecticut State Statute 52-59b(c), with the Secretary of State, with the statutory fee attached, said office being the designated recipient for Service, service being made at the office of the Secretary of State of Connecticut, 165 Capitol Ave, Hartford, CT, and in further accordance with C.G.S. 52-59b(c) an additional true and attested copy was sent by mailing, postage paid and certified, return receipt requested, addressed to Lionsrock Wisconsin LLC, 2253 Air Pk Rd, Rhinelander, WI 54501 [95890710527018074 79263]; and to Lionsrock Wisconsin LLC, 4 Sundown Dr, Rolling Hills Estates, CA 90274 [95890710527018074 79294].

      SS: Trumbull       August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, on the out of state defendant T3

ERNEST A. LADEN
STATE MARSHAL FAIRFIELD COUNTY

STATE MARSHAL'S RETURN OF SERVICE

Aquatics, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant T3 Aquatics, 1405 W 178th St., Gardena, CA 90248 [9589071052701807479201]; and T3 Aquatics, 4 Sundown Dr, Rolling Hills Estates, CA 90274 [9589071052701807479256].; and T3 Aquatics, 2253 Air Pk Rd, Rhinelander, WI 54501 [9589071052701807479218].

SS: Trumbull                    August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, on the out of state defendant Siam Tropical Fish LTD, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant Siam Tropical Fish LTD, 1405 W 178th St., Gardena, CA 90248 [9589071052701807479270].

SS: Trumbull                    August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, on the out of state defendant Tropical Aquarium Fish (Fiji) LTD, in accordance with C.G.S. 33-929, by mailing, postage paid and certified, return receipt requested, a true and attested copy to the defendant, defendant Tropical Aquarium Fish (Fiji) LTD, 1405 W 178th St., Gardena, CA 90248 [9589071052701807479300].

SS: Hartford                    August 4, 2025
SS: Trumbull                    August 7, 2025

Then and there by virtue hereof and by direction of the plaintiff's attorney, I made further service of the within original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, by leaving a true and attested copy for the out of state defendant Charitha I Samarasinghe, in accordance with Connecticut State Statute 52-59b, with the Secretary of State, with the statutory fee attached, said office being the designated recipient for Service, service being made at the office of the Secretary of State of Connecticut, 165 Capitol Ave, Hartford, CT, and in further accordance with C.G.S. 52-59b an additional true and attested copy was sent by mailing, postage paid and certified, return receipt requested, addressed to Charitha I Samarasinghe, 4 Sundown Dr, Rolling Hills Estates, CA 90274 [9589071052701807479225].

At least one such copy for each of the within named defendants.

The within and foregoing is the original Amended Complaint, Statement of Amount In Demand, Exhibit A, and Exhibit B, with my doings hereon endorsed.

| Travel | $ 0.00 |
| Copies | $ 810.00 |
| Services | $ 390.00 |
| Endorsement | $ 8.00 |
| State & Mailing Fee | $ 302.40 |
| Total | $ 1510.40 |

ATTEST:_____
Ernest A. Laden
State Marshal for Fairfield County

| | | |
|---|---|---|
| DOCKET NO: FST-CV25-6075223-S | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | SEPTEMBER 12, 2025 |

<u>MOTION FOR DEFAULT FOR FAILURE TO APPEAR</u>

Pursuant to Practice Book § 17-20, the plaintiff, Panthers Capital LLC ("Plaintiff"), moves for the entry of default against the defendants, **CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish (D-01), Charitha I Samarasinghe (D-02)**, **CIS International Distributors Inc. (D-01), Live Aquaria Holdings Corp (D-04), Lionsrock Investments LLC (D-05), Lionsrock Wisconsin LLC (D-06), T3 Aquatics (D-07), Siam Tropical Fish LTD (D-08),** and **Tropical Aquarium Fish (Fiji) LTD (D-09)**, for failure to timely appear. The return date was August 12, 2025. Thereafter, on August 27, 2025, Plaintiff filed an Amended Complaint. See DE 101.00 (Amended Complaint); DE 103.00 (Return of Service of Amended Complaint). To date, the defendants have not appeared.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By /s/ John T. Szalan
    John T. Szalan
    Neubert, Pepe & Monteith, P.C.
    195 Church Street, 13th Floor
    New Haven, CT 06510
    Telephone No. (203) 781-2856
    Firm Juris Number 407996

<u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing was mailed on September 12, 2025, to all appearing parties, and in accordance with Practice Book § 10-12(b), all parties sought to be defaulted for their failure to appear, as follows:

<u>SENT BY FIRST CLASS MAIL</u>
CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish
1405 W 178th St
Gardena, CA 90248
*Non-appearing party*

<u>SENT BY FIRST CLASS MAIL</u>
Charitha I Samarasinghe
4 Sundown Dr
Rolling Hills Estates, CA 90274
*Non-appearing party*

<u>SENT BY FIRST CLASS MAIL</u>
CIS International Distributors Inc.
1401 W 178th St b
Gardena, CA 90248
*Non-appearing party*

<u>SENT BY FIRST CLASS MAIL</u>
Live Aquaria Holdings Corp
1405 W 178th St
Gardena, CA 90248
*Non-appearing party*

<u>SENT BY FIRST CLASS MAIL</u>
Lionsrock Investments LLC
1405 W 178th St
Gardena, CA 90248
*Non-appearing party*

SENT BY FIRST CLASS MAIL
Lionsrock Wisconsin LLC
2253 Air Pk Rd,
Rhinelander, WI 54501
 and/or
Lionsrock Wisconsin LLC
4 Sundown Dr
Rolling Hills Estates, CA 90274
*Non-appearing party*

<u>SENT BY FIRST CLASS MAIL</u>
T3 Aquatics
2253 Air Pk Rd,
Rhinelander, WI 54501
  and/or
T3 Aquatics
1401 W 178th St.
Gardena, CA 90248
  and/or
T3 Aquatics
4 Sundown Dr
Rolling Hills Estates, CA 90274
*Non-appearing party*

<u>SENT BY FIRST CLASS MAIL</u>
Siam Tropical Fish LTD
1405 W 178th St
Gardena, CA 90248
*Non-appearing party*

<u>SENT BY FIRST CLASS MAIL</u>
Tropical Aquarium Fish (Fiji) LTD
1405 W 178th St
Gardena, CA 90248
*Non-appearing party*

<u>/s/ John T. Szalan</u>
John T. Szalan
Neubert, Pepe & Monteith, P.C.

4

ORDER   089998

DOCKET NO: FSTCV256075223S

SUPERIOR COURT

PANTHERS CAPITAL LLC
  V.
CIS INTERNATIONAL HOLDINGS (N.A.)
CORP. D/B/A E TR Et Al

JUDICIAL DISTRICT OF STAMFORD
  AT STAMFORD

9/19/2025

## ORDER

ORDER REGARDING:
09/12/2025 104.00 MOTION FOR DEFAULT -FAILURE TO APPEAR PB 17-20

The foregoing, having been considered by the clerk, is hereby:

ORDER: DENIED

Motion for default for failure to appear is denied because an appearance was filed.

Judicial Notice (JDNO) was sent regarding this order.

089998
_____

BY THE CLERK
Processed by: Scott Abel

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

DOCKET NO: FST-CV25-6075223-S : SUPERIOR COURT
:
PANTHERS CAPITAL LLC : J.D. OF STAMFORD/NORWALK
: AT STAMFORD
V. :
:
CIS INTERNATIONAL HOLDINGS (N.A.) :
CORP. d/b/a E TROPICAL FISH, :
CHARITHA I SAMARASINGHE, :
CIS INTERNATIONAL DISTRIBUTORS INC., :
LIVE AQUARIA HOLDINGS CORP, :
LIONSROCK INVESTMENTS LLC, :
LIONSROCK WISCONSIN LLC, :
T3 AQUATICS, :
SIAM TROPICAL FISH LTD, :
TROPICAL AQUARIUM FISH (FIJI) LTD : SEPTEMBER 30, 2025

## NOTICE OF BANKRUPTCY FILING

The plaintiff, Panthers Capital LLC, hereby provides notice that on September 22, 2025,

the defendants, **CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish**, filed a

voluntary petition in bankruptcy under Title 11, Chapter 11, U.S.C., in the United States

Bankruptcy Court for Central District of California (Los Angeles), Case Number 25-18374-BR.

The Affidavit of John T. Szalan, Esq. is attached hereto.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By: /s/ John T. Szalan
John T. Szalan, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510-2026
Tel.: (203) 781-2840
Juris No.: 407996

DOCKET NO: FST-CV25-6075223-S      :      SUPERIOR COURT

PANTHERS CAPITAL LLC      :      J.D. OF STAMFORD/NORWALK

         :      AT STAMFORD

V.      :

         :

CIS INTERNATIONAL HOLDINGS (N.A.)      :
CORP. d/b/a E TROPICAL FISH,      :
CHARITHA I SAMARASINGHE,      :
CIS INTERNATIONAL DISTRIBUTORS INC.,      :
LIVE AQUARIA HOLDINGS CORP,      :
LIONSROCK INVESTMENTS LLC,      :
LIONSROCK WISCONSIN LLC,      :
T3 AQUATICS,      :
SIAM TROPICAL FISH LTD,      :
TROPICAL AQUARIUM FISH (FIJI) LTD      :      SEPTEMBER 30, 2025

## AFFIDAVIT IN SUPPORT OF NOTICE OF BANKRUPTCY FILING

I, John T. Szalan, being duly sworn, hereby depose and say:

1.      I am over the age of eighteen years and believe in the obligations of an oath.

2.      I am an attorney at the law firm of Neubert, Pepe & Monteith, P.C., counsel for the plaintiff in this matter.

3.      On September 30, 2025, the defendants, **CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish**, filed a voluntary petition in bankruptcy under Title 11, Chapter 11, U.S.C., in the United States Bankruptcy Court for Central District of California (Los Angeles), Case Number 25-18374-BR.

4.      As of today's date, the bankruptcy case is pending and the automatic stay of 11 U.S.C. § 362(a) is in effect.

John T. Szalan, Esq.

Subscribed and sworn to before me on September 30, 2025

Joseph R. Dunaj
Commissioner of the Superior Court

2

CERTIFICATION OF SERVICE

I hereby certify that a copy of the above was mailed or electronically delivered on September 30, 2025, to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served.

SENT BY EMAIL ONLY pluccarelli@sisco-law.com
Peter A Luccarelli III
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602
*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

    /s/ John T. Szalan
    John T. Szalan
    Neubert, Pepe & Monteith, P.C.

3

| | | |
|---|---|---|
| DOCKET NO: FST-CV25-6075223-S | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.), et al. | : | OCTOBER 3, 2025 |

<u>DEMAND FOR DISCLOSURE OF DEFENSE</u>

The Plaintiff, Panthers Capital LLC, hereby demands, in accordance with Practice Book §

13-19, that the appearing Defendants, Charitha I Samarasinghe (D-02), CIS International

Distributors Inc. (D-03), Live Aquaria Holdings Corp (D-04), Lionsrock Investments LLC (D-05),

Lionsrock Wisconsin LLC (D-06), T3 Aquatics (D-07), Siam Tropical Fish LTD (D-08), and

Tropical Aquarium Fish (Fiji) LTD (D-09), through their respective attorneys, present to this Court

a writing, to become a part of the Court file in this case, signed by such attorney, stating whether

said attorney has reason to believe and does believe that there exists a bona fide defense to the

Plaintiff's cause of action and whether such a defense will be made together with a general

statement of the nature or substance of such defense.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By /s/ Lucas Rocklin
  Lucas Rocklin
  Neubert, Pepe & Monteith, P.C.
  195 Church Street, 13th Floor
  New Haven, CT 06510
  Telephone No. (203) 781-2835
  Email: lrocklin@npmlaw.com
  Firm Juris Number 407996

CERTIFICATE OF SERVICE

       I certify that a copy of the above was or will immediately be mailed or delivered electronically or non-electronically on October 3, 2025, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

SENT BY EMAIL ONLY pluccarelli@sisco-law.com
Peter A Luccarelli III
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602
*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

                /s/ Lucas Rocklin
              Lucas Rocklin
              Neubert, Pepe & Monteith

2

DOCKET NO: FST-CV25-6075223-S      :      SUPERIOR COURT

                                 :

PANTHERS CAPITAL LLC           :      J.D. OF STAMFORD/NORWALK

                                 :      AT STAMFORD

V.                                      :

                                 :

CIS INTERNATIONAL HOLDINGS (N.A.), et al. :      OCTOBER 24, 2025

<u>MOTION FOR DEFAULT FOR FAILURE TO DISCLOSE A DEFENSE</u>

Pursuant to Practice Book § 13-19, the plaintiff, Panthers Capital LLC, hereby moves that a default enter against the defendants[1], Charitha I Samarasinghe (D-02), CIS International Distributors Inc. (D-03), Live Aquaria Holdings Corp (D-04), Lionsrock Investments LLC (D-05), Lionsrock Wisconsin LLC (D-06), T3 Aquatics (D-07), Siam Tropical Fish LTD (D-08), and Tropical Aquarium Fish (Fiji) LTD (D-09) (collectively, the "Defendants"), for failing to disclose a defense. A Demand for Disclosure of Defense was filed and served upon the Defendants on October 3, 2025, (DE 106.00). To date, the Defendants have failed to disclose a defense.

WHEREFORE, the Plaintiff moves that its Motion be granted and that the Defendants be defaulted for failing to disclose a defense.

THE PLAINTIFF,
PANTHERS CAPITAL LLC


By <u>/s/ 422247</u>
     Lucas B. Rocklin
     Neubert, Pepe & Monteith, P.C.
     195 Church Street, 13th Floor
     New Haven, CT 06510
     Telephone No. (203) 781-2840
     Firm Juris Number 407996

---

[1] This motion is <u>not</u> directed against CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish (D-01) which is a debtor in a pending bankruptcy case. <u>See</u> DE 105.00 (Notice of Bankruptcy).

CERTIFICATE OF SERVICE

I certify that a copy of the above was or will immediately be mailed or delivered electronically or non-electronically on October 24, 2025, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

SENT BY EMAIL ONLY pluccarelli@sisco-law.com
Peter A Luccarelli III
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602
*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

/s/ 422247
Lucas B. Rocklin
Neubert, Pepe & Monteith, P.C.

| | | |
|---|---|---|
| DOCKET NO: FST-CV25-6075223-S | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | OCTOBER 29, 2025 |

## DEFENDANTS' DISCLOSURE OF DEFENDANTS

Attorneys for Defendants, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD[1] hereby disclose that they have reason to and do believe that there exist bona fide defenses to Plaintiff's action, including, but not limited to, the defenses of misrepresentation, payment, fraudulent inducement, impossibility, unconscionability, unclean hands, usury, failure to mitigate damages, lack of subject matter jurisdiction, violations of the Connecticut Unfair Trade Practices Act, breach of contract by Plaintiff, unjust enrichment, breach of the duty of good faith and fair dealing, and promissory estoppel. The undersigned reserves the right to supplement their defenses.

---

[1] Defendant CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish is currently subject to a bankruptcy stay.

Respectfully Submitted,

SISCO-LAW

__/s/ Peter A. Luccarelli_____
Peter A. Luccarelli, III
pluccarelli@sisco-law.com
Connecticut Bar No. 433492
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Defendants*

## **CERTIFICATION**

The undersigned hereby certifies that, on October 30, 2025, a copy of the foregoing was mailed or delivered electronically to all counsel and self-represented parties of record as follows:

Lucas B. Rocklin
John T. Szalan II
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Lrocklin@npmlaw.com
JSzalan@npmlaw.com
*Counsel for Plaintiff*

_\_\_/s/ Peter A. Luccarelli_____
Attorney

DOCKET NO: FST-CV25-6075223-S  :  SUPERIOR COURT

             :

PANTHERS CAPITAL LLC    :  J.D. OF STAMFORD/NORWALK

             :  AT STAMFORD

V.             :

             :

CIS INTERNATIONAL HOLDINGS (N.A.), et al. :  NOVEMBER 11, 2025

## MOTION FOR DEFAULT FOR FAILURE TO PLEAD

The Plaintiff, Panthers Capital LLC, hereby moves for the entry of a default against the Defendants[1], Charitha I Samarasinghe (D-02), CIS International Distributors Inc. (D-03), Live Aquaria Holdings Corp (D-04), Lionsrock Investments LLC (D-05), Lionsrock Wisconsin LLC (D-06), T3 Aquatics (D-07), Siam Tropical Fish LTD (D-08), and Tropical Aquarium Fish (Fiji) LTD (D-09), for failure to plead in accordance with the Connecticut Practice Book § 17-32. The return date was August 12, 2025.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By /s/ Lucas Rocklin
  Lucas Rocklin
  Neubert, Pepe & Monteith, P.C.
  195 Church Street, 13th Floor
  New Haven, CT 06510
  Telephone No. (203) 781-2835
  Email: lrocklin@npmlaw.com
  Firm Juris Number 407996

---

[1] This Motion is not directed against CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish (D-01), which is a debtor in a pending bankruptcy proceeding. See Docket Entry No. 105.00.

## CERTIFICATE OF SERVICE

I certify that a copy of the above was or will immediately be mailed or delivered electronically or non-electronically on November 11, 2025, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

SENT BY EMAIL ONLY pluccarelli@sisco-law.com
Peter A Luccarelli III
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602
*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

/s/ Lucas Rocklin
Lucas Rocklin
Neubert, Pepe & Monteith

2

ORDER   089998

DOCKET NO: FSTCV256075223S

SUPERIOR COURT

PANTHERS CAPITAL LLC
   V.
CIS INTERNATIONAL HOLDINGS (N.A.)
CORP. D/B/A E TR Et Al

JUDICIAL DISTRICT OF STAMFORD
   AT STAMFORD

12/16/2025

ORDER

ORDER REGARDING:
11/12/2025 109.00 MOTION FOR DEFAULT-FAILURE TO PLEAD

The foregoing, having been considered by the clerk, is hereby:

ORDER: DENIED

Motion for default for failure to plead is denied because an answer was filed.

Judicial Notice (JDNO) was sent regarding this order.

089998
_____

BY THE CLERK
Processed by: Scott Abel

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

| | | |
|---|---|---|
| DOCKET NO: FST-CV25-6075223-S | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | November 20, 2025 |

## DEFENDANTS' MOTION FOR EXTENSION OF TIME
## <u>TO RESPOND TO MOTION FOR DEFAULT</u>

The Defendants, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD (collectively, the "Non-Bankruptcy Defendants"), respectfully move this Court for a nine (9) day extension of time to respond to Plaintiff Panthers Capital LLC's ("Panthers") Motion for Default for Failure to Plead and to respond to the Amended Complaint in this matter, and in support thereof states as follows:

1.      This is an action for breach of contract in which Panthers alleges that Defendant CIS International Holdings (N.A.) Corp. (the "Bankruptcy Defendant") breached two contracts with Panthers, and that the Non-Bankruptcy Defendants, as guarantors of those contracts, are jointly and severally liable for damages.

2.      Shortly after the Defendants made an appearance in this matter, the Bankruptcy Defendant entered a bankruptcy proceeding in California, staying all actions

against that defendant and substantially complicating the defense of the remaining Non-Bankruptcy Defendants.

3.     Panthers filed a Motion for Default Judgment for Failure to Plead as to the Non-Bankruptcy Defendants on November 12, 2025, meaning the clerk can enter default judgment at any time pursuant to Connecticut Practice Book § 17-32.

4.     Defendants require additional time to prepare an adequate response to Panthers' motion for the following reasons:

a. The Non-Bankruptcy Defendants recently learned that one of the two contracts at issue in the Amended Complaint contain a binding arbitration provision, which Panthers did not comply with when it filed the Amended Complaint. Counsel for the Non-Bankruptcy Defendants has requested Panthers' position on consenting to dismiss and/or abate this action so that one or both contracts can be submitted to binding arbitration pursuant to the contract;

b. The bankruptcy proceeding against the Bankruptcy Defendants has substantially complicated the Non-Bankruptcy Defendants' ability to defend this action. Specifically, the Non-Bankruptcy Defendants and counsel must frequently confer with bankruptcy counsel for the Bankruptcy Defendant to confirm that they are not taking any action that affects may affect the Bankruptcy Defendant, the bankruptcy action, or any rights that may now be held by the bankruptcy trustee.

c. A short extension will also allow the parties to continue settlement discussions.

5.      No prejudice will result to Panthers if this extension is granted.

6.      The undersigned contacted opposing counsel for their position on an extension of time. However, given the need for the Non-Bankruptcy Defendants to request an extension prior the entry of default by the clerk, the Non-Bankruptcy Defendants do not presently know Panthers' position on the request and will promptly update this motion upon receipt.

WHEREFORE, for the reasons stated above, the Non-Bankruptcy Defendants respectfully move this Court for an Order extending their time to respond to Plaintiff's Motion for Default for Failure to Plead or otherwise respond to the Amended Complaint through November 28, 2025.

Respectfully Submitted,

SISCO-LAW

__/s/ Peter A. Luccarelli_____
Peter A. Luccarelli, III
pluccarelli@sisco-law.com
Connecticut Bar No. 433492
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Defendants*

## **CERTIFICATION**

The undersigned hereby certifies that, on November 20, 2025, a copy of the foregoing was mailed or delivered electronically to all counsel and self-represented parties of record as follows:

Lucas B. Rocklin
John T. Szalan II
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Lrocklin@npmlaw.com
JSzalan@npmlaw.com
*Counsel for Plaintiff*

    __/s/ Peter A. Luccarelli_____
Attorney

| DOCKET NO: FST-CV25-6075223-S | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | November 26, 2025 |

## DEFENDANTS' SECOND MOTION FOR EXTENSION OF TIME
## TO RESPOND TO MOTION FOR DEFAULT AND AMENDED COMPLAINT

The Defendants, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD (collectively, the "Non-Bankruptcy Defendants"), respectfully move this Court for a second, twelve (12) day extension of time to respond to Plaintiff Panthers Capital LLC's ("Panthers") Motion for Default for Failure to Plead and to respond to the Amended Complaint in this matter, and in support thereof states as follows:

1.     This is an action for breach of contract in which Panthers alleges that Defendant CIS International Holdings (N.A.) Corp. (the "Bankruptcy Defendant") breached two contracts with Panthers, and that the Non-Bankruptcy Defendants, as guarantors of those contracts, are jointly and severally liable for damages.

2.     Shortly after the Defendants made an appearance in this matter, the Bankruptcy Defendant entered a bankruptcy proceeding in California, staying all actions

against that defendant and substantially complicating the defense of the remaining Non-Bankruptcy Defendants.

3.      Panthers filed a Motion for Default Judgment for Failure to Plead as to the Non-Bankruptcy Defendants on November 12, 2025, meaning the clerk can enter default judgment at any time pursuant to Connecticut Practice Book § 17-32.

4.      On November 20, 2025, the Non-Bankruptcy Defendants moved for a short extension of time to respond to, among other things, confer with opposing counsel on possible binding arbitration and consult with bankruptcy counsel. Panthers' counsel advised the undersigned shortly after the Non-Bankruptcy Defendants moved for an extension of time that Panthers would not oppose the motion.

5.      Defendants require additional time to prepare an adequate response to Panthers' motion for the following reasons:

     a. The Non-Bankruptcy Defendants must confer with the trustee for the Bankruptcy Defendant as to the trustee's position on how the Non-Bankruptcy Defendants should respond to the Amended Complaint, because next steps and/or any rulings from the Court may affect the rights of the Bankruptcy Defendant once the stay is lifted. Unfortunately, the trustee is unavailable to meet with counsel for the Non-Bankruptcy Defendants until November 28, 2025, meaning an additional extension of time is necessary to confirm that the Non-Bankruptcy Defendants do not take any action that may affect the bankruptcy stay;

     b. The bankruptcy proceeding against the Bankruptcy Defendants has substantially complicated the Non-Bankruptcy Defendants' ability to defend

this action. Specifically, the Non-Bankruptcy Defendants and counsel must frequently confer with bankruptcy counsel for the Bankruptcy Defendant to confirm that they are not taking any action that affects may affect the Bankruptcy Defendant, the bankruptcy action, or any rights that may now be held by the bankruptcy trustee.

6. No prejudice will result to Panthers if this second extension is granted. The Non-Bankruptcy Defendants anticipate that they will espond to Panthers' Amended Complaint and Motion for Default shortly after conferring with the bankruptcy trustee.

7. The undersigned contacted opposing counsel for their position on an extension of time. Counsel for Panthers advised on November 26, 2025 that Panthers would not consent to a further extension of time.

WHEREFORE, for the reasons stated above, the Non-Bankruptcy Defendants respectfully move this Court for an Order extending their time to respond to Plaintiff's Motion for Default for Failure to Plead or otherwise respond to the Amended Complaint through December 10, 2025.

Respectfully Submitted,

SISCO-LAW

__*/s/ Peter A. Luccarelli*_____
Peter A. Luccarelli, III
pluccarelli@sisco-law.com
Connecticut Bar No. 433492
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Defendants*

## **CERTIFICATION**

The undersigned hereby certifies that, on November 26, 2025, a copy of the foregoing was mailed or delivered electronically to all counsel and self-represented parties of record as follows:

Lucas B. Rocklin
John T. Szalan II
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Lrocklin@npmlaw.com
JSzalan@npmlaw.com
*Counsel for Plaintiff*

　　　　　　　　　　　　　　　　__*/s/ Peter A. Luccarelli*_____
　　　　　　　　　　　　　　　　Attorney

DOCKET NO: FST-CV25-6075223-S    :    SUPERIOR COURT

PANTHERS CAPITAL LLC    :    J.D. OF STAMFORD/NORWALK
    :    AT STAMFORD
V.    :

CIS INTERNATIONAL HOLDINGS (N.A.)    :
CORP. d/b/a E TROPICAL FISH,    :
CHARITHA I SAMARASINGHE,    :
CIS INTERNATIONAL DISTRIBUTORS INC.,    :
LIVE AQUARIA HOLDINGS CORP,    :
LIONSROCK INVESTMENTS LLC,    :
LIONSROCK WISCONSIN LLC,    :
T3 AQUATICS,    :
SIAM TROPICAL FISH LTD,    :
TROPICAL AQUARIUM FISH (FIJI) LTD    :    DECEMBER 10, 2025

## ANSWER, SPECIAL DEFENSES, AND COUNTERCLAIMS

Defendants Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD[1] (hereinafter, the "Guarantor Defendants") submit this Answer and Special Defenses to Panthers Capital, LLC's ("Panthers") Complaint:

## COUNT ONE
## (BREACH OF CONTRACT AGAINST SELLER)

1.    The Guarantor Defendants do not respond to the allegations in Count One, as said count is directed solely to the Bankruptcy Defendant and subject to a bankruptcy stay.

---

[1] Defendant CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish (hereinafter, the "Bankruptcy Defendant") is currently subject to a bankruptcy stay.

## COUNT TWO
## (BREACH OF CONTRACT AGAINST GUARANTORS)

1. The Guarantor Defendants have insufficient knowledge and/or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 of Count Two and, therefore, leave Plaintiff to its proof.

2. The Guarantor Defendants admit that Panthers and the Bankruptcy Defendant entered into an agreement with one another on or about June 4, 2025, but otherwise deny the allegations in Paragraph 2 of Count Two.

3. The Guarantor Defendants admit signing the agreement identified in Paragraph 2 of Count Two, but otherwise deny the allegations in Paragraph 3 of Count Two. The Guarantor Defendants further deny that defendant Charitha I Samarasinghe signed the agreement as a personal guarantor.

4. The Guarantor Defendants deny the allegations in Paragraph 4 of Count Two.

5. The Guarantor Defendants deny the allegations in Paragraph 5 of Count Two.

6. The Guarantor Defendants deny the allegations in Paragraph 6.

7. The Guarantor Defendants admit that the agreement contains a forum selection clause, but otherwise deny the allegations in Paragraph 7.

8. The Guarantor Defendants admit that the agreement contains certain language regarding prejudgment attachment of property, but otherwise deny the allegations in Paragraph 8.

9. The Guarantor Defendants have insufficient knowledge and/or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 9 and, therefore, leave Plaintiff to its proof.

## COUNT THREE
## (BREACH OF CONTRACT AGAINST SELLER)

1.      The Guarantor Defendants do not respond to the allegations in Count Three, as said count is directed solely to the Bankruptcy Defendant and subject to a bankruptcy stay.

## COUNT FOUR
## (BREACH OF CONTRACT AGAINST GUARANTORS)

1.      The Guarantor Defendants have insufficient knowledge and/or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 of Count Four and, therefore, leave Plaintiff to its proof.

2.      The Guarantor Defendants admit that Panthers and the Bankruptcy Defendant entered into an agreement with one another on or about December 1, 2024, but otherwise deny the allegations in Paragraph 2 of Count Four.

3.      The Guarantor Defendants admit signing the agreement identified in Paragraph 2 of Count Four, but otherwise deny the allegations in Paragraph 3 of Count Four.

4.      The Guarantor Defendants admit the allegations in Paragraph 4 of Count Four.

5.      The Guarantor Defendants deny the allegations in Paragraph 5 of Count Four.

6.      The Guarantor Defendants deny the allegations in Paragraph 6.

7.      The Guarantor Defendants admit that the agreement contains a forum selection clause, but otherwise deny the allegations in Paragraph 7.

3

8.    The Guarantor Defendants have insufficient knowledge and/or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 9 and, therefore, leave Plaintiff to its proof.

## COUNT FIVE
## (FRAUDULENT MISREPRESENTATION)

1.    The Guarantor Defendants do not respond to the allegations in Count Five, as said count is directed solely to the Bankruptcy Defendant and subject to a bankruptcy stay.

## COUNT SIX
## (FRAUDULENT MISREPRESENTATION)

1.    The Guarantor Defendants do not respond to the allegations in Count Six, as said count is directed solely to the Bankruptcy Defendant and subject to a bankruptcy stay.

## COUNT SEVEN
## (BREACH OF GOOD FAITH AND FAIR DEALING)

1.    The Guarantor Defendants do not respond to the allegations in Count Seven, as said count is directed solely to the Bankruptcy Defendant and subject to a bankruptcy stay.

## COUNT EIGHT
## (VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA"))

1.    The Guarantor Defendants do not respond to the allegations in Count Eight, as said count is directed solely to the Bankruptcy Defendant and subject to a bankruptcy stay.

WHEREFORE, Panthers is not entitled to any of its requested relief against the Guarantor Defendants that it seeks in the Amended Complaint, or any other relief.

SPECIAL DEFENSES

4

**FIRST SPECIAL DEFENSE**

Panthers' claims are barred by Panthers' prior material breach. Specifically, in June 2025 Panthers breached the "Factoring Agreement" identified in Count Four, Paragraph 2 of the Amended Complaint by unilaterally reducing the advance rate to the Bankruptcy Defendant from 85%—as required by Paragraph 1.3 of the Factoring Agreement annexed as Exhibit "B" to the Amended Complaint—to 60%, resulting in reduced cashflow to the Bankruptcy Defendant and preventing its performance under both the Factoring Agreement and the "Agreement" identified in Count Two, Paragraph 2 of the Amended Complaint. Panthers restricted the cashflow to the Bankruptcy Defendant with knowledge of the Bankruptcy Defendant's precarious financial situation and prior and ongoing repayment issues, and Panthers' breach directly prevented the Guarantor Defendants from having meaningful opportunities to perform under either agreement.

**SECOND SPECIAL DEFENSE**

Both the Agreement and Factoring Agreement annexed as, respectively, Exhibits "A" and "B" to the Amended Complaint are disguised loans that are void pursuant to Connecticut General Statutes §§ 37-4, 37-5, 37-8, and/or 37-9, as the annual interest rates exceed those allowable under Connecticut law.

**THIRD SPECIAL DEFENSE**

There is no jurisdiction over the claims in the Amended Complaint because both the Factoring Agreement and Agreement required Panthers to submit their disputes to binding arbitration, which Panthers failed to do.

5

**FOURTH SPECIAL DEFENSE**

Both the Factoring Agreement and Agreement are procedurally and substantively unconscionable and unenforceable. Both agreements, among other things: (i) functioned as disguised loans to the Bankruptcy Defendant—with full recourse against all of the Guarantor Defendants in the event of any breach by either the Bankruptcy Defendant or the Guarantor Defendants—while styled as the sale of accounts by the Bankruptcy Defendant (ii) required payment of interest rates in excess of those permitted under Connecticut law; (iv) required payment of unconscionable interest rates, irrespective of Connecticut laws on interest rates; (iv) required the Bankruptcy Defendant and the Guarantor Defendants—but not Panthers— to waive a number of legal and equitable claims; and (v) provides enforcement provisions and remedies to Panthers that are not available to either the Bankruptcy Defendant or the Guarantor Defendants.

**FIFTH SPECIAL DEFENDANTS**

Panthers cannot recover against the Guarantor Defendants pursuant to the doctrine of unclean hands. Panthers authored agreements with the Bankruptcy Defendant that are void and unenforceable under Connecticut Law. Panthers continued to lend money to the Bankruptcy Defendant with knowledge of the Bankruptcy Defendant's prior and ongoing issue repaying high interest loans to Panthers. Panthers then breached the Factoring Agreement by reducing the advance rates to the Bankruptcy Defendants, knowing that doing so would cause the Bankruptcy Defendant to experience further financial issues and likely prevent the Bankruptcy Defendant from continuing to make payments to Panthers. And Panthers, after orchestrating the Bankruptcy Defendant's inability to continue payments

6

to Panthers, sued the Bankruptcy Defendant for breach of contract and associated claims and seeks full recourse from the Guarantor Defendants.

## SIXTH SPECIAL DEFENSE

Panthers failed to honor the covenant of good faith and fair dealing implicit in both the Agreement and Factoring Agreement by, among other things: (i) misrepresenting that the Agreement and Factoring Agreement were sales of future receivables and invoices, when in fact they were disguised loan agreements with the Bankruptcy Defendant in violation of Connecticut law; (ii) continuing to enter into disguised loan agreements with the Bankruptcy Defendant in violation of Connecticut law and with knowledge that the Bankruptcy Defendant may be unable to comply with the terms of those agreements; (iii) reducing the factoring advance to the Bankruptcy Defendant in an attempt to force the Bankruptcy Defendant to breach the Agreement and/or Factoring Agreement; and (iv) attempting to use the Bankruptcy Defendant's financial issues resulting from Panthers' breach of the Factoring Agreement as a means to gain additional financial concessions from the Guarantor Defendants.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent the Factoring Agreement and/or the Agreement constitute a sale of the Bankruptcy Defendant's accounts, the contracts are unenforceable as unconscionable under Connecticut General Statutes § 42a-2-302.

## EIGHTH SPECIAL DEFENSE

To the extent the Factoring Agreement and/or the Agreement constitute a sales-based financing  of the Bankruptcy Defendant's accounts, the contracts are unenforceable for failing to comply with the provisions of Connecticut General Statutes § 36a-861 *et seq*.,

or by consolidating prior agreements between Panthers and the Bankruptcy Defendant that themselves failed to comply with the provisions of Connecticut General Statutes § 36a-861 *et seq*.

## <u>NINTH SPECIAL DEFENSE</u>

While the Guarantor Defendants do not concede that Panthers suffered any damages as a result of the allegations identified in its Amended Complaint, Panthers has failed to mitigate its damages.

**COUNTERCLAIM BY CHARITHA I SAMARASINGHE,      CIS INTERNATIONAL DISTRIBUTORS INC., LIVE AQUARIA HOLDINGS CORP, LIONSROCK INVESTMENTS LLC, LIONSROCK WISCONSIN LLC, T3 AQUATICS, SIAM TROPICAL FISH LTD, AND TROPICAL AQUARIUM FISH (FIJI) LTD AGAINST PANTHERS CAPITAL LLC**

Defendants/Counterclaimants, the Guarantor Defendants,[2] assert the following counterclaims against Panthers.

**PARTIES**

1.      Upon information and belief, Panthers is a limited liability company incorporated in New York and with a principal place of business in New Haven, Connecticut.

2.      Upon information and belief, Quick Funding Group LLC ("Quick") is a limited liability company incorporated in New York and with a principal place of business in Cedarhurst, New York. Upon information and belief, Quick's foreign business registration in Connecticut was revoked in October 2024 for failure to file necessary documentation with the Connecticut Secretary of State.

3.      Upon information and belief, Panthers and Quick share ownership by at least one principal (Benjamin Isaacov), shared a mailing address while Quick was active in Connecticut, shared an agent of service, and conducted similar business to one another.

4.      Defendant Charitha I Samarasinghe is a citizen of California who resides in Rolling Hills, California.

---

[2] The Guarantor Defendants assert the following counterclaims on their behalf only. While their counterclaims reference actions taken by and against the Bankruptcy Defendant, the Guarantor Defendants are not asserting any claims on behalf of the Bankruptcy Defendant. The Bankruptcy Defendant is currently subject to a bankruptcy stay, and all the Bankruptcy Defendant's claims and defenses remain the property of the bankruptcy estate and subject to the bankruptcy stay.

9

5.      Defendant CIS International Distributors Inc. is a company incorporated in California with a principal place of business in Gardena, California.

6.      Live Aquaria Holdings Corp. is a company incorporated in California with a principal place of business in Gardena, California.

7.      Defendant Lionsrock Investments LLC is a limited liability company incorporated in California and with a principal place of business in Gardena, California.

8.      Defendant Lionsrock Wisconsin LLC is a limited liability company incorporated in Wisconsin and with a principal place of business in Rhinelander, Wisconsin.

9.      Defendant T3 Aquatics is a company incorporated in Nevada with a principal place of business in Gardena, California.

10.      Defendant Siam Tropical Fish LTD is a company incorporated in Thailand with a principal place of business in Thailand.

11.      Defendant Tropical Aquarium Fish (Fiji) LTD is a company incorporated in Fiji with a principal place of business in Fiji.

12.      The above individual defendants and defendant companies are collectively identified as the "Guarantor Defendants."

13.      Mr. Samarasinghe currently or previously owned the Bankruptcy Defendant and the corporate Guarantor Defendants.

**<u>ALLEGATIONS COMMON TO ALL COUNTS</u>**

14.      Mr. Samarasinghe began importing tropical fish from Sri Lanka and selling them in the United States in approximately 1989. He operated out of his apartment in Jacksonville, Florida, selling tropical fish out of his car to local pet stores and retailers.

10

15.     In approximately 1994 and due to increasing sales, Mr. Samarasinghe moved from Florida to California, where the majority of the tropical fish he imported from East Asia first arrived in the United States.

16.     Mr. Samarasinghe incorporated the Bankruptcy Defendant in approximately 1999 as the company through which he imported tropical fish from overseas for sale to customers in the United States.

17.     By January 2020, the Bankruptcy Defendant, the Guarantor Defendants, and other companies employed hundreds of people worldwide to facilitate the sale of tropical fish in the United States.

18.     Unfortunately, the COVID-19 pandemic was devastating to the finances of the Bankruptcy Defendant and the Guarantor Defendants. Business opportunities slowed or dried up, while margins shrank substantially due to, among other things increased freight costs to import tropical fish into the United States. This resulted in substantial financial issues to both the Bankruptcy Defendant and the Guarantor Defendants, both due to reduced cashflow and insufficient cash on hand to continue operating the Bankruptcy Defendant and the corporate Guarantor Defendants.

19.     Due to these ongoing cashflow issues for the Bankruptcy Defendant, Mr. Samarasinghe began investigating the use of merchant cash advance ("MCA") products as a way to obtain immediate cashflow by selling a percentage of future revenue, which is withdrawn from the seller's account on a periodic basis until the lender is repaid the purchase price, plus various fees.

20.     MCAs are, on paper, different from traditional loans. Among other things, true MCAs do not guarantee payment to a buyer (who bears some risk of loss should, for

11

example, the seller's revenue fluctuate or dry up, or the seller goes bankrupt) and should be repaid based on a percentage of a sellers revenue at a rate that can fluctuate depending on cashflow to the seller.

21.     Unfortunately, some MCAs do in fact operate as disguised loans by, among other things, requiring personal guarantees of repayment by the seller and guarantors, providing recourse by the buyer against the seller and the guarantors requiring repayment of the sale price, with fees and interest, to the buyer for a host of reasons, and do not adequately allow the repayment amounts to the buyer to fluctuate based on cashflow to the seller. These disguised loans are often styled as MCAs to allow buyers to receive repayments at rates that exceed various state laws limiting interest rates on traditional loans.

22.     In approximately October or November 2022, Isaacov introduced Mr. Samarasinghe to Mike Herzog ("Herzog"), a broker who was, at the time, associated with MM5 Funding. Shortly thereafter, Mr. Samarasinghe began using and relying upon Herzog's brokering services to locate and broker lending agreements to address the Bankruptcy Defendant's ongoing cashflow issues.

23.     Upon information and belief, Isaacov and Herzog had a separate financial relationship, which included brokering lending agreements on behalf of the Bankruptcy Defendant to Isaacov's benefit, even where the agreements were not directly with a company owned by Isaacov.

24.     In approximately November 2022, Quick issued its first of several MCAs[3] to nonparty Automated Systems International Inc. ("ASI"), a California company owned by Mr.

---

[3] While the Guarantor Defendants refer to various agreements involving Quick and Panthers in their counterclaims as "MCAs," the Guarantor Defendants dispute that these agreements were true MCAs; the Guarantor Defendants refer to the agreements as

12

Samarasinghe (the "First Quick MCA"). The Bankruptcy Defendant and certain of the corporate Guarantor Defendants were required to personally guarantee the First Quick MCA.[4] Herzog did not broker the deal between ASI and Quick, but began brokering deals between the Bankruptcy Defendant and other lenders shortly thereafter.

25.     In approximately January 2023, Quick made a second MCA to ASI under (the "Second Quick MCA") under substantially identical terms to the First Quick MCA.

26.     In approximately March 2023, Herzog helped broker a deal between the Bankruptcy Defendant and Newtek Bank ("Newtek") for substantial loans from the Small Business Administration. On or about March 15 and May 9, 2023, Newtek filed UCC-1s with the State of California (the "Newtek UCC-1s) identifying the Bankruptcy Defendant and the Guarantor Defendants as debtors to Newtek. The Newtek UCC-1s were publicly available documents, and served to put any subsequent creditors on notice of Newtek's claims. Copies of the Newtek UCC-1s are collectively annexed hereto as Exhibit "A."

27.     On or about May 22, 2023, Quick filed a UCC-1 with the State of California (the "Quick UCC-1") identifying ASI, The Bankruptcy Defendant, certain of the corporate Guarantor Defendants, and Mr. Samarasinghe personally as debtors to Quick. A copy of the Quick UCC-1 is annexed hereto as Exhibit "B."

28.     In failing to timely record its UCC-1, Quick became a junior creditor to Newtek.

---

MCAs because they are styled as MCAs, and not because the Guarantor Defendants concede that they are.

[4] Given the number of MCAs made by Quick and Panthers to ASI and the Bankruptcy Defendant during the times relevant to these counterclaims, the Guarantor Defendants do not attach copies of each as exhibits to their counterclaim for judicial economy. All MCAs involving Quick and/or Panthers in the Guarantor Defendants' possession will be produced during discovery and can be provided to Panthers or the Court upon request. Upon information and belief, Panthers should currently have access to all MCAs with ASI and the Bankruptcy Defendant.

29.    On or about August 15, 2023, and after ASI had issues making continued payments to Quick under its MCA agreements, Quick initiated a breach of contract action (the "First MCA Lawsuit") against ASI in Connecticut state court entitled *Quick Funding Group, LLC d/b/a Quick Funding Group v. Automated Systems Inc., d/b/a Automated Systems et al.*, NNH-CV23-6135262-S. The suit also named the Bankruptcy Defendant, the identified corporate Guarantor Defendants, and Mr. Samarasinghe personally as guarantors.

30.    After Quick initiated the First MCA Lawsuit, Mr. Samarasinghe, on behalf of himself and the other named defendants, approached Herzog for assistance responding to the suit and to negotiate a resolution with Quick. Herzog located counsel to make an appearance and answer the First MCA Lawsuit on behalf of Mr. Samarasinghe and the corporate defendants, and assisted Mr. Samarasinghe in negotiating a resolution of the First MCA Lawsuit with Isaacov.

31.    On or about October 5, 2023, the parties negotiate a resolution to the First MCA Lawsuit. As part of that settlement, Isaacov issued a zero-balance letter, dated October 22, 2023, to Mr. Samarasinghe and Herzog, on behalf of Quick, stating that the Quick UCC-1 has expired and is of no further force and effect. Of note, while the zero-balance letter referenced resolution of the Second Quick MCA and the Quick UCC-1, Isaacov sent the letter from an "@pantherscapital.com" email address, despite Panthers being uninvolved in the dispute. A copy of the zero-balance letter from Quick is annexed hereto as Exhibit "C."

32.    On October 19, 2023—prior to issuing the zero-balance letter—Quick makes another MCA to ASI (the "Third Quick MCA"), Upon information and belief, the amount

14

specified in the Third Quick MCA was to pay Quick's legal fees from the First MCA Lawsuit.
Three days later, Quick issued the zero-balance letter identified in Exhibit C.

33.     On October 31, 2023—one week after Isaacov issued the zero-payment letter
as part of the resolution of the First MCA Lawsuit from an "@pantherscapital.com" email
address—Panthers makes its first MCA to ASI (the "First Panthers MCA"). As with the
Second Quick MCA, Panthers issued the First Panthers MCA to ASI with notice of ASI's
difficulty making payments under the First Quick MCA, and the recently-settle lawsuit
resulting from those payment issues. Panthers, like Quick, required the Bankruptcy
Defendant and certain of the corporate Guarantor Defendants were required to personally
guarantee the First Panthers MCA.

34.     This means that, within a month of ASI negotiating settlement of a lawsuit
stemming from repayment issues from the First Quick MCA, two companies partially owned
by Isaacov issued two new, independent MCAs to ASI.

35.     One week after issuing the First Panthers MCA to ASI, Panthers made a
second MCA (the "Second Panthers MCA") to ASI, using the same conditions and personal
guarantee terms as contained in the First Panthers MCA. This represents the third MCA
made to ASI by a company owned by Isaacov within twenty days. Each MCA required the
Bankruptcy Defendant and certain of the corporate Guarantor Defendants to personally
guarantee it.

36.     Panthers made additional MCAs to the Bankruptcy Defendant, in addition to
the MCAs made to ASI, throughout 2024. The Guarantor Defendants are aware of at least
four additional MCAs between Panthers and the Bankruptcy Defendant made in
approximately March, June, September, and October 2024. Each of the MCAs required that

15

some or all of the Guarantor Defendants personally guarantee the Bankruptcy Defendant's performance under the MCA.

37.    In approximately April 2024, the Bankruptcy Defendant entered into a factoring agreement with Settle for the sale of certain invoices owed to the Bankruptcy Defendant. On or about April 17, 2024, Settle filed a UCC-1 with the State of California (the "Settle UCC-1) identifying the Bankruptcy Defendant as a debtor to Settle. The Settle UCC-1 was a publicly available document, and served to put any subsequent creditors on notice of Settle's claims. A copy of the Settle UCC-1 is annexed hereto as Exhibit "D."

38.    In failing to record its own UCC-1s Panthers became a junior creditor to Settle. Panthers was also on notice of Settle's creditor interest in the Bankruptcy Defendant, through the Settle UCC-1, when Panthers made MCAs to the Bankruptcy Defendant in June, September, and October 2024.

39.    At approximately the same time in October 2024 that Panthers made its fourth MCA to the Bankruptcy Defendant, Herzog introduced Mr. Samarasinghe to representatives from Hum Capital, a private capital funding company. Herzog and Hum Capital representatives began discussions with Mr. Samarasinghe about Hum Capital making a substantial investment into the Bankruptcy Defendant sufficient to pay of all creditors (including Panthers), and to provide the Bankruptcy Defendant with capital to increase the strength and value of the business.

40.    Shortly after Herzog helped initiate investment discussions between Mr. Samarasinghe and Hum Capital, Herzog became a Panthers employee. The Guarantor Defendants are unaware when Herzog and Panthers began discussing his employment, what information Herzog shared with Panthers about the Bankruptcy Defendant or the

16

Guarantor Defendants, or whether Herzog initiated discussions between Mr. Samarasinghe and Hum Capital to, in part ensure payment on all outstanding Panthers MCAs.

41.     Upon information and belief, Herzog remained in direct contact with representatives of Hum Capital about its negotiations with the Bankruptcy Defendant after Herzog became a Panthers employee. The Guarantor Defendants are currently unaware of what information Hum Capital provided to Herzog (and, by extension, Panthers) about the Bankruptcy Defendant or the Guarantor Defendants, and whether Panthers then used that information when extending further MCAs to the Bankruptcy Defendant.

**Panthers discovers it is a junior creditor to and transfers the expired Quick UCC-1 from Quick to Panthers to try and gain priority over senior creditors**

42.     On or about November 18, 2024, Panthers filed its first and only *de novo* UCC-1 with the State of California (the "Panthers UCC-1") identifying The Bankruptcy Defendant, certain of the corporate Guarantor Defendants, and ASI as debtors to Panthers. Of note, Herzog filed the Panthers UCC-1 on behalf of Panthers as a Panthers employee. A copy of the Panthers UCC-1 is annexed hereto as Exhibit "E."

43.     Upon information and belief, at approximately the same time that Panthers filed the Panthers UCC-1, it became aware of the Newtek UCC-1s, the Settle UCC-1, and other UCC-1s from various creditors, each of which established priority rights by those creditors against Panthers.

44.     Shortly thereafter, on or about November 26, 2024, Herzog, on behalf of Panthers, filed a purported UCC-1 assignment with the State of California (the "Fraudulent Assignment") which purports to assign the Quick UCC-1—which Quick confirmed had been satisfied a year prior in its zero-balance letter to both Herzog and Mr. Samarasinghe—to Panthers. A copy of the Fraudulent Assignment is annexed hereto as Exhibit "F."

17

**Panthers enters into the Factoring Agreement with the Bankruptcy Defendant and attempts to usurp priority of senior creditors using the expired Quick UCC-1**

45.     By November 2024, the Bankruptcy Defendant faced substantial issues meeting its multiple payment obligations to Panthers under the multiple MCAs Panthers made to the Bankruptcy Defendant.

46.     In November 2024, Panthers was also aware that the Bankruptcy Defendant had a longstanding financial relationship with Petco Animal Supply Stores, Inc. ("Petco") for the sale of tropical fish, and that payments from Petco to the Bankruptcy Defendant constituted approximately 80-90% of the Bankruptcy Defendant's revenue.

47.     On or about December 1, 2024, Panthers entered into the "Factoring Agreement" annexed as Exhibit B to the Amended Complaint with the Bankruptcy Defendant. The purpose of the Factoring Agreement was to consolidate money allegedly owed by the Bankruptcy Defendant to Panthers under multiple prior MCAs, convert the MCAs to a factoring agreement, which would allow Panthers to be paid directly by Petco, with payments to be factored back to the Bankruptcy Defendant under the Factoring the Agreement. The "Factor Charge" under the factoring agreement, on an annualized basis, was approximately 135% APR.

48.     Panthers argued that the Fraudulent Assignment gave it superior rights to creditors, like Settle, who filed UCC-1s prior to Panthers.

49.     One day after entering into the Factoring Agreement—which existed because of the Bankruptcy Defendant's issues repaying prior MCAs to Panthers—Panthers issues a new MCA to the Bankruptcy Defendant. As with prior MCA's, the Guarantor Defendants were required to personally guarantee the MCA.

18

50.     Panthers would ultimately make fourteen separate MCAs to the Bankruptcy Defendant between December 2, 2024 and May 27, 2025, in addition to the Factoring Agreement.

51.     The combination of the Factoring Agreement and the multiple post-Factoring Agreement MCAs permitted Panthers to control the inflow of approximately 80-90% of the Bankruptcy Defendant's revenue into its accounts, while simultaneously making daily withdrawals to pay back the MCAs.

52.     The Bankruptcy Defendant, understandably, faced substantial issues complying with the payment terms of fourteen new MCAs in addition to its obligations under the Factoring Agreement.

53.     Beginning in June 2025, negotiations between the Bankruptcy Defendant and Hum Capital, which had been ongoing, began to stall, in part due to the amounts owed by the Bankruptcy Defendant to Panthers under the various MCAs.

54.     Beginning on June 3, 2025, Panthers, in breach of the Factoring Agreement, reduced the amount factored back to the Bankruptcy Defendant from 85% of revenue from Petco to 60%. This resulted in an immediate loss of vital cashflow to the Bankruptcy Defendant.

55.     The following day, Panthers entered into the Agreement attached as Exhibit "A" with the Bankruptcy Defendant, under which Panthers consolidated various MCAs owed by the Bankruptcy Defendant into a new agreement, extended no new cash payments to the Bankruptcy Defendant, and applied approximately $500,000 in additional cost to the Bankruptcy Defendant for the Agreement. Panthers expected the Guarantor Defendants

19

56.     Panthers did not resume factoring payments at 85% to the Bankruptcy Defendant until June 25, 2025.

57.     Coincidentally, also on June 25, 2025, Herzog met with Mr. Samarasinghe in Miami, Florida, where he provided Mr. Samarasinghe with a handwritten contract under which Mr. Samarasinghe was required to transfer two properties owned by one of the Guarantor Defendants in Wisconsin, via quitclaim deed, to be returned to the Guarantor Defendant upon payment of $1 million dollars. A copy of the handwritten contract is annexed hereto as Exhibit "F."

58.     On July 2, 2025, Panthers makes its last factoring payment under the Factoring Agreement to the Bankruptcy Defendant. Panthers does not make the next factoring payment due on July 8, 2025, and accuses the Bankruptcy Defendant of breaching the Factoring Agreement three days later on July 11, 2025.

59.     Three weeks later, Panthers files its initial Complaint in this action against the Bankruptcy Defendant and the Guarantor Defendants.

60.     Due largely to the actions of Panthers and the resulting loss of payments from Petco, the Bankruptcy Defendant filed for bankruptcy in California on September 22, 2025.

## COUNT I

## BREACH OF CONTRACT UNDER THE FACTORING AGREEMENT

61.     The Guarantor Defendants repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

62.     Panthers defaulted under the Factoring Agreement in June 2025 by unilaterally reducing the amount factored to the Bankruptcy Defendant below the level set in the contract.

20

63.     Panthers is a citizen of Connecticut and initiated the Amended Complaint in Connecticut.

64.     The Guarantor Defendants suffered individual damages as a result of Panthers' breach of the Factoring Agreement.

## COUNT II

## BREACH OF GOOD FAITH AND FAIR DEALING

65.     The Guarantor Defendants repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

66.     Implicit in the Factoring Agreement and the Agreement was a covenant of good faith and fair dealing, obligating Panthers to act honestly and fairly in the performance and enforcement of the parties' contractual relationships, and towards the parties Panthers alleges personally guaranteed the agreements.

67.     Panthers' conduct deprived the Bankruptcy Defendant of the benefit of the bargain and undermined the reasonable expectations of the Bankruptcy Defendant.

68.     As a direct result of Panthers' breach, the Guarantor Defendants have sustained damages.

## COUNT III

## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA"))

69.     The Guarantor Defendants repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

70.     Panthers' actions were unethical, unscrupulous, and offend established public policy as set forth in CUTPA.

21

71.     As a result of Panthers' unfair and deceptive acts, the Guarantor Defendants have suffered an ascertainable loss of money and property.

72.     The Guarantor Defendants are entitled to all remedies available, including actual damages, attorney's fees, and punitive damages.

WHEREFORE, the Guarantor Defendants respectfully request that the Court enter judgment in their favor and award the following relief:

a. Money damages in an amount to be determined at trial;

b. Punitive damages

c. The Buyer's reasonable attorneys' fees and costs incurred herein;

d. Prejudgment and post-judgment interest as permitted by law and the Agreement; and

e. Such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

SISCO-LAW

__/s/ Peter A. Luccarelli_____
Peter A. Luccarelli, III
pluccarelli@sisco-law.com
Connecticut Bar No. 433492
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Defendants*

22

## **CERTIFICATION**

The undersigned hereby certifies that, on December 10, 2025, a copy of the

foregoing was mailed or delivered electronically to all counsel and self-represented

parties of record as follows:

Lucas B. Rocklin
John T. Szalan II
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Lrocklin@npmlaw.com
JSzalan@npmlaw.com
*Counsel for Plaintiff*


　　　　　　　　　　　　　　__/s/ Peter A. Luccarelli_____
　　　　　　　　　　　　　　Attorney

DOCKET NO: FST-CV25-6075223-S   :   SUPERIOR COURT
      :

PANTHERS CAPITAL LLC   :   J.D. OF STAMFORD/NORWALK
      :   AT STAMFORD

V.   :
      :

CIS INTERNATIONAL HOLDINGS (N.A.)   :
CORP. d/b/a E TROPICAL FISH,   :
CHARITHA I SAMARASINGHE,   :
CIS INTERNATIONAL DISTRIBUTORS INC.,   :
LIVE AQUARIA HOLDINGS CORP,   :
LIONSROCK INVESTMENTS LLC,   :
LIONSROCK WISCONSIN LLC,   :
T3 AQUATICS,   :
SIAM TROPICAL FISH LTD,   :
TROPICAL AQUARIUM FISH (FIJI) LTD   :   DECEMBER 11, 2025

## EXHIBITS
## DEFENDANTS' ANSWER, SPECIAL DEFENSES, AND COUNTERCLAIMS
## ENTRY NO. 112.00

1 of 2

Respectfully Submitted,

SISCO-LAW

__/s/ Peter A. Luccarelli_____
Peter A. Luccarelli, III
pluccal@sisco    -law.com
Connecticut Bar No. 433492
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Defendants*

## **CERTIFICATION**

The undersigned hereby certifies that, on December 11, 2025, a copy of the foregoing was mailed or delivered electronically to all counsel and self-represented parties of record as follows:

Lucas B. Rocklin
John T. Szalan II
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Lrocin@nmlaw.com
JSzlan@n_mlaw.com
*Counsel for Plaintiff*

　　　　　　　　　　　　　　　　　　　 __*/s/ Peter A. Luccarelli*_____
　　　　　　　　　　　　　　　　　　　 Attorney

# Exhibit A

U230017912023



## STATE OF CALIFORNIA
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: U230017912023

Date Filed: 3/15/2023

Submitter Information:

| | |
|---|---|
| Contact Name | RACHEL SIMS |
| Organization Name | UNISEARCH, INC. |
| Phone Number | (800) 722-0708 |
| Email Address | RACHEL.SIMS@UNISEARCH.COM |
| Address | 1780 BARNES BLVD SW TUMWATER, WA 98512 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| CIS INTERNATIONAL HOLDINGS (N.A.) CORP | 1405 W. 178TH STREET GARDENA, CA 90248 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| NEWTEK SMALL BUSINESS FINANCE, LLC | 1981 MARCUS AVENUE, SUITE 130 LAKE SUCCESS, NY 11042 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:
Not Applicable

Select an additional alternate Financing Statement type:
Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Not Applicable

Optional Filer Reference Information:
NSBF2244616

Miscellaneous Information:

Search to Reflect:

Page 1 of 2

B1590-4184 03/15/2023 10:14 AM Received by California Secretary of State

B1590-4185 03/15/2023 10:14 AM Received by California Secretary of State

☐ Order a Search to Reflect





**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U230024063929 |
| Date Filed: 4/5/2023 |

U230024063929

Submitter Information:

| | |
| --- | --- |
| Contact Name | MEGAN BRANNBERG |
| Organization Name | COGENCY |
| Phone Number | (360) 956-9500 |
| Email Address | MBRANNBERG@COGENCYGLOBAL.COM |
| Address | 1780 Barnes Boulevard SW TUMWATER, WA 98512 |

Amendment Action Information:

| | |
| --- | --- |
| Initial Financing Statement File Number | U230017912023 |
| Date Filed | 03/15/2023 |
| Amendment Action | Debtor Amendment |
| Debtor Action | Add Debtor |

Add Debtor:

| Debtor Name | Mailing Address |
| --- | --- |
| CIS INTERNATIONAL HOLDINGS N.A. CORP | 1401 W 178TH ST. GARDENA, CA 90248 |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | NEWTEK SMALL BUSINESS FINANCE, LLC |
| --- | --- |

Optional Filer Reference Information:
NSBF2244616

Miscellaneous Information:

B1654-5233 04/05/2023 3:56 PM Received by California Secretary of State

Page 1 of 1



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

U230034992335

| For Office Use Only |
| :---: |
| **-FILED-** |
| File No.: U230034992335 |
| Date Filed: 5/17/2023 |

**Submitter Information:**

| | |
| --- | --- |
| Contact Name | MEGAN BRANNBERG |
| Organization Name | COGENCY GLOBAL |
| Phone Number | (360) 956-9500 |
| Email Address | MBRANNBERG@COGENCYGLOBAL.COM |
| Address | 1780 Barnes Boulevard SW<br>TUMWATER, WA 98512 |

**Amendment Action Information:**

| | |
| --- | --- |
| Initial Financing Statement File Number | U230017912023 |
| Date Filed | 03/15/2023 |
| Amendment Action | Secured Party Amendment |
| Secured Party Action | Edit Secured Party |

**Edit Secured Party:**

| Secured Party Name | Mailing Address |
| --- | --- |
| *Changed From:*<br>NEWTEK SMALL BUSINESS FINANCE, LLC<br>*Changed To:*<br>NEWTEK BANK, NATIONAL ASSOCIATION | *Changed From:*<br>1981 MARCUS AVENUE, SUITE 130<br>LAKE SUCCESS, NY 11042<br>*Changed To:*<br>1981 MARCUS AVENUE, SUITE 130<br>LAKE SUCCESS, NY 11042 |

**Name of Secured Party of Record Authorizing This Amendment:**

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| | |
| --- | --- |
| Authorizing Secured Party Name | NEWTEK SMALL BUSINESS FINANCE, LLC |

**Optional Filer Reference Information:**
NBNA2244616

**Miscellaneous Information:**



U230032746727

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| :--: |
| **-FILED-** |
| File No.: U230032746727 |
| Date Filed: 5/9/2023 |

**Submitter Information:**

| | |
| --- | --- |
| Contact Name | CORPORATION SERVICE COMPANY |
| Organization Name | CORPORATION SERVICE COMPANY |
| Phone Number | 18008585294 |
| Email Address | SPRFiling@cscglobal.com |
| Address | 801 ADLAI STEVENSON DR<br>SPRINGFIELD, IL 62703 |

**Debtor Information:**

| Debtor Name | Mailing Address |
| --- | --- |
| CIS INTERNATIONAL HOLDINGS N.A. CORP | 1405 W 178TH ST<br>GARDENA, CA 90248 |
| LIONSROCK INVESTMENTS LLC | 1405 W 178TH ST<br>GARDENA,, CA 90248 |
| CIS INTERNATIONAL DISTRIBUTORS INC | 1401 W. 178TH ST. UNIT B<br>GARDENA,, CA 90248 |
| LIVE AQUARIA HOLDINGS CORP | 1405 W 178 STGARDENA<br>GARDENA,, CA 90248 |
| CHARITHA NDUNIL SAMARASINGHE | 4 SUNDOWN DRIVE<br>E ROLLING HILLS ESTATE, CA 90274 |

**Secured Party Information:**

| Secured Party Name | Mailing Address |
| --- | --- |
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | P.O. BOX 2576  UCCSPREP@CSCINFO.COM<br>SPRINGFIELD, IL 62708 |

**Indicate how documentation of Collateral is provided:**
Entered as Text

**Description:**
Receivables - All assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations;  and i. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY"

**Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:**
Not Applicable

**Select an alternate Financing Statement type:**

**Select an additional alternate Financing Statement type:**

**Select an alternative Debtor/Secured Party designation for this Financing Statement:**

**Optional Filer Reference Information:**
2551 56461

B1738-5981 05/09/2023 6:50 AM Received by California Secretary of State

B1738-5982 05/09/2023 6:50 AM Received by California Secretary of State

# Exhibit B



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

U230036138529

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U230036138529 |
| Date Filed: 5/22/2023 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071
GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| CIS INTERNATIONAL HOLDINGS N.A. CORP. | 1405 W 178TH ST
GARDENA, CA 90248 |
| AUTOMATED SYSTEMS INC | 1401 WEST 178 ST
GARDENA, CA 90248 |
| CIS INTERNATIONAL HOLDINGS N.A. CORP. | 1405 W 178TH ST
GARDENA, CA 90248 |
| CIS INTERNATIONAL DISTRIBUTOR | 1405 W 178TH ST
GARDENA, CA 90248 |
| SIAM TROPICAL FISH LTD | 1405 W 178TH ST
GARDENA, CA 90248 |
| TROPICAL FISH INTERNATIONAL EUROPE | 1405 W 178TH ST
GARDENA, CA 90248 |
| TROPICAL AQUARIUM FISH (FIJI) LTD | 1405 W 178TH ST
GARDENA, CA 90248 |
| CHARITHA I SAMARASINGHE | 1405 W 178TH ST
GARDENA, CA 90248 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| QUICK FUNDING GROUP | 583 GRANT PLACE
CEDARHURST, NY 11516 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
Receivables - All assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and i. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

| Select an alternate Financing Statement type: |
| Select an additional alternate Financing Statement type: |
| Select an alternative Debtor/Secured Party designation for this Financing Statement: |
| Optional Filer Reference Information:<br>   93087729 |

B1770-2619 05/22/2023 11:34 AM Received by California Secretary of State

# Exhibit C



Mike Merzoug <mike@mm5corp.com>

---

## Zero Balance Letter - For Contract Dated 01/25/2023 AUTOMATED SYSTEMS INC

1 message

---

**Benjamin Isaacov** <ben@pantherscapital.com>                    Sun, Oct 22, 2023 at 2:21 PM
To: Mike Merzoug <Mike@mm5corp.com>, Sam Samarasinghe <sam@etropicalfish.com>

Hi sam , read below.



Business Name: AUTOMATED SYSTEMS INC

Merchant Name: SHARITHA SAMARASINGHE

RE: ZERO-BALANCE LETTER CONTRACT DATED 01/25/2023 in the amount of $800,000 is paid off and lawsuit is removed and accounts are released.

In regards to the future receivables purchase and sale contract between AUTOMATED SYSTEMS INC and QUICK FUNDING GROUP LLC, our records indicate that the current balance of purchased but unremitted receivables is $ 0.00. QUICK FUNDING GROUP LLC will close this contract and release its security interest reflected in the UCC-1 financing statement.

If you should have any questions or concerns, please contact us at (516)-755-7790

**************

The information contained in these documents is confidential, privileged and only for the information of the intended recipient and may not be used, published or redistributed without the prior written consent of QUICK FUNDING GROUP LLC. All Rights Reserved.

**************

# Exhibit D



## STATE OF CALIFORNIA
*Office of the Secretary of State*
## UCC FINANCING STATEMENT (UCC 1)
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U240034230118 |
| Date Filed: 4/17/2024 |

U240034230118

**Submitter Information:**

| | |
| --- | --- |
| Contact Name | CORPORATION SERVICE COMPANY |
| Organization Name | CORPORATION SERVICE COMPANY |
| Phone Number | 18008585294 |
| Email Address | SPRFiling@cscglobal.com |
| Address | 801 ADLAI STEVENSON DR SPRINGFIELD, IL 62703 |

**Debtor Information:**

| Debtor Name | Mailing Address |
| --- | --- |
| CIS INTERNATIONAL HOLDINGS (N.A.) CORP. | 1405 W. 178TH STREET GARDENA, CA 90248 |

**Secured Party Information:**

| Secured Party Name | Mailing Address |
| --- | --- |
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | P.O. BOX 2576   UCCSPREP@CSCINFO.COM SPRINGFIELD, IL 62708 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All assets and all personal property of Debtor, whether now owned or hereafter acquired, including all products and proceeds of the foregoing.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
2810 87557

B2669-8657 04/17/2024 3:21 PM Received by California Secretary of State

# Exhibit E

U240089083636



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U240089083636 |
| Date Filed: 11/18/2024 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | Mike Herzog |
| Organization Name | Panthers Capital LLC |
| Phone Number | (561) 922-5838 |
| Email Address | Mike@pantherscapital.com |
| Address | 9 W BROAD ST #320 STAMFORD, CT 06902 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| CIS INTERNATIONAL HOLDINGS (N.A.) CORP. | 1405 W 178TH ST GARDENA, CA 90248 |
| CIS INTERNATIONAL DISTRIBUTORS INC. | 1405 W 178TH ST GARDENA, CA 90248 |
| SIAM TROPICAL FISH LTD | 1405 W 178TH ST GARDENA, CA 90248 |
| LIVE AQUARIA HOLDINGS CORP | 1405 W 178TH ST GARDENA, CA 90248 |
| CIS INTERNATIONAL TROPICAL FISH CORP. | 1405 W 178TH ST GARDENA, CA 90248 |
| AUTOMATED SYSTEMS INTERNATIONAL INC. | 1405 W 178TH ST GARDENA, CA 90248 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| PANTHERS CAPITAL LLC | 157 CHURCH STREET SUITE 1971 NEW HAVEN, CT 06510 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:

THE SECURED PARTY HAS LAWFULLY ACQUIRED ALL "FUTURE RECEIPTS" FROM THE DEBTOR THROUGH AN ABSOLUTE AND IRREVOCABLE SALE, NOT A SECURITY ASSIGNMENT. "FUTURE RECEIPTS" ENCOMPASS ALL FORMS OF MONETARY PAYMENTS RECEIVED BY THE DEBTOR, INCLUDING CASH, CHECKS, ACH, ELECTRONIC TRANSFERS, CREDIT CARD, DEBIT CARD, BANK CARD, AND ANY OTHER PAYMENT METHODS IN THE ORDINARY COURSE OF BUSINESS. THE DEBTOR IS STRICTLY PROHIBITED FROM OBTAINING FINANCING OR CREATING ANY ENCUMBRANCE THAT COULD IMPAIR THE VALUE OF THE FUTURE RECEIPTS OR THE SECURED PARTY'S RIGHT TO COLLECT THEM. SUCH ACTIONS CONSTITUTE A DIRECT BREACH OF THE AGREEMENT AND WILL BE SUBJECT TO IMMEDIATE LEGAL REMEDIES. THE SECURED PARTY RETAINS A PERFECTED, FIRST-PRIORITY LIEN ON ALL PRESENT AND FUTURE ASSETS OF THE DEBTOR, INCLUDING BUT NOT LIMITED TO ACCOUNTS RECEIVABLE, INVENTORY, EQUIPMENT, CONTRACT RIGHTS, GENERAL INTANGIBLES, AND ALL PROCEEDS THEREOF. THIS LIEN IS SECURED UNDER UCC ARTICLE 9 AND SUPPORTED BY A PERSONAL GUARANTY OF PERFORMANCE. UPON DEFAULT, THE SECURED PARTY IS ENTITLED TO ALL AVAILABLE REMEDIES UNDER UCC ARTICLE 9, INCLUDING THE PRE-JUDGMENT RIGHT TO SEIZE ACCOUNTS RECEIVABLE AND OTHER COLLATERAL. THE DEBTOR MUST MAINTAIN ALL ASSETS FREE OF ANY LIENS OR ENCUMBRANCES THAT WOULD COMPROMISE THE SECURED PARTY'S PRIORITY. ANY VIOLATION CONSTITUTES AN EVENT OF DEFAULT, INVOKING THE SECURED PARTY'S RIGHTS UNDER THE GUARANTY AND UCC ARTICLE 9. THE SECURED PARTY

Page 1 of 2

B3202-1710 11/18/2024 3:06 PM Received by California Secretary of State

B3202-1711  11/18/2024  3:06 PM Received by California Secretary of State

ASSERTS A CONTINUING CLAIM ON ALL ASSETS NOW OWNED OR ACQUIRED IN THE FUTURE BY THE DEBTOR, INCLUDING ACCOUNTS (INCLUDING CREDIT CARD RECEIVABLES), CHATTEL PAPER, INVENTORY, EQUIPMENT, INSTRUMENTS (INCLUDING PROMISSORY NOTES), INVESTMENT PROPERTY, DOCUMENTS, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS, GENERAL INTANGIBLES, SUPPORTING OBLIGATIONS, AND ALL PROCEEDS THEREOF. FURTHER ENCUMBRANCE OF ANY COLLATERAL DESCRIBED HEREIN MAY CONSTITUTE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHTS. THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS RESULTING FROM ANY UNAUTHORIZED SECURITY INTEREST GRANTED IN DEBTOR'S ACCOUNTS, CHATTEL PAPER, OR GENERAL INTANGIBLES.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:

Not Applicable

Select an alternate Financing Statement type:

Not Applicable

Select an additional alternate Financing Statement type:

Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Not Applicable

Optional Filer Reference Information:

Miscellaneous Information:

Search to Reflect:

☒  Order a Search to Reflect

Debtor Name                                    CIS INTERNATIONAL HOLDINGS (N.A.) CORP.

# Exhibit F

U240091268128



## STATE OF CALIFORNIA
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only

**-FILED-**

File No.: U240091268128

Date Filed: 11/26/2024

| Submitter Information: | |
| --- | --- |
| Contact Name | Mike Herzog |
| Organization Name | Panthers Capital LLC |
| Phone Number | (561) 922-5838 |
| Email Address | Mike@pantherscapital.com |
| Address | 9 W BROAD ST<br>#320<br>STAMFORD, CT 06902 |

| Amendment Action Information: | |
| --- | --- |
| Initial Financing Statement File Number | U230036138529 |
| Date Filed | 05/22/2023 |
| Amendment Action | Assignment |

Secured Party Assignee:

| Secured Party Name | Mailing Address | Assignee |
| --- | --- | --- |
| PANTHERS CAPITAL LLC | 157 CHURCH STREET<br>SUITE 1971<br>NEW HAVEN, CT 06510 | ☒ Assignee |

| Indicate how documentation of Collateral is provided: | Entered as Text |
| --- | --- |

Description:

PANTHERS CAPITAL LLC ("PANTHERS CAPITAL"), AS ASSIGNEE, HEREBY TAKES ASSIGNMENT FROM QUICK FUNDING GROUP OF ALL RIGHTS, TITLE, AND INTERESTS IN THE COLLATERAL AS DEFINED UNDER THE ORIGINAL UCC-1 FILING. THE COLLATERAL INCLUDES ALL ACCOUNTS, DEPOSIT ACCOUNTS, ACCOUNTS RECEIVABLE, CHATTEL PAPER, INVENTORY, EQUIPMENT, INSTRUMENTS (INCLUDING PROMISSORY NOTES), INVESTMENT PROPERTY, DOCUMENTS, LETTER OF CREDIT RIGHTS, GENERAL INTANGIBLES, AND SUPPORTING OBLIGATIONS, AS WELL AS ALL PROCEEDS AND PRODUCTS THEREOF, WHETHER EXISTING NOW OR ACQUIRED HEREAFTER, FROM AUTOMATED SYSTEMS INC. AND ALL OTHER ENTITIES LISTED IN EXHIBIT A TO THIS AGREEMENT. THIS ASSIGNMENT IS PURSUANT TO AND INTEGRATED INTO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT EXECUTED BETWEEN PANTHERS CAPITAL AND THE SELLER, IN WHICH PANTHERS CAPITAL ACQUIRES THE SPECIFIED INTEREST IN FUTURE RECEIPTS OF THE SELLER ON THE TERMS AND CONDITIONS SET FORTH WITHIN.

☐ Check this box to see additional UCC Collateral options.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | QUICK FUNDING GROUP |
| --- | --- |

Optional Filer Reference Information:
93087729

Miscellaneous Information:

B3221-5784 11/26/2024 10:33 AM Received by California Secretary of State

Page 1 of 1

# Exhibit G

You Transfer 2 Buildings    Letter of Interest

I resume 85% Factor    Non Binding cntal attny

You resume 10w a duty    Draft & review agrments

Once I'm paid I transfer buildings to you.

/s/ _____    — if in 30 calendar days from 6/25/2025, CIS pays me $1,000,000.00 I agree to return properties and provide a Zero Balance Letter on the MCA Ded # 4426.

Mike Herzog

Panthers Capital
6/25/2025

MH / S

/s/ _____
Sharitta Samaras
CIS
6/25/25

Settlement Agent, Shoreline Title Services, Inc.

| | | |
|---|---|---|
| DOCKET NO: FST-CV25-6075223-S | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. D/B/A E TROPICAL FISH, ET AL. | : | DECEMBER 31, 2025 |

## <u>MOTION TO DISMISS COUNTERCLAIM</u>

The Plaintiff, Panthers Capital LLC (the "Plaintiff"), hereby moves to dismiss the Three-Count Counterclaim, in its entirety, as filed by the Defendants, Charitha I Samarasinghe (D-02), CIS International Distributors Inc. (D-03), Live Aquaria Holdings Corp (D-04), Lionsrock Investments LLC (D-05), Lionsrock Wisconsin LLC (D-06), T3 Aquatics (D-07), Siam Tropical Fish LTD (D-08), and Tropical Aquarium Fish (Fiji) LTD (D-09) (collectively, the "Guarantors" or the "Defendants").  The Plaintiff claims that the Defendants lack standing to assert the affirmative claims contained within the Counterclaim, and that, as such, this Court lacks subject matter jurisdiction, all as more specifically set forth in the accompanying Memorandum of Law, submitted in accordance with Practice Book Sections 10-30(c) and 11-10(a).

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By /s/ S. Bruce Fair
    S. Bruce Fair
    Neubert, Pepe & Monteith, P.C.
    195 Church Street, 13th Floor
    New Haven, CT 06510
    Telephone No. (203) 821-2000
    Firm Juris Number 407996

CERTIFICATE OF SERVICE

       I certify that a copy of the above was or will immediately be mailed or delivered electronically or non-electronically on December 31, 2025, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

SENT BY EMAIL ONLY pluccarelli@sisco-law.com
Peter A Luccarelli III
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602
*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

                        /s/ S. Bruce Fair
                        S. Bruce Fair
                        Neubert, Pepe & Monteith

2

ORDER   409664

DOCKET NO: FSTCV256075223S

SUPERIOR COURT

PANTHERS CAPITAL LLC
  V.
CIS INTERNATIONAL HOLDINGS (N.A.)
CORP. D/B/A E TR Et Al

JUDICIAL DISTRICT OF STAMFORD
  AT STAMFORD

2/11/2026

ORDER

ORDER REGARDING:
12/31/2025 114.00 MOTION TO DISMISS PB 10-30

The foregoing, having been considered by the Court, is hereby:

ORDER:

This matter will be scheduled for a remote hearing, on the record, at a later date. Do not come to court on the short calendar date. You will receive a separate notice when your remote hearing is scheduled.

Judicial Notice (JDNO) was sent regarding this order.

409664
_____

Judge: JOHN F KAVANEWSKY JR
Processed by: Scott Abel

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

FSTCV256075223S   2/11/2026

Page 1 of 1

ORDER   409664

DOCKET NO: FSTCV256075223S

PANTHERS CAPITAL LLC
  V.
CIS INTERNATIONAL HOLDINGS (N.A.)
CORP. D/B/A E TR Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF STAMFORD
  AT STAMFORD

3/16/2026

<u>ORDER</u>

ORDER REGARDING:
12/31/2025 114.00 MOTION TO DISMISS PB 10-30

The foregoing, having been heard by the Court, is hereby:

ORDER: TAKE PAPERS

Superior Court Results Automated Mailing (SCRAM) Notice was sent on the underlying motion.

409664
_____

Judge: JOHN F KAVANEWSKY JR
Processed by: Carlos Cajas

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

DOCKET NO: FST-CV25-6075223-S          :          SUPERIOR COURT
                                                   :
PANTHERS CAPITAL LLC                     :          J.D. OF STAMFORD/NORWALK
                                                   :          AT STAMFORD
V.                                               :
                                                   :
CIS INTERNATIONAL HOLDINGS (N.A.)       :
CORP. D/B/A E TROPICAL FISH, ET AL.      :          DECEMBER 31, 2025

<div align="center">

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIM**

</div>

Pursuant to Connecticut Practice Book §§ 10-30, *et seq.* and 11-10(a), the Plaintiff,

Panthers Capital LLC (the "Plaintiff" or the "Buyer"), hereby submits this Memorandum of Law

in support of its Motion seeking to dismiss, *in its entirety*, the Counterclaim filed by the

Defendants, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings

Corp, Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish

LTD, and Tropical Aquarium Fish (Fiji) LTD (collectively, the "Defendants" or the "Guarantors").

### I.    BRIEF STATEMENT OF FACTS & PROCEDURAL HISTORY

This case involves commercial transactions for the purchase and sale of accounts

receivable and future receivables. As alleged in the Amended Complaint (D.E. # 101.00), the

Plaintiff and the Defendant, CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish (the

"Seller")[1] entered into a Purchase and Sale of Future Receipts Agreement dated June 4, 2025,

whereby the Seller sold, and the Plaintiff purchased, future receipts of the Seller, totaling

$1,500,236.00 (the "MCA Agreement").[2]  The MCA Agreement restructured prior merchant case

advance obligations into a consolidated arrangement with reduced payment obligations for the

Seller. The Guarantors jointly and severally personally guaranteed the Seller's obligations under

---

[1] The Seller is currently a debtor in certain bankruptcy proceedings.  See, D.E. # 105.00. Accordingly, the Plaintiff's action, as against that particular defendant only, is stayed.

[2] The MCA Agreement is attached to the Amended Complaint as Exhibit A.

the MCA Agreement, as evidenced by the Guarantors each having executed a Guaranty of Performance contained in the MCA Agreement (the "Guaranty").  See, Amended Complaint, para 3 of Counts One and Two.

Previously, on or about December 1, 2024, the Plaintiff and the Seller had entered into a Factoring Facility Agreement (the "Factoring Agreement"), pursuant to which Plaintiff purchased designated accounts receivable of the Seller.[3]  The Factoring Agreement contains, among other things, express warranties that the receivables sold to the Plaintiff had not previously been sold or assigned, and would not be sold or assigned, to any other party during the term of the agreement (see, Factoring Agreement, Section 8); a defaulted balance provision in which Seller acknowledged an adjusted outstanding balance of $1,018,196.92 and agreed that certain Petco receivables were allocated to satisfy that balance (see, Factoring Agreement, Section 36.4); and a cross-collateral addendum identifying the Guarantors and obliging them for the Seller's performance.

The Plaintiff asserts that the Seller breached the MCA Agreement and the Factoring Agreement by, without limitation, selling or re-selling encumbered receivables, making false representations regarding prior liens and factoring agreement, and interfering with agreed-upon remittances.  The Guarantors subsequently defaulted on the Guaranty.  The Plaintiff then commenced this action by way of writ, summons, and eight-count complaint bearing a return date of August 12, 2025.  At this particular time, the Plaintiff is pursuing claims for breach of guaranty

---

[3] A copy of the Factoring Agreement is attached to the Amended Complaint as Exhibit B.

against the Guarantors with respect to the MCA Agreement (Count Two) and to the Factoring

Agreement (Count Four).

On December 11, 2025, the Guarantors filed an Answer, multiple Special Defenses, and a

three-count Counterclaim.  See, D.E. # 112.00.  In the Answer, the Guarantors admit signing the

MCA Agreement and the Factoring Agreement but leave the Plaintiff to its proof or deny virtually

every other allegation contained within Counts Two and Four of the Amended Complaint.  Put

succinctly, the Counterclaim alleges that the Plaintiff engaged in predatory lending, committed

usury, breached the Factoring Agreement by adjusting advance rates, violated CUTPA, acted

unconscionably, and improperly asserted priority over the Seller's receivables.

The Plaintiff argues that each of these allegations arises from purported injuries to the

Seller under the underlying agreements. The Counterclaim does not allege any independent

contract, statutory duty or direct injury running from the Plaintiff to the Guarantors separate and

apart from the Seller's rights or position as the merchant/seller.  The Seller is not even a party to

the Counterclaim and, presumably and in any event, is barred by bankruptcy laws from prosecuting

the Counterclaim in this particular forum.  Accordingly, the Plaintiff now moves to dismiss the

Counterclaim in its entirety based upon the Guarantors' lack of standing.

## II.      LAW AND ARGUMENT

### A. Motion to Dismiss – Generally

"A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting

that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by

the court."(Internal quotation marks omitted.) *Bacon Construction Co. v. Dept. of Public Works*,

294 Conn. 695, 706, 987 A.2d 348 (2010). "A court deciding a motion to dismiss must determine

not the merits of the claim or even its legal sufficiency, but rather, whether the claim is one that the court has jurisdiction to hear and decide . . . A motion to dismiss tests, *inter alia*, whether, on the face of the record, the court is without jurisdiction." (Citation omitted; internal quotation marks omitted.) *Bailey v. Medical Examining Board for State Employee Disability Retirement*, 75 Conn.App. 215, 219, 815 A.2d 281 (2003).

"[A] motion to dismiss pursuant to Practice Book § 10-30 (a) (1) is the appropriate procedure for challenging subject matter jurisdiction." *Machado v. Taylor*, 326 Conn. 396, 401, 163 A.3d 558 (2017). "Trial courts addressing motions to dismiss . . . pursuant to § 10-31 (a) (1) may encounter different situations, depending on the status of the record in the case. . . . [L]ack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. . . . Different rules and procedures will apply, depending on the state of the record at the time the motion is filed." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Conboy v. State*, 292 Conn. 642, 650-51, 974 A.2d 669 (2009). "[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Financial Consulting, LLC v. Commissioner of Ins.*, 315 Conn. 196, 226, 105 A.3d 210 (2014).

B. **The Counterclaim must be dismissed in its entirety because the Guarantors lack standing**

"[B]ecause the issue of standing implicates subject matter jurisdiction, it may be a proper basis for granting a motion to dismiss." *Electrical Contractors, Inc. v. Dept. of Education*, 303 Conn. 402, 413, 35 A.3d 188 (2012).  "It is a basic principle of our law . . . that [the plaintiff] must have standing in order for a court to have jurisdiction . . . Standing is the legal right to set judicial machinery in motion." (Citation omitted; internal quotation marks omitted.) *Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co.*, 312 Conn. 714, 727-28, 95 A.3d 1031 (2014). "Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." *Carrubba v. Moskowitz*, 274 Conn. 533, 550, 877 A.2d 773 (2005). "One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue…." (Citation omitted; internal quotation marks omitted.) *Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co., supra*, 728.

"[S]tanding is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest [in the subject

matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action] . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co., supra*, 312 Conn. at 729, citing *Wilcox v. Webster Ins., Inc., supra*, 294 Conn. at 214-15. "When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue and not whether the controversy is otherwise justiciable, or whether, on the merits, the [party] has a legally protected interest [which may be remedied]." (Internal quotation marks omitted.) *Steeneck v. University of Bridgeport*, 235 Conn. 572, 579, 668 A.2d 688 (1995).

A guarantor generally does not have standing to assert an obligor's rights under a contract. "Guarantors may not recover affirmatively on the debtor's claims, usually because they lack standing, in the absence of damages that are independent from those suffered by the principal . . ." (Footnotes omitted.) 38 Am.Jur.2d, Guaranty § 88 (May 2021 Update). Put another way, in order for the Guarantors in this case to be able to assert an affirmative claim against Plaintiff, the Guarantors must establish that they suffered a direct injury as a result of the Plaintiff's alleged breach against the *Seller*, which is independent from and not merely derivative of the resulting injury suffered by the Seller." *Performance Electric, Inc. v. CIB Bank*, 371 Ill.App.3d 1037, 1040, 864 N.E.2d 779, 309 Ill. Dec. 538 (Ill.App. 2007).

Connecticut courts have adopted this view. For example, in *Beerwald v. Hearth Management, LLC*, Superior Court, judicial district of New Haven, Docket No. CV-14-5034796-S, 2015 Conn. Super. LEXIS 1512 (June 1, 2015, Wilson, J.), it was alleged that "the defendants coerced [one of the named plaintiffs] into executing a guarantee agreement on behalf of [the other plaintiff]." The defendants moved to dismiss the claims brought by the plaintiff guarantor, on the grounds that she lacked standing "because she has failed to allege that she has sustained a direct injury . . . [The guarantor] is merely seeking to recover for [the other plaintiff's] alleged injuries. In the absence of a direct and personal injury, the defendants argue, the court lacks subject matter jurisdiction over [the guarantor's] claims." *Id.* Judge Wilson agreed with the defendants in *Beerwald*, citing 38 Am.Jur.2d, Guaranty § 98 (2015) and *Miller v. United States Bank of Washington, N.A.*, 72 Wash.App. 416, 865 P.2d 536 (1994), *inter alia*, for the principle that a guarantor lacks standing to assert rights on behalf of a principal . A similar conclusion is warranted here.

Quite simply, the Guarantors' Counterclaim has not established that the Guarantors suffered a direct injury (or injuries) as a result of the Plaintiff's alleged breach against the *Seller*, which injury (or injuries) is independent from and not merely derivative of the injury (or injuries) purportedly suffered by the Seller.  In other words, the Guarantors' Counterclaim, in its entirety, fails as a matter of law because it does not allege that the Guarantors themselves suffered a direct, personal injury caused by Plaintiff's conduct. Connecticut law is clear that a party lacks standing where the alleged harm is derivative of injury to another entity and not independent of that entity's rights. See, generally, *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 347–48 (2001) (plaintiff must plead an injury that is "direct and personal," not one that is "remote, contingent, or

derivative"); <u>See, also</u>, *In re Tayquon H.*, 76 Conn. App. 693, 698, 821 A.2d 796 (2003) ("Generally speaking, a person has no standing to assert the rights of another"); *Jackson v. Drury*, 191 Conn. App. 587, 216 A.3d 768 (2019).

The Counterclaim itself demonstrates that every alleged injury flows exclusively from the purported harm to the Seller. Each of the Guarantors' theories (breach of contract, breach of the implied covenant of good faith and fair dealing, CUTPA violations, etc.) rests entirely on alleged misconduct by Plaintiff in its contractual dealings *with the Seller*, not with the Guarantors. The Counterclaim does not allege that Plaintiff breached any duty owed directly *to the Guarantors*, interfered with any Guarantor-owned property, or engaged in any conduct directed *at the Guarantors* independent of the Seller's contractual position.

As stated previously, Connecticut courts routinely reject standing where guarantors or affiliated entities attempt to assert claims that belong, if at all, to the primary obligor. The Guarantors' exposure on a guaranty, whether in the form of increased risk, downstream liability, or enforcement, is *not a cognizable independent injury*, but rather a consequence of the Seller's alleged injury. Such contingent harm does not satisfy standing requirements. That defect is particularly stark here because the Counterclaim repeatedly anchors its allegations to Seller's alleged "collapse," "cash-flow crisis," and "loss of business," all of which are injuries unique to the Seller. The Guarantors do not allege that they made payments under the guarantees as a result of Plaintiff's conduct, that Plaintiff enforced the guarantees unlawfully, or that Plaintiff committed any act directed specifically at them. Instead, the Guarantors merely repackage the Seller's alleged defenses and potential claims as their own, which is precisely what the standing doctrine forbids.

Moreover, the Seller's bankruptcy underscores the derivative nature of the Counterclaim. To the extent the Seller may possess claims against Plaintiff arising from the Factoring Agreement or the MCA Agreement, those claims belong to the bankruptcy estate and may be asserted only by the debtor-in-possession or trustee, not by non-debtor guarantors in a collateral state court action. The Guarantors cannot circumvent bankruptcy law by prosecuting the Seller's claims under the guise of a counterclaim.

The Counterclaim does not, and indeed, cannot, identify any injury running directly to the Guarantors. Because the Guarantors' alleged injuries are wholly derivative of the Seller's purported injuries as the merchant/seller to the contracts at issue, the Counterclaim must be dismissed in its entirety for lack of standing. Even if some of the Guarantors' allegations could theoretically be raised as a shield to contest liability under the guarantees, they cannot be transformed into a sword.  The Guarantors may not bootstrap standing to assert an affirmative claim by recharacterizing a defense as a counterclaim.

## III. CONCLUSION

In conclusion, the Guarantors lack standing to assert the affirmative causes of action

comprising the Counterclaim and, consequently, this Court lacks subject matter jurisdiction.  The

Counterclaim, then, should be dismissed in its entirety.

<div style="margin-left:40%">

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By /s/ S. Bruce Fair
S. Bruce Fair (421368)
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 821-2000
Firm Juris Number 407996

</div>

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the above was or will immediately be mailed or delivered electronically or non-electronically on December 31, 2025, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

<u>SENT BY EMAIL ONLY</u> pluccarelli@sisco-law.com
Peter A Luccarelli III, Esq.
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602

*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

                                        /s/ S. Bruce Fair
                                        S. Bruce Fair
                                        Neubert, Pepe & Monteith

DOCKET NO: FST-CV25-6075223-S        :        SUPERIOR COURT

                                                        :

PANTHERS CAPITAL LLC                 :        J.D. OF STAMFORD/NORWALK

                                                        :        AT STAMFORD

V.                                                     :

                                                        :

CIS INTERNATIONAL HOLDINGS (N.A.), et al. :     JANUARY 8, 2026

## <u>NOTICE OF REQUESTS FOR ADMISSION</u>

Pursuant to Practice Book § 13-22, Panthers Capital LLC, Plaintiff in the above-

referenced case, hereby provides notice that, on January 8, 2026, it served Requests for

Admission on the Defendants, Charitha I Samarasinghe, CIS International Distributors Inc., Live

Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics,

Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD.

PANTHERS CAPITAL LLC


By:    /s/421368
         S. Bruce Fair
         Neubert, Pepe & Monteith, P.C.
         195 Church Street, 13th Floor
         New Haven, CT 06510
         Telephone No. (203) 821-2000
         Firm Juris Number 407996

## CERTIFICATE OF SERVICE

I certify that a copy of the above was or will immediately be mailed, or delivered electronically or non-electronically, on January 8, 2026, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

SENT BY EMAIL ONLY pluccarelli@sisco-law.com
Peter A Luccarelli III
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602
*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

/s/ 421368

S. Bruce Fair
Neubert, Pepe & Monteith, P.C.

DOCKET NO: FST-CV25-6075223-S     :     SUPERIOR COURT

                                              :

PANTHERS CAPITAL LLC          :     J.D. OF STAMFORD/NORWALK

                                              :     AT STAMFORD

V.                                            :

                                              :

CIS INTERNATIONAL HOLDINGS (N.A.)    :
CORP. d/b/a E TROPICAL FISH,         :
CHARITHA I SAMARASINGHE,           :
CIS INTERNATIONAL DISTRIBUTORS INC.,   :
LIVE AQUARIA HOLDINGS CORP,        :
LIONSROCK INVESTMENTS LLC,          :
LIONSROCK WISCONSIN LLC,            :
T3 AQUATICS,                             :
SIAM TROPICAL FISH LTD,              :
TROPICAL AQUARIUM FISH (FIJI) LTD     :     January 30, 2026

## <u>DEFENDANTS' OBJECTION TO MOTION TO DISMISS</u>

Defendants Charitha I Samarasinghe ("Mr. Samarasinghe"), CIS International

Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock

Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD[1]

(hereinafter, collectively, the "Guarantor Defendants") respectfully object to Plaintiff Panthers

Capital, LLC's ("Panthers") Motion to Dismiss the Guarantor Defendants' counterclaims

against Panthers and Memorandum of Law in Support (Dkt. Nos. 112-13) (the "Motion") on

the grounds that the Guarantor Defendants have alleged injuries separate from the

Bankruptcy Defendant's claims against Panthers.

Here, the Guarantor Defendants have alleged that they are separate victims of a

predatory lending scheme by Panthers. While the Guarantor Defendants note that Panthers

breached its contract with the Bankruptcy Defendant by withholding contractually obligated

payments to the Bankruptcy Defendant beginning on June 3, 2025, they allege that Panthers

---

[1] Defendant CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish (hereinafter, the "Bankruptcy Defendant") is currently subject to a bankruptcy stay.

did so for the express purpose of pressuring the Guarantor Defendants to assign assets to Panthers—to which Panthers was not entitled—to ensure that Panthers would resume making the contractually obligated payments to the Bankruptcy Defendant. The Guarantor Defendants further allege that Panthers only resumed making those payments after Mr. Samarasinghe signed a letter of intent indicating that he would comply with Panthers' extracontractual demand. And, when Mr. Samarasinghe did not surrender the Guarantor Defendants' assets to Panthers as requested, the Guarantor Defendants allege that Panthers simply accused Mr. Samarasinghe of breaching a contract with Panthers and immediately began pursuing the Guarantor Defendants for the assets Panthers previously demanded, both in this action and through other means. Panthers' actions against the Guarantor Defendants also breached Panthers' duty of good faith and fair dealing to them as guarantors to the relevant contracts, and support a claim by the Guarantor Defendants against Panthers under CUTPA.

This scheme resulted in direct harm to the Guarantor Defendants that is independent of the Bankruptcy Defendant's claims, and establishes standing for the Guarantor Defendants to counterclaim against Panthers. As a threshold matter, the Guarantor Defendants note that they are victims of a predatory lending scheme, and that Panthers is pursuing them because it is no longer entitled to pursue the assets of the Bankruptcy Defendant. As a result of Panthers' actions, the Guarantor Defendants were also exposed to greater liability under the agreements between Panthers and the Bankruptcy Defendant because Panthers, by unilaterally withholding contractual payments to the Bankruptcy Defendant, interfered with the Bankruptcy Defendant's ability to make payments under those agreements. This caused two types of damages specific to the Guarantor Defendants. First,

this increased the Guarantor Defendants' exposure to liability under the agreements by making it harder for the Bankruptcy Defendant to make payments, which Panthers would then insist that the Guarantor Defendants pay instead. Second, by limiting the Bankruptcy Defendant's ability to pay Panthers, Panthers increased the amount owed by the Bankruptcy Defendant to Panthers (including penalties and fees for late payments that Panthers was responsible for) that Panthers now seeks directly from the Guarantor Defendants. Mr. Samarasinghe and the corporate Guarantor Defendants are also now exposed to additional litigation as a result of Panthers' actions in the form of claims and/or lawsuits made directly against them by other vendors and servicers of the Bankruptcy Defendant who can no longer seek repayment from the Bankruptcy Defendant itself. Panthers has also affected Mr. Samarasinghe's and the corporate Guarantor Defendants' relationships with the Bankruptcy Defendant's customers, affecting present and future business. Finally, the Guarantor Defendants are now forced to pay to defend themselves as guarantors in a breach of contract action where Panthers itself orchestrated the breach to pursue the Guarantor Defendants' assets. If they are unable to continue funding their defense, the Guarantor Defendants risk a default judgment and Panthers seeking to collect on the Guarantor Defendants' assets.

Panthers cannot equitably claim that the Guarantor Defendants have no right to sue Panthers for its scheme to deprive them of their assets or to seek compensation for the ongoing financial effects the Guarantor Defendants continue to face as a result of that scheme, while at the same time trying to use this Court to obtain those assets as a guarantee for the contract that Panthers breached.

3

The Guarantor Defendants also note for the Court that they attempted to resolve the Motion by requesting leave of Panthers' counsel to amend their counterclaim to allege facts supporting more specifically their right to assert a counterclaim. Counsel for Panthers declined and asserted there is no legal basis for the Guarantor Defendants' counterclaim, regardless of the facts alleged. While the Guarantor Defendants dispute this and believe their counterclaim is both factually and legally sufficient, they respectfully request that, if the Court grants the Motion based on the facts as pled, the Guarantor Defendants be given leave to file a more detailed counterclaim.

I.      Statement of Fact

As discussed in more detail in the Guarantor Defendants' counterclaim against Panthers, the Guarantor Defendants have alleged a hybrid scheme by Panthers, at least one related company owned by Panthers' principal, and others affiliated with Panthers to extract capital from Mr. Samarasinghe, the corporate Guarantor Defendants, and the Bankruptcy Defendant itself. First, Panthers and the related company began making high interest loans[2] to various companies owned by Mr. Samarasinghe, while also requiring him and various other corporate Guarantor Defendants to each personally guarantee full repayment of all money that Panthers provided. Separately, the broker who Mr. Samarasinghe retained to act on his behalf and to obtain funding for various companies that Mr. Samarasinghe owned brokered, or attempted to broker, more substantial loans from traditional lenders to the companies that Mr. Samarasinghe owned, again with personal guarantees of repayment by Mr. Samarasinghe and various other corporate Guarantor Defendants. Upon information and believe, Mr. Samarasinghe's broker and Panthers'

---

[2] The Guarantor Defendants acknowledge that Panthers describes these loans as merchant cash advance ("MCA") products and dispute that assertion.

4

principal had a prior financial relationship, and the funding that the broker negotiated on behalf of Mr. Samarasinghe was meant to repay loans by Panthers and its related companies rather than for the benefit of Mr. Samarasinghe and his companies. This allowed Panthers and its related companies to repay themselves from other loans arranged for their benefit, while leaving Mr. Samarasinghe and various other corporate Guarantor Defendants personally liable to the other lenders. Mr. Samarasinghe and various other corporate Guarantor Defendants remain personally liable on these other loans, and have and continue to experience financial and legal consequences as a result.

As outlined in the Guarantor Defendants' counterclaim, Panthers' scheme against them reached a critical point in June 2025. On June 3, 2025, Panthers unilaterally reduced factoring payments to the Bankruptcy Defendant pursuant to their Factoring Agreement.[3] This constituted a breach of the Factoring Agreement, because there was no provision of the agreement allowing Panthers to do this. The following day, Panthers entered into the Agreement[4] with the Bankruptcy Defendant, under which Panthers consolidated various MCAs owed by the Bankruptcy Defendant into a new agreement, extended no new cash payments to the Bankruptcy Defendant, and applied approximately $500,000 in additional cost to the Bankruptcy Defendant for the Agreement. Within approximately twenty-four hours, Panthers had obligated the Bankruptcy Defendant to make additional payments to Panthers, while also unilaterally reducing the funds available to the Bankruptcy Defendant to make those additional payments. Panthers did this knowing that the Guarantor Defendants were obligated to pay any amount not paid by the Bankruptcy Defendant in full,

---

[3] A copy of the Factoring Agreement is attached as Exhibit B to Panthers' Amended Complaint, and is so identified in the Motion.

[4] A copy of the Agreement is attached as Exhibit A to Panthers' Amended Complaint, and is so identified in the Motion.

5

and that the Guarantor Defendants had available assets in the event the Bankruptcy Defendant did—or was forced to—stop making payments to Panthers.

Three weeks later on June 25, 2025, Panthers instructed Mr. Samarasinghe to travel to Florida, where a Panther's principal attempted to coerce Mr. Samarasinghe to turn over assets held by the Guarantor Defendants in exchange for Panthers resuming the factoring payments to the Bankruptcy Defendant: payments that Panthers was already contractually obligated to make. The Guarantor Defendants attached a copy of the proposed "agreement" that a Panthers principal hand wrote on a napkin as Exhibit "F" to the counterclaim, under which Mr. Samarasinghe had to agree to assign two commercial properties owned by corporate Guarantor Defendant Lionsrock Wisconsin LLC as a collateral to a promise to pay Panthers $1 million within thirty days. The Guarantor Defendants will establish during discovery that the properties Panthers sought appraised for well over $10 million, meaning Panthers was demanding that it be entitled to a substantial financial windfall if Mr. Samarasinghe could not comply with the terms of that agreement. It is telling that Panthers does not reference this agreement or attempt to justify it in the Motion. It is also telling that, while Mr. Samarasinghe insisted the agreement be styled as a letter of intent and non-binding pending review and approval by counsel, Panthers did not resume its contractually obligated factoring payments to the Bankruptcy Defendant until Mr. Samarasinghe signed the agreement.

Unfortunately for the Guarantor Defendants, Panthers elected a short time (July 8, 2025) later to stop factoring payments entirely, accused Mr. Samarasinghe of breaching the Factoring Agreement (July 11, 2025), and immediately pursued the Guarantor Defendants' assets through legal action (initially filed with the court on July 11, 2025, despite giving Mr.

6

Samarasinghe until July 14, 2025 to respond to the breach notice with a plan of action) and other means.

Panthers further demonstrated its laser focus on the Guarantor Defendants' assets by preparing, on July 13 and 14, 2025, a document entitled "Secured Quitclaim Collateral Agreement," (the "Quitclaim Agreement') which is annexed hereto as Exhibit "A." The Quitclaim Agreement required Guarantor Defendants Mr. Samarasinghe and Lionsrock Wisconsin LLC to admit that Lionsrock Wisconsin LLC had "overleveraged its obligations to [Panthers]—despite the fact that Lionsrock Wisconsin LLC had no direct obligation, as a guarantor, to Panthers—among other admissions, and agree to turn over the two properties owned by Lionsrock Wisconsin LLC to secure payment of $1 million to Panthers within thirty days. If Guarantor Defendant Lionsrock Wisconsin LLC failed to remit $1 million to Panthers within thirty days, Panthers would be allowed to hold the properties as repayment of approximately $2.9 million that Panthers claimed it was owed. Panthers would then be allowed to sell those properties after four months if Panthers was not repaid in full. Panthers also gave itself the right to declare Guarantor Defendant Lionsrock Wisconsin LLC in default of the Quitclaim Agreement under a wide array of circumstances, which would permit Panthers to immediately sell the property. Nothing in the Quitclaim Agreement required Panthers to return any excess sale proceeds to Guarantor Defendant Lionsrock Wisconsin LLC above what Panthers claimed it was owed if Panthers instituted a sale of the properties, which would have resulted in a significant financial windfall to Panthers. The Guarantor Defendants note that Panthers would not be entitled to such favorable conditions even if it obtained a judgment against the Guarantor Defendants in this case.

7

The Guarantor Defendants are now forced to defend themselves as guarantors in a breach of contract action where Panthers engineered the original breach, exposing them to liability and increased damages that Panthers is responsible for causing. And, as a further result of Panthers' breach and the Bankruptcy Defendant's resulting bankruptcy, Mr. Samarasinghe and other of the corporate Guarantor Defendants are exposed to additional liability via lawsuits by former vendors to the Bankruptcy Defendant who are now pursuing them for debts that they cannot collect from the Bankruptcy Defendant. And, finally, Mr. Samarasinghe and other of the corporate Guarantor Defendants remain liable for substantial loans made to the Bankruptcy Defendant by other lenders, that Panthers, upon information and belief, arranged with the express purpose of paying of the loans it made to Mr. Samarasinghe's companies.

II.    <u>Law and Argument</u>

The Connecticut Supreme Court has previously held that when "ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Citation omitted.) *Bailey v. Medical Examining Board for State Employee Disability Retirement*, 75 Conn.App. 215, 219, 815 A.2d 281 (2003). Panthers argument therefore depends on its claim that, even if all of the facts cited in the Guarantor Defendants counterclaim and summarized in this objection are true, the Guarantor Defendants have no legal recourse against Panthers. Connecticut's courts cannot be closed to the Guarantor Defendants under these circumstances; they have distinct claims against Panthers apart from the Bankruptcy Defendant's claims, and it would

8

be inequitable to the Guarantor Defendants in this case to prevent them from doing anything more than defending themselves against Panthers' claims.

The only potentially relevant Connecticut case that Panthers cites in support of the Motion, *Beerwald v. Hearth Management, LLC*, NNH-CV-14-5034796-S, 2015 Conn. Super. LEXIS 1512 (Super. June 1, 2015), bears no resemblance to the issues presented in this case. In *Beerwald*, Judge Wilson noted that, while Ms. Beerwald claimed that the defendants required her to execute documents that would expose her to personal liability for a lease that her mother signed, none of the documents that Beerwald submitted in support of her claim contained a personal guarantee. *Id.* at *10-11. She did not sign four of the five leases at all, and she signed the fifth lease only as a witness, which Judge Wilson held was insufficient for Beerwald to establish a claim against the defendants. *Id.* It is clear, therefore, that while Beerwald claimed to be a guarantor on her mother's lease agreements, this was factually incorrect because she did not execute a personal guarantee, and therefore had no basis to make a claim. While the *Beerwald* decision contains some discussion as to what a guarantor must establish to pursue a lender, these discussions were not ultimately relevant to the court's determination that Beerwald could not assert her claim, based on the court's determination that Beerwald was not a guarantor. The court further held that the only provable damages in the case—excess rent charged to Beerwald's mother—were damages owed to the mother only, and Beerwald had not identified damages other than the excess rent that would entitle her to her own claim against defendants.

Here, by contrast, each of the Guarantor Defendants signed at least one of the agreements between Panthers and the Bankruptcy Defendant as personal guarantors. And the Guarantor Defendants have identified specific actions that Panthers took against them

9

that are distinct from the Bankruptcy Defendant's claims against Panthers and that have caused separate damages to the Guarantor Defendants. The Guarantor Defendants also note that Panthers' actions against the Guarantor Defendants violated Panthers' contractual duty of good faith and fair dealing to the Guarantor Defendants, and constitute deceptive trade practice and/or violations of public policy to support a CUTPA claim against Panthers.

While the specific facts of this case may be a matter of first impression in Connecticut, the Guarantor Defendants offer that the case of *Groth Family L.P. v. TD Bank, N.A.*, MMX-CV-10-6001813-S, 2011 Conn. Super. LEXIS 2108 (Super. Aug. 11, 2011) is more relevant to the facts of this case than the *Beerwald* decision. The *Groth* case involved a series of actions filed after a foreclosure sale of collateral by TD Bank to collect money on a defaulted loan where several of the plaintiffs were guarantors. *Id.* at *2-3. The guarantor plaintiffs sued TD Bank under several theories, and Judge Holzberg ultimately rejected TD Bank's claim that the guarantors could not sue it because the right to sue belonged only to the debtor. Judge Holzberg held that the guarantors met their burden of establishing direct harm by alleging that: 1) they were exposed to greater liability for the deficiency judgment that TD Bank obtained against them because TD Bank failed to conduct the foreclosure sale properly; and 2) they were exposed to litigation by other aggrieved parties from the foreclosure sale because TD Bank failed to conduct the foreclosure sale properly. *Id.* at *8-10. Judge Holzberg noted that these were allegations of direct harm, and not the types of attenuated and/or derivative claims such as those alleged by the mayor of Bridgeport in *Ganin*, *infra*. *Id.* at *9-10. The Guarantor Defendants respectfully note that they suffered similar harms to those identified in *Groth*, in addition to the intentional bad acts that Panthers undertook against them. And, while the Guarantor Defendants do not have the specific

10

statutory standing to sue Panthers that the *Groth* plaintiffs had against TD Bank, *Id.* at *8-9,

that does not prevent this Court from adopting Judge Holzberg's damages analysis in *Groth*.

The other Connecticut cases that Panthers cites in its motion are also no relevant to

the facts in this case. In *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313 (2001), the

Supreme Court held that the mayor of Bridgeport's attempt to link the city's loss of tax

revenue and increased health care costs, among other things, to the negligent design and

marketing of handguns was too attenuated to give the city standing to sue the

manufacturers, and that these harms were also derivative of the harms suffered by individual

residents who were physically harmed by violence. *Id.* at 355-56. *In re Tayquon H.*, 76 Conn.

App. 693, 821 A.2d 796 (2003) concerned a dispute as to whether a child's natural guardian

or court-appointed guardian ad litem had superior rights to speak for the child, *Id.* at 710,

and is not relevant to this case beyond the general legal principle for which Panthers cites

it. And *Jackson v. Drury*, 191 Conn. App. 587, 216 A.3d 768 (2019) held that a court order

approving attorney's fees charged to a subtrust "in no way affected" the plaintiff's separate

trust, meaning the plaintiff lacked standing to contest the fee order. *Id.* at 600. The Guarantor

Defendants respectfully note that the actions Panthers took against them bear no

resemblance to the factual disputes in these cases.

III.     Conclusion

The Guarantor Defendants have alleged a pattern of practice by Panthers against

them, including both a predatory lending scheme and an attempt to force them to assign

assets to Panthers that Panthers was not entitled to.  In doing so, Panthers violated its duty

of good faith and fair dealing to the Guarantor Defendants, engaged in improper business

practices that fall squarely within CUTPA, and breached its contract with the Bankruptcy

11

Defendant. Panthers breached its contract with the Bankruptcy Defendant specifically to target and harm the Guarantor Defendants, and the Guarantor Defendants have identified several categories of damages that they have suffered as a result of Panthers' actions. Panthers has been laser focused on obtaining assets from the Guarantor Defendants since at least June 2025, took steps to try and gain control of those assets in breach of its contractual obligations and its duty of good faith and fair dealing, and continues to actively pursue those assets by maintaining this action against the Guarantor Defendants. Finally, the Guarantor Defendants note the iniquity of Panthers, having engaged in activity that ultimately forced the Bankruptcy Defendant into bankruptcy proceedings, now claiming that the Guarantor Defendants have no affirmative right to pursue Panthers for what it did to them specifically. Panthers' Motion to Dismiss should be denied in its entirety.

Respectfully Submitted,

SISCO-LAW

*/s/ Peter A. Luccarelli*
Peter A. Luccarelli, III
pluccarelli@sisco-law.com
Connecticut Bar No. 433492
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Defendants*

12

## **CERTIFICATION**

The undersigned hereby certifies that, on January 30, 2026, a copy of the foregoing was mailed or delivered electronically to all counsel and self-represented parties of record as follows:

Lucas B. Rocklin
John T. Szalan II
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Lrocklin@npmlaw.com
JSzalan@npmlaw.com
*Counsel for Plaintiff*

                                             */s/ Peter A. Luccarelli*
                                             Attorney

# Exhibit A

## SECURED QUITCLAIM COLLATERAL AGREEMENT

This Secured Quitclaim Collateral Agreement ("Agreement") is made and entered into as of July 14, 2025, by and between Lionsrock Wisconsin LLC, a Wisconsin limited liability company ("Grantor"), by and through its duly authorized Chief Executive Officer and Managing Member, Charitha Samarasinghe, and Panthers Capital LLC, a Connecticut limited liability company ("Grantee").

1. **Purpose of Conveyance.** Grantor, having overleveraged its obligations to Grantee under multiple funding arrangements, including, without limitation, the over assignment of invoices and other related breaches, hereby conveys, assigns, and quitclaims to Grantee all of its right, title, and interest in and to the following real properties (collectively, the "Properties"), free and clear of all liens, claims, and encumbrances:

   - 2389 Air Park Rd, Rhinelander, WI 54501, with APN RH-9012-0601.
   - 2423 Air Park Rd, Rhinelander, WI 54501, with APN RH-9012-0602.

   Legal title to the Properties shall transfer to Grantee on the effective date of this Agreement and shall be held by Grantee as collateral security for the Debt, as defined herein.

2. **Debt Secured.** This conveyance is made for the purpose of securing a $1,000,000.00 portion of the outstanding obligations owed by Grantor to Grantee. Such obligations arise under (i) that certain Factoring Facility Agreement, pursuant to which invoices were sold and assigned to Grantee and identified under separate deal numbers, and (ii) that certain Future Receivables Sale and Purchase Agreement, designated as Deal #4426. As of the close of business on July 11, 2025, the total aggregate indebtedness under both agreements is two million eight hundred ninety-five thousand seven hundred thirty-four dollars and forty-two cents ($2,895,734.42), inclusive of all accrued and accruing interest, fees, costs, expenses, and other charges (collectively, the "Debt").

3. **Conditional Reconveyance Upon Partial Debt Paydown.** Grantor shall be entitled to a reconveyance by Quitclaim Deed of the Properties upon tender to Grantee of one million dollars ($1,000,000.00) in immediately available funds on or before July 25, 2025. Such payment shall constitute a partial paydown of the total Debt and shall fully satisfy the portion of the Debt secured by this conveyance, specifically the obligations arising under the Future Receivables Sale and Purchase Agreement (Deal #4426). Upon timely receipt of such payment, Grantee shall reconvey title to the Properties to Grantor and issue a written zero-balance letter confirming full satisfaction of Deal #4426. All other obligations, including those arising under the Factoring Facility Agreement, shall remain in full force and effect and shall continue to be due and enforceable in accordance with their respective terms.

4. **Holding Period after Thirty Days.** If the partial Debt payment described in Section 3 is not received by July 25, 2025, Grantee shall retain legal title to the Properties as continuing collateral security for the full amount of the Debt. Grantor shall remain fully obligated to pay the entire outstanding balance, including all amounts due under both the Factoring Facility Agreement and the Future Receivables Sale and Purchase Agreement (Deal #4426). Upon full and final satisfaction of all such obligations, Grantee shall reconvey title to the Properties to Grantor. In such event, any early payoff discount or reduced settlement option

Page 1 out of 3

previously offered in connection with Deal #4426 shall be deemed forfeited and shall no longer be available to Grantor.

    a. **Sale Restriction Period.** Grantee agrees not to initiate any sale of the Properties for a period of four (4) months from the date of execution of this Agreement (the "Restriction Period"). If the Debt is paid in full within the Restriction Period, Grantee shall reconvey title to the Properties to Grantor in accordance with the terms set forth in Section 4. If the Debt remains unpaid following the expiration of the Restriction Period, Grantee may, in its sole and absolute discretion and without further notice to Grantor, either (i) proceed to market and sell one or both of the Properties pursuant to the remedies provided in Section 6, or (ii) grant additional time for Grantor to satisfy the outstanding Debt. For the avoidance of doubt, the existence of the Restriction Period shall not preclude Grantee from declaring an Event of Default under Section 6 if separate default conditions occur during such time.

5. **Carrying Costs.** Until the Debt is paid in full, Grantor shall be solely responsible for all costs and expenses associated with the Properties, including, without limitation, real estate taxes, insurance premiums, utility charges, repairs, maintenance, and all other costs arising from or related to the ownership, use, management, or operation of the Properties. Failure by Grantor to timely pay any such amounts when due shall constitute an Event of Default under this Agreement if not cured within thirty (30) calendar days following the applicable due date.

6. **Default and Remedies.** If any Event of Default occurs under either (i) the Factoring Facility Agreement or (ii) the Future Receivables Sale and Purchase Agreement (Deal #4426), including, without limitation: (a) failure to pay any portion of the Debt when due; (b) failure to satisfy Carrying-Cost obligations within the applicable cure period; (c) gross negligence; (d) double-selling of invoices; or (e) any act of negligence, misrepresentation, or fraud, then Grantee may, in its sole discretion and without further notice, declare the entire Debt immediately due and payable and may exercise any and all rights and remedies available at law or in equity. Upon any Event of Default, and without limiting the foregoing, Grantee may market and sell one or both Properties by public auction or private sale on terms it deems commercially reasonable. Upon consummation of any such sale, Grantor shall either (i) immediately vacate the sold Property, or (ii) at the purchaser's election, enter into a commercially reasonable written lease for continued occupancy at a market rental rate. If the parties cannot agree on such rate within ten (10) days, it shall be determined by an MAI-certified appraiser jointly selected by Grantor and the purchaser, and such determination shall be final, conclusive, and binding on all parties. Grantor's failure to vacate or to execute the lease shall constitute unlawful detainer, entitling Grantee or the purchaser to pursue eviction, injunctive relief, or other legal action under applicable law. All reasonable costs and expenses incurred by Grantee in protecting or enforcing its rights hereunder, including attorneys' fees, shall be added to, and become part of, the Debt.

7. **Governing Law; Jurisdiction and Venue.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Connecticut, without regard to its conflict of law principles. The parties irrevocably agree that exclusive jurisdiction and venue for any action, suit, or proceeding arising out of or relating to this Agreement shall lie in the state or federal court located in Fairfield County, Connecticut, and each party hereby

consents to the personal jurisdiction of such courts and waives any objection based on forum non conveniens or improper venue. Each party knowingly, voluntarily, and irrevocably waives any right to trial by jury in any action arising out of this Agreement.

8.  **Acknowledgement of Counsel Review.** Grantor acknowledges that Charitha Samarasinghe, in his capacity as Chief Executive Officer and Managing Member of Grantor, was afforded a full and fair opportunity to consult with independent legal counsel prior to executing this Agreement. Grantor further acknowledges that this Agreement is executed voluntarily, knowingly, and with a full understanding of its terms, provisions, and legal consequences.

9.  **Electronic Execution; Binding Effect.** This Agreement may be executed in counterparts and by electronic means, including, without limitation, PDF, DocuSign, or any other secure electronic signature platform, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. This Agreement shall be binding and fully enforceable upon Grantor immediately upon execution by Charitha Samarasinghe, in his capacity as Chief Executive Officer and Managing Member of Grantor, without the need for execution or countersignature by Grantee. This Agreement shall be binding upon and enforceable against Grantor and its successors, assigns, and affiliates.

**IN WITNESS WHEREOF,** the undersigned has executed this Agreement as of the date first written above.

LIONSROCK WISCONSIN LLC – Grantor


By: _____
Name: Charitha Samarasinghe
Title: Chief Executive Officer and Managing Member
Address: 2389 Air Park Rd, Rhinelander, WI 54501
Date: _____

Subscribed and sworn to before me this _____ day of July, 2025, by Charitha Samarasinghe, Chief Executive Officer and Managing Member of Lionsrock Wisconsin LLC.


_____
Notary Public
(Print Name): _____
My Commission Expires: _____

Page 3 out of 3

DOCKET NO: FST-CV25-6075223-S       :       SUPERIOR COURT

:

PANTHERS CAPITAL LLC          :       J.D. OF STAMFORD/NORWALK

:       AT STAMFORD

V.                                 :

:

CIS INTERNATIONAL HOLDINGS (N.A.)  :

CORP. D/B/A E TROPICAL FISH, ET AL.  :       FEBRUARY 5, 2026

## PLAINTIFF'S REPLY TO
## DEFENDANTS' OBJECTION TO MOTION TO DISMISS COUNTERCLAIM

The Plaintiff, Panthers Capital LLC (the "Plaintiff"), hereby replies to the Objection to

Motion to Dismiss (117.00) filed by the Defendants, Charitha I Samarasinghe, CIS International

Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin

LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD (the

"Defendants" or the "Guarantors").

At the outset, and to reframe Plaintiff's position, it is important to distinguish between the

respective roles of the Seller and the Defendants (the latter, of course, being guarantors) under the

contracts at issue. The Seller's role is obvious. The Defendants' role is equally clear, but

highlighting the legal distinction between the two parties is quite crucial to the disposition of the

Motion to Dismiss. A guaranty is a promise to answer for another party's debt, default, or failure

to perform a contractual obligation. See *Superior Wire & Paper Products, Ltd. v. Talcott Tool &*

*Machine, Inc.*, 184 Conn. 10, 20–21 n.8, 441 A.2d 43 (1981); *Wolthausen v. Trimpert*, 93 Conn.

260, 265, 105 A. 687 (1919); 1 Restatement (Second), Contracts § 88 (1981). As Connecticut

courts have consistently recognized, a guaranty is a contractual obligation that is separate and

distinct from the underlying agreement. "As a contractual obligation separate from the contractual

agreement…, a guaranty imports the existence of two different obligations: the obligation of the

[principal] and the obligation of the guarantor." *JP Morgan Chase Bank v. Winthrop Properties*,

312 Conn. 662, 675, 94 A.3d 622 (2014) (quoting *Regency Savings Bank v. Westmark Partners*, 59 Conn. App. 160, 164, 756 A.2d 299 (2000); 38 Am. Jur. 2d, Guaranty § 4 (2010)).

Because these obligations are distinct, alleged injuries arising from a purported breach or wrongdoing directed at one party cannot simply be transferred to the other. The Seller's alleged injuries are its own. The Defendants' obligations arise only from their separate agreement to answer for *the Seller's* default. A guarantor does not acquire standing to assert affirmative claims merely because enforcement of the guaranty may expose the guarantor to liability. That exposure is the consequence of the guaranty itself.  It cannot be a direct injury caused by the Plaintiff.

That said, the Plaintiff respectfully contends that the points raised in the Defendants' Objection do not operate to cure the fundamental defect identified in the underlying Motion to Dismiss Counterclaim. The fact remains that the Counterclaim does not allege injuries that belong to the Defendants themselves, as guarantors.  That is, the Counterclaim rests solely on alleged harm to the Seller, the consequences of the Seller's bankruptcy, and the ordinary effects of the enforcement of guarantees.

While the Defendants' Objection seemingly seeks to add further narrative detail to the Counterclaim, that additional narrative does nothing to change the Counterclaim's legal character. Ultimately, the Defendants contend that the Plaintiff's conduct impaired the Seller's ability to perform, forced the Seller into bankruptcy, thereby increasing the Defendants' exposure, and caused downstream business consequences. Those allegations are derivative as matters of fact and law. If the Seller was injured, the claims belong to the Seller (or, currently, to the bankruptcy estate). The Defendants, as guarantors, lack standing to pursue them and any purported injuries befalling the Defendants are necessarily derivative in nature.

2

In their Objection the Defendants assert that they suffered "independent" harm, but the Plaintiff still cannot identify an injury that is truly *independent* in the requisite legal sense. Increased liability under a guaranty, for instance, is not an independent injury. It is the very risk the guarantors agreed to assume. And if exposure under a guaranty were sufficient to support an affirmative claim, *every* action seeking to enforce a guaranty would automatically give rise to counterclaims. This would be an absurd result.

The analysis is not altered by the Defendants' discussion of alleged bad faith, predatory conduct, and/or CUTPA violations. The Counterclaim does not plead facts establishing a duty owed by the Plaintiff to the Defendants independent of the guaranties themselves, nor does it allege conduct that is unfair or deceptive apart from the Plaintiff's exercise of the rights conferred upon it by the Agreements. The same is true of any bankruptcy-related allegations. Any losses flowing from a debtor's insolvency, harm to business relationships, and/or exposure to claims by the debtor's vendors or lenders are all consequences of the debtor's injury and failure. They are not direct injuries to the guarantors as they depend on intervening events and third-party decisions. Accordingly, they are both derivative and too attenuated to confer standing.

The Objection also appears to rely on the Defendants' litigation costs in defending this action. That theory should fail as a matter of law. The undersigned is unaware of any Connecticut law recognizing litigation expenses incurred in defending a lawsuit as damages that could support a counterclaim, absent, perhaps, vexatious litigation or abuse of process. No such things are pleaded here. At best, defense costs may possibly be recoverable by statute or contract if a party ultimately prevails but that has no bearing whatsoever in the context of conferring standing to assert a counterclaim.

3

Moreover, the Objection does not meaningfully distinguish the caselaw cited in the Plaintiff's Memorandum of Law in Support of the Motion to Dismiss. For example, in its Supporting Memorandum the Plaintiff cited the Superior Court case of *Beerwald v. Hearth Management, LLC*, Superior Court, judicial district of New Haven, Docket No. CV14-5034796-S (June 1, 2015, *Wilson, J.*) to stand for the proposition that Connecticut courts have adopted the rule that guarantors lack standing to assert affirmative claims based on injury to the principal obligor absent a direct, independent injury. The Objection does not explain why that general proposition fails to apply here.  In other words, *Beerwald* reflects the settled rule that a party lacks standing where the alleged harm is inseparable from injury to another entity. The Defendants' attempt to distinguish *Beerwald* on a factual basis overlooks this underlying core concept, which squarely applies in this case.

Similarly, the Defendants' reliance on *Groth Family L.P. v. TD Bank, N.A.*, Superior Court, judicial district of Middlesex, Docket No. CV10-6001813-S, (August 5, 2011, *Holzberg, J*), 2011 WL 4031104, is underwhelming. That case involved parties with **statutory** standing and alleged misconduct in the conduct of a foreclosure sale, a process governed by specific legal duties. *Groth* does not stand for the proposition that guarantors may assert counterclaims whenever enforcement increases their financial exposure or produces collateral consequences. The factual and legal predicates present in *Groth* are absent in this case.

Penultimately, the Defendants' objection relies on the assertion that "there was an agreement" on or about June 25, 2025.  Objection, pp. 6-7.  The document they reference, however, expressly states that it is non-binding. (A point the Defendants appear to acknowledge.)  Therefore, on its face, this "agreement" does not create enforceable rights or obligations. For purposes of the Motion to Dismiss, this matters for two reasons. First, a non-binding letter of intent cannot, in and

4

of itself, be breached. Without a binding obligation, there can be no breach and no legally cognizable injury flowing from it.  Second, even assuming, *arguendo*, the letter was binding, the Defendants do not allege that it created obligations owed to *them* as guarantors, separate from the underlying contracts with the Seller. Thus, the lack of standing issue quite necessarily remains unchanged.[1]

Factoring payments, by the Defendants' own framing, were obligations owed to *the Seller*, not to the Guarantors. Any alleged withholding of those payments is, by definition, an alleged breach against the Seller. Once again, injuries arising from an alleged breach against the principal obligor belong to the principal obligor (or, in this case, to the bankruptcy estate), not to the guarantors.  The Defendants' alleged exposure resulting from the Seller's alleged inability to perform is not a direct injury. It is the downstream consequence of the guaranty. That is exactly the distinction alluded to in *Beerwald*.

Finally, in the Objection the Defendants request leave to amend their Counterclaim if the Plaintiff's Motion to Dismiss is granted. The Plaintiff respectfully submits that any such amendment would be futile since the issue here is jurisdictional in nature. Accordingly, even with additional factual details, the Defendants' alleged injuries remain derivative of the Seller's alleged injury, remain dependent on the Seller's bankruptcy, or remain incidental to the enforcement of the guaranties. Where the defect is legal and jurisdictional, as opposed to factual, dismissal is appropriate notwithstanding a request to replead.

---

[1] The procedural posture of this case must be kept clear.  While the Plaintiff certainly does not concede any wrongdoing on its part whatsoever, the Court is not deciding whether the Plaintiff acted appropriately, whether the factoring agreement was breached by Plaitniff, or whether the June 25, 2025 episode was, for lack of a better term, heavy-handed.  The only question before the Court on this Motion to Dismiss is whether the Defendants have alleged a legally cognizable injury that belongs to *them*, as guarantors.

THE PLAINTIFF,
PANTHERS CAPITAL LLC

By /s/ S. Bruce Fair
  S. Bruce Fair
  Neubert, Pepe & Monteith, P.C.
  195 Church Street, 13th Floor
  New Haven, CT 06510
  Telephone No. (203) 821-2000
  Firm Juris Number 407996

6

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the above was or will immediately be mailed or delivered electronically or non-electronically on February 5, 2026, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

<u>SENT VIA EMAIL ONLY</u> pluccarelli@sisco-law.com

Peter A Luccarelli III, Esq.
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602

*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

　　　　　　　/s/ S. Bruce Fair
　　　　　　　S. Bruce Fair
　　　　　　　Neubert, Pepe & Monteith

7

| | | |
|---|---|---|
| DOCKET NO: FST-CV25-6075223-S | : | SUPERIOR COURT |
| | : | |
| PANTHERS CAPITAL LLC | : | J.D. OF STAMFORD/NORWALK |
| | : | AT STAMFORD |
| V. | : | |
| | : | |
| CIS INTERNATIONAL HOLDINGS (N.A.) | : | |
| CORP. d/b/a E TROPICAL FISH, | : | |
| CHARITHA I SAMARASINGHE, | : | |
| CIS INTERNATIONAL DISTRIBUTORS INC., | : | |
| LIVE AQUARIA HOLDINGS CORP, | : | |
| LIONSROCK INVESTMENTS LLC, | : | |
| LIONSROCK WISCONSIN LLC, | : | |
| T3 AQUATICS, | : | |
| SIAM TROPICAL FISH LTD, | : | |
| TROPICAL AQUARIUM FISH (FIJI) LTD | : | FEBRUARY 9, 2026 |

## **DEFENDANTS' OBJECTIONS AND RESPONSE TO REQUESTS FOR ADMISSION**

Pursuant to Practice Book § 13-23(a), Defendants, Charitha I Samarasinghe ("Mr. Samarasinghe"), CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC, Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD (hereinafter, collectively, the "Guarantor Defendants"), by and through counsel, hereby submit:

- Responses to Plaintiff's Requests for Admission Nos. 1-12, 15-18, 21, 24-26, 32, 41, 43-49, 52-53;

- Responses and objections to Plaintiff's Requests for Admission Nos. 13-14, 20, 21-23, 27-29, 31, 33-40, 50-51; and

- Objections to Plaintiff's Requests for Admission Nos. 19, 30, 42

Respectfully Submitted,

SISCO-LAW


/s/ Peter Luccarelli
Peter A. Luccarelli, III
pluccarelli@sisco-law.com
Connecticut Bar No. 433492
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Defendants*

## **CERTIFICATION**

The undersigned hereby certifies that, on February 9, 2026, a copy of the foregoing

was mailed or delivered electronically to all counsel and self-represented parties of record

as follows:

Lucas B. Rocklin
John T. Szalan II
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Lrocklin@npmlaw.com
JSzalan@npmlaw.com
*Counsel for Plaintiff*

　　　　　　　　　　　　　　　　　__*/s/ Peter A. Luccarelli*_____
　　　　　　　　　　　　　　　　　Attorney

DOCKET NO: FST-CV25-6075223-S  :  SUPERIOR COURT

            :

PANTHERS CAPITAL LLC    :  J.D. OF STAMFORD/NORWALK

            :  AT STAMFORD

V.             :

            :

CIS INTERNATIONAL HOLDINGS (N.A.) :

CORP. D/B/A E TROPICAL FISH, ET AL. :  MARCH 9, 2026

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

The Plaintiff, Panthers Capital LLC (the "Plaintiff"), hereby respectfully submits this notice of recently issued appellate authority relevant to the Court's consideration of Plaintiff's pending Motion to Dismiss the Defendants' counterclaims (D.E. #114.00). Plaintiff provides this authority as a courtesy to the Court in light of the decision's direct relevance to the standing issues raised in the underlying motion.

More specifically, since the filing of the Motion to Dismiss and the responses thereto, our Appellate Court has issued a decision that squarely confirms the premise underlying Plaintiff's Motion to Dismiss; i.e., a guarantor does not have standing to assert claims arising from contracts to which the guarantor is not a party absent a direct and personal injury independent of the principal obligor.  In *Ligeri v. White Road Capital, LLC*, AC 48077 (officially released March 10, 2026), a copy of which is attached hereto, the plaintiff, who, like the defendants here, had executed personal guaranties of a company's obligations under accounts receivable financing agreement, attempted to assert claims arising out of the contracts between the funder and the company. Although the Appellate Court concluded that certain tort claims could proceed where the plaintiff alleged a *direct personal injury to himself*, the court affirmed that a guarantor lacks standing to assert claims arising from contracts to which the guarantor is not a party absent an injury that is independent of the principal obligor. In other words, the Appellate Court drew a bright line between claims a guarantor may pursue and those that must be dismissed for lack of standing. The

Appellate Court explained that, while the plaintiff was "an individual guarantor of [the company's] performance obligations," that status "is not enough to confer standing on the plaintiff in his individual capacity." *Ligeri v. White Road Capital, LLC*, AC 48077, slip op. at 13 (Conn. App. Mar. 10, 2026).

The reasoning of *Ligeri* precisely applies here. The counterclaims asserted by the Guarantor Defendants in this case are predicated on alleged misconduct toward the Seller in connection with the underlying financing agreements. As *Ligeri* makes clear, however, a guarantor's obligations arise from a guaranty, which is "a separate and distinct obligation from that of the principal obligor." *Id*. at 13. Because those obligations are distinct, injuries allegedly suffered by the principal obligor do not automatically give rise to claims by the guarantor. To establish standing, the guarantor must allege a direct and personal injury independent of the obligor's alleged injury.

The Appellate Court allowed certain tort counts to proceed in *Ligeri* only because the complaint alleged conduct directed at the plaintiff *personally*; namely, that the defendant froze the plaintiff's individual PayPal account and interfered with his personal finances. *Id.* at 14–15. Those allegations were sufficient to show a "direct and personal injury" to the guarantor himself. No comparable allegations exist in this case, however. The Guarantor Defendants' counterclaims are based entirely on alleged harm to the Seller and the resulting enforcement of the guaranties. Under the rule reaffirmed in *Ligeri*, such derivative claims cannot support standing and must be dismissed.

The Plaintiff contends that the standing rule reaffirmed in *Ligeri* directly supports the arguments advanced in Plaintiff's Motion to Dismiss in this case. The decision does not alter the

2

arguments already presented in Plaintiff's Motion to Dismiss but instead confirms the standing

principles upon which the motion relies.

Plaintiff respectfully submits this authority for the Court's consideration in connection with

the pending Motion to Dismiss.


THE PLAINTIFF,
PANTHERS CAPITAL LLC

By /s/ S. Bruce Fair 421368
    S. Bruce Fair
    Neubert, Pepe & Monteith, P.C.
    195 Church Street, 13th Floor
    New Haven, CT 06510
    Telephone No. (203) 821-2000
    Firm Juris Number 407996

3

## CERTIFICATE OF SERVICE

I certify that a copy of the above was or will immediately be mailed or delivered electronically or non-electronically on March 9, 2026, to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served, as follows:

SENT VIA EMAIL ONLY pluccarelli@sisco-law.com

Peter A Luccarelli III, Esq.
777 S. Harbour Is. Blvd. Suite 320
Tampa, FL 33602

*Representing CIS International Holdings (N.A.) Corp. d/b/a E Tropical Fish, Charitha I Samarasinghe, CIS International Distributors Inc., Live Aquaria Holdings Corp, Lionsrock Investments LLC), Lionsrock Wisconsin LLC, T3 Aquatics, Siam Tropical Fish LTD, and Tropical Aquarium Fish (Fiji) LTD*

      /s/ S. Bruce Fair
S. Bruce Fair
Neubert, Pepe & Monteith

4

******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

1

Ligeri *v.* White Road Capital, LLC, Series 168814

## BENJAMIN LIGERI *v.* WHITE ROAD CAPITAL, LLC, SERIES 168814 ET AL.
### (AC 48077)

Elgo, Clark and Westbrook, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment granting, on standing grounds, motions to dismiss filed by the defendants. He claimed, inter alia, that the court improperly concluded that he lacked standing to prosecute the underyling action because he was not a party to the contracts that formed the basis of the action. *Held*:

The trial court did not abuse its discretion in denying the plaintiff's request for an evidentiary hearing in accordance with *Standard Tallow Corp.* v. *Jowdy* (190 Conn. 48), as the plaintiff never claimed before the court that any disputed issues of fact needed to be resolved with respect to whether he was a proper party to invoke judicial resolution of the disputes alleged in the complaint.

The trial court properly dismissed the action as to all defendants with respect to the count of the plaintiff's complaint seeking a declaratory judgment, as the plaintiff failed to demonstrate that he was the proper party to request the declaratory relief sought because that request arose entirely out of contracts between a nonparty, C Co., and the defendants, the plaintiff was not a party to those contracts, and, although, he was an individual guarantor of C Co.'s performance obligations, that status was not sufficient to confer standing on the plaintiff in his individual capacity.

The trial court improperly dismissed three counts of the plaintiff's complaint directed against the defendant A Co. that sound in tortious interference with business expectancies, negligent misrepresentation, and a violation of the Connecticut Unfair Trade Practices Act (§ 42-110a et seq.), as the allegations made in support of those counts, namely, that A Co.'s unauthorized or illegal actions resulted in the freezing of the plaintiff's personal PayPal account, demonstrated that he arguably had some direct and personal interest in those causes of action.

Argued September 15, 2025—officially released March 10, 2026

*Procedural History*

Action seeking, inter alia, a declaratory judgment as to the rights and remedies of parties to certain accounts receivable factoring agreements, and for other relief, brought to the Superior Court in the judicial district of New London, where the court, *Spallone, J.*, denied the plaintiff's motion for an evidentiary hearing; thereafter,

2

---

Ligeri *v.* White Road Capital, LLC, Series 168814

---

the court, *Spallone, J.*, granted the defendants' motions to dismiss and rendered judgment thereon, from which the plaintiff appealed to this court. *Reversed in part*; *further proceedings*.

*Edward E. Bona*, for the appellant (plaintiff).

*Jared M. Alfin*, with whom, on the brief, was *Forrest A. Noirot*, for the appellee (named defendant).

*Gary J. Greene*, with whom, on the brief, was *Christopher Ryan Boy*, for the appellee (defendant The Fundworks, LLC).

*Opinion*

WESTBROOK, J. The plaintiff, Benjamin Ligeri, appeals from the judgment of the trial court granting, on standing grounds, motions to dismiss filed by the defendants, White Road Capital, LLC, Series 168814, doing business as GFE Holdings (White Road); The Fundworks, LLC (Fundworks); and Advance Servicing, Inc. (Advance).[1] On appeal, the plaintiff claims that the court improperly (1) granted the defendants' motions to dismiss without first conducting an evidentiary hearing in accordance with *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 56, 459 A.2d 503 (1983), and (2) concluded that the plaintiff lacked standing to prosecute the underlying action because he was not a party to the contracts that formed the basis of the action. We agree with the plaintiff that the court improperly dismissed the action with respect to counts two, three and four of the complaint directed solely against Advance and remand for further proceedings on those counts; we otherwise affirm the judgment of the trial court.[2]

The following procedural history and facts, as alleged in the operative complaint or necessarily implied by

---

[1] Advance did not file a brief with this court or otherwise participate in the present appeal.

[2] The plaintiff also raises as a third claim that the court improperly determined that it lacked subject matter jurisdiction to render the declaratory judgment sought by the plaintiff in count one of the complaint.

3

---

*Ligeri v. White Road Capital, LLC, Series 168814*

---

those allegations, are relevant to this appeal. See *May* v. *Coffey*, 291 Conn. 106, 108, 967 A.2d 495 (2009). The plaintiff is a resident of Voluntown and the owner and principal of Central Concepts, Inc. (Central), a Rhode Island corporation. Central is a third-party logistics provider for Amazon, Inc. (Amazon), and relies on Amazon for its revenue. In his capacity as principal for Central, the plaintiff executed certain "accounts receivables factoring contracts" (contracts) with each of the defendants, all nonresident business entities.[3] Pursuant to the contracts, the defendants agreed to make up-front payments to Central in exchange for Central's future receivables from Amazon.[4] The plaintiff, in his individual capacity, also executed personal guaranties of Central's contractual obligations.

The plaintiff commenced the underlying action in August, 2023. The operative amended complaint contains four counts. Count one is directed at all three of the defendants and seeks a declaratory judgment. Specifically, the plaintiff asked the court to declare that no sums are due from Central to the defendants under the parties' contracts, and that no executions of any judgments obtained against Central may issue in Connecticut unless and until Central receives funds that it claims

---

Given our conclusion that the plaintiff lacked standing with respect to count one, it is unnecessary for us to address that claim.

[3] White Road is a New York limited liability company, Fundworks is a California limited liability company, and Advance is a company incorporated in New Jersey.

[4] The complaint is not a model of clarity with respect to the precise nature of the business relationships between the various parties. According to the complaint, "once products [were] sold through [Amazon's] platform, [Amazon would decide] what its fees [were] for storage, inventory and listing through its platform, after which it [would] disperse money to Central's account with Webster Bank." According to the plaintiff, each of Central's accounts receivables factoring contracts with the defendants provide that the defendants are not due any proceeds or sums under the contracts until Amazon first places funds into Central's bank account. Moreover, the plaintiff alleges that Amazon started destroying inventory belonging to the plaintiff and Central and withholding funds by refusing to deposit funds due to Central into its bank account.

Ligeri *v.* White Road Capital, LLC, Series 168814

are due to it from Amazon.[5] Counts two, three and four were directed against Advance only and sound in, respectively, tortious interference with business expectancies, negligent misrepresentation, and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. All three of the counts against Advance relied in part on allegations that Advance had frozen the plaintiff's individual PayPal account without authorization to do so.

The defendants each filed motions to dismiss the operative complaint, in which they argued, inter alia, that Central, and not the plaintiff in his individual capacity, is the real party in interest with respect to any and all of the harms alleged in the operative complaint and, therefore, the plaintiff in his individual capacity lacked standing to bring the action. The motions to dismiss also raised whether Connecticut was a proper forum in which to bring the action in light of a forum selection clause in the contracts and whether the court had personal jurisdiction over the nonresident defendants.

In response, the plaintiff first filed a motion for order in which he requested that the court hold an evidentiary hearing pursuant to *Standard Tallow Corp.* v. *Jowdy*, supra, 190 Conn. 48, to address a number of issues relevant to whether the court could exercise jurisdiction over the defendants pursuant to the state's long arm statute, General Statutes § 52-59b, and whether Connecticut was the proper forum in which to bring the

[5] The plaintiff argues in his appellant's brief that "[a]ll three of the defendants had both threatened and begun to take actions against the plaintiff in this forum to collect on debts owed by [Central], declaring Central in breach of its respective agreements with them and asserting funds to be immediately due from the plaintiff." The only action described in the record is a civil action that Advance apparently commenced in May, 2023, not "in this forum," but in the state of New York (New York case). In the New York case, Advance raised claims that Central had defaulted on its contractual obligations with Advance and that the plaintiff had defaulted on his guaranty of Central's performance. The plaintiff and Central purportedly filed a motion to dismiss the New York case on the ground of alleged improper service of process, but the record does not reflect the present status of the New York case.

5

action. In that motion, the plaintiff did not claim that there were any disputed issues of fact relevant to the issue of the plaintiff's standing to bring the action. The court, *Spallone, J.*, denied the motion for order without comment.

The plaintiff subsequently filed a memorandum in opposition to the motions to dismiss, attaching an affidavit by the plaintiff. Similar to the plaintiff's motion for order, the plaintiff's opposition only addressed the defendants' assertions in the motion to dismiss suggesting that Connecticut was not the proper venue for the action and that the court lacked personal jurisdiction over the defendants. The plaintiff did not address the arguments in the motions to dismiss that he lacked standing to maintain the action.

The court conducted a hearing on the motions to dismiss on April 1, 2024. On July 23, 2024, the court granted the motions and rendered judgment dismissing the action. In its order, the court agreed with the defendants that the plaintiff was not the proper party to bring the action. Moreover, because it granted the motions to dismiss on standing grounds, the court elected not to address the other grounds raised in the defendants' motions to dismiss. The court explained that the plaintiff had brought the action in his individual capacity as a guarantor of Central, and Central was not a party to the action. Relying on the reasoning in several Superior Court cases that had addressed the issue of guarantors and standing, the court concluded that the plaintiff lacked standing to assert claims that legally belonged to Central, and, in the absence of allegations in the complaint tending to demonstrate some direct and personal injury to the plaintiff that was separate and distinct from Central, the plaintiff lacked standing, and the action must be dismissed.[6]

The plaintiff filed a motion to reargue and for reconsideration and also filed a motion for extension of time

---

[6] Judge Spallone's order stated in relevant part: "The issue of guarantors and standing has been taken up in several Superior Court cases. As

---

Ligeri *v.* White Road Capital, LLC, Series 168814

---

to file an appeal. The defendants opposed the plaintiff's motion to reargue and for reconsideration, which the court denied without comment. The plaintiff timely filed the present appeal.

Before addressing the plaintiff's claims, we set forth governing legal principles, including our standard of review. Practice Book § 10-30 (a) provides in relevant part that "[a] motion to dismiss shall be used to assert . . . lack of jurisdiction over the subject matter . . . ." It

Judge Pierson held in *Fischer* v. *People's United Bank, N.A.*, Superior Court, judicial district of Ansonia-Milford at Milford, [Docket No. CV-20-6040118-S] (August 3, 2021), [aff'd in part, 216 Conn. App. 426, 285 A.3d 421 (2022), cert. denied, 346 Conn. 904, 287 A.3d 136 (2023)]: Guarantors may not recover affirmatively on the debtor's claims, usually because they lack standing, in the absence of damages that are independent from those suffered by the principal . . . . 38 Am. Jur. 2d, Guaranty § 88 (May 2021 Update). Put another way, [i]n order to assert an affirmative claim against a lender, a guarantor must establish that he suffered a direct injury as a result of the lender's alleged breach against the principal, which is independent from and not merely derivative of the resulting injury suffered by the principal. . . . *Performance Electric, Inc.* v. *CIB Bank*, 371 Ill. App. 3d 1037, 1040, 864 N.E.2d 779 (2007).

"Judge Pierson went on to note that this position on the standing of guarantors has generally been adopted by our courts: Connecticut courts have adopted this view. For example, in *Beerwald* v. *Hearth Management, LLC*, Superior Court, judicial district of New Haven, Docket No. CV-14-5034796-S (June 1, 2015), it was alleged that the defendants coerced [one of the named plaintiffs] into executing a guarantee agreement on behalf of [the other plaintiff]. The defendants moved to dismiss the claims brought by the plaintiff guarantor, on the grounds that she lacked standing because she has failed to allege that she has sustained a direct injury. . . . [The guarantor] is merely seeking to recover for [the other plaintiff's] alleged injuries. In the absence of a direct and personal injury, the defendants argue, the court lacks subject matter jurisdiction over [the guarantor's] claims. Id. The *Beerwald* court agreed with the defendants, citing 38 Am. Jur. 2d, Guaranty § 98 (2015), and *Miller* v. *U.S. Bank of Washington, N.A.*, 72 Wn. App. 416, 865 P.2d 536 (1994), inter alia, for the principle that a guarantor lacks standing to assert rights on behalf of a principal debtor. Accord *Peterson* v. *Parillo*, Superior Court, judicial district of New Haven, Docket No. CV-03-0477220-S (December 8, 2005) (a guarantor may not recover affirmatively on the claims of the principal debtor [quoting *Miller* v. *U.S. Bank of Washington, N.A.*, supra, 424]).

"The court finds Judge Pierson's analysis above and the cases cited therein persuasive. The defendants' motions to dismiss are granted." (Internal quotation marks omitted.)

7

Ligeri *v.* White Road Capital, LLC, Series 168814

is axiomatic that "a plaintiff must have standing for the court to have [subject matter] jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has . . . some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . The standing requirement is designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Citations omitted; internal quotation marks omitted.) *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 552–53, 698 A.2d 245 (1997). Because the issue of standing implicates subject matter jurisdiction, it is a proper ground for the granting of a motion to dismiss pursuant to Practice Book § 10-30 (a). "[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." (Internal quotation marks omitted.) *North Branford Citizens Against Bulk Propane Storage* v. *North Branford*, 230 Conn. App. 335, 341, 330 A.3d 196 (2025). "Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary." (Internal quotation marks omitted.) Id., 342.

I

The plaintiff first claims that the court improperly granted the defendants' motions to dismiss without first conducting an evidentiary hearing in accordance with *Standard Tallow Corp.* v. *Jowdy*, supra, 190 Conn. 56. Because the plaintiff failed to raise and demonstrate to the trial court that a determination regarding his standing to bring the underlying action was dependent on the court's resolution of any critical factual disputes, we disagree with the plaintiff that the court was required to

8

Ligeri *v.* White Road Capital, LLC, Series 168814

hold an evidentiary hearing before granting the motions to dismiss.

"Trial courts addressing motions to dismiss for lack of subject matter jurisdiction pursuant to [Practice Book § 10-30] may encounter different situations, depending on the status of the record in the case. . . . [If] a trial court decides a jurisdictional question raised by a pretrial motion to dismiss on the basis of the complaint alone, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . .

"In contrast, if the complaint is supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss . . . other types of undisputed evidence . . . and/or public records of which judicial notice may be taken . . . the trial court, in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings. . . . If, however, the defendant submits either no proof to rebut the plaintiff's jurisdictional allegations . . . or only evidence that fails to call those allegations into question . . . the plaintiff need not supply counteraffidavits or other evidence to support the complaint, but may rest on the jurisdictional allegations therein. . . .

"Finally, where a jurisdictional determination is dependent on the resolution of a critical factual dispute, it cannot be decided on a motion to dismiss in the absence

9

Ligeri *v.* White Road Capital, LLC, Series 168814

of an evidentiary hearing . . . because a court cannot make a critical factual [jurisdictional] finding based on memoranda and documents submitted by the parties." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Cuozzo* v. *Orange*, 315 Conn. 606, 615–17, 109 A.3d 903 (2015). An evidentiary hearing to resolve disputed jurisdictional facts is sometimes referred to as a *Standard Tallow* hearing after our Supreme Court's decision in *Standard Tallow Corp.* v. *Jowdy*, supra, 190 Conn. 48, which held, in part, that whenever resolution of disputed "issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." Id., 56. "[I]t is the plaintiff's burden both to request an evidentiary hearing and to present evidence that establishes disputed factual allegations in support of an evidentiary hearing," and, if the plaintiff fails to do either, the court properly may decide the motion to dismiss on the basis of the pleadings and any affidavits provided. *Walshon* v. *Ballon Stoll Bader & Nadler, P.C.*, 121 Conn. App. 366, 371, 996 A.2d 1195 (2010). "We review the denial of a request for an evidentiary hearing under the abuse of discretion standard." *St. Denis-Lima* v. *St. Denis*, 190 Conn. App. 296, 303, 212 A.3d 242, cert. denied, 333 Conn. 910, 215 A.3d 734 (2019).

In his motion seeking an evidentiary hearing, the plaintiff stated that an evidentiary hearing was necessary to resolve properly whether (1) with respect to count one, the defendants had "reached into this jurisdiction" in such a fashion as to trigger § 52-59b, the state's long arm statute, and (2) with respect to the remaining counts, whether Advance had committed one of the alleged torts against the plaintiff "from without the state" using computers and computer networks or whether Advance expected or reasonably should have expected its actions to have consequences in Connecticut. The plaintiff did not argue in any respect that any disputed facts existed pertaining to whether he had a direct and personal interest in the litigation and, thus, had standing to bring the

10

Ligeri *v.* White Road Capital, LLC, Series 168814

action.[7] Moreover, as the defendant Fundworks aptly argues in its brief with respect to count one of the complaint, the complaint was "completely and utterly devoid of any factual allegations that the trial court could reasonably view as a claim of harm suffered by the plaintiff . . . at the hands of [the defendants] . . . [and] [a]bsent a pleading stating a claim of actual harm, there [was] no basis for a *Standard Tallow* hearing to occur."

It bears repeating that the trial court strictly limited its ruling on the motions to dismiss to the issue of whether the plaintiff was the proper party to assert the claims alleged in the complaint. The court did not reach the defendants' additional arguments regarding choice of law, improper venue, or whether the court had personal jurisdiction over the defendants under the applicable long arm statute. Because the plaintiff never claimed before the trial court that any disputed issues of fact needed to be resolved with respect to whether he was a proper party to invoke judicial resolution of the disputes alleged in the complaint, we cannot conclude that the court abused its discretion by denying the plaintiff's request for an evidentiary hearing.

II

The plaintiff also claims that the court improperly concluded that the plaintiff, who is a guarantor of Central's obligations under its contracts with the defendants but not a party to those contracts, lacked standing to bring the underlying action. Although we conclude that the plaintiff has failed to demonstrate that he has standing to pursue the declaratory relief sought in count one of the complaint, we agree that he has alleged facts demonstrating some potential personal interest in the causes of action brought against Advance as alleged in counts two, three, and four of the operative complaint. Accordingly, the court should not have dismissed those counts on standing grounds.

[7] In his appellant's brief, the plaintiff himself describes his motion for an evidentiary hearing as having sought "to address the issues of whether the defendants acted tortiously in this state."

11

## A

We first address whether the plaintiff had standing to prosecute count one of the complaint, which sought a declaratory judgment. We agree with the trial court that he does not.

"It is a basic principle of our law . . . that the [plaintiff] must have standing in order for a court to have jurisdiction to render a declaratory judgment. . . . A party pursuing declaratory relief must therefore demonstrate, as in ordinary actions, a justiciable right in the controversy sought to be resolved, that is, contract, property or personal rights . . . as such will be affected by the [court's] decision . . . ." (Citation omitted; internal quotation marks omitted.) *North Branford Citizens Against Bulk Propane Storage* v. *North Branford*, supra, 230 Conn. App. 342. "When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . . Standing is established by showing that the party claiming it is authorized . . . to bring an action . . . ." (Internal quotation marks omitted.) *World Business Lenders, LLC* v. *526-528 North Main Street, LLC*, 197 Conn. App. 269, 274, 231 A.3d 386 (2020). "[I]f the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. Where, for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them." *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 347–48, 780 A.2d 98 (2001).

In the present case, count one of the complaint seeks a declaration as to each defendant that no sums are due and owing from Central under the parties' contracts and

12

no executions of any judgments obtained against Central may issue in Connecticut until Central receives the funds it contends it is due from Amazon. In other words, the request for declaratory relief arises entirely out of the contracts between Central and the defendants. It is undisputed that the plaintiff in his individual capacity is not a party to those contracts. Although the plaintiff is an individual guarantor of Central's performance obligations, as the trial court determined, that status is not enough to confer standing on the plaintiff in his individual capacity to prosecute claims arising out of the contracts. "A guarantee . . . is a contract, in which a party, sometimes referred to as a secondary obligor, contracts to fulfill an obligation upon the default of the principal obligor. . . . Our Supreme Court has recognized the general principle that a guarantee agreement is a separate and distinct obligation from that of the . . . other obligation. . . . [A] guarantor's liability does not arise from the . . . other obligation secured by the [principal obligor's contract]; rather, it flows from the separate and distinct obligation incurred under the guarantee contract." (Internal quotation marks omitted.) *World Business Lenders, LLC* v. *526-528 North Main Street, LLC*, supra, 197 Conn. App. 275.

Moreover, although the plaintiff is the owner and principal of Central, he filed this action solely in his own name, i.e., in his individual capacity. Corporations are separate and distinct legal entities; see *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, 304 Conn. 128, 139, 37 A.3d 724 (2012); and, because the plaintiff is not an attorney, he cannot represent Central in this action. See *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut*, 34 Conn. App. 543, 546–47, 642 A.2d 62 ("A corporation may not appear by an officer of the corporation who is not an attorney. . . . This is so, despite the fact that the officer may be the principal shareholder of that corporation." (Citation omitted; internal quotation marks omitted.)), cert. denied, 230 Conn. 915, 645 A.2d 1018 (1994). Furthermore, it is well established that a shareholder

Ligeri *v.* White Road Capital, LLC, Series 168814

may not bring an action in his individual capacity seeking to recover for an injury to the corporation. See *May* v. *Coffey*, 291 Conn. 106, 115, 967 A.2d 495 (2009) ("[a] shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation" (internal quotation marks omitted)). The plaintiff has offered no explanation why he did not have the present action brought on behalf of Central rather than commencing it in his name.

On the basis of our review of the record and briefs, we conclude that the plaintiff has failed to demonstrate that he is the proper party to request the declaratory relief sought in count one of the complaint. Accordingly, the court properly dismissed the action as to all defendants with respect to count one.

B

We next consider whether the plaintiff had standing to pursue counts two, three and four of the complaint, which were directed only against Advance. We agree with the plaintiff that the allegations made in support of these counts demonstrate that the plaintiff arguably has some direct and personal interest in these causes of action. Accordingly, we conclude that the court improperly dismissed counts two, three and four on standing grounds.

As previously stated, counts two, three, and four of the complaint are directed against Advance only, and sound in, respectively, tortious interference with business expectancies, negligent misrepresentation, and a violation of CUTPA. Among the factual allegations that the plaintiff makes in support of these counts is that Advance took unauthorized or illegal actions that resulted in the freezing of his personal PayPal account. In other words, the plaintiff alleges that he was directly and personally injured by Advance's actions. We note that Advance did not file an appellee's brief on appeal disputing the plaintiff's arguments regarding his standing to pursue the counts directed solely against it. Assuming, as we

14

---

Ligeri *v.* White Road Capital, LLC, Series 168814

---

must, that the plaintiff's allegations are true, Advance interfered with the plaintiff's personal finances related to running his business. Accordingly, we are convinced that the plaintiff has made a colorable claim of direct injuries to himself individually and that the allegations are sufficient to demonstrate standing to prosecute the counts of the complaint directed against Advance alone.[8] See *Bernblum* v. *Grove Collaborative, LLC*, 211 Conn. App. 742, 760–61, 761 n.13, 274 A.3d 165 (holding plaintiff business owner lacked standing in individual capacity to prosecute counts related to contracts in which his business, but not himself individually, was party, but plaintiff's allegations in complaint posed colorable claim of direct injuries to plaintiff individually sufficient to withstand standing challenge with respect to certain tort counts), cert. denied, 343 Conn. 925, 275 A.3d 626 (2022). Accordingly, we conclude that the court improperly granted Advance's motion to dismiss with respect to counts two, three and four of the complaint.

The judgment is reversed with respect to counts two, three, and four of the operative complaint and the case is remanded for further proceedings in accordance with law on those counts; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[8] Our conclusion regarding standing should not be misconstrued as taking any position regarding the relative merits of these counts including whether, as a whole, the allegations state a claim on which relief may be granted.

15

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 18400 Von Karman Ave., Suite 800, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **REMOVED CIVIL ACTION DOCKET AND DOCUMENTS**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 3/26/2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Caroline Djang on behalf of Plaintiff Tropical Aquarium Fish (FIJI) Ltd
cdjang@buchalter.com, docket@buchalter.com;lverstegen@buchalter.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) 3/26/2026_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

CIS INTERNATIONAL HOLDINGS (N.A.) CORPORATION
1405 W. 178th St.
Gardena, CA 90248

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method <u>for each person or entity served</u>): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 3/26/2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/26/2026 | LAURIE VERSTEGEN | /s/Laurie Verstegen |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

BUCHALTER LLP
IRVINE

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**